**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AHMED ALI MUTHANA, individually and as next friend of Hoda Muthana and Minor John Doe initials A.M., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MICHAEL POMPEO, *et al.*, | ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:19-cv-00445-RBW

## <u>MEMORANDUM IN RESPONSE TO THE COURT'S MARCH 1, 2019 ORDER</u>

## <u>TABLE OF CONTENTS</u>

Introduction ........................................................................................................................... 1

Background ........................................................................................................................... 3

Argument .............................................................................................................................. 7

    A.  The Court Should Not Grant Any Relief to Plaintiff—His Claims Are Profoundly Flawed Because Muthana Is Not and Was Never a U.S. Citizen ..................................................... 8

    B.  The Equities Weigh Overwhelmingly Against Granting Any Relief or Expediting this Case ............................................................................................................................... 17

    C.  Plaintiff's Claims Are Flawed for Other Reasons ........................................................... 21

        1.  Plaintiff Has Not Satisfied the Requirements for Next-Friend Status .......................... 21

        2.  The United States Has Not Waived Sovereign Immunity............................................... 23

        3.  The Court Cannot Grant Citizenship in Equity or Treat Someone as a Citizen on Equitable Theories ....................................................................................................... 24

        4.  Plaintiff Lacks Standing to Bring a Claim for Declaratory Relief on His Claim Regarding 18 U.S.C. § 2339B ....................................................................................... 25

    D.  Plaintiff's Litigation Decisions Give Reason for Serious Pause, and the Court Should Afford the Government the Full Rights and Procedures Granted to It Under the Federal Rules. ............................................................................................................................. 27

Conclusion .......................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*Abdulaziz v. Metropolitan Dade Cnty.*, 741 F.2d 1328 (11th Cir. 1984)............................ 3, 4, 13

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010)...................................................... 24

*Raya v. Clinton*, 703 F. Supp. 2d 569 (W.D. Va. 2010) .................................................... 11

*Ashwander v. Tennessee Valley Authority*, 297 U.S. 288 (1936) .................................... 30

*Babbitt* v. *Farm Workers*, 442 U. S. 289 (1979) ........................................................... 31

*Boos v. Barry*, 485 U.S. 312 (1988)............................................................................... 16

*Califano v. Sanders*, 430 U.S. 99 (1977) ...................................................................... 21

*Chacoty v. Tillerson*, 285 F. Supp. 3d 293 (D.D.C. 2018) ............................................ 21

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp. Civil Aeronautics Board,* 333 U.S. 103 (1947)....................................................................................................................... 22

*Citizens for Responsibility & Ethics in v. U.S. Dep't of Justice*, 846 F.3d 1235 (D.C. Cir. 2017 21

*Earth Island Inst. v. Christopher*, 6 F.3d 648  (9th Cir. 1993) ...................................... 22

*Fedorenko v. United States*, 449 U.S. 490 (1981) ........................................................ 28

*Flast v. Cohen*, 392 U.S. 83 (1968) ................................................................................ 30

*Gilbert v. DaGrossa*, 756 F.2d 1455 (9th Cir. 1985)..................................................... 26

*Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442 (S.D. Fla. 1980) ............................ 22

*Hinojosa v. Horn*, 896 F.3d 305 (5th Cir. 2018)........................................................... 21

*Historic Eastern Pequots v. Salazar*, 934 F. Supp. 2d 272 (D.C. Cir. 2013) ............... 27

*In re Baiz*, 135 U.S. 403 (1890) .................................................................................... 13

*INS v. Pangilinan*, 486 U.S. 875 (1988) ....................................................................... 28

*Johnson v. Williams,* 699 F.Supp.2d 159 (D.D.C. 2010)................................................ 26

*Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502 (1982) ............... 25

*Livonia Props. Holdings, LLC v. 12840-12976 Farmington Road Holdings,* 399 F. App'x 97 (6th Cir. 2010)........................................................................................................................ 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 29

*Munaf v. Geren*, 553 U.S. 674 (2008).......................................................................... 22

*Nikoi v. Attorney Gen.*, 939 F.2d 1065 (D.C. Cir. 1991) ............................................... 10

*Public Service Com. v. Wycoff Co.*, 344 U.S. 237 (1952) ....................................... 29, 31

*Rusk v. Cort*, 369 U.S. 367 (1962),................................................................................ 21

*San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 692 F.2d 814 (1st Cir. 1982) ............................................................................................................................. 20

*Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370 (D.C. Cir. 2010) ................................ 30

*Skelley Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950) .................................. 27

*Slaughter-House Cases*, 83 U.S. 36 (1872) ................................................ 10

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996)............................................ 4, 17

*Tabion v. Mufti*, 877 F.Supp. 285 (E.D.V.A. 1995), *aff'd* 73 F.3d 535 (4th Cir. 1996)................. 4

*Tachiona v. United States*, 386 F.3d 205 (2d Cir. 2004) .................................... 12

*Tozzi v. EPA*, 148 F.Supp. 2d 35 (D.D.C. 2001) ............................................ 23

*United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004) .................................. 13

*United States v. Guinand*, 688 F. Supp. 774 (D.D.C. 1988)................................. 18

*United States v. Khobragade*, 15 F. Supp. 3d 383 (S.D.N.Y. 2014) ........................... 18

*United States v. Kuznetsov*, 442 F. Supp. 2d 102 (S.D.N.Y. 2006)............................ 11

*United States v. Mitchell*, 463 U.S. 206 (1983) ........................................... 26

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................. 22

*United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992)................................... 26

*United States v. Philip Morris USA, Inc.*, 396 F.3d 1190 (D.C. Cir. 2005) ................... 29

*United States v. Sherwood*, 312 U.S. 584 (1941)........................................... 26

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898)...................................... 10

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) .......................................... 24, 25

**Statutes**

8 U.S.C. § 1401................................................................... 28

8 U.S.C. § 1401(a) ............................................................... 10

8 U.S.C. § 1503(b) ............................................................ 20, 21

8 U.S.C. 1504(a) ................................................................. 21

18 U.S.C. § 2339B ............................................................... 29

22 U.S.C. §§ 254a–254e ........................................................... 3

28 U.S.C. § 2242 ................................................................. 25

**Other Authorities**

Agreement Between the United Nations and the United States of America Regarding the
      Headquarters of the United Nations, 21 U.S.T. 1418 ................................... 4

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227...................................... 3

Vienna Convention on Diplomatic Relations, art. 10(1)(a).................................... 10

Vienna Convention on Diplomatic Relations, art. 37(1) ...................................... 10

Vienna Convention on Diplomatic Relations, art. 39(1) ...................................... 10

Vienna Convention on Diplomatic Relations, art. 43 ................................................................. 14

**Rules**

Fed. R. Civ. P. 12(a)(2) ...................................................................................................... 1, 28

Fed. R. Civ. P. 12(b) ......................................................................................................... 1, 28

Fed. R. Civ. P. 17(c)(2) .......................................................................................................... 22

Fed. R. Civ. P. 57 ............................................................................................................ 27, 31

**Regulations**

8 C.F.R. § 101.3(a)(1) ............................................................................................................ 11

22 C.F.R. § 51.70 .................................................................................................................... 6

**Constitutional Provisions**

U.S. Const. amend. XIV, § 1 ................................................................................................... 9

**Introduction**

The government respectfully submits this brief in response to the Court's order to "file a response to the Plaintiff's complaint." March 1, 2019 Minute Order.[1] A explained below, the Court should grant no relief to Plaintiff and should handle this case in the normal course rather than on the expedited basis urged by Plaintiff.

*First*, the Court cannot grant any relief for Hoda Muthana because Plaintiff's claims on her behalf are meritless. Those claims are profoundly flawed because Muthana is not and has never been a U.S. citizen, and her son likewise is not a U.S. citizen. Settled law applied to the relevant events clearly demonstrates that Plaintiff enjoyed diplomatic-agent-level-immunity until February 6, 1995—after Muthana's birth. Thus, Muthana was not subject to the jurisdiction of the United States when she was born, by virtue of her parents' enjoyment of diplomatic-agent-level immunity. So she did not and could not have acquired U.S. citizenship at birth. Because Muthana is not a citizen, every claim seeking relief for her fails.

*Second*, the equities in this case defeat any claim for emergency relief—injunctive, declaratory, or mandamus—or for expedited treatment. Most fundamentally, Muthana's own actions belie any claim for emergency equitable relief or for expedited treatment. The circumstances underlying the alleged need for expedited relief or consideration—Muthana's alleged internment by Kurdish forces in Syria—are a result of Muthana's own decision to travel abroad to join a foreign terrorist organization. Furthermore, Muthana was advised that she was

---

[1] Under Federal Rule of Civil Procedure 12, the government has 60 days to serve an answer, Fed. R. Civ. P. 12(a)(2), or to present defenses in a motion, Fed. R. Civ. P. 12(b). By submitting this brief, the government does not waive any defenses, claims, or responses to the complaint afforded under Rule 12. The government reserves its right to file a motion to dismiss or other responsive pleading, as it is entitled to do under the Federal Rules of Civil Procedure. The government notes that Plaintiff has not submitted any motion for preliminary or substantive relief—declaratory, injunctive, or otherwise—but instead has filed a motion to expedite, which this response addresses.

not a U.S. citizen *over three years ago*—in January 2016—but she did not challenge that determination then and her father has waited until now to challenge it and to seek expedited treatment.  Importantly, Muthana would have understood this unchallenged determination that she was not a U.S. citizen when she gave birth to her son abroad, and his circumstance is like that of any child born abroad to a non-citizen.  To the extent that there are any plausible exigencies, they are of Muthana's own creation.  And in any event, there is no judicially enforceable duty of the United States to attempt to obtain the release of Muthana or her son—even if she were a U.S. citizen.  Plaintiff's request for an order of release from foreign military custody is far beyond any relief that could be ordered by a court.

*Third*, the complaint is profoundly flawed for still other reasons—providing additional independent grounds to reject any relief for Plaintiff.  Although the government is not waiving its right to respond to Plaintiff's claims in full, the government believes that it is important for the Court to be alerted to some of the basic flaws presented.  The Court's jurisdiction is doubtful over all of the claims associated with Muthana due to lack of next-friend standing and no waiver of sovereign immunity.  Moreover, the Court cannot grant citizenship in equity.  And the Court cannot evaluate the scope of the material-support statute in this litigation because Plaintiff has lacks standing and seeks an improper advisory opinion.

*Finally*, Plaintiff's litigation tactics should give this Court serious pause.  He has taken a highly unorthodox approach that seems aimed at papering over the profound flaws in his lawsuit and at improperly benefiting from expedited consideration.  Plaintiff should not benefit from his tactical efforts to present these baseless claims for relief, which grossly mischaracterize the government's revocation of a passport of a non-citizen that occurred years ago, on an emergency track that does not respect the importance of the issues involved.  The Court should not truncate

the normal period permitted under Federal Rule of Civil Procedure 12 to respond to the complaint and should return this case to the normal civil process.

## Background

The government presents the following background to aid the Court at the March 4 hearing. Without admitting or denying any allegations in the complaint—or waiving any defenses—the government cites allegations in and exhibits to the complaint, and factual information on Plaintiff's status as a diplomatic agent in 1994 and 1995. The government submits this information to assist the Court in its evaluation of the case and to explain why the Court should not evaluate the complaint on an expedited basis or grant any relief to Plaintiff.

Legal Background. The controlling statute in the United States on diplomatic immunity is the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 254a–254e, which incorporated the Vienna Convention on Diplomatic Relations, done April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (entered into force with respect to the United States on December 13, 1972). *See Abdulaziz v. Metropolitan Dade Cnty.*, 741 F.2d 1328, 1330 (11th Cir. 1984). The Vienna Convention encapsulates accepted practice regarding diplomatic relations between states and provides the governing law in the United States on diplomatic privileges and immunities. S*ee Tabion v. Mufti*, 73 F.3d 535, 538 (4th Cir. 1996).

The Vienna Convention provides "diplomats with absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the 'receiving State,' *i.e.*, the state where they are stationed." *Id.* at 537. The Convention states that the purpose of diplomatic privileges and immunities "is not to benefit individuals but to ensure the efficient performance of the functions of diplomatic missions as representing States." Vienna Convention Preamble, ¶ 5. Under the Vienna Convention, the term "diplomatic-agent-level immunity"

3

denotes the complete criminal and comprehensive civil and administrative immunity that diplomatic agents enjoy from the jurisdiction of the receiving State and is relevant for determining whether a person born in the United States to parents with diplomatic-agent-level immunity is (or was) born "subject to the jurisdiction" of the United States for purposes of acquiring U.S. citizenship at birth.

"The courts have recognized that diplomatic immunity serves the needs of the foreign sovereign and that the diplomat's privilege is 'merely incidental to the benefit conferred on the government he represents.'" *Abdulaziz*, 741 F.2d at 1330 (citation omitted). The Vienna Convention also serves to protect United States diplomatic agents abroad. *Tabion v. Mufti*, 877 F. Supp. 285, 293 (E.D.V.A. 1995), *aff'd* 73 F.3d 535 (4th Cir. 1996) ("Because not all countries provide the level of due process to which United States citizens have become accustomed, and because diplomats are particularly vulnerable to exploitation for political purposes, immunity for American diplomats abroad is essential. And, understandably, reciprocity is the price paid for that immunity.").

Under the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, June 26 – Nov. 21, 1947, 61 Stat. 3416, and the Convention on Privileges and Immunities of the United Nations, adopted Feb. 13, 1946, United States accession, April 29, 1970, 21 U.S.T. 1418, representatives of permanent missions to the United Nations are entitled to the same privileges and immunities in the United States as the United States accords to diplomatic envoys.

Factual Background. On October 15, 1990, the United Nations notified the United States Mission to the United Nations in New York (USUN), Host Country Affairs that Yemen appointed Plaintiff Ahmed Ali Muthana as First Secretary of the Permanent Mission of Yemen to the United

4

Nations.  Complaint, ECF No. 1 ¶¶ 20, 21, Ex. D; Certification of James B. Donovan, Minister-Counselor for Host Country Affairs at USUN (Mar. 1, 2019) (attached hereto as Ex. A).   In accordance with Section 15 of the United Nations Headquarters Agreement and Article 39 of the Vienna Convention, the United States thus accorded Plaintiff and family members forming his household diplomatic-agent-level immunity.   Compl. ¶ 18, Exs. C, D; Donovan Certification. Yemen allegedly terminated Plaintiff as First Secretary either in June 1994 or September 1994, but the United Nations did not notify the USUN at that time of the termination.  Compl. ¶¶ 19, 25, 29, 42, Exs. C, D; Donovan Certification.  In the meantime, Plaintiff's daughter, Hoda Muthana, was born in New Jersey on ███████, 1994, while Plaintiff and his family, now including the newborn Muthana, enjoyed diplomatic-agent-level immunity.   Compl. ¶ 20, Ex. D; Donovan Certification.  On February 6, 1995, the United Nations officially notified the USUN that Yemen had terminated Plaintiff as First Secretary in September 1994.  Compl. ¶ 21, Ex. D; Donovan Certification.

Years later, on January 24, 2005, the State Department issued Muthana a U.S. passport in error.  Compl. ¶ 21, Ex. D.  The State Department renewed the passport in error on February 21, 2014. *Id.*

In November 2014, Muthana departed the United States for Turkey and eventually entered Syria. *Id.* ¶ 22.  After arriving in Syria, Muthana entered territory controlled by the Islamic State of Iraq and Syria (ISIS) and joined ISIS.  *Id.* ¶ 23 n.3.

On January 15, 2016, the United States revoked Muthana's U.S. passport because it determined that it had issued the passport in error and that Muthana was not, and had never been, a U.S. citizen.  *Id*., Ex. D.  In a letter sent to her on that date, the Department of State informed Muthana that her passport had been revoked because it had been issued erroneously, and that she

was not a U.S. citizen because she was not subject to the jurisdiction of the United States when she was born.  *Id*.  The letter advised her that she had a right to request a hearing within 60 days to challenge the revocation under 22 C.F.R. § 51.70, a State Department regulation that allows a passport bearer to request a hearing "to review the basis for the denial or revocation" of a passport.  *Id*.  Muthana did not challenge this revocation, but even though Plaintiff was not the passport bearer, Plaintiff responded, indicating that Muthana was not in the country and asserting that Muthana was a U.S. citizen.  Compl. ¶¶ 28, 29.

After Muthana left the United States, she gave birth to A.M.  Compl. ¶ 24.  On or about December 16, 2018, Kurdish forces in Syria took custody of Muthana and A.M.  *Id*. ¶¶ 30, 31.

Procedural History.  On February 21, 2019, Plaintiff, individually and as putative next friend of Muthana and A.M., filed this suit.  *See* Compl.  Plaintiff seeks injunctive relief barring the United States from rescinding Muthana's (or A.M.'s) purported U.S. citizenship, *id.* ¶¶ 39-56, 67-92 (Counts 1, 2, 4, 5, and 6), a declaratory judgment that the United States denied Muthana due process when it purportedly revoked her alleged U.S. citizenship, *id.* ¶¶ 57-66 (Count 3), a writ of mandamus requiring the United States to aid in the return of Muthana and A.M. to the United States, *id.* ¶¶ 93-116 (Counts 7 and 8), and a declaratory judgment finding that Plaintiff would not violate 18 U.S.C. § 2339B—which makes it a crime to provide material support or resources to designated foreign terrorist organizations—if he were to provide financial assistance to Muthana, *id.* ¶¶ 117-28 (Count 9).

The same day that he filed the complaint, Plaintiff moved for an expedited hearing under Federal Rule of Civil Procedure 57.  Motion to Expedite Hearing, ECF No. 2; *see* Fed. R. Civ. P. 57 ("The court may order a speedy hearing of a declaratory-judgment action.").  Plaintiff sought an expedited hearing on all nine counts of the complaint.  Mot. 3.  Plaintiff alleges that "the failure

6

of the United States urgently to facilitate the return of Ms. Muthana and her son will cause immediate and irreparable harm by jeopardizing their ability in the future to return to the United States." *Id.* ¶ 3.  As a result of this alleged harm, Plaintiff claims that an expedited hearing is appropriate because "extreme damage will result to the interests of Plaintiff Ahmed Ali Muthana, and the interests of Hoda Muthana and Minor John Doe." *Id.* at 2 ¶ 4.

On February 26, this Court issued a minute order directing the parties to appear "for a hearing on the plaintiff's Expedited Complaint for Declaratory Judgment, Injunctive Relief and Petition for Writ of Mandamus on March 4, 2019."  Feb. 26, 2019 Minute Order.

On February 28, Plaintiff sought leave to file a memorandum of law in support of the complaint.  Motion for Leave, ECF No. 9.  On March 1, this Court granted the motion for leave and issued a minute order stating that "the defendants shall file a response to the plaintiff's Complaint, if any, on or before March 4, 2019, at 8:00 a.m."  Mar. 1, 2019 Minute Order.

## Argument

The Court should deny all of the relief that Plaintiff requests and should handle this case in the normal course rather than on the expedited course that Plaintiff has urged.  Although Defendants will at the time specified under the Federal Rules of Civil Procedure submit a comprehensive response to Plaintiff's complaint, at this point several points are clear.  First, all of Plaintiff's claims on Muthana's behalf are profoundly flawed because Muthana is not, and never was, a U.S. citizen.  Settled law regarding the citizenship of children born to diplomats—and the undisputed course of relevant events—conclusively show this, as the State Department informed Muthana over three years ago.  Because all claims for relief for Muthana rest on the demonstrably wrong claim that she is a U.S. citizen, this threshold point resolves Plaintiff's case.  Second, the equities in this case defeat any claim for emergency relief or for expedited treatment.  The

government formally advised Muthana years ago that she was not and had never been a U.S. citizen. Muthana failed to act in response to that notification. Plaintiff errs in attempting to transform Muthana's own inaction and acquiescence into a purported "emergency" that is the result of her own decision to enter Syria and join a foreign terrorist organization. The equities are far too lopsided in this case for the Court to grant any relief to Plaintiff—particularly in a way that truncates the time needed to fully address the many flaws in Plaintiff's case. Third, the complaint is profoundly flawed for still other reasons. Although the government does not purport to address these flaws fully here—it will do so in the appropriate filing afforded to it under the Civil Rules— it notes just a few of these flaws below: Plaintiff has failed to establish that he may bring this suit on a next-friend theory; the United States has not waived its sovereign immunity; settled principles of equity bar the Court from granting the injunctive, declaratory, or mandamus relief that Plaintiff seeks; Plaintiff and Muthana have failed to use the appropriate processes for the sort of claims that Plaintiff now makes; and Plaintiff lacks standing bring a claim on the material-support-of-terrorism statute. Finally, Plaintiff's litigation tactics should give this Court serious pause. Plaintiff has taken a highly unorthodox approach that seems aimed at papering over the flaws in his lawsuit and at improperly benefiting from expedited consideration. Plaintiff should not benefit from his inappropriate tactical efforts to present his baseless claims for relief. The Court should not truncate the normal period permitted under Federal Rule of Civil Procedure 12 to respond to the complaint and should return this case to the normal civil process.

**A.    The Court Should Not Grant Any Relief to Plaintiff—His Claims Are Profoundly Flawed Because Muthana Is Not and Was Never a U.S. Citizen**

Although the United States will present its full set of arguments and defenses at the appropriate time, for purposes of the March 4 hearing the government emphasizes that the Court should not grant any relief to Plaintiff because his claims are, on their face, profoundly flawed.

All claims on Muthana's behalf rest on a fundamental and dispositive error—the assertion that Muthana is a U.S. citizen.  She is not and never was a U.S. citizen.  She was born to parents who enjoyed diplomatic-agent-level immunity at that time of her birth, so she was born not subject to the jurisdiction of the United States, and did not and could not acquire U.S. citizenship at birth. [2]

The Fourteenth Amendment to the U.S. Constitution confers citizenship only on persons "born or naturalized in the United States, *and subject to the jurisdiction thereof.*"  U.S. Const. amend. XIV, § 1 (emphasis added); *see also* 8 U.S.C. § 1401(a).  The Supreme Court has long held that the phrase "subject to the jurisdiction" excludes children of foreign ministers or diplomatic officers born within the United States from operation of the citizenship clause of the Fourteenth Amendment.  *Slaughter-House Cases*, 83 U.S. 36, 73 (1872) (phrase "was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign States born within the United States"); *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898) ("[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory" "with the exceptions or qualifications (as old as the rule itself) of" (among other exceptions) "children of foreign sovereigns or their ministers"); *Nikoi v. Attorney Gen.*, 939 F.2d 1065, 1066 (D.C. Cir. 1991) ("Because one parent was a foreign official with diplomatic immunity when each child was born, the birth did not confer United States citizenship."); *see also* 8 C.F.R. § 101.3(a)(1) ("A person born in the United States to a foreign diplomatic officer accredited to the

---

[2]  Because A.M.'s claims of citizenship would be resolved by virtue of Muthana's lack of citizenship, the government does not separately discuss the claim, Count 6, Compl. ¶¶ 86-92, brought by Plaintiff solely on his behalf.

Because Muthana and her parents enjoyed diplomatic-agent-level immunity at the time of her birth, it is not necessary to reach the argument advanced by *amicus* that, absent that status, Muthana still would not be a U.S. citizen because her parents were not legal permanent residents.  *See* Brief of *Amicus Curiae* Center for Constitutional Jurisprudence, ECF No. 11-1 (filed Mar. 1, 2019). Only if the Court were to conclude that her parents did not enjoy the relevant immunity would it become necessary to consider that argument.

United States, as a matter of international law, is not subject to the jurisdiction of the United States. That person is not a United States citizen under the Fourteenth Amendment to the Constitution.").[3]

Under the Vienna Convention, "recognition and certification by the State Department is necessary to establish diplomatic immunity." *United States v. Kuznetsov*, 442 F. Supp. 2d 102, 106 (S.D.N.Y. 2006), the corollary is also true—the State Department must receive notification of termination in order to determine when to stop affording privileges and immunities to a diplomatic agent. Article 39 of the Vienna Convention states that "[e]very person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed." Vienna Convention, art. 39(1); *see also Raya v. Clinton*, 703 F. Supp. 2d 569, 578 (W.D. Va. 2010) ("[T]he Vienna Convention requires sending countries to provide formal notice of a diplomatic agent's appointment and termination, and specifically states that an agent's diplomatic functions come to an end on notification of termination by the sending country."). Article 37 extends the privileges and immunities specified in Articles 29 to 36 to "members of the family of a diplomatic agent forming part of his household." *Id*. art. 37(2).

The Vienna Convention requires that the sending state notify the receiving state of "[t]he appointment of members of the mission, their arrival and their final departure or the termination of their functions with the mission." Vienna Convention, art. 10(1)(a). At the United Nations, the

---

[3] Plaintiff incorrectly argues that the immigration status of Basmeh M. Elshayri, Muthana's mother, is relevant to the question whether Muthana acquired U.S. citizenship at birth. As a non-U.S. national member of Plaintiff's household, Elshayri also enjoyed diplomatic-agent-level immunity. Vienna Convention, art. 37(1) ("The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36").

diplomat's sending state sends a notification of appointment to the United Nations Office of Protocol.  Declaration of James B. Donovan (Mar. 3, 2019) ¶ 3.  After accepting the accreditation, the United Nations Office of the Protocol then sends a notification of appointment to the USUN.  Donovan Decl. ¶¶ 4, 5.  The United Nations uses the same process to send a notification of termination to the USUN.  Donovan Decl. ¶¶ 12-14.  Courts have recognized that because foreign policy is the province and responsibility of the Executive Branch, the Department of State has broad and nearly exclusive authority to set the conditions for when the United States affords diplomatic privileges and immunities.  *See Tachiona v. United States*, 386 F.3d 205, 213 (2d Cir. 2004).

Under established law that has been consistent for over a century, when the Department of State certifies the diplomatic status of an individual, "the courts are bound to accept that determination."  *Abdulaziz*, 741 F.2d at 1339.  The "certificate of the secretary of state . . . is the best evidence to prove the diplomatic character of a person."  *In re Baiz*, 135 U.S. 403, 421 (1890); *see also United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004) ("[W]e hold that the State Department's certification, which is based upon a reasonable interpretation of the Vienna Convention, is conclusive evidence as to the diplomatic status of an individual.  Thus, we will not review the State Department's factual determination that, at the time of his arrest, Al-Hamdi fell outside the immunities of the Vienna Convention.").  The Fourth Circuit noted in *Al-Hamdi* that "it appears that no reviewing court has ever held that the State Department's certification is anything but conclusive."  356 F.3d at 572.

Under these principles, it is clear that Muthana is not and never was a U.S. citizen—and thus none of the relief sought for her can be granted.

*First*, the attached State Department certification—which addresses Plaintiff's diplomatic status at the time of Muthana's birth—conclusively establishes that Muthana did not acquire U.S. citizenship at birth.  Donovan Certification.  This certification shows:  that the United States was not officially notified of Plaintiff's termination until February 6, 1995; that the Muthana family continued to enjoy diplomatic-agent-level immunity until that date; and that Muthana therefore was not eligible to become—and did not become—a U.S. citizen based on her birth in the United States.  Donovan Certification.  This certification ends the factual inquiry into the matter.  *See Abdulaziz*, 741 F.2d at 1331 ("[O]nce the United States Department of State has regularly certified a visitor to this country as having diplomatic status, the courts are bound to accept that determination.").

*Second*, although the State Department's certification of Plaintiff's status is dispositive under the law, it is based upon contemporaneous evidence that shows conclusively that the USUN received official notification of Plaintiff's termination on February 6, 1995.  Donovan Decl. ¶ 18, Ex. 1 KARDEX.  As explained in the Donovan Declaration, at the relevant time the USUN maintained its privileges-and-immunities records in what was known as a KARDEX system, in which each accredited diplomat had a card reflecting relevant information.  *Id.* ¶¶ 7-11.  The KARDEX card for Plaintiff (Exhibits 1) are clearly annotated to record the termination of this diplomatic-agent-level privileges and immunities as of February 6, 1995.  *Id.* Ex. 1 KARDEX.

Further, Plaintiff's card also reflects an annotation recording the birth of Muthana, with her place and date of birth.  *Id.* Ex. 1 KARDEX.  This annotation is significant for two reasons.  First, the same notification that applies for the appointment, arrival, and termination of diplomats is used to notify the USUN of the addition of persons to a diplomat's household is made through the same notification process, to ensure that the United States, as the host nation, has an accurate record of

who enjoys diplomatic privileges and immunities at any given time.  *Id.* ¶¶ 9-11.  Second, this annotation is significant because it indicates that the staff at the USUN, at the time they received notification of Muthana's birth, were according Plaintiff diplomatic-agent-level immunity, since there would have been no reason to annotate the card to reflect the addition of a new child if the individual, *i.e.*, Plaintiff, were not then enjoying such privileges and immunities.  *Id.* ¶ 19.

Nothing in Plaintiff's complaint conflicts with these facts.  The complaint alleges that Plaintiff—Muthana's father—served as First Secretary from October 15, 1990, until sometime in 1994.  Compl. ¶¶ 20, 21, Ex. D.  But the complaint does not address the date that is relevant to the issue here—the date when the United States received official notification of Plaintiff's termination as First Secretary.  Plaintiff's diplomatic-agent-level immunity—and that of his family members forming part of his household—continued until February 6, 1995, when the Department of State was notified of his termination.  *Id.*  On ▮▮▮▮▮▮, 1994, Muthana was born with diplomatic-agent-level immunity because she was a member of the household of her father, *id.* ¶ 21, and because the United Nations did not notify the USUN until February 6, 1995, of his termination, her father held diplomatic-agency-level immunity at the time of her birth.  Under the Vienna Convention,  "[t]he function of a diplomatic agent comes to an end, *inter alia*, (a) *on notification by the sending State to the receiving State* that the function of the diplomatic agent has come to an end . . . ."  Vienna Convention, art. 43 (emphasis added).

Reliance on the date of official notification is critical to our foreign relations.  The Supreme Court has emphasized "the concept of reciprocity that governs much of international law" on diplomatic privileges and immunities, as well as other strong reasons "to protect foreign diplomats in this country": "Doing so ensures that similar protections will be accorded those that we send abroad to represent the United States, and thus serves our national interest in protecting our own

citizens.  Recent history is replete with attempts, some unfortunately successful, to harass and harm our ambassadors and other diplomatic officials.  These underlying purposes combine to make our national interest in protecting diplomatic personnel powerful indeed."  *Boos v. Barry*, 485 U.S. 312, 323-24 (1988).  By relying on the date of official notification of termination, the United States preserves the foreign government's control over when its emissaries' functions and immunity ends (absent bad acts by the emissary resulting in expulsion).  This is critical in preserving our ability to determine when the functions of our mission members end.  For example, the United States would not want a foreign state to determine—without notification from the United States—that one of our mission members no longer is employed by the Embassy or to commence criminal prosecution based on its own determination of employment by the United States.

It is far more intrusive and problematic for foreign countries to be probing into the diplomatic status of foreign officials, and relying on the date of notification of termination is a critical component of avoiding such issues.  Further, the State Department relies on the official notification date as determinative of when immunity ends to ensure uniform application of the Vienna Convention in all cases and because it is a bright-line rule to address a matter that could otherwise devolve into a protracted investigation concerning the facts and circumstances surrounding an actual termination date.  It would be arbitrary and capricious not to adhere to the express provision of the Vienna Convention stating that diplomatic immunity comes to an end upon official notification of termination.  Moreover, the reliance on the date of notification ensures that mission personnel are protected.  Thus, if Plaintiff had (for example) been detained by a U.S. law enforcement officer before February 6, 1995, the United States would have afforded him immunity from arrest and prosecution in accordance with the Vienna Convention, because he was entitled to such privileges and immunities until the United Nations officially notified the USUN

of his termination—a notification that occurred on February 6, 1995.  The United States expects that kind of protection for its own diplomatic agents accredited to a foreign state, and therefore the United States must provide that same protection for foreign diplomatic agents in the United States. *Tabion*, 877 F. Supp. at 293.

Under settled law and the undisputed course of events, then, Muthana was born to a father with diplomatic-agent-immunity and she, like her father, was not "subject to the jurisdiction" of the United States.  As a result she did not acquire U.S. citizenship at birth.

In support of his argument that diplomatic-agent-level immunity "last[s] only as long as the diplomatic position itself," Plaintiff points to a 2004 letter completed by Russell F. Graham, a minister counselor at USUN.  Compl. Ex C.[4]  In the letter, Mr. Graham notes two dates: Plaintiff's date of appointment, October 15, 1990, and date of termination, September 1, 1994.  *Id.*  While Plaintiff asserts that the termination date on this letter is erroneous and that Plaintiff was terminated in June 1994, Compl. ¶¶ 18, 29, the government does not contend that the date of termination occurred after Muthana's birth.  Rather, the government maintains that Plaintiff errs in attaching the legal significance that he does to the date of his termination.  His view is irreconcilable with the Vienna Convention's Article 43, which provides that "[t]he function of a diplomatic agent comes to an end, *inter alia*, (a) *on notification by the sending State to the receiving State* that the function of the diplomatic agent has come to an end . . . ."  Plaintiff is thus wrong when he alleges that, "[a]s a matter of law, Mr. Muthana's termination from his diplomatic position no later than September 1, 1994 and his subsequent decision to remain in the United States within a reasonable

---

[4] Plaintiff alleges that he provided the government with a copy of the 2004 letter in support of Muthana's 2005 passport application.  Compl. ¶ 21.  But the letter is addressed to "Bureau of Citizenship and Immigration Services," *id.*, Ex. C, which is a component of the Department of Homeland Security and has no role in passport issuance.

period of time terminated his diplomatic immunity."  Compl. ¶ 42.  Indeed, Plaintiff acknowledges

that the United Nations notified the USUN on February 6, 1995.  Compl. ¶ 21, Ex. D.

To support his incorrect claim of the legal significance of the date of termination, Plaintiff

cites *United States v. Khobragade*, 15 F. Supp. 3d 383 (S.D.N.Y. 2014), and *United States v.*

*Guinand*, 688 F. Supp. 774 (D.D.C. 1988).  Compl. ¶ 41.  But neither case addressed the distinction

between the date a person was terminated and the date the United States was notified of

termination.  In *Khobragade*, the defendant was a member of the Indian permanent mission to the

United Nations with diplomatic-agent-level immunity, who after being indicted for a crime

departed the United States.  15 F. Supp. 3d at 386.  The case does not address the issue here—the

legal significance of the termination date—and does not find that diplomatic immunity under the

Vienna Convention ends upon termination.  *Id.*  In *Guinand*, the court also did not address the date

of notification of termination, but simply stated as a general matter—in addressing a diplomat who

was fired after engaging in drug dealing—that U.S. jurisdiction may be exercised "over persons

whose status as members of the diplomatic mission has been terminated for acts they committed

during the period in which they enjoyed privileges and immunities," *Guinand*, 688 F. Supp. at 775.

Lastly, the 2004 letter does not purport to state or analyze when Plaintiff's diplomatic

privileges ended—nor did it address the situation here, namely, Plaintiff's status between

September 1, 1994 and the date of notification of termination of February 6, 1995.  Instead, the

latter stated, correctly, that diplomatic privileges existed during his period of employment, and

made no assessment of the period at issue in this suit.  Rather than this letter, the official

government record showing when Plaintiff's diplomatic privileges terminated—the certification

submitted herewith, supported by the contemporaneous record, KARDEX, which shows when the

United Nations notified the USUN of Plaintiff's termination—establishes that his diplomatic privileges ended on February 6, 1995.

### B.     The Equities Weigh Overwhelmingly Against Granting Any Relief or Expediting this Case

On top of the central flaw just addressed, the equities in this case defeat any claim for emergency relief or even for expedited treatment.  The government informed Muthana more than three years ago that she is not a citizen and cancelled her erroneously issued passport.  Muthana—who was at the time a member of ISIS—failed to act timely in response to that notification, remained in a war zone through hostilities for a period of years.  Plaintiff should not now be permitted to turn Muthana's own delay and acquiescence—not to mention her decision to join a foreign terrorist organization in Syria—into an emergency requiring special solicitude for granting her a speedy hearing and speedy relief.  It is Muthana's actions in joining ISIS—and not her citizenship status—that have led to her current predicament of being detained by Kurdish forces, and this Court could not direct the government to seek a diplomatic negotiation for her release. The equities are far too lopsided in this case for the Court to grant any relief or to curtail the time needed to fully address the many flaws in Plaintiff's case.

*First*, the purported emergency in this case is the result of Muthana's voluntary conduct in going to Syria and joining ISIS, not the decision of the U.S. government on her citizenship status. *Cf. Livonia Props. Holdings, LLC v. 12840-12976 Farmington Road Holdings,* 399 F. App'x 97, 104 (6th Cir. 2010) ("[S]elf inflicted harm is not the type that injunctions are meant to prevent."). On or about October 2014, Muthana left the United States and freely joined a foreign terrorist organization in Syria.  Compl. ¶¶ 22, 23 n.3, 24.  She and her son have ended up in the custody of foreign armed forces because she joined ISIS.  Muthana is in foreign custody due to her own actions in a theater of war.  Plaintiff now claims an emergency need for the United States

Government to act for Muthana's release from Kurdish custody, but that purported emergency is of Muthana's own making. Moreover, the purported emergency here is a result of Muthana's failure to act much sooner. *Cf. San Francisco Real Estate Investors v. Real Estate Inv. Trust of Am.*, 692 F.2d 814, 818 (1st Cir. 1982) (the plaintiff's harm was largely self-inflicted and, therefore, "it was not only not irreparable in the absence of the district court's order, but entirely avoidable"). In January 2016—over three years ago—Muthana was informed that the United States revoked her passport because she was not and had never been a citizen, and the prior passport had been issued in error. Compl. Ex. D. Despite being advised of the steps to contest the decision, Muthana took no steps to contest that determination in court (or otherwise) or to press the theories of imminent harm now being pursued. *Id.*, Ex. D. Moreover, Muthana has a congressionally mandated remedy for a person in her circumstances. 8 U.S.C. § 1503(b) ("If any person who is not within the United States claims a right or privilege as a national of the United States and is denied such right or privilege . . . upon the ground that [s]he is not a national of the United States, such person may make application . . . for a certificate of identity"). Contrary to Plaintiff's gross mischaracterization, the State Department did not "revoke" Muthana's citizenship. Compl. Ex. D. Rather, the Department of State simply revoked her passport and explained that it had been issued in error because Muthana had never been a U.S. citizen to begin with. Compl. Ex. D; *see Chacoty v. Tillerson*, 285 F. Supp. 3d 293, 298 (D.D.C. 2018) (while an unexpired U.S. passport is proof of U.S. citizenship, passports "do not confer citizenship; rather they merely provide proof of one's status as a citizen"); *see also* 8 U.S.C. § 1504(a) ("The cancellation under this section of any document purporting to show the citizenship status of the person to whom it was issued *shall affect only the document and not the citizenship status of the person in whose name the document was issued*.) (emphasis added). Moreover, Plaintiff has not

followed the process Congress provided in 8 U.S.C. § 1503(b), which "comprises 'both agency obligations and a mechanism for judicial enforcement.'" *Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018) (quoting *Citizens for Responsibility & Ethics in v. U.S. Dep't of Justice*, 846 F.3d 1235, 1245 (D.C. Cir. 2017).[5] It is manifestly inappropriate for Plaintiff now to seek emergency judicial relief on critical issues—including questions regarding the U.S. citizenship of someone who is acknowledged to have joined ISIS—when Muthana long ago could have pursued available avenues for relief.

*Second*, irrespective of Muthana's citizenship status, this Court could not provide any of the extraordinary relief that Plaintiff seeks. In particular, the Court could not require the United States to take diplomatic action to obtain her release from foreign custody. "[T]he Constitution plainly grants the President the initiative in matters directly involved in the conduct of diplomatic affairs," and this Court cannot "compel the Secretary of State to initiate negotiations with foreign nations." *Earth Island Inst. v. Christopher*, 6 F.3d 648, 653 (9th Cir. 1993) (rejecting request for court "to compel the Secretary of State to initiate negotiations with foreign nations") (internal quotation marks omitted); *see Haitian Refugee Ctr. v. Civiletti*, 503 F. Supp. 442, 470 (S.D. Fla. 1980) ("This court could no more order the President to sign a treaty or the Secretary of State to negotiate an international agreement than the President could direct the court to decide an issue in his favor.") (citing *United States v. Nixon*, 418 U.S. 683, 704-05 (1974)).[6] It is not uncommon for

---

[5] *Cf. Rusk v. Cort*, 369 U.S. 367 (1962), *abrogated in part by Califano v. Sanders*, 430 U.S. 99 (1977). In *Rusk*, the Supreme Court allowed the plaintiff to bypass 8 U.S.C. § 1503 and to bring an Administrative Procedure Act (APA) claim to challenge a passport denial. *Id.* at 379-80. But *Califano* rejected *Rusk*'s finding that the APA is a jurisdiction-conferring statute. 430 U.S. at 105. In any event, Plaintiff has not brought a claim under the APA here.

[6] *See also Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp. Civil Aeronautics Board*, 333 U.S. 103, 111 (1947) ("[E]xecutive decisions as to foreign policy . . . are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken

U.S. persons to find themselves in jeopardy abroad—and indeed joining ISIS is certainly the type of action that anyone would expect to lead to severe and foreseeable consequences.   In those circumstances, U.S. courts have stayed their hand when their intervention is requested.  *Cf. Munaf v. Geren*, 553 U.S. 674 (2008) (declining to stop the U.S. military forces from transferring a U.S. citizen to Iraqi criminal custody).

*Third*, Plaintiff's claim that Muthana may suffer harm without judicial intervention is— like her claims for relief—speculative.  *See Tozzi v. EPA*, 148 F. Supp. 2d 35, 38 (D.D.C. 2001) ("speculative harm is not sufficient to constitute irreparable harm").   Plaintiff's stated need for expedited relief is the United States' pending withdrawal from Syria, which will purportedly "jeopardiz[e]" Muthana and A.M.'s "ability in the future to return to the United States."  Mot. ¶¶ 3, 4.  Plaintiff bases this asserted emergency on the suggestion that the United States will not be able to negotiate with the Kurds after the United States withdraws.  *Id.* ¶ 3.  That is pure conjecture. Even crediting Plaintiff's erroneous claim that Muthana is a U.S. citizen, Plaintiff offers no support for why the United States would lose an ability to *negotiate* the return of a citizen if the United States is not physically present in Syria.   Plaintiff has not pleaded any plausible facts suggesting that that Muthana's purported prospect of release is in imminent danger.

These are just some of the equity-laden reasons why the Court cannot and should not grant any relief to Plaintiff.  These reasons also show why expedited treatment is not warranted and this case should be handled in the normal course.  The United States should be afforded the ordinary time to respond to the complaint so that it can fully marshal the arguments on the many claims

---

only by those directly responsible to the people whose welfare they advance or imperil.  They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.") (citations omitted).

raised by Plaintiff.  The stakes are too high in this case—which involves important matters of diplomatic immunity, citizenship, and foreign relations—to accelerate this case through the courts without a full opportunity for the United States to present all arguments for why Plaintiff is plainly not entitled to any relief.

### C.     Plaintiff's Claims Are Flawed for Other Reasons

Plaintiff's claims are severely flawed for still other reasons.  The government identifies some of those flaws now, and will address others, if necessary, at the appropriate time.

#### 1.     Plaintiff Has Not Satisfied the Requirements for Next-Friend Status

To start, Plaintiff fails to establish that he can bring suit on Counts 1 through 8.  He seeks to proceed as "next friend" to assert these eight claims on Muthana's behalf.  Compl. ¶¶ 39-116 (Counts 1-8).  But he has not established that he can proceed on that basis.

Next-friend standing—which allows someone to file a claim on someone else's behalf—is "by no means granted automatically to whomever seeks to pursue an action on behalf of another." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990); *see also Al-Aulaqi v. Obama*, 727 F. Supp. 2d (D.D.C. 2010) (denying next-friend standing when putative next friend could not show that the person on whose behalf the action was brought—who was overseas—lacked access to the courts). Rather, consistent with Article III, a litigant who asserts next-friend standing bears the burden of "clearly . . . establish[ing] the propriety of his status and thereby justify[ing] the jurisdiction of the court."  *Id.* at 164.  To meet this burden, a purported next friend must satisfy "two firmly rooted prerequisites" to have standing.  First, a putative next friend must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action.  Second, the putative next friend must be truly dedicated to the best interests of the person on whose behalf he seeks to

litigate, and it has been further suggested that a next friend must have some significant relationship with the real party in interest. *Id.* at 163-64. The next friend does not become a party to the case, "but simply pursues the cause on behalf of the [incompetent or unavailable party], who remains the real party in interest." *Id.* at 163. "For that reason, the 'next friend' application has been uncommonly granted." *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 523 (1982). "If there were no restriction on 'next friend' standing in federal courts, the litigant asserting only a generalized interest in constitutional governance could circumvent the jurisdictional limits of Art. III simply by assuming the mantle of 'next friend.'" *Whitmore*, 495 U.S. at 164.

Plaintiff has not established either prerequisite to next-friend status. He does not seek such status based on any recognized category. He has not invoked any applicable statute or rule authorizing his next-friend status. *Compare* Compl. *with, e.g.*, Fed. R. Civ. P. 17(c)(2) (providing that a "[a] minor or an incompetent person who does not have a duly appointed representative may sue by a next friend"), and *Whitmore*, 495 U.S. at 164 (noting that next friends are authorized to appear in the habeas corpus context pursuant to federal statute, *see* 28 U.S.C. § 2242 (2010 ed.)). Plaintiff's sole basis for claiming next-friend status is Muthana's "limited or inconsistent access to the internet or the communications, and . . . difficulty with communicating with counsel." Compl. ¶¶ 8, 9. But he acknowledges that counsel and Plaintiff have received "communications" from Muthana. *Id.* ¶ 9. Indeed, Plaintiff acknowledges that Muthana has "repeatedly [been interviewed] by Western news media." Memorandum of Law, ECF No. 9-2 at 22 n.69. This Court should not expand the concept of next-friend standing beyond what any other federal court appears to have accepted or the Federal Rules of Civil Procedure authorize. Plaintiff lacks standing to bring Counts 1 through 8 as next friend.

## 2.    The United States Has Not Waived Sovereign Immunity

The United States is "immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586 (1941).  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  The consent must be "unequivocally expressed." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, (1992).  "The doctrine of sovereign immunity, then, bars suits against the United States unless immunity specifically is waived by statute." *Johnson v. Williams,* 699 F.Supp.2d 159, 165 (D.D.C. 2010) (citing *Sherwood*, 312 U.S. at 586).  Where, as here, a plaintiff has not asserted any waiver of sovereign immunity, a court must dismiss the action for lack of subject-matter jurisdiction.  *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).  A party bringing a suit bears the burden of establishing jurisdiction. *KVOS, Inc. v. Assoc. Press*, 299 U.S. 269, 278 (1936).

In his complaint, Plaintiff has asserted that this Court has jurisdiction over Counts 1 through 6 solely under 28 U.S.C. § 1331—not the APA or any other statute that does supply a cause of action in certain circumstances.  Compl. ¶ 11.  This assertion lacks a supportable legal basis.  Section 1331 merely provides district courts with original jurisdiction, rather than subject matter jurisdiction, over certain federal actions; the section does not provide the waiver of sovereign immunity necessary to proceed with an action against the federal government.  *See Historic Eastern Pequots v. Salazar*, 934 F. Supp. 2d 272, 282 n. 10 (D.C. Cir. 2013) (section 1331 "does not provide a waiver of sovereign immunity").  This section, therefore, simply offer remedies in cases where jurisdiction already exists; neither provides an independent basis for jurisdiction.  *Skelley Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  Because Plaintiff has failed to meet his burden to show that the government has consented to a suit—indeed,

the government has *not* so consented—Plaintiff has failed to plead that this Court has jurisdiction over Counts 1 through 6.

> ### 3. The Court Cannot Grant Citizenship in Equity or Treat Someone as a Citizen on Equitable Theories

There is no legal basis for affording someone citizenship based on an exercise of equitable authority.  For that reason, there is no basis for Plaintiff's Counts 4 and 5, Compl. ¶¶ 67-85, which claim that the United States is equitably estopped from asserting that Muthana is not a U.S. citizen.  For the same reason, it would also not be appropriate to enter preliminary relief based on a likelihood-of-success standard on the citizenship question.

The law squarely precludes courts from exercising equitable discretion in a matter that would contravene statutory authority regarding citizenship.  Congress has explicitly set—by statute—the conditions under which U.S. citizenship is conferred at birth, including for those persons "born in the United States, and subject to the jurisdiction thereof."  8 U.S.C. § 1401.  Once a court determines that a person does not meet the statutory requirements for conferring U.S. citizenship, "the district court has no discretion to ignore the defect and grant citizenship." *Fedorenko v. United States*, 449 U.S. 490, 517 (1981) (internal citation omitted).  "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [Congressionally imposed] limitations."  *INS v. Pangilinan*, 486 U.S. 875, 885 (1988).

Here, however, Plaintiff asks the Court to wield such purported equitable authority—to disregard statute and controlling case law and instead make a determination on citizenship based on claimed "extraordinary circumstances."  Compl. ¶ 69.  The Court should reject this request.  It is because Plaintiff cannot satisfy the governing requirement—that Muthana must have been "subject to the jurisdiction" of the United States at the time of her birth in order to acquire U.S.

citizenship—that Plaintiff raises an equitable cause of action.  *See supra*, Part A.  Neither "the doctrine of estoppel" nor "the invocation of equitable powers" enables this Court "to confer citizenship in violation of [Congressionally imposed] limitations."  *Pangilinan*, 486 U.S. at 885.

Plaintiff also alleges that "[j]urisdiction is further proper under the general equity jurisdiction granted by 28 U.S.C. § 1331(a)."  Compl. ¶ 11.  But as discussed above, a court cannot use its discretionary authority to overcome a plaintiff's inability to meet the congressionally imposed conditions for citizenship.  *See Pangilinan*, 486 U.S. at 885.  Therefore, this Court lacks general equity jurisdiction under 28 U.S.C. § 1331 to grant the relief sought in Counts 4 and 5. *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1197 (D.C. Cir. 2005) (We will not expand upon our equitable jurisdiction if, as here, we are restricted by the statutory language, but may only assume broad equitable powers when the statutory or Constitutional grant of power is equally broad.").

### 4.    Plaintiff Lacks Standing to Bring a Claim for Declaratory Relief on His Claim Regarding 18 U.S.C. § 2339B

In Count 9, Plaintiff requests that this Court grant him a declaratory judgment that certain potential future conduct will not violate 18 U.S.C. § 2339B.  Compl. ¶¶ 117-28.  The Court should reject this claim.

First, Plaintiff has not established standing on this claim.  To seek a declaratory judgment, a party must establish Article III standing.  *See Public Service Com. v. Wycoff Co.*, 344 U.S. 237, 242 (1952).  Count 9 request is based on a hypothetical set of necessarily incomplete facts and speculation.  *See* Compl. ¶¶ 123-27 (alleging that Muthana is no longer a member of ISIS, has ceased support for ISIS, and would use the money to travel).  Such speculation is insufficient to establish standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("the plaintiff must have suffered an injury in fact . . . not conjectural or hypothetical").

Second, Plaintiff improperly seeks an advisory opinion.  Any declaratory judgment would be based on hypothetical facts regarding unknowable conduct, events, and matters of intent.  *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 325 (1936) (the "controversy" must necessarily be "of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts.").  Plaintiff hypothesizes that Muthana is no longer a member of ISIS or engaging in terrorist activities in support of ISIS, Compl. ¶ 125, and asks this Court to accept this allegation as true and bless his providing support to her based on that hypothetical state of affairs, *id.* ¶¶ 126-28.  But the Court does not know and cannot know if these allegations are true or would be true in the future.  This Court therefore cannot provide the advisory opinion that he seeks.  *See Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 377 (D.C. Cir. 2010) ("a federal court does not have jurisdiction to issue an advisory opinion.") (citing *Flast v. Cohen*, 392 U.S. 83, 95, (1968) ("no justiciable controversy is presented . . . when the parties are asking for an advisory opinion").  Plaintiff also does not allege a constitutional right to transfer money abroad to an adult child.  Plaintiff's claim therefore falls outside the narrow category of pre-enforcement challenges that may be brought, where a plaintiff alleges "an intention to engage in a course of conduct arguably affected with a *constitutional interest*, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298 (1979) (emphasis added).  Plaintiff has not established that he can bring Count 9, and the Court cannot grant declaratory relief on that Count.  *See Public Service Com. v. Wycoff Co.*, 344 U.S. 237, 242 (1952) (declaratory-judgment statute was held constitutional "only by interpreting it to confine the declaratory remedy within conventional 'case or controversy limits'").

**D.    Plaintiff's Litigation Decisions Give Reason for Serious Pause, and the Court Should Afford the Government the Full Rights and Procedures Granted to It Under the Federal Rules.**

Plaintiff's litigation tactics should give this Court serious pause.  He has taken a highly unorthodox approach that seems aimed at papering over the profound flaws in his lawsuit and at improperly benefiting from expedited consideration.  Plaintiff has filed an "expedited complaint" based on a speculative and manufactured emergency.  He sought a speedy hearing under Federal Rule of Civil Procedure 57, which addresses only declaratory judgments, Fed. R. Civ. P. 57 ("The court may order a speedy hearing of a declaratory-judgment action."), yet the bulk of his complaint does not seek declaratory relief.  *Compare* Compl. Counts 3 & 9, *with* Counts 1, 2, & 4-8.  Plaintiff has not filed any motion for substantive relief, *see, e.g.,* Fed. R. Civ. P. 65, but has instead filed an unorthodox memorandum of law.  *See* Memo. of Law.  Plaintiff, as next of friend, does not plead any actual causes of action.  *See* Compl. ¶¶ 39-116.

Plaintiff should not benefit from his highly unorthodox tactical efforts to present these baseless claims for relief, which grossly mischaracterize the government's revocation of a passport of a non-citizen, on an emergency track that does not respect the importance of the issues involved. As already explained, the Court should not truncate the normal period permitted under Federal Rule of Civil Procedure 12 to respond to the complaint and should return this case back to the normal civil process.

The government notes one final matter.  The government has been clear that it is filing this brief to address the Court's March 1 minute order to respond to the expedited complaint, and is not waiving its right to serve an answer, *see* Fed. R. Civ. P. 12(a)(2), or to present defenses in a motion, *see* Fed. R. Civ. P. 12(b), is not waiving any defenses or claims or arguments, and is not waiving its right to file any other submission to which the Rules entitle the government.  The

government notes that the Court's March 1 minute order calling for a response by March 4 does not direct the government to file a response contemplated under Rule 12 by that date; nothing in the text of the order purports to direct that sort of response or to override the process prescribed in the Rules.  The government further notes that this interpretation of the Court's March 4 minute order is reasonable as the government would suffer prejudice if the Court intended its order to override the process prescribed in the Rules, thereby lessening the governments' response time from 60 days to 6 days and requiring the government to provide a response under Rule 12 with less than 72 hours of notice.  Plaintiff did not seek such relief in its motion for expedited hearing under Rule 57, nor does Rule 57 provide for such relief.  Out of an abundance of caution, however, if the Court were to treat the minute order as directing a Rule 12 response, the government respectfully moves for the full period permitted to the government under Federal Rule of Civil Procedure 12(a)(2) to respond to the complaint up to, and including April 26, 2019.  In the alternative, if the Court were not to grant an extension, the government respectfully moves to convert this response to a motion under Rule 12(b).

## Conclusion

For the reasons state above, the Court should not grant any relief to Plaintiff and should deny Plaintiff's request to handle the complaint and this case outside of the normal civil process.

March 4, 2019                     Respectfully submitted,

                                 JOSEPH H. HUNT
                                 Assistant Attorney General

                                 SCOTT G. STEWART
                                 Deputy Assistant Attorney General

                                 AUGUST E. FLENTJE
                                 Special Counsel

                                 WILLIAM C. PEACHEY
                                 Director

                                 EDWARD S. WHITE
                                 Senior Litigation Counsel

                                 /s/ Joseph F. Carilli, Jr.
                                 JOSEPH F. CARILLI, JR.
                                 N.H. Bar Identification No. 15311
                                 Trial Attorney
                                 United States Department of Justice
                                 Civil Division
                                 Office of Immigration Litigation
                                 District Court Section
                                 P.O. Box 868, Ben Franklin Station
                                 Washington, D.C. 20044
                                 Telephone: (202) 616-4848
                                 E-mail: joseph.f.carilli2@usdoj.gov

                                 *Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 4, 2019, the foregoing was filed electronically.  Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ Joseph F. Carilli, Jr.
JOSEPH F. CARILLI, JR.
N.H. Bar Identification No. 15311
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4848
E-mail: joseph.f.carilli2@usdoj.gov

*Attorney for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————————
AHMED ALI MUTHANA,                                  )
                                                    )
                    Plaintiff,                      )
                                                    )
           v.                                       )        Civil Action No. 1:19-cv-00445-RBW
                                                    )
MICHAEL POMPEO, *et al.*,                           )
                                                    )
                    Defendants.                     )
—————————————————————————)

## <u>EXHIBIT INDEX TO</u>
## <u>MEMORANDUM IN RESPONSE TO THE COURT'S MARCH 1, 2019 ORDER</u>

<u>Exhibit</u>          <u>Title</u>
A                Certification of James B. Donovan (Mar. 1, 2019)
B                Declaration of James B. Donovan (Mar. 3, 2019)

Exhibit A



UNITED STATES MISSION TO THE UNITED NATIONS

799 UNITED NATIONS PLAZA
NEW YORK, N.Y. 10017-3505

March 1, 2019

Re: Ahmed Muthana

   This is to certify that I, James B. Donovan, Minister Counselor, Host Country Affairs, at the U.S. Mission to the United Nations, United States Department of State, am responsible for overseeing the registration and maintenance of the official records of diplomatic officers and other employees of foreign governments serving in missions to the United Nations, and their family members.

   The official records of the Host Country Affairs section of the U.S. Mission indicate that Mr. Ahmed A. Muthana was appointed as First Secretary to the Yemeni Mission to the United Nations on October 15, 1990, and together with other family members forming his household, began to enjoy diplomatic agent level privileges and immunities on October 19, 1990.   On February 6, 1995, the United Nations provided the U.S. Mission with official notification of Mr. Muthana's termination from the Yemeni Mission.  The notification noted that Mr. Muthana had been terminated in September of 1994. Mr. Muthana and his family enjoyed diplomatic agent level immunity until February 6, 1995.

James B. Dononvan
Minister Counselor for
   Host Country Affairs

Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AHMED ALI MUTHANA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:19-cv-00445-RBW |
| | ) |
| MICHAEL POMPEO, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF JAMES B. DONOVAN**

I, James B. Donovan, do hereby declare:

1.      I am a Minister-Counselor for Host Country Affairs at the United States Mission to the United Nations (USUN Host Country Affairs).  I make this declaration based on my personal knowledge and my review of official documents and records maintained by USUN, Host Country Affairs.  If called to testify, I could and would do so competently.

2.      This declaration describes the process by which USUN Host Country Affairs registers and keeps track of foreign government officials assigned to the Permanent Missions of foreign governments to the United Nations (Permanent Mission).  In addition, this declaration addresses the specific records related to a former First Secretary to the Yemeni Mission to the United Nations – Ahmed A. Muthana.

3.      Before a foreign government official can be afforded privileges and immunities, such as those of a diplomatic agent, in the United State as a result of his or her assignment to a Permanent Mission to the United Nations, the individual's sending state must first notify the United Nations (U.N.) Office of Protocol of the individual's appointment, date of assumption of duties, as well as the level of privileges and immunities the sending state requests for the individual to be afforded. This is accomplished when the Permanent Mission sends the U.N. Office of Protocol notification of the appointment of a Permanent Mission member and a request for privileges and immunities for that mission member and the family members forming his or her household.

4.      Once the U.N. Office of Protocol accepts the accreditation of the Permanent Mission member to the United Nations, the U.N. Office of Protocol notifies USUN Host Country Affairs and requests that the United States afford that individual the appropriate privileges and immunities.

5.      If the proposed Permanent Mission member satisfies the criteria for extending privileges and immunities as set forth by the United States, USUN Host Country Affairs sends back to the Permanent Mission a Department of State Diplomatic Identification Card, bearing the permanent mission member's name.  The back of the card indicates the immunities to which the foreign

mission member is entitled.  In the case of a diplomatic agent, it would state that the individual is immune from criminal and civil jurisdiction.

6.      It is important for the Department of State Diplomatic Identification Card to state the level of immunities accorded to the diplomat because different Permanent Mission members may have different levels of immunities.  For example, a member of the support staff of a Permanent Mission to the United Nations would have only immunity from the jurisdiction of the United States for acts performed within his/her official duties or functions.    Such a person would be subject to the criminal jurisdiction of the United States if he/she commits a crime unrelated to official duties as a member of the permanent mission.  Likewise, such an individual would be subject to the civil jurisdiction of the United States and could be held liable for money damages if, for example, the mission member hits a pedestrian while driving on personal time.  By contrast, diplomatic agents enjoy complete criminal and comprehensive civil and administrative immunity from the jurisdiction of the United States and cannot be held liable for crimes or civil torts unless the sending State waives immunity.

7.      In addition to sending the Department of State Diplomatic Identification Card to the Permanent Mission, USUN Host Country Affairs creates its own internal records pertaining to the accredited individual.  Until around 2013, those records consisted of a physical paper card called the KARDEX; additionally, starting in 1984, as an electronic record created in an electronic database known internally as TOMIS.  While USUN Host Country Affairs still uses the TOMIS system, we ceased using the paper KARDEX records around 2013. We have, however, maintained the vast majority of KARDEX records already in existence.

8.      The KARDEX was a card printed on paper stock, which contained the basic and important information about the Permanent Mission member and his or her family members forming part of his or her household.   In addition to the name of the individual, his or her place of birth, the name of the Permanent Mission to which he or she was accredited, and other important details about the mission member, the KARDEX also contained information about any family members forming part of his/her household.

9.      The KARDEX contained information about the beginning and end of the privileges and immunities afforded to the diplomat and the family members forming part of his or her household.  Specifically, the KARDEX contained the date of the U.N. appointment, as well as the date of the approval of attachment of privileges and immunities.  Finally, the KARDEX contained a field for the official U.N. Termination Date.   This field was completed when the U.N. Office of Protocol formally notified USUN Host Country Affairs of the Permanent Mission member's termination.  Until we received that official notification from the U.N. Office of Protocol, we continued to extend privileges and immunities to a diplomat and the family members forming part of his or her household.

10.      In addition, the KARDEX was updated to reflect the addition of any new family members joining the Permanent Mission member's household each time the U.N. Office of Protocol informed us of such an addition or we learned of the addition through some other channel.  This might occur, for example, when a diplomat was joined by a spouse who had previously been living abroad, or when a diplomat had a new baby.  It was important to update the KARDEX with these

additional family members because, as members of the diplomat's household, they too enjoyed the same level of privileges and immunities as the diplomat.

11.     In addition to recording information on the KARDEX, which we ceased doing in 2013, we also recorded pertinent facts about the foreign mission member in the TOMIS electronic system, including the foreign mission member's "Appointment Date," "Termination Date," and "Termination Received Date."  We record the latter two dates because, as explained above, the United States continues to extend the applicable privileges and immunities to the foreign mission member and the family members forming his or her household until we are notified of the individual's termination from the U.N. Office of Protocol.

12.     Though permanent missions are advised, whenever possible, to notify the U.N. Office of Protocol of the terminations of their Permanent Mission members in advance of the departure or termination date, not infrequently, we receive the notification after the mission member had already been terminated by the permanent mission.   This is because, the U.N. Office Protocol itself, relies on the Permanent Missions to self-report these terminations.  Thus, if a Permanent Mission is dilatory in timely reporting a termination to the U.N. Protocol Office, the U.N. Protocol Office in turn, will be late in notifying us through no fault of its own.

13.     The notifications of the terminations of diplomats at the various permanent missions come to USUN Host Country Affairs from the U.N. Office of Protocol on a weekly basis.  The U.N. Office of Protocol compiles this list based on information it receives from the Permanent Missions. According to the policy of the U.N. Protocol Handbook in effect in 1994 and still applicable today, Permanent Missions are required to submit a form called the "Notification of Final Departure" (known as the SG.8) to the U.N. Office of Protocol each time a foreign mission member is terminated from the mission for whatever reason.  The SG.8 serves as official notification of departure for the U.N. Office of Protocol.

14.     When the U.N. Office of Protocol sends us notification of termination in advance of the actual termination date, under applicable international law, the foreign mission member enjoys privileges and immunities for a reasonable period after the actual termination date.  It has long been our practice to interpret this reasonable period as consisting of 30 days (absent extenuating circumstances).   As mentioned above, not infrequently such notification comes after the termination has already occurred.  For that reason, it is important to note the actual termination date as well as the "Termination Received Date."  The actual termination date shows when the individual's actual employment with the foreign mission ended.  The "Termination Received Date," however, shows when USUN Host Country Affairs received notice of the mission member's termination.   In the event the "Termination Received Date" postdated the actual termination date, it is "Termination Received Date" that is used to determine the end of the privileges and immunities afforded to that individual and his or her family members.

This is because when the official notification of termination is not timely sent, *i.e.*, there is a gap between the stated actual date of termination and the date the official notification is sent to USUN Host Country Affairs, USUN Host Country Affairs generally (absent circumstances such as a death of a mission member) does not know that the diplomat is no longer employed by the mission until the official notification is received. Without this knowledge, USUN Host Country Affairs cannot

end the diplomat's and his/her family members' privileges and immunities, and does not terminate a diplomat's privileges and immunities without official notice from the United Nations.  We rely on the official notification date because anything short of that, such as reliance on  hearsay about the status of a diplomat, could erroneously expose an accredited diplomat to the jurisdiction of the United States, when in fact, under applicable international law, he or she would enjoy immunities.

15.    For example, if a March 1, 2019 notification from UN Protocol states that a Permanent Mission member was terminated on February 15, 2019, we would extend that individual's privileges and immunities until March 17, 2019, to ensure that he or she receives the 30-day reasonable period from the actual termination date.   Likewise, if a March 1, 2019 notification from UN Protocol states that a Permanent Mission member will be terminated on March 15, 2019, we would extend that individual's privileges and immunities until April 14, 2019, to ensure that he or she receives the 30-day reasonable period from the actual termination date.   If, however, the March 1, 2019 notification states that the individual <u>was</u> terminated on January 1, 2019, the March 1, 2019 day would be the last day that he or she would enjoy privileges and immunities because in essence he or she has already gotten more than the "30-day reasonable period" from the date of the actual termination.

16.    Upon receipt of the weekly termination list form the U.N. Office of Protocol, before 2013, USUN Host Country Affairs would update both the KARDEX and the TOMIS electronic records to reflect both the termination date and the notification-of-termination date.  After updating the KARDEX and TOMIS, USUN Host Country Affairs would retire the paper KARDEX record for that Permanent Mission member from our active files to our retired files.   The KARDEX would then only be accessed in the event questions come up about the foreign mission member's service.

17.    I have reviewed our records pertaining to Mr. Ahmed A. Muthana and have separately provided the Department of State's Certification of his dates of service, as well as the period during which he enjoyed diplomatic-agent-level privileges and immunities as a result of his status a First Secretary with the Yemeni Mission to the United Nations to the U.S. Department of Justice.  In reaching the conclusion in the Certification, I reviewed the following records: (a) KARDEX, (b) TOMIS, and (c) the Termination List sent to USUN Host Country Affairs by the U.N. Office of Protocol informing us of Mr. Muthana's termination.  A copy of each is attached hereto as Exhibit 1, 2, and 3 respectively.

18.    Based on my review of these three records, I am confident that Mr. Muthana continued to enjoy diplomatic-agent-level privileges and immunities until February 6, 1995, because that is the date on which the U.N. Office of Protocol officially notified us that Mr. Muthana's service at the Yemeni Mission had terminated.  In the termination notice from the U.N. Office of Protocol on February 6, 1995, the United Nations informed us that Mr. Muthana had been terminated from the Yemeni Mission in September of 1994.  It was not until we received the official notice of termination from the U.N. Office of Protocol on February 6, 1995, however, that we stopped extending privileges and immunities to Mr. Muthana.  All three records—KARDEX, TOMIS, and the U.N. Termination List—are consistent on the fact that USUN Host Country Affairs received official notification of Mr. Muthana's termination on February 6, 1995.

19.     The fact that Mr. Muthana enjoyed privileges and immunities in the period between September 1994 (the date he was actually terminated from the Yemeni mission according to the Notice provided to us by the United Nations Office of Protocol) and February 6, 1995 (the date USUN Host Country Affairs received official notice of his termination from the UN Office of Protocol), is evidenced by the fact that we added the birth of his daughter Hoda to the KARDEX after her birth in October 1994.   A U.S.-born child, born after the diplomat's privileges and immunities had ended, would not have been added to the diplomat's KARDEX because any such child would have simply been irrelevant to us.   The only reason to add family members forming part of a diplomat's household to the KARDEX is to register the fact that these family members, like the principal diplomat, enjoy certain privileges and immunities.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Dated: March 3, 2019
New York, New York

James B. Donovan
Minister-Counselor for Host Country Affairs
United States Mission to the United Nations

6

Exhibit 1

NAME   Ahmed Ali Saleh MUTHANA

COUNTRY     YEMEN

TITLE:

    First Secretary

PDOB:  /59

59

FAMILY MEMBERS:

11·15·90 WIFE: BASNA MOHAMMED

██ 93  Son: Anwar Ahmed ALI (bny)

    Dau: Arwa Ahmed ALI (bny)

    Dau: HODA (bny ██ 94)

P.I.D. ██ 2444

VISA:

U.N. APPOINTMENT:   OCT 15 1990

P&I APPROVED:   OCT 19 1990

U.N. TERMINATION:  FEB 6, 1995

STATE I.D. RETURNED:

DEPARTURE INFORMATION:

HOUSEHOLD EMPLOYEES



MUTHANA, AHMED ALI SALEH

REMARKS:

fired 6/94

left  YEMEN

Exhibit 2

**OFM Information System - [Protocol - Muthana, Ahmed Ali]**

Action   Edit   Subsystem   Reports   Admin   Window   Help

Personnel

PID [ ██0-2444 ]   Name MUTHANA, AHMED ALI   Personnel Status [

Date of Birth [ ██1959 ]   Nationality YEMENI   Family Status [ ]   Created By [

Immunity NONE   Job (Function) Title FIRST SECRETARY   I-94 G-1   Modified By [

| Prod Remarks | Personal | Positions | Family Members | Immunity Cards | Photo |

| Status | Country | Mission | City/St | Annex | Position | Job Title | Duty |
|--------|---------|---------|---------|-------|----------|-----------|------|
| | YM | U | NYNY | 0 | D | FIRST SECRETARY | 10/15 |
| | | | | | | | |
| | | | | | | | |

Position Status TERMINATED ▼   Status Date 02/14/1995   Country YEMEN   Mi:

Mission Name PERMANENT MISSION OF THE REPUBLIC OF YEMEN TO THE   City/State NEW YORK, NY

Address 413 E. 51ST ST
NEW YORK, NY 10022

Job Title FIRST SECRETARY   ↓ Employee/Function Title [

Position Type DIPLOMATIC AGENT   ▼   Employer PID [ ]   Employe

Appointment Notification Date 10/15/1990   Duty Assume Date 10/15/1990

DoS Accreditation Date [ ]   White House Accreditation Date [ ]

Termination Received Date 02/06/1995   Termination/Rejection Date 09/01/1994

Termination Destination [

2

**OFM Information System - [Protocol - Muthana, Ahmed Ali]**

Action   Edit   Subsystem   Reports   Admin   Window   Help

Personnel

PID [ ███ ]-2444     Name MUTHANA, AHMED ALI                          Personnel Status

Date of Birth [ ██ ]/1959     Nationality YEMENI          Family Status          Created By

Immunity NONE     Job (Function) Title FIRST SECRETARY          I-94 G-1     Modified By

Prod Remarks  |  Personal  |  Positions  |  Family Members  |  Immunity Cards  |  Photo

To/From Date: Nature, Location

Biography

Personnel

Position  LEFT MSN SEPTEMBER 1994 W/WIFE AND CHILDREN. WILL WORK IN EGYPT C. END 02/1995:
HIS MOTHER-IN-LAW IS USC & HAS PETITIONED FOR PRA STATUS FOR MUTHANA'S WIFE AND
FIRED 6/94  SEE CARDEX
INT'L USA PROGRAM
ONE DAY BUSINESS TRIP. 12/1/1993: VISIT BOEING FACTORY, SEATTLE

Exhibit 3

Terminations/blue list/6 February 1995/Page Four

<u>TUNISIA</u> (continued)

JERANDI, Mr. Othman

    Counsellor.  Left the Mission and the U.S. on 20 December 1994 from N.Y. on Air France Flt. 007 with wife.

JOMAA, Mr. Ghazi

    First Secretary.  Left the Mission on 15 January and the U.S. on 24 January 1995 from N.Y. on Air France Flt. 007.

<u>UKRAINE</u>

ANDRIYAKA, Mr. Victor

    Second Secretary.  Left the Mission and the U.S. on 26 March 1994 from N.Y. on Air Ukraine with wife and son.

<u>VIET NAM</u>

H.E. Mr. LE VAN BANG

    Ambassador, Chargé d'Affaires a.i. Left the Mission on 26 January 1995 with wife and children. Transferred to Washington, D.C.

<u>YEMEN</u>

AL-AKBARI, Mr. Gamal O.

    First Secretary. Left the Mission and the U.S. in September 1994 from N.Y. by airplane with wife and son.

GHANIM, Mr. Gamil H.

    First Secretary.  Left the Mission and the U.S. in September 1994 from N.Y. by airplane with wife and children.

MUTHANA, Mr. Ahmed A.

    First Secretary. Left the Mission in September 1994 with wife and children. ~~No further information available.~~ Will have for residence and in???? EGYPT C. 2nd Feb. '95 His mother-in-law is USC + has petitioned for ????? status for Muthana's wife (+ family).  2/10/95