# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AHMED ALI MUTHANA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:19-cv-00445-RBW |
| | ) |
| MICHAEL POMPEO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## **DECLARATION OF JAMES B. DONOVAN**

I, James B. Donovan, do hereby declare:

1.   I am a Minister-Counselor for Host Country Affairs at the United States Mission to the United Nations (USUN Host Country Affairs). I make this declaration based on my personal knowledge and my review of official documents and records maintained by USUN, Host Country Affairs. If called to testify, I could and would do so competently.

2.   This declaration describes the process by which USUN Host Country Affairs registers and keeps track of foreign government officials assigned to the Permanent Missions of foreign governments to the United Nations (Permanent Mission). In addition, this declaration addresses the specific records related to a former First Secretary to the Yemeni Mission to the United Nations – Ahmed A. Muthana.

3.   Before a foreign government official can be afforded privileges and immunities, such as those of a diplomatic agent, in the United State as a result of his or her assignment to a Permanent Mission to the United Nations, the individual's sending state must first notify the United Nations (U.N.) Office of Protocol of the individual's appointment, date of assumption of duties, as well as the level of privileges and immunities the sending state requests for the individual to be afforded. This is accomplished when the Permanent Mission sends the U.N. Office of Protocol notification of the appointment of a Permanent Mission member and a request for privileges and immunities for that mission member and the family members forming his or her household.

4.   Once the U.N. Office of Protocol accepts the accreditation of the Permanent Mission member to the United Nations, the U.N. Office of Protocol notifies USUN Host Country Affairs and requests that the United States afford that individual the appropriate privileges and immunities.

5.   If the proposed Permanent Mission member satisfies the criteria for extending privileges and immunities as set forth by the United States, USUN Host Country Affairs sends back to the Permanent Mission a Department of State Diplomatic Identification Card, bearing the permanent mission member's name. The back of the card indicates the immunities to which the foreign

mission member is entitled.  In the case of a diplomatic agent, it would state that the individual is immune from criminal and civil jurisdiction.

6.      It is important for the Department of State Diplomatic Identification Card to state the level of immunities accorded to the diplomat because different Permanent Mission members may have different levels of immunities.  For example, a member of the support staff of a Permanent Mission to the United Nations would have only immunity from the jurisdiction of the United States for acts performed within his/her official duties or functions.   Such a person would be subject to the criminal jurisdiction of the United States if he/she commits a crime unrelated to official duties as a member of the permanent mission.  Likewise, such an individual would be subject to the civil jurisdiction of the United States and could be held liable for money damages if, for example, the mission member hits a pedestrian while driving on personal time.  By contrast, diplomatic agents enjoy complete criminal and comprehensive civil and administrative immunity from the jurisdiction of the United States and cannot be held liable for crimes or civil torts unless the sending State waives immunity.

7.      In addition to sending the Department of State Diplomatic Identification Card to the Permanent Mission, USUN Host Country Affairs creates its own internal records pertaining to the accredited individual.  Until around 2013, those records consisted of a physical paper card called the KARDEX; additionally, starting in 1984, as an electronic record created in an electronic database known internally as TOMIS.  While USUN Host Country Affairs still uses the TOMIS system, we ceased using the paper KARDEX records around 2013. We have, however, maintained the vast majority of KARDEX records already in existence.

8.      The KARDEX was a card printed on paper stock, which contained the basic and important information about the Permanent Mission member and his or her family members forming part of his or her household.   In addition to the name of the individual, his or her place of birth, the name of the Permanent Mission to which he or she was accredited, and other important details about the mission member, the KARDEX also contained information about any family members forming part of his/her household.

9.      The KARDEX contained information about the beginning and end of the privileges and immunities afforded to the diplomat and the family members forming part of his or her household. Specifically, the KARDEX contained the date of the U.N. appointment, as well as the date of the approval of attachment of privileges and immunities.  Finally, the KARDEX contained a field for the official U.N. Termination Date.   This field was completed when the U.N. Office of Protocol formally notified USUN Host Country Affairs of the Permanent Mission member's termination.  Until we received that official notification from the U.N. Office of Protocol, we continued to extend privileges and immunities to a diplomat and the family members forming part of his or her household.

10.     In addition, the KARDEX was updated to reflect the addition of any new family members joining the Permanent Mission member's household each time the U.N. Office of Protocol informed us of such an addition or we learned of the addition through some other channel.  This might occur, for example, when a diplomat was joined by a spouse who had previously been living abroad, or when a diplomat had a new baby.  It was important to update the KARDEX with these

2

additional family members because, as members of the diplomat's household, they too enjoyed the same level of privileges and immunities as the diplomat.

11. In addition to recording information on the KARDEX, which we ceased doing in 2013, we also recorded pertinent facts about the foreign mission member in the TOMIS electronic system, including the foreign mission member's "Appointment Date," "Termination Date," and "Termination Received Date." We record the latter two dates because, as explained above, the United States continues to extend the applicable privileges and immunities to the foreign mission member and the family members forming his or her household until we are notified of the individual's termination from the U.N. Office of Protocol.

12. Though permanent missions are advised, whenever possible, to notify the U.N. Office of Protocol of the terminations of their Permanent Mission members in advance of the departure or termination date, not infrequently, we receive the notification after the mission member had already been terminated by the permanent mission. This is because, the U.N. Office Protocol itself, relies on the Permanent Missions to self-report these terminations. Thus, if a Permanent Mission is dilatory in timely reporting a termination to the U.N. Protocol Office, the U.N. Protocol Office in turn, will be late in notifying us through no fault of its own.

13. The notifications of the terminations of diplomats at the various permanent missions come to USUN Host Country Affairs from the U.N. Office of Protocol on a weekly basis. The U.N. Office of Protocol compiles this list based on information it receives from the Permanent Missions. According to the policy of the U.N. Protocol Handbook in effect in 1994 and still applicable today, Permanent Missions are required to submit a form called the "Notification of Final Departure" (known as the SG.8) to the U.N. Office of Protocol each time a foreign mission member is terminated from the mission for whatever reason. The SG.8 serves as official notification of departure for the U.N. Office of Protocol.

14. When the U.N. Office of Protocol sends us notification of termination in advance of the actual termination date, under applicable international law, the foreign mission member enjoys privileges and immunities for a reasonable period after the actual termination date. It has long been our practice to interpret this reasonable period as consisting of 30 days (absent extenuating circumstances). As mentioned above, not infrequently such notification comes after the termination has already occurred. For that reason, it is important to note the actual termination date as well as the "Termination Received Date." The actual termination date shows when the individual's actual employment with the foreign mission ended. The "Termination Received Date," however, shows when USUN Host Country Affairs received notice of the mission member's termination. In the event the "Termination Received Date" postdated the actual termination date, it is "Termination Received Date" that is used to determine the end of the privileges and immunities afforded to that individual and his or her family members.

This is because when the official notification of termination is not timely sent, *i.e.*, there is a gap between the stated actual date of termination and the date the official notification is sent to USUN Host Country Affairs, USUN Host Country Affairs generally (absent circumstances such as a death of a mission member) does not know that the diplomat is no longer employed by the mission until the official notification is received. Without this knowledge, USUN Host Country Affairs cannot

3

end the diplomat's and his/her family members' privileges and immunities, and does not terminate a diplomat's privileges and immunities without official notice from the United Nations. We rely on the official notification date because anything short of that, such as reliance on hearsay about the status of a diplomat, could erroneously expose an accredited diplomat to the jurisdiction of the United States, when in fact, under applicable international law, he or she would enjoy immunities.

15.     For example, if a March 1, 2019 notification from UN Protocol states that a Permanent Mission member was terminated on February 15, 2019, we would extend that individual's privileges and immunities until March 17, 2019, to ensure that he or she receives the 30-day reasonable period from the actual termination date. Likewise, if a March 1, 2019 notification from UN Protocol states that a Permanent Mission member will be terminated on March 15, 2019, we would extend that individual's privileges and immunities until April 14, 2019, to ensure that he or she receives the 30-day reasonable period from the actual termination date. If, however, the March 1, 2019 notification states that the individual <u>was</u> terminated on January 1, 2019, the March 1, 2019 day would be the last day that he or she would enjoy privileges and immunities because in essence he or she has already gotten more than the "30-day reasonable period" from the date of the actual termination.

16.     Upon receipt of the weekly termination list form the U.N. Office of Protocol, before 2013, USUN Host Country Affairs would update both the KARDEX and the TOMIS electronic records to reflect both the termination date and the notification-of-termination date. After updating the KARDEX and TOMIS, USUN Host Country Affairs would retire the paper KARDEX record for that Permanent Mission member from our active files to our retired files. The KARDEX would then only be accessed in the event questions come up about the foreign mission member's service.

17.     I have reviewed our records pertaining to Mr. Ahmed A. Muthana and have separately provided the Department of State's Certification of his dates of service, as well as the period during which he enjoyed diplomatic-agent-level privileges and immunities as a result of his status a First Secretary with the Yemeni Mission to the United Nations to the U.S. Department of Justice. In reaching the conclusion in the Certification, I reviewed the following records: (a) KARDEX, (b) TOMIS, and (c) the Termination List sent to USUN Host Country Affairs by the U.N. Office of Protocol informing us of Mr. Muthana's termination. A copy of each is attached hereto as Exhibit 1, 2, and 3 respectively.

18.     Based on my review of these three records, I am confident that Mr. Muthana continued to enjoy diplomatic-agent-level privileges and immunities until February 6, 1995, because that is the date on which the U.N. Office of Protocol officially notified us that Mr. Muthana's service at the Yemeni Mission had terminated. In the termination notice from the U.N. Office of Protocol on February 6, 1995, the United Nations informed us that Mr. Muthana had been terminated from the Yemeni Mission in September of 1994. It was not until we received the official notice of termination from the U.N. Office of Protocol on February 6, 1995, however, that we stopped extending privileges and immunities to Mr. Muthana. All three records—KARDEX, TOMIS, and the U.N. Termination List—are consistent on the fact that USUN Host Country Affairs received official notification of Mr. Muthana's termination on February 6, 1995.

19.     The fact that Mr. Muthana enjoyed privileges and immunities in the period between September 1994 (the date he was actually terminated from the Yemeni mission according to the Notice provided to us by the United Nations Office of Protocol) and February 6, 1995 (the date USUN Host Country Affairs received official notice of his termination from the UN Office of Protocol), is evidenced by the fact that we added the birth of his daughter Hoda to the KARDEX after her birth in October 1994.  A U.S.-born child, born after the diplomat's privileges and immunities had ended, would not have been added to the diplomat's KARDEX because any such child would have simply been irrelevant to us.  The only reason to add family members forming part of a diplomat's household to the KARDEX is to register the fact that these family members, like the principal diplomat, enjoy certain privileges and immunities.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Dated: March 3, 2019
New York, New York

*[signature]*

James B. Donovan
Minister-Counselor for Host Country Affairs
United States Mission to the United Nations

# Exhibit 1

| | | |
|---|---|---|
| NAME  Ahmed Ali Saleh MUTHANA | | COUNTRY   YEMEN |
| TITLE: First Secretary | PDOB: /59 | P.I.D.   2444 |
| FAMILY MEMBERS: | | VISA: |
| 11·15·90 WIFE: BASNA MOHAMMED | | U.N. APPOINTMENT: OCT 15 1990 |
| ▇93 Son: Anwar Ahmed Ali (bny) | | P&I APPROVED: OCT 19 1990 |
| Dau: Arwa Ahmed Ali (bny) | | U.N. TERMINATION: FEB 6, 1995 |
| Dau: HODA (bNY ▇/94) | | STATE I.D. RETURNED: |
| | | DEPARTURE INFORMATION: |

HOUSEHOLD EMPLOYEES



MUTHANA, AHMED ALI SALEH

REMARKS: fired 6/94

left YEMEN

# Exhibit 2

**OFM Information System - [Protocol - Muthana, Ahmed Ali]**

Action   Edit   Subsystem   Reports   Admin   Window   Help

**Personnel**

| | | |
|---|---|---|
| PID: ▆-2444 | Name: MUTHANA, AHMED ALI | Personnel Status: |
| Date of Birth: ▆ 1959 | Nationality: YEMENI | Family Status: | Created By: |
| Immunity: NONE | Job (Function) Title: FIRST SECRETARY | I-94: G-1 | Modified By: |

Prod Remarks | Personal | Positions | Family Members | Immunity Cards | Photo

| Status | Country | Mission | City/St | Annex | Position | Job Title | Duty |
|---|---|---|---|---|---|---|---|
| | YM | U | NYNY | 0 | D | FIRST SECRETARY | 10/15 |

Position Status: TERMINATED     Status Date: 02/14/1995     Country: YEMEN

Mission Name: PERMANENT MISSION OF THE REPUBLIC OF YEMEN TO THE     City/State: NEW YORK, NY

Address: 413 E. 51ST ST
NEW YORK, NY 10022

Job Title: FIRST SECRETARY     Employee/Function Title:

Position Type: DIPLOMATIC AGENT     Employer PID:

Appointment Notification Date: 10/15/1990     Duty Assume Date: 10/15/1990

DoS Accreditation Date:     White House Accreditation Date:

Termination Received Date: 02/06/1995     Termination/Rejection Date: 09/01/1994

Termination Destination:

2

**OFM Information System - [Protocol - Muthana, Ahmed Ali]**

Action   Edit   Subsystem   Reports   Admin   Window   Help

Personnel

| | | |
|---|---|---|
| PID: ▮-2444 | Name: MUTHANA, AHMED ALI | Personnel Status: |
| Date of Birth: ▮/1959 | Nationality: YEMENI | Family Status:    Created By: |
| Immunity: NONE | Job (Function) Title: FIRST SECRETARY | I-94: G-1    Modified By: |

Prod Remarks | Personal | Positions | Family Members | Immunity Cards | Photo

To/From Date: Nature, Location

Biography:

Personnel:

Position: LEFT MSN SEPTEMBER 1994 W/WIFE AND CHILDREN. WILL WORK IN EGYPT C. END 02/1995;
HIS MOTHER-IN-LAW IS USC & HAS PETITIONED FOR PRA STATUS FOR MUTHANA'S WIFE AND
FIRED 6/94  SEE CARDEX
INT'L USA PROGRAM
ONE DAY BUSINESS TRIP, 12/1/1993: VISIT BOEING FACTORY, SEATTLE

# Exhibit 3

**TUNISIA** (continued)

JERANDI, Mr. Othman — Counsellor. Left the Mission and the U.S. on 20 December 1994 from N.Y. on Air France Flt. 007 with wife.

JOMAA, Mr. Ghazi — First Secretary. Left the Mission on 15 January and the U.S. on 24 January 1995 from N.Y. on Air France Flt. 007.

**UKRAINE**

ANDRIYAKA, Mr. Victor — Second Secretary. Left the Mission and the U.S. on 26 March 1994 from N.Y. on Air Ukraine with wife and son.

**VIET NAM**

H.E. Mr. LE VAN BANG — Ambassador, Chargé d'Affaires a.i. Left the Mission on 26 January 1995 with wife and children. Transferred to Washington, D.C.

**YEMEN**

AL-AKBARI, Mr. Gamal O. — First Secretary. Left the Mission and the U.S. in September 1994 from N.Y. by airplane with wife and son.

GHANIM, Mr. Gamil H. — First Secretary. Left the Mission and the U.S. in September 1994 from N.Y. by airplane with wife and children.

MUTHANA, Mr. Ahmed A. — First Secretary. Left the Mission in September 1994 with wife and children. ~~No further information available.~~ Will leave for residence and work in EGYPT c. 2nd Feb. '95. His mother-in-law is USC + has petitioned for LPR status for Muthana's wife (+ family). [signature] 2/10/95