# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

AHMED ALI MUTHANA,

      *Plaintiff/Petitioner,*

vs.

MICHAEL POMPEO, *et al.*,

      *Defendants/Respondents.*

Civil Action No. 1:19-cv-00445-RBW

**BRIEF OF *AMICUS CURIAE***
**CENTER FOR CONSTITUTIONAL JURISPRUDENCE**
**IN SUPPORT OF DEFENDANTS/RESPONDENTS**

/s/ *Julie Axelrod*

JULIE AXELROD (D.C. Bar No. 1001557)
1629 K Street, NW
Washington, DC 20006
Tel: (703) 888-2442
jba@cis.org

JOHN C. EASTMAN (Cal. Bar No. 193726)
(*pro hac vice* application forthcoming)
Center for Constitutional Jurisprudence
c/o Chapman University Fowler School of Law
One University Dr.
Orange, CA 92866
Tel: (877) 855-3330 x2; Fax: (714) 844-4817
jeastman@chapman.edu

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTEREST OF AMICUS CURIAE ............................................................................. iii

SUMMARY OF ARGUMENT ..................................................................................... 2

ARGUMENT .................................................................................................................. 2

    I.     The Text of the Citizenship Clause Requires *Both* Birth In United States
           Territory *and* Jurisdictional Allegiance to the United States In Order For
           One To Have a Constitutional Right to Citizenship. ......................................................2

    II.    The Supreme Court's Subsequent *Holding* in *Wong Kim Ark* Dealt With A
           Child Born to Parents Who Were Lawfully and Permanently "Domiciled"
           in the United States, Not Those Who Were Merely Temporary Visitors. ......................7

    III.   The Overly-Broad Reading That Has Been Given to *Wong Kim Ark* Is
           Incompatible with the Theory of Government by Consent Adopted by
           the Founders and Reaffirmed by the Framers of the Fourteenth Amendment. ..............22

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Benny v. O'Brien*,
    58 N.J.L. 36, 32 Atl. 696 (1895) ............................................................... 17, 18, 19

*Boyd v. U. S.*,
    116 U. S. 616 (1886) ............................................................................................ 12

*Cohens v. Virginia*,
    19 U.S. (6 Wheat.) 264 (1821) .................................................................... 10, 15

*Crandall v. Woods*,
    8 Cal. 136 (1857) ................................................................................................ 14

*Elk v. Wilkins*,
    112 U.S. 94 (1884) ................................................................................ 5, 6, 20, 21

*Ex parte Hickey*,
    12 Miss. 751 (Miss. Err. & App. 1845) ............................................................ 14

*Ex parte Holman*,
    28 Iowa 88 (1869) ............................................................................................... 14

*Ex parte Wilson*,
    114 U. S. 417 (1885) ........................................................................................... 12

*Gilbert v. Richards' Heirs*,
    7 Vt. 203 (1835) .................................................................................................. 14

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) .............................................................................................. 2

*In re Garneau*,
    127 Fed. 677, 02 C. C. A. 403 (7th Cir. 1904) ................................................ 8, 9

*Inglis v. Sailors' Snug Harbor*,
    28 U.S. (9 Pet.) 99 (1830) .................................................................................. 16

*Lynch v. Clarke*,
    3 N.Y.Leg.Obs. 236, 1844 WL 4808 (N.Y. Ch. 1844) ..................................... 14

*Minor v. Happersett*,
    88 U.S. (21 Wall.) 162 (1874) ........................................................................... 12

*Moore v. U. S.*,
    91 U. S. (1 Otto) 270 (1875) .............................................................................. 12

*People v. Van Rensselaer*,
    9 N.Y. 291 (1853) ............................................................................................... 14

*Pierson v. Lane*,
    60 Iowa 60, 14 N.W. 90 (1882) ......................................................................... 14

*Salem v. Lyme*,
   29 Conn. 74 (1860) ..................................................................................... 8

*Shively v. Bowlby*,
   152 U.S. 1 (1894) ...................................................................................... 13

*Smith v. Alabama*,
   124 U.S. 465 (1888) ................................................................................. 12

*Starr & others v. Child & others*,
   20 Wend. 149 (N.Y. 1838) ....................................................................... 14

*The Slaughter-House Cases*,
   83 U.S. (16 Wall.) 36 (1872) ................................................................. 5, 9

*United States v. Reid,*
   53 U.S. (12 How.) 363 (1851) ................................................................. 13

*United States v. Rhodes*,
   27 F. Cas. 785 (C.C.D. Ky. 1866) ........................................................... 17

*United States v. Wong Kim Ark* ,
   169 U.S. 649 (1898) ........................................................................ passim

*Van Ness v. Pacard*,
   27 U.S. (2 Pet.) 137 (1829) ..................................................................... 13

*Wagner v. Bissell*,
   3 Iowa 396 (1856) ..................................................................................... 14

*Webster v. Reid*,
   52 U.S. 437 (1850) .................................................................................... 13

*Whitney v. Powell*,
   2 Pin. 115, 1849 WL 3235 (Wis. 1849) ................................................... 14

**Statutes and Constitutional Provisions**

8 U.S.C. § 1401(a) ........................................................................................ 21

Act concerning the Rights of American Citizens in foreign States,
   15 Stat. 223 (July 27, 1868) .................................................................... 24

Act of July 15, 1870, 16 Stat. 361, ch. 296, § 10 ......................................... 21

Act of March 3, 1873, 17 Stat. 632, ch. 332, § 3 ......................................... 22

An Act making Appropriations for sundry Civil Expenses of the Government for the Year ending
   June thirty, eighteen hundred and sixty-four, and for the Year ending the 30[th] of June, 1863,
   and for other Purposes, § 23, 12 Stat. 744, 754 (March 3,1863) ............... 19

An Act to regulate the Diplomatic and Consular Systems of the United States, § 23, 11 Stat. 52,
   60 (Aug. 18, 1856) ................................................................................... 20

Civil Rights Act of 1866, 14 Stat. 27, ch. 31 (April 9, 1866) ................ passim

Declaration of Independence, 1 Stat. 1 (July 4, 1776) .......................................................... passim

Indian Citizenship Act of 1924, 43 Stat. 253, 8 U.S.C. § 1401(b) ............................................. 22

Mass. Const. of 1780, Preamble .............................................................................................. 23

U.S. Const. Amend. XIV, § 1 .................................................................................................... passim

U.S. Const. Art. I, § 8, cl. 4 ....................................................................................................... 21

**Other Authorities**

Anton, Michael, "Citizenship shouldn't be a birthright," Washington Post (July 18, 2018) ......... 2

Black's Law Dictionary (2nd ed., 1910) ................................................................................. 8, 9

Blackstone, William, 1 Commentaries on the Laws of England (1979) (1765) .......................... 23

Brief of Amicus Curiae The Claremont Institute Center for Constitutional Jurisprudence in
   Support of Respondents, *Hamdi v. Rumsfeld*, 542 U.S. 507, 2004 WL 871165 (2004) ............. 2

Cockburn, Lord Chief Justice, Cockb. Nat. 7 ....................................................................... 11, 16

Congressional Globe, 39th Cong., 1st Sess. (1866) .................................................................. 4, 18

Congressional Globe, 40th Cong., 2nd Sess. (1868) ................................................................. 24

Cooley, Thomas, The General Principles of Constitutional Law in America (2001) (1880) ......... 6

Dicey, Confl. Laws .................................................................................................................. 11

Eastman, John C., "Born in the U.S.A.?  Re-assessing Birthright Citizenship in the Wake of
   9/11," 42 U. Rich. L. Rev. 955 (2008); 12 Tex. Rev. L. & Pol. 167 (2007) ............................ 1

Eastman, John C., "From Feudalism to Consent: Rethinking Birthright Citizenship," The
   Heritage Foundation, Legal Memorandum (2006) .................................................................. 1

Epps, Garrett, *The Citizenship Clause: A "Legislative History,"*
   60 Am. U. L. Rev. 331 (2010) .............................................................................................. 19

Erler, Edward J., "Citizenship Clause," in David F. Forte, *et al.*, eds., The Heritage Guide
   to the Constitution (Regnery Publishing, 2005 and 2014) ....................................................... 1

Erler, Edward J., *et al.*, The Founders on Citizenship and Immigration: Principles and
   Challenges in America (Rowman & Littlefield 2007) .......................................................... 1, 23

Government Printing Office, *The American Passport: Its History and a Digest of Laws,*
   *Rulings, and Regulations Governing Its Issuance by the Department of State* (1898) ............. 20

Ho, James C., *Defining "American": Birthright Citizenship and the Original Understanding*
   *of the 14th Amendment*, 9 Green Bag 2d 341, 344 (2006) ...................................................... 19

Kent, Chancellor James, 1 Commentaries on American Law (1826) ........................................ 13

Schuck, Peter H. & Smith, Rogers M., Citizenship Without Consent: Illegal Aliens in the
   American Polity (1985) .......................................................................................................... 4

Snow, Freeman, "Hausding's Case," *Cases and Opinions on International Law* 222 (1893) ..... 20

Story, Joseph, Commentaries on the Conflict of Laws, Foreign and Domestic, in regard to Contracts, Rights and Remedies, and especially in regard to Marriages, Divorces, Wills, Successions, and Judgments (1834)...................................................................................... 8, 10

West, Thomas G., Vindicating the Founders, 166-67 (Rowman & Littlefield 1997) .................. 23

**Regulations**

22 C.F.R. 33.23 (1938) ............................................................................................................ 20

22 C.F.R. 51.43 (1967) ............................................................................................................ 20

## INTEREST OF AMICUS CURIAE

The Center for Constitutional Jurisprudence is the public interest law arm of The Claremont Institute for the Study of Statesmanship and Political Philosophy, a non-profit educational foundation whose stated mission is to "restore the principles of the American Founding to their rightful and preeminent authority in our national life." The Institute and its affiliated scholars are among the leading proponents of the view, well-grounded in the historical record, that the "subject to the jurisdiction" phrase of the Citizenship Clause of the Fourteenth Amendment was understood by those who drafted, passed, and ratified the Amendment to require full and complete jurisdiction, not merely a partial, territorial jurisdiction such as applies to temporary visitors, before the constitutional mandate of automatic citizenship was triggered. The Institute's affiliated scholars have presented this argument in scholarly books and journal articles, in Supreme Court briefing and legislative testimony, and in the popular press, including: Edward J. Erler, Thomas A. West, and John G. Marini, The Founders on Citizenship and Immigration: Principles and Challenges in America (Rowman & Littlefield 2007); John C. Eastman, "Born in the U.S.A.?  Re-assessing Birthright Citizenship in the Wake of 9/11," 42 U. Rich. L. Rev. 955 (2008) and 12 Tex. Rev. L. & Pol. 167 (2007) (reprinting testimony given at the Oversight Hearing on Dual Citizenship, Birthright Citizenship, and the Meaning of Sovereignty to the Subcommittee on Immigration, Border Security and Claims of the Committee on the Judiciary of the U.S. House of Representatives, September 29, 2005); Edward J. Erler, "Citizenship Clause," in David F. Forte, *et al.*, eds., The Heritage Guide to the Constitution (Regnery Publishing, 2005 and 2014); John C. Eastman, "From Feudalism to Consent: Rethinking Birthright Citizenship," The Heritage Foundation, Legal Memorandum (2006);[1]

---

[1] Available at https://tinyurl.com/y69uul7q.

Michael Anton, "Citizenship shouldn't be a birthright," Washington Post (July 18, 2018);[2] and

Brief of Amicus Curiae The Claremont Institute Center for Constitutional Jurisprudence in

Support of Respondents, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) WL 871165 (2004).  The

Center believes that its expertise will greatly aid the Court in the disposition of the case on the

overarching issue about the meaning of the Citizenship Clause that has not been addressed by

either party to the case.

## SUMMARY OF ARGUMENT

Hoda Muthana was not eligible to be a citizen of the United States at birth whether or not

her father was a diplomat at the time, and whether or not the United States had been notified of

the revocation of his diplomatic status at the time, because her parents were, at most, temporary

sojourners at the time of her birth and as such not subject to the full and complete jurisdiction of

the United States required by the Fourteenth Amendment for the grant of automatic citizenship at

birth.

## ARGUMENT

I. **The Text of the Citizenship Clause Requires *Both* Birth In United States Territory *and* Jurisdictional Allegiance to the United States In Order For One To Have a Constitutional Right to Citizenship.**

The Citizenship Clause of the Fourteenth Amendment provides that "All persons born or

naturalized in the United States, *and* subject to the jurisdiction thereof, are citizens of the United

States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1 (emphasis added). As

manifest by the conjunctive "and," the clause contains two prerequisites for birth citizenship: 1)

birth in the United States; and 2) being subject to the jurisdiction of the United States.

---

[2] Available at https://tinyurl.com/yysjvynq.

Hoda Muthana was indisputably born in the United States, so the issue in this case is whether she was also at the time subject to the jurisdiction of the United States in the sense intended by the Citizenship Clause of the Fourteenth Amendment. Clearly, if her father was still a diplomat at the time of her birth, then she was not "subject to the jurisdiction"—on that point, all agree.

But even if her father was no longer a diplomat at the time of her birth, he was at most a temporary sojourner. Although he and his wife—who also entered the United States under her husband's diplomatic auspices—allege that they had by then applied for permanent residence apart from their diplomatic status, that status, by their own admission, had not been granted by the time of Hoda's birth. They were therefore at the time mere temporary sojourners (perhaps even *persona non grata*, having lost their diplomatic status on which their presence in the United States was based). Although the widely-held view today is that any person (other than diplomats and invading armies) entering the territory of the United States—even for a short visit; even illegally—is considered to have subjected himself to the laws of the United States, that is not the understanding of the "subject to the jurisdiction" phrase that was held by those who drafted, passed, and ratified the Fourteen Amendment.

The language of the 1866 Civil Rights Act, from which the Citizenship Clause of the Fourteenth Amendment was derived, provides the key to its meaning. The 1866 Act provides: "All persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." 14 Stat. 27, ch. 31 (April 9, 1866). As this formulation makes clear, any child born on U.S. soil to parents who were temporary visitors to this country and who, as a result of the foreign citizenship of the child's

parents, remained a citizen or subject of the parents' home country, was not entitled to claim the birthright citizenship provided by the 1866 Act.

The jurisdiction clause of the Fourteenth Amendment is somewhat different from the jurisdiction clause of the 1866 Act, of course, but the legislative debate we have regarding this provision of the Fourteenth Amendment does not support the claim that those who drafted and ratified it intending anything other than the codification of the 1866 Act.

When pressed about whether Indians living on reservations would be covered by the clause since they were "most clearly subject to our jurisdiction, both civil and military," for example, Senator Lyman Trumbull, a key figure in the drafting and adoption of the Fourteenth Amendment, responded that "subject to the jurisdiction" of the United States meant subject to its "complete" jurisdiction; "[n]ot owing allegiance to anybody else."  Congressional Globe, 39th Cong., 1st Sess., 2893 (May 30, 1866) (Statement of Sen. Trumbull). And Senator Jacob Howard, who introduced the language of the jurisdiction clause on the floor of the Senate, contended that it should be construed to mean "a full and complete jurisdiction," "the same jurisdiction in extent and quality as applies to every citizen of the United States now" (*i.e.*, under the 1866 Act). *Id*. at 2890 (Statement of Sen. Howard). That meant that the children of Indians who still "belong[ed] to a tribal relation" and hence owed allegiance to another sovereign (however dependent the sovereign was) would not qualify for citizenship under the clause. Because of this interpretative gloss, provided by the authors of the provision, an amendment offered by Senator James Doolittle of Wisconsin explicitly to exclude "Indians not taxed," as the 1866 Act had done, was rejected as redundant. *Id*. at 2892-97; *see also* Peter H. Schuck & Rogers M. Smith, Citizenship Without Consent: Illegal Aliens in the American Polity 72-89 (1985).

The interpretative gloss offered by Senators Trumbull and Howard was also accepted by the Supreme Court—by both the majority and the dissenting justices—in *The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). The majority in that case correctly noted that the "main purpose" of the Clause "was to establish the citizenship of the negro," and that "[t]he phrase, 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, *and citizens or subjects of foreign States born within the United States*." *Id.* at 73 (emphasis added). Justice Steven Field, joined by Chief Justice Chase and Justices Swayne and Bradley in dissent from the principal holding of the case, likewise acknowledged that the Clause was designed to remove any doubts about the constitutionality of the 1866 Civil Rights Act, which provided that all persons born in the United States were as a result citizens both of the United States and the state in which they resided, provided they were not at the time subjects of any foreign power. *Id.* at 92-93 (Field, J., dissenting).

Although the statement by the majority in *Slaughter-House* was *dicta*, the position regarding the "subject to the jurisdiction" language advanced there was subsequently adopted as holding by the Supreme Court in *Elk v. Wilkins*, 112 U.S. 94 (1884). John Elk was born on an Indian reservation within the territorial limits of the United States and subsequently moved to non-reservation U.S. territory, renounced his former tribal allegiance, and claimed U.S. citizenship by virtue of the Citizenship Clause. The Supreme Court held that Elk was not "subject to the jurisdiction" of the United States at birth, which required that he be "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* at 102. Elk did not meet the jurisdictional test because, as a member of an Indian tribe at his birth, he "owed immediate allegiance to" his tribe and not to the United States. Although "Indian tribes, being

within the territorial limits of the United States, were not, strictly speaking, foreign states," "they were alien nations, distinct political communities," according to the Court. *Id*. at 99.

Drawing explicitly on the language of the 1866 Civil Rights Act, the Court continued:

Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indian tribes (an alien though dependent power), although in a geographical sense born in the United States, are no more "born in the United States and subject to the jurisdiction thereof," within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations.

*Id*. at 102. Indeed, if anything, American Indians, as members of tribes that were themselves dependent upon the United States (and hence themselves subject to its jurisdiction), had a stronger claim to citizenship under the Fourteenth Amendment merely by virtue of their birth within the territorial jurisdiction of the United States than did children of foreign nationals. But the Court in *Elk* rejected even that claim, and in the process necessarily rejected the claim that the phrase, "subject to the jurisdiction" of the United States, meant merely territorial jurisdiction as opposed to complete, political jurisdiction.

Such was the interpretation of the Citizenship Clause initially given by the Supreme Court, and it was the correct interpretation.  As Thomas Cooley noted in his treatise—the most authoritative treatise of the era—"subject to the jurisdiction" of the United States "meant full and complete jurisdiction to which citizens are generally subject, and not any qualified and partial jurisdiction, such as may consist with allegiance to some other government." Thomas Cooley, The General Principles of Constitutional Law in America 243 (2001) (1880).

II.     **The Supreme Court's Subsequent *Holding* in *Wong Kim Ark* Dealt With A Child Born to Parents Who Were Lawfully and Permanently "Domiciled" in the United States, Not Those Who Were Merely Temporary Visitors.**

Thirty years after adoption of the Fourteenth Amendment, in the case of *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), Justice Horace Gray, writing for the Supreme Court, held that "a child born in the United States, of parents of Chinese descent, who at the time of his birth were subjects of the emperor of China, but have a permanent domicile and residence in the United States," was, merely by virtue of his birth in the United States, a citizen of the United States as a result of the Citizenship Clause of the Fourteenth Amendment. 169 U.S. at 653. Although Justice Gray used some very broad language suggesting that anyone born on U.S. soil (save for diplomats) would be a citizen, the case actually involved a child born to parents who were lawfully and permanently "domiciled" in the United States.

Indeed, the critical word "domicile" appears 24 times in the majority opinion and introductory statement of facts, and another 4 times in the dissent.[3]  The "question presented," as stated by Justice Gray,

> is whether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment of the constitution: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

*Wong Kim Ark*, 169 U.S. at 653 (emphasis added).

The fact that Wong Kim Ark's parents were "*domiciled residents* of the United States" at the time of Wong Kim Ark's birth in 1873, "and had established and enjoyed *a permanent*

---

[3] The words "resident" or "residence" occur an additional thirty-two times in the majority opinion, and twelve times in the dissent.

*domicile* and residence therein, at said city and county of San Francisco," California, was explicitly part of the agreed-upon facts on which the case had been submitted to the U.S. District Court for the Northern District of California for decision.  *Id.* at 650-51 (emphasis added). Justice Gray repeated that factual stipulation at the outset of his opinion:  "They [Won Kim Ark's parents] were at the time of his birth *domiciled residents* of the United States, having previously established and are still *enjoying a permanent domicile* and residence therein at San Francisco."  *Id.* at 652 (emphasis added).  He also noted, per the factual stipulation, that Wong Kim Ark himself, "ever since his birth, has had but one residence, to wit, in California, within the United States and has there resided, claiming to be a citizen of the United States, and has never lost or changed that residence, or gained or acquired another residence; and neither he, nor his parents acting for him, ever renounced his allegiance to the United States."  *Id.*  Although Justice Gray used the word "residence" rather than "domicile" when describing Wong Kim Ark's circumstances, it was (and is) well established, as Justice Joseph Story noted in his Commentaries on the Conflict of Laws, that "the place of birth of a person is considered as his domicil, *if it is at the time of his birth the domicil of his parents*."  Joseph Story, Commentaries on the Conflict of Laws, Foreign and Domestic, in regard to Contracts, Rights and Remedies, and especially in regard to Marriages, Divorces, Wills, Successions, and Judgments, § 46 (1834) (emphasis added).

"Domicile" is, of course, a legal term of art.  According to Black's Law Dictionary, it is "That place in which a man has voluntarily fixed the habitation of himself and family, not for a mere special or temporary purpose, but with the present intention of making a permanent home, until some unexpected event shall occur to induce him to adopt some other permanent home. Black's Law Dictionary, "Domicile" (2nd ed., 1910) (citing *In re Garneau*, 127 Fed. 677, 02 C.

C. A. 403 (7th Cir. 1904)). "It is his *legal residence*, as distinguished from his temporary place of abode." *Id*. (emphasis added) (citing *Salem v. Lyme*, 29 Conn. 74 (1860)).  "Legal residence" is in turn defined by Black's as "the term applied to the place a person spends most of his time and is *the home that is recognised (sic) by law*." *Id*., "Legal Residence" (emphasis added). Or, as the Seventh Circuit put it in *In re Garneau*, it is the place where a person "exercises his political rights." *In re Garneau*, 127 Fed. at 678.

Thus, by repeatedly describing Wong Kim Ark's parents as "domiciled" in the United States, the actual holding in the case addressed only children born in the United States to parents who are *domiciled* in the United States, which is to say, have their "legal residence" in the United States as the place where they exercise their "political rights."

Chief Justice Fuller, joined by Justice Harlan, contested even this in his dissent.  Though "domiciled" in the United States, Wong Kim Ark's parents (and hence Wong Kim Ark himself) could not be "subject to the jurisdiction" of the United States in the complete, political sense intended by the Fourteenth Amendment, he argued, because by treaty they were not allowed to become citizens but remained "subjects" of the Emperor of China, to whom they therefore continued to owe allegiance.  *Wong Kim Ark*, 169 U.S. at 725-26 (Fuller, C.J., dissenting). Whether or not Chief Justice Fuller was correct on that score—and we believe he was—that majority opinion could not extend further than the facts of the case warranted, namely, that children born to parents who are *domiciled* in the United States are sufficiently "subject to the jurisdiction" of the United States that the Fourteenth Amendment bestows on them automatic

citizenship upon birth.[4]  As Justice Gray himself noted when discounting the contrary language

in *The Slaughter-House Cases* cited above:

> it is well to bear in mind the often-quoted words of Chief Justice Marshall: 'It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.

*Wong Kim Ark*, 169 U.S. at 679 (quoting *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399

(1821)).

Chief Justice Marshall's long-standing distinction between *holding* and *dicta* is

particularly germane in assessing the scope of *Wong Kim Ark*'s holding, because language in

Justice Gray's opinion that appears to apply more broadly than to those domiciled in the United

States is, at times, patently wrong—errors that likely would have not been made had the precise

issue been before the Court.  In one glaring example, Justice Gray quoted Justice Joseph Story

for the proposition that "Persons who are born in a country are generally deemed citizens and

subjects of that country," *id.* at 661 (quoting Story, Confl. Laws, § 48), but he omitted the very

next sentence in Justice Story's treatise, namely, that "[a] reasonable qualification of the rule

would seem to be, that it should not apply to the children of parents, who were *in itinere*

[traveling] in the country, or who were abiding there for temporary purposes, as for health, or

curiosity, or occasional business."  Story, Conflict of Laws, *supra*, § 48.  Although Justice Story

acknowledged that "[i]t would be difficult . . . to assert, that in the present state of public law

such a qualification is universally established," *id.*, Justice Gray's omission of the qualification

altogether erroneously implies that the opposite was universally established.

---

[4] One could even argue that the actual holding is narrower still, limited to those domiciled in the United States who were barred by treaty from ever becoming citizens.

Story's caveat directly addresses several of the modern issues that have never been addressed by the Supreme Court.  Does "subject to the jurisdiction" cover children born to those who are in the United States lawfully but only temporarily, such as those on tourist, student, or work visas (temporary sojourners, to use the language of the day)?  Does it also extend to children born to those who have overstayed their visas and become unlawfully present in the United States?  Does it extend to diplomats who have remained in the United States after their diplomatic credentials have been revoked, as in this case?  And can it possibly also extend to children born to those who were never lawfully admitted into the United States in the first place?

Another example of error committed by Justice Gray in his *dicta*:  Justice Gray claimed that the English common law rule of *jus soli* "was in force" not only "in all the English colonies upon this continent down to the time of the Declaration of Independence," as it clearly was, but also "in the United States afterwards, and continued to prevail under the constitution as originally established."  *Wong Kim Ark*, 169 U.S. at 658  The latter point is patently erroneous. The English common law rule, accurately described by Justice Gray, is that

> every person born within the dominions of the crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject, save only the children of foreign ambassadors (who were excepted because their fathers carried their own nationality with them), or a child born to a foreigner during the hostile occupation of any part of the territories of England.

*Wong Kim Ark*, 169 U.S. at 657 (quoting Lord Chief Justice Cockburn, Cockb. Nat. 7).

Moreover, being an "English subject" meant, on the other side of the *jus soli* coin, owing "*permanent* allegiance to the crown."  *Id.* (quoting Dicey, Confl. Laws, pp. 173-77, 741, emphasis in original).  The Declaration of Independence is not just a thorough repudiation of that

old feudal idea of "permanent allegiance," but perhaps the most eloquent repudiation of it ever written.

The Declaration begins with a statement that it had become necessary for the American people "to dissolve the political bands which ha[d] connected them" to the English people. Declaration of Independence, ¶ 1.  It then asserts as a "self-evident truth" "[t]hat whenever any Form of Government becomes destructive of [the end of securing the unalienable rights with which the people are endowed by their Creator], it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness." *Id.* ¶ 2.  And if it were not clear enough from those two statements that the Americans were repudiating the notion that they owed perpetual allegiance to the English crown, the language of the closing paragraph is unmistakable, declaring "That these United Colonies are, and of Right ought to be Free and Independent States; *that they are Absolved from all Allegiance to the British Crown*, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved …." *Id.* ¶ 32 (emphasis added).  The notion that the English common law of *jus soli* therefore continued unabated after the Declaration of Independence could not be more mistaken.

Much of the evidence Justice Gray marshalled in support of his broad statements in *dicta* likewise suffers from the lack of care that might have been brought to bear had the broader question actually been at issue.  By way of example, Justice Gray cited several cases for the unobjectionable proposition that "[t]he interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in light of that history." *Wong Kim Ark*, 169 U.S. at 655

(quoting *Smith v. Alabama*, 124 U.S. 465, 478 (1888)); *see also id.* at 654-55 (citing *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874); *Ex parte Wilson*, 114 U. S. 417, 422 (1885); *Boyd v. U. S.*, 116 U. S. 616, 624, 625 (1886); *Smith v. Alabama*, 124 U. S. 465 (1888); and *Moore v. U. S.*, 91 U. S. (1 Otto) 270, 274 (1875)). What Justice Gray failed to mention is that the general rule about using the common law as a rule of interpretation only applies to the extent that the common law was compatible with the principles of the American revolution.  As Justice Story noted in his 1829 opinion in *Van Ness v. Pacard*, "The common law of England is not to be taken in all respects to be that of America. Our ancestors brought with them its general principles, and claimed it as their birthright; but they brought with them and adopted only that portion which was applicable to their situation."  *Van Ness v. Pacard*, 27 U.S. (2 Pet.) 137, 144 (1829); *Webster v. Reid*, 52 U.S. 437, 455 (1850); *Shively v. Bowlby*, 152 U.S. 1, 52 (1894); *see also United States v. Reid,* 53 U.S. (12 How.) 363, 363 (1851) ("The colonists who established the English colonies in this country undoubtedly brought with them the common and statute laws of England, as they stood at the time of their emigration, *so far as they were applicable to the situation and local circumstances of the colony*" (emphasis added)); Cooley, Conflict of Laws ¶ 31 ("when the constitution of the United States was adopted, the general rules of the common law, *in so far as they were applicable to the conditions then existing in the colonies, and subject to the modifications necessary to adapt them to the uses and needs of the people*, were recognized and were in force in the colonies" (emphasis added)); 1 Kent, Comm. 473 ("The common law, *so far as it is applicable to our situation and government*, has been recognized and adopted as one entire system by the constitutions of Massachusetts, New York, New Jersey, and Maryland. It has been assumed by the courts of justice, or declared by statute, with the like modifications, as the law of the land in every state. It was imported by our colonial ancestors *as*

*far as it was applicable*." (emphasis added)).  Indeed, long before Justice Gray treated the common law as an obligatory and indisputable governing principle in the United States, the California Supreme Court had much more accurately described that the rule was just the opposite.  There was, it claimed:

> no doctrine better settled, than that such portions of the law of England as are not adapted to our condition, form no part of the law of this State. This exception includes not only such laws as are inconsistent with the spirit of our institutions, but such as are framed with special reference to the physical condition of a country differing widely from our own. It is contrary to the spirit of the common law itself to apply a rule founded on a particular reason, to a case where that reason utterly fails. *Cesante ratione legis cessat ipsa lex*. [The reason for a law ceasing, the law itself ceases].

*Crandall v. Woods*, 8 Cal. 136, 142-43 (1857) (quoting *Starr & others v. Child & others*, 20 Wend. 149 (N.Y. 1838) (Bronson, J., dissenting)).  In short, "[t]he principles of the common law have been adopted in this country only so far as applicable to the habits and condition of our society, and in harmony with the genius, spirit, and objects of our institutions."  *Pierson v. Lane*, 60 Iowa 60, 14 N.W. 90, 92 (1882); *see also, e.g.*, *Ex parte Holman*, 28 Iowa 88, 126 (1869) ("The courts of this country unite in holding that the common law, *so far as it is suited to the condition of our people and accords with our institutions*, is the law of the land" (emphasis added)); *Wagner v. Bissell*, 3 Iowa 396, 403 (1856) ("where [the common law] has been varied by custom, not founded in reason, or not consonant to the genius and manners of the people, it ceases to have force"); *People v. Van Rensselaer*, 9 N.Y. 291, 316 (1853) ("There is this necessary limitation implied [upon adoption of the common law by British subjects in new territories], that they carry with them all the laws applicable to their situation, and not repugnant to the local and political circumstances in which they are placed"); *Whitney v. Powell*, 2 Pin. 115, 117, 1849 WL 3235, at *2 (Wis. 1849) ("The common law of England is not to be taken in all respects to be that of America"); *Ex parte Hickey*, 12 Miss. 751, 776-77 (Miss. Err. & App.

1845) ("The United States have not taken, in all respects, the common law of England. So much only of its general principles are claimed and adopted which is applicable to our situation, institutions and form of government"); *Lynch v. Clarke*, 3 N.Y.Leg.Obs. 236, 1844 WL 4808 (N.Y. Ch. 1844) (noting that the colonists "brought with them as a birth-right and inheritance, so much of the common law as was applicable to their local situation and change of circumstances"); *Gilbert v. Richards' Heirs*, 7 Vt. 203, 205 (1835) ("Such part only of the common law of England, is adopted here 'as is applicable to the local situation and circumstances' of this state").  They are not applicable otherwise, and the common law *jus soli* principle of perpetual and irrevocable allegiance is simply incompatible with the doctrine of consent explicated in the Declaration of Independence.

Chief Justice Fuller correctly noted in his dissent this significant caveat about the general applicability of the common law in the United States:

> Manifestly, when the sovereignty of the crown was thrown off, and an independent government established, every rule of the common law, and every statute of England obtaining in the colonies, in derogation of the principles on which the new government was founded, was abrogated.

*Wong Kim Ark*, 169 U.S. at 709 (Fuller, C.J., dissenting).  But Justice Gray chose not to engage him on the point, simply asserting, without any of the necessary nuance that the subject deserved (and directly contrary to the express language of the Declaration), that the English common law rule of *jus soli* was "in force" *after* the Declaration "and continued to prevail under the Constitution as originally established." *Id.* at 658 (majority opinion of Justice Gray).  Such manifest errors on matters collateral to the holding of a case is precisely why John Marshall's old maxim about *dicta* is so important.  As Justice Gray himself noted:

> The reason for [John Marshall's] maxim [regarding *dicta*] is obvious.  The question actually before the court is investigated with care, and considered in its

full extent. Other principles which may serve to illustrate it are considered in their
relation to the case decided, but their possible bearing on all other cases is seldom
completely investigated.

*Id.* at 679 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) at 399).

Viewed through that lens, much of the case authority relied on by Justice Gray is

irrelevant to the issues that remain to be addressed.  That "citizenship by birth was the law of the

English colonies in America" and during the time that New York City was under British

occupation during the war—the issue confronted by the Court in *Inglis v. Sailors' Snug Harbor*,

28 U.S. (9 Pet.) 99 (1830) (cited in *Wong Kim Ark*, 169 U.S. at 659), tells us nothing about

whether, or the extent to which, the principles of the Declaration repudiated the common law of

*jus soli*.  Indeed, another aspect of that case, built on the uncertainty about the timing of the John

Inglis's birth, demonstrates that the rule set down in the majority opinion in the case is just the

opposite of that which was attributed to it by Justice Gray's *dicta*.  Addressing the period of time

between the Declaration of Independence in July 1776, and the occupation of New York by the

British army in September 1776 (*i.e.*, when the City was "in the United States" and not under

occupation by a foreign army), the Court held:

> If born after the 4th of July 1776, and before the 15th of September of the same
> year, when the British took possession of New York, his infancy incapacitated
> him from making any election for himself, and *his election and character
> followed that of his father*, subject to the right of disaffirmance in a reasonable
> time after the termination of his minority; which never having been done, he
> remains a British subject, and disabled from inheriting the land in question.

*Id.* at 126 (emphasis added).  The italicized language is inaccurate under the pure form of *jus soli*

claimed by Justice Gray, for the status of the father is irrelevant if the child is born on the soil of

the sovereign.  To repeat the prior language of Lord Chief Justice Cockburn, quoted by Justice

Gray earlier in the opinion:

> By the common law of England, every person born within the dominions of the crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject, save only the children of foreign ambassadors (who were excepted because their fathers carried their own nationality with them), or a child born to a foreigner during the hostile occupation of any part of the territories of England.

*Wong Kim Ark*, 169 U.S. at 657 (quoting Cockb. Nat. 7).

Justice Gray similarly ignored a key component of Justice Swayne's decision in *U.S. v. Rhodes* while riding circuit. The issue in that case was the constitutionality of the 1866 Civil Rights Act, which, as Justice Swayne noted, provided that anyone "born in the United States, *and not subject to any foreign power*," was a citizen and therefore able to testify in court. *United States v. Rhodes*, 27 F. Cas. 785, 785 (C.C.D. Ky. 1866) (citing "An act to protect all persons in the United States in their civil rights, and to furnish the means for their vindication, 14 Stat. 27 (April 9, 1866), emphasis added). Nancy Talbot was, Justice Swayne held, "a citizen of the United States of the African race, having been born in the United States, and not subject to any foreign power." *Id.* His later description of the common law of *jus soli* is therefore pure *dicta*.

Most egregious, though, was Justice Gray's reliance on the New Jersey Supreme Court's decision in *Benny v. O'Brien*, 58 N.J.L. 36, 32 Atl. 696 (1895), as support for his broad claim that "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory" for all children here born of resident aliens" except diplomats and occupying armies. *Wong Kim Ark*, 169 U.S. at 693. *Benny*, like *Wong Kim Ark* itself, involved parents who were "domiciled" in the United States, *Benny*, 58 N.J.L. at 37, and so its holding is likewise limited to that context. But the New Jersey court was also quite explicit in noting that the Fourteenth Amendment did not provide automatic citizenship beyond that. "Two facts must concur" for there to be automatic citizenship, it held. "The person must be born here, and he

must be subject to the jurisdiction of the United States according to the fourteenth amendment, which means, according to the civil rights act, that the person is not subject to any foreign power." *Id.* at 39.  The two provisions—that is, the Civil Rights Act and the Citizenship Clause of the Fourteenth Amendment—"by implication concede that there may be instances in which the right to citizenship does not attach by reason of birth in this country," the Court stated.  *Id.* And contrary to Justice Gray's claim, those exceptions involved not just the children of diplomats or invading armies: "Persons intended to be excepted are only those born in this country of *foreign parents who are temporarily traveling here*, and children born of persons resident here in the diplomatic service of foreign governments." *Id.* (emphasis added).

The New Jersey Court's acknowledgement that the phrases "subject to the jurisdiction" and "not subject to any foreign power" were both intended to exclude temporary visitors confirms that the phrases meant complete, political jurisdiction, not a partial, territorial jurisdiction.  And it comports with a key discussion during the debates over the Fourteenth Amendment in the Senate.  Shortly after Senator Howard introduced the language that was to become the Citizenship Clause, Senator Cowan asked: "Is the child of the Chinese immigrant in California a citizen [under the language of the proposed amendment]?  Is the child of a Gypsy born in Pennsylvania a citizen?  If so, what rights have they?  *Have they any more rights than a sojourner in the United States*?"  Cong. Globe, 39th Cong., 1st Sess. 2890 (1866) (remarks of Sen. Cowan, emphasis added).  Senator Conness responded that the amendment would grant citizenship to the children of Chinese living in California and Gypsies living in Pennsylvania, *Id.* at 2892 (remarks of Sen. Conness), but his response must be read in light of the distinction that Cowan himself had made between the Chinese and Gypsies to whom we has referring and "sojourners."  In other words, by asking whether children of the Chinese and Gypsies were to be

given "more rights than a sojourner," Cowan was necessarily referring to Chinese and Gypsies who were *not* mere sojourners (temporary visitors), but who were instead permanently domiciled in the United States and not owing allegiance to any foreign power.  Far from establishing that the Citizenship Clause guarantees citizenship to everyone born on U.S. soil no matter the circumstances of their parents, as several scholars have claimed, *See, e.g.*, Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. U. L. Rev. 331, 356 (2010); James C. Ho, *Defining "American": Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 2d 341, 344 (2006), this important colloquy therefore demonstrates just the opposite.  Citizenship would not be limited to white Europeans, as prior naturalization acts had done, but neither would it be extended to the children born on U.S. soil to parents who were merely temporary visitors—sojourners—to the United States.

This is precisely the interpretation of the Fourteenth Amendment given by the New Jersey Supreme Court, Justice Gray's claims notwithstanding:  "The fourteenth amendment, by the language, 'all persons born in the United States and subject to the jurisdiction thereof," was intended to bring all races, without distinction of color, within the rule, which, prior to that time, pertained to the white race," stated the New Jersey Court.  It therefore extended to a child "of alien parents, who at the time of his birth were *domiciled* in this country."  But it did not extend to "those born in this country of foreign parents who are temporarily traveling here."  *Benny*, 58 N.J.L. at 39-40.

The executive branch of the federal government likewise recognized both before and for two-thirds of a century after the decision in *Wong Kim Ark* that more than mere birth on U.S. soil was required for the grant of automatic citizenship.  With the exception of wartime when

passports could be issued to non-citizen members of the military who took an oath of allegiance,[5] only citizens have been eligible for passports since 1856, so proof of citizenship has been required when applying for a passport. *An Act to regulate the Diplomatic and Consular Systems of the United States*, § 23, 11 Stat. 52, 60 (Aug. 18, 1856). But shortly after the Court's decision in *Elk v. Wilkins*, the passport office adopted a form for use by any "native citizen" applying for a passport that required, *inter alia*, the following information: 1) city, state, and date of birth in the U.S.; 2) whether the father was a native or naturalized citizen; 3) confirmation that the individual was domiciled in the United States, including the city and state of permanent residence; and 4) an oath of allegiance to the United States. Government Printing Office, *The American Passport: Its History and a Digest of Laws, Rulings, and Regulations Governing Its Issuance by the Department of State* 64 (1898). Information about the father's status continued until it was inexplicably dropped as a requirement in 1967. *Compare, e.g.*, 22 C.F.R. 33.23 (1938) (requiring for "native citizen" applications, *inter alia*, "the name, date and place of birth, and place of residence of the applicant's father"), *with* 22 C.F.R. 51.43 (1967) (requiring only proof of birth in the United States). If birth on U.S. soil alone was sufficient for citizenship, the information about the father's citizenship status would not have been necessary.

Similarly, as Chief Justice Fuller noted in his *Wong Kim Ark* dissenting opinion, Secretary of State Frederick Frelinghuysen rendered an opinion in 1885 that a child born on U.S. soil to Saxon parents who were "temporarily in the United States" was not a citizen because,

---

[5] *See, e.g., An Act making Appropriations for sundry Civil Expenses of the Government for the Year ending June thirty, eighteen hundred and sixty-four, and for the Year ending the 30[th] of June, 1863, and for other Purposes*, § 23, 12 Stat. 744, 754 (March 3, 1863) (exempting from the citizen requirement foreign-born males between the ages of twenty and forty-five "who shall have declared on oath their intention to become citizens and who were therefore obligated to military service by *An Act for enrolling and calling out the national Forces, and for other Purpose*, § 1, 12 Stat. 731, 731 (March 3, 1863)).

through his parents, he was subject to a foreign power. Freeman Snow, "Hausding's Case," *Cases and Opinions on International Law* 222 (1893), citing 2 Wharton Int'l Dig. 399. And Frelinghuysen's successor as Secretary of State, Thomas Bayard, rendered the same opinion in Greisser's case. Greisser was born in Ohio in 1867 to a father who was a German subject and domiciled in Germany. Greisser was therefore not a citizen, according to Secretary of State Bayard, because he was "'subject to a foreign power,' and 'not subject to the jurisdiction of the United States.'" *Wong Kim Ark*, 169 U.S. at 719 (Fuller, C.J., dissenting).

In sum, the distinction between sojourners and those permanently domiciled in the United States was made during the debates over the Fourteenth Amendment, in state court judicial opinions, and by the actual practice of the passport office, indicating that the mandate of automatic citizenship was not understood to apply to children of temporary visitors to the United States. Such temporary visitors, including those such as Hoda Muthana's parents who had applied for but not yet been granted more permanent status, are subject only to the partial, territorial jurisdiction of the United States in the sense that they must comport with the laws while physically present within the borders of the United States. But they are not subject to the jurisdiction of the United States in the broader sense intended by the Fourteenth Amendment. They are not subject to the complete, political jurisdiction, for their temporary sojourn to the territory of the United States brings with it only a temporary obligation to obey her laws, not a full allegiance to her sovereignty.

This is not to say that Congress could not, pursuant to its naturalization power, choose to grant citizenship to the children of such foreign nationals. *See* U.S. Const. Art. I, § 8, cl. 4 ("The Congress shall have power … To establish a uniform Rule of Naturalization"). But thus far it has not done so. Instead, the language of the current naturalization statute simply tracks the

minimum constitutional guarantee that anyone "born in the United States, and subject to the

jurisdiction thereof," is a citizen. 8 U.S.C. § 1401(a). Indeed, Congress has by its own actions

with respect to Native Americans—both before and after the Supreme Court's decision in *Wong*

*Kim Ark*—rejected the claim that the Citizenship Clause itself confers citizenship merely by

accident of birth. *See* Act of July 15, 1870, 16 Stat. 361, ch. 296, § 10 (cited in *Elk*, 112 U.S., at

104) (extending the jurisdiction of the United States to any member of the Winnebago Tribe who

desired to become a citizen); Act of March 3, 1873, 17 Stat. 632, ch. 332, § 3 (cited in *Elk*, 112

U.S., at 104) (same offer of citizenship to members of the Miami tribe of Kansas); Indian

Citizenship Act of 1924, 43 Stat. 253, 8 U.S.C. § 1401(b) (granting citizenship to Indians born

within the territorial limits of the United States). None of these citizenship acts would have been

necessary—indeed, all would have been redundant—under the expansive view of the Citizenship

Clause propounded by Justice Gray in *dicta*.

III.    **The Overly-Broad Reading That Has Been Given to *Wong Kim Ark* Is
        Incompatible with the Theory of Government by Consent Adopted by the
        Founders and Reaffirmed by the Framers of the Fourteenth Amendment.**

Once one considers the full import of Justice Gray's *obiter dicta* language in *Wong Kim*

*Ark*, it becomes clear that his proposition is simply incompatible not only with the text of the

Citizenship Clause but with the political theory of the American founding as well.

At its core, as articulated by Thomas Jefferson in the Declaration of Independence, that

political theory posits the following: Governments are instituted among particular peoples,

comprised of naturally-equal human beings, to secure for themselves certain unalienable rights.

Such governments, in order to be legitimate, must be grounded in the consent of the governed—a

necessary corollary to the self-evident proposition of equality. Decl. of Ind. ¶ 2. This consent

must be present, either explicitly or tacitly, not just in the formation of the government but in the

ongoing decision whether to embrace others within the social compact of the particular people.

As formulated in the Massachusetts Bill of Rights of 1780:

> The end of the institution, maintenance, and administration of government, is to secure the existence of the body-politic, to protect it, and to furnish the individuals who compose it with the power of enjoying in safety and tranquility their natural rights …. The body-politic is formed by a voluntary association of individuals; it is a social compact by which the whole people covenants with each citizen and each citizen with the whole people that all shall be governed by certain laws for the common good.

Mass. Const. of 1780, Preamble (emphasis added). Thus, as Professor Edward Erler has noted:

> [T]he social contract requires reciprocal consent. Not only must the individual consent to be governed, but he must also be accepted by the community as a whole. If all persons born within the geographical limits of the United States are to be counted citizens—even those whose parents are in the United States illegally—then this would be tantamount to the conferral of citizenship without the consent of 'the whole people.

Edward J. Erler, *et al.*, The Founders on Citizenship and Immigration 77 (Rowman & Littlefield 2007); *see also* Thomas G. West, Vindicating the Founders, 166-67 (Rowman & Littlefield 1997). In other words, birthright citizenship—the claim advanced by Muthana that she is entitled to citizenship status merely by accident of birth—is contrary to the principle of consent that is one of the bedrock principles of the American regime.

Such a claim of birthright citizenship traces its roots not to the republicanism of the American founding, grounded as it was in the consent of the governed, but to the feudalism of medieval England, grounded in the notion that a subject owed perpetual allegiance and fealty to his sovereign. *See* Erler, Citizenship and Immigration, at 81. A necessary corollary of the feudal notion of citizenship was the ban on expatriation, embraced by England and described by Blackstone as follows:

> Natural allegiance is such as is due from all men born within the king's dominions immediately upon their birth. For, immediately upon their birth, they are under the king's protection …. Natural allegiance is therefore a debt of gratitude; which cannot be forfeited, canceled, or altered, by any change of time, place, or

circumstance.… For it is a principle of universal law, that the natural-born subject of one prince cannot by any act of his own, no, not by swearing allegiance to another, put off or discharge his natural allegiance to the former: for this natural allegiance was intrinsic, and primitive, and antecedent to the other, and cannot be divested without the concurrence act of that prince to whom it was first due.

William Blackstone, 1 Commentaries on the Laws of England 357-58 (1979) (1765).

Thus, when Congress passed as a companion to the Fourteenth Amendment the Expatriation Act of 1868, which provided simply that "the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness," Act concerning the Rights of American Citizens in foreign States, 15 Stat. 223 (July 27, 1868),.it necessarily rejected the feudal birth-right citizenship doctrine of medieval England, advanced here by Muthana, as fundamentally incompatible with the principles of the Declaration of Independence. As Representative Woodward of Pennsylvania noted on the floor of the House of Representatives: "It is high time that feudalism were driven from our shores and eliminated from our law, and now is the time to declare it." Cong. Globe, 40th Cong., 2nd Sess., at 868 (1868); *see also id*. at 967 (Rep. Baily) (describing birth-right citizenship as "the slavish feudal doctrine of perpetual allegiance"); *Wong Kim Ark*, 169 U.S. at 707 (Fuller, J., dissenting) (describing the rule adopted by the majority as "the outcome of the connection in feudalism between the individual and the soil on which he lived, and the allegiance due was that of liege men to their liege lord").

Such remnants of feudalism were rejected by our nation's founders, when they declared to a candid world that they no longer owed allegiance to the king of their birth. They were rejected again by the Congress in 1866, and by the nation when it ratified the Fourteenth Amendment. Muthana's case presents this Court with the opportunity to reject them once and for

all, and to repudiate the erroneous *dicta* of *Wong Kim Ark* that would revive that forgotten

doctrine to the detriment of the American republican ideal of government by consent.


## CONCLUSION

Hoda Muthana was not eligible for U.S. citizenship at the time of her birth whether or not

she was born while her father was still a diplomat or afterwards, and whether or not she was born

before the United States had been notified of the revocation of his diplomatic credentials.  Her

parents were, at best, temporary visitors at the time, owing only a partial and territorial allegiance

to the United States and not the full allegiance intended by the "subject to the jurisdiction"

phrase of the Fourteenth Amendment's Citizenship Clause.  Her claim of U.S. Citizenship must

therefore be denied.


Dated:  March 1, 2019                    Respectfully submitted,


                                         /s/ *Julie Axelrod*
                                         JULIE AXELROD (D.C. Bar No. 1001557)
                                         1629 K Street, NW
                                         Washington, DC 20006
                                         Tel: (703) 888-2442
                                         jba@cis.org

                                         JOHN C. EASTMAN (Cal. Bar No. 193726)
                                         (*pro hac vice* application forthcoming)
                                         Center for Constitutional Jurisprudence
                                         c/o Chapman University Fowler School of Law
                                         One University Dr.
                                         Orange, CA 92866
                                         Tel: (877) 855-3330 x2; Fax: (714) 844-4817
                                         jeastman@chapman.edu