IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AHMED ALI MUTHANA, individually and as next friend of Hoda Muthana and Minor John Doe initials A.M., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MICHAEL POMPEO, *et al.*, | ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:19-cv-00445-RBW

## **MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

Introduction ............................................................................................................... 1

Background ................................................................................................................ 3

    A. Legal Background ........................................................................................... 3

    B. Factual Background ........................................................................................ 5

    C. Procedural History ......................................................................................... 7

Legal Standards ........................................................................................................ 9

    A. Federal Rule of Civil Procedure 12(b)(1) ..................................................... 9

    B. Federal Rule of Civil Procedure 12(b)(6) ..................................................... 9

    C. Federal Rule of Civil Procedure 56 ............................................................... 9

Argument ................................................................................................................ 11

    A. The Court Should Dismiss All of Plaintiff's Next-Friend Claims (Counts 1–8) or, in the Alternative, Grant Summary Judgment to Defendants on Those Claims ......................... 11

        1. Plaintiff Has Not Satisfied the Requirements to Proceed as a Next Friend ............... 11

        2. Muthana Is Not and Was Never a U.S. Citizen ...................................... 16

            a) The Allegations in the Complaint and Exhibits to the Complaint Fail to Establish that Muthana Is a U.S. Citizen—So All of Plaintiff's Next-Friend Claims Fail .. 17

            b) The Attached Department of State Certification and Underlying Records Confirm that Muthana Did Not Acquire U.S. Citizenship at Birth ..................................... 27

        3. Plaintiff Has Not Alleged a Cause of Action to Challenge Muthana's Passport Revocation ........................................................................... 31

        4. Defendants Did Not Violate Procedural Due Process In Revoking Muthana's Passport ................................................................................................ 32

        5. Courts Lack Authority to Grant Citizenship Claims in Equity .................................. 34

        6. The United States Does Not Have a Duty to Facilitate Muthana's Return ............... 36

            a) The United States Does Not Have a Duty to Facilitate the Return of Its Citizens from Abroad ....................................................................................... 36

            b) Plaintiff Has Not Adequately Pleaded a Claim for Relief Under Geneva Convention IV  38

    B. The Court Should Dismiss Plaintiff's Personal Claim (Count 9) Because Plaintiff Lacks Standing to Seek Declaratory Relief on That Claim ......................................... 40

Conclusion ............................................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**

*Abdulaziz v. Metro. Dade Cty.*, 741 F.2d 1328 (11th Cir. 1984) ............................................. 4, 28

*Acosta v. Gaffney*, 558 F.2d 1153 (3d Cir. 1977) ........................................................... 37

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) .................................................. 13, 14, 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................... 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................... 9

*Ashwander v. Tenn.Valley Auth.*, 297 U.S. 288 (1936) ...................................................... 40

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979) ............................................................. 42

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 9

*Boos v. Barry*, 485 U.S. 312 (1988) ............................................................................ 21

*Califano v. Sanders*, 430 U.S. 99 (1977) ..................................................................... 32

*Chacoty v. Tillerson*, 285 F. Supp. 3d 293 (D.D.C. 2018) .................................................. 31

*Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367 (2004) .............................. 37

*Croce v. Bromley Corp.*, 623 F.2d 1084 (5th Cir. 1980) ..................................................... 12

*Davis v. Austin*, 492 F. Supp. 273 (N.D. Ga. 1980) ......................................................... 14

*Fedorenko v. United States*, 449 U.S. 490 (1981) ............................................................ 34

*Flast v. Cohen*, 392 U.S. 83 (1968) ............................................................................ 41

*Fornaro v. James*, 416 F.3d 63 (D.C. Cir. 2005) ........................................................... 37, 38

*Haig v. Agee*, 453 U.S. 280 (1981) ........................................................................... 33, 37

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .................................................................. 39

*Hauser v. Moore*, 223 F.3d 1316 (11th Cir. 2000) ........................................................... 14

*Hellenic Lines, Ltd v. Moore*, 345 F.2d 978 (D.C. Cir. 1965) .............................................. 24

*Hilton v. Guyot*, 159 U.S. 113 (1895) .......................................................................... 23

*Hinojosa v. Horn*, 896 F.3d 305 (5th Cir. 2018) ............................................................. 32

*Historic E. Pequots v. Salazar*, 934 F. Supp. 2d 272 (D.C. Cir. 2013) ................................... 39

*Hizam v. Kerry,* 747 F.3d 102 (2d Cir. 2014) ................................................................. 34

*Idris v. Obama*, 667 F. Supp. 2d 25 (D.D.C. 2009) .......................................................... 14

*In re Baiz*, 135 U.S. 403 (1890) ................................................................................ 28

*INS v. Pangilinan*, 486 U.S. 875 (1988) .................................................................... 34, 35

*Johnson v. Williams,* 699 F. Supp. 2d 159 (D.D.C. 2010) .................................................. 39

*Kelso v. U.S. Dep't of State*, 13 F. Supp. 2d 1 (D.D.C. 1998) .............................................. 34

*Khadr v. United States*, 529 F.3d 1112 (D.C. Cir. 2008)................................................. 9

*Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502 (1982) ................................ 12

*Logan v. Dupuis*, 990 F. Supp. 26 (D.D.C. 1997) ....................................................... 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................. 40

*Medellin v. Texas*, 552 U.S. 491 (2008) .............................................................. 39

*Munaf v. Geren*, 553 U.S. 674 (2008).................................................................. 38

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423 (D.C. Cir. 1996) ........................ 41

*Nattah v. Bush*, 770 F. Supp. 2d 193 (D.D.C. 2011) ................................................... 39

*Neely v. Henkel*, 180 U.S. 109 (1901) ................................................................ 38

*Newton v. INS*, 736 F.2d 336 (6th Cir. 1984) ......................................................... 37

*Nikoi v. Attorney Gen.*, 939 F.2d 1065 (D.C. Cir. 1991) .............................................. 17

*Proctor v. District of Columbia*, 74 F. Supp. 3d 436 (D.D.C. 2014).................................... 10

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237 (1952)..................................... 40, 42

*Rahman v. Chertoff*, 530 F.3d 622 (7th Cir. 2008).................................................... 37

*Raya v. Clinton*, 703 F. Supp. 2d 569 (W.D. Va. 2010) ............................................... 21

*Rusk v. Cort*, 369 U.S. 367 (1962).................................................................... 32

*Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370 (D.C. Cir. 2010) .............................. 41

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098 (D.C. Cir. 2005) ...................................... 13

*Tabion v. Mufti*, 73 F.3d 535 (4th Cir. 1996)......................................................... 4

*Tabion v. Mufti*, 877 F. Supp. 285 (E.D. Va. 1995)................................................... 5

*Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011)...................................................... 9

*The Schooner Adeline*, 13 U.S. 244 (1815) ........................................................... 23

*United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789 (E.D.N.Y. 1963).......................... 38

*United States v. Al-Hamdi*, 356 F.3d 564 (4th Cir. 2004) ............................................ 28

*United States v. Flores-Montano*, 541 U.S. 149 (2004) ............................................... 37

*United States v. Guinand*, 688 F. Supp. 774 (D.D.C. 1988)......................................... 25, 26

*United States v. Khobragade*, 15 F. Supp. 3d 383 (S.D.N.Y. 2014) ................................. 25, 26

*United States v. Philip Morris USA, Inc.*, 396 F.3d 1190 (D.C. Cir. 2005) ............................ 35

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898)........................................... 4, 17, 20

*Vargas v. Lambert*, 159 F.3d 1161 (9th Cir. 1998) ................................................... 14

*Vo v. Benov*, 447 F.3d 1235 (9th Cir. 2006) ......................................................... 38

*Wash. Legal Found. v. U.S. Sent'g Comm'n*, 89 F.3d 897 (D.C. Cir. 1996)............................. 40

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................... 11, 12, 13

*Worthy v. Herter*, 270 F.2d 905 (D.C. Cir. 1959) .......................................................... 37

*Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017) ............................................................ 32

**Statutes**

8 U.S.C. § 1401 ............................................................................................................... 34

8 U.S.C. § 1401(a) .......................................................................................................... 17

8 U.S.C. § 1503(b) .......................................................................................................... 31

8 U.S.C. § 1504 ............................................................................................................... 33

8 U.S.C. § 1504(a) .......................................................................................................... 31

18 U.S.C. § 2339B ........................................................................................................... 40

22 U.S.C. §§ 254a–254e .................................................................................................... 3

28 U.S.C. § 2242 ............................................................................................................. 12

42 U.S.C. § 264 ............................................................................................................... 37

**Rules**

Fed. R. Civ. P. 17(c)(1) ................................................................................................... 12

Fed. R. Civ. P. 17(c)(2) ................................................................................................... 12

Fed. R. Civ. P.12(b)(1) ......................................................................................... 9, 16, 35, 42

Fed. R. Civ. P. 12(b)(6) ............................................................................................. passim

Fed. R. Civ. P. 56 ....................................................................................................... 9, 10

**Treatise**

5C Charles Alan Wright, et al., Federal Practice & Procedure § 1366 (3d ed. 2012) .................. 10

**Regulations**

22 C.F.R. § 51.62(a)(2) .................................................................................................... 33

22 C.F.R. § 51.70(a) ........................................................................................................ 33

**Constitutional Provisions**

U.S. Const. Art. I, § 8, cl. 4 ............................................................................................. 34

U.S. Const. Amend. XIV, § 1 ......................................................................................... 4, 17

**Other Authorities**

Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War, 6 U.S.T. 3516 .............................................................................................................................. 39

Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, 21 U.S.T. 1418 ........................................................... 5

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227 ........................................ passim

Vienna Convention on the Law of Treaties, 1155 U.N.T.S. 331 ....................................... 23

**INTRODUCTION**

The Court should dismiss this lawsuit.  Most of Plaintiff's claims (Counts 1–8) depend on the assertion that his daughter, Hoda Muthana (Muthana), is a United States citizen.  She is not and never has been a United States citizen.  Settled law and contemporaneous records establish this conclusively.  The Court can dismiss these claims under either Rule 12 or Rule 56.  Plaintiff's only remaining claim (Count 9), which seeks an impermissible advisory opinion endorsing Plaintiff's desire to send money to Muthana without risk of criminal liability, should be dismissed as well.  This Court does not have jurisdiction to provide that endorsement and there are strong reasons not to do so.

Plaintiff brings suit on behalf of Muthana and her minor son, A.M., both of whom Plaintiff alleges are currently detained by Kurdish forces in Syria.  Muthana traveled to Syria in 2014 to join the Islamic State of Iraq and Syria (ISIS).  Once there, she made her way to ISIS-controlled territory and married an ISIS soldier.  After her first husband was killed, Muthana married another ISIS soldier, and gave birth to her son, A.M.

In January 2016, the United States revoked Muthana's U.S. passport—which had been issued in error—on the ground that she was not and never was a U.S. citizen.  In a letter stating the grounds for revocation, the Department of State explained that because Muthana's father (Plaintiff), a former Yemeni diplomat to the United Nations, held diplomatic immunity at the time of Muthana's birth in 1994, Muthana was not born a U.S. citizen under well-established law.

Plaintiff now claims that the United States wrongfully rescinded Muthana's citizenship when it revoked her passport in 2016 and has a duty to facilitate her and A.M.'s return to the United States.  Plaintiff seeks injunctive and declaratory relief on behalf of Muthana and A.M., as well as

a declaration that he may send money to Muthana without violating 18 U.S.C. § 2339B, the material-support-for-terrorist-organizations statute.

All of Plaintiff's claims fail.

*First*, the Court lacks jurisdiction over any of Plaintiff's claims. The Court lacks jurisdiction over Plaintiff's next-friend claims (Counts 1–8). Plaintiff has sued as a next friend to Muthana, but provides no valid reason why Muthana has not herself brought this action or signed on to the allegations in the complaint. Indeed, the complaint (as well as frequent media reports and interviews) show that Muthana is capable of communicating with counsel, and in such circumstances a suit cannot proceed on a next-friend basis. The complaint also leaves serious doubts about whether Plaintiff and Muthana are aligned in the way that next-friend standing demands. Finally, the Court lacks jurisdiction over Plaintiff's one claim for an advisory opinion on how the material-support statute would apply based on a hypothetical set of facts (Count 9).

*Second*, Plaintiff fails to state any claim on Counts 1 through 8 because Muthana is not and never has been a U.S. citizen, and her son also is not a U.S. citizen. All of Plaintiffs' next-friend claims are based on the assertion that Muthana acquired U.S. citizenship at birth. Settled law, however, demonstrates that Plaintiff, a former Yemeni diplomat to the United Nations, enjoyed diplomatic-agent-level immunity at the time of Muthana's birth. Under Article 43 of the Vienna Convention on Diplomatic Relations, which governs diplomatic immunity in the United States, "[t]he function of a diplomatic agent comes to an end . . . *on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end*" (emphasis added). Here, the United States was not notified that Plaintiff's diplomatic status had been terminated through the process designed to implement Article 43 until February 6, 1995, more than three months *after* Muthana's birth. The Department of State thus continued to afford Plaintiff

diplomatic-agent-level immunity at the time Muthana was born.  As a result, Muthana was born not subject to the jurisdiction of the United States and did not acquire U.S. citizenship at birth.

This Court can conclude that Muthana did not acquire U.S. citizenship at birth based on the allegations in the complaint.  If, however, the Court has any doubt as to whether it can resolve the complaint on Rule 12 grounds, the Court can and should grant summary judgment to Defendants.  The controlling Department of State certification and contemporaneous records—including the contemporaneous KARDEX record that recorded Muthana's birth to indicate that she was a member of Plaintiff's family and subject to diplomatic immunity—conclusively establish that Plaintiff enjoyed diplomatic-agent-level immunity when Muthana was born, and thus Muthana did not acquire U.S. citizenship at birth.

*Third*, even if Muthana was born a U.S. citizen (she was not), Plaintiff's next-friend claims would still fail under Rule 12(b)(6).  Plaintiff has not stated a cause of action for passport revocation (Counts 1–6); Defendants did not violate procedural due process in revoking Muthana's passport (Count 3); courts lack authority to grant citizenship in equity (Counts 4–5); and Plaintiff has failed to adequately plead that the United States has a duty to facilitate Muthana's return to this country (Counts 7–8).

For these reasons, as further explained below, the Court should dismiss the complaint in its entirety under Rule 12.  In the alternative, the Court should grant summary judgment to Defendants on Counts 1 through 8.

## BACKGROUND

**A.** **Legal Background**

The controlling statute on diplomatic immunity is the Diplomatic Relations Act of 1978, 22 U.S.C. §§ 254a–254e, which incorporated the Vienna Convention on Diplomatic Relations,

done April 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, 500 U.N.T.S. 95 (entered into force with respect to the United States Dec. 13, 1972).  *See Abdulaziz v. Metro. Dade Cty.*, 741 F.2d 1328, 1330 (11th Cir. 1984).  The Vienna Conventionencapsulates accepted practice on diplomatic relations between States on diplomatic privileges and immunities.  S*ee Tabion v. Mufti*, 73 F.3d 535, 538 (4th Cir. 1996).

The Vienna Convention provides "diplomats with absolute immunity from criminal prosecution and protection from most civil and administrative actions brought in the 'receiving State,' *i.e.*, the state where they are stationed." *Id.* at 537.  The Department of State, the agency that administers and determines diplomatic immunity of foreign diplomats within the United States,  uses the phrase "diplomatic-agent-level immunity" to refer to the complete criminal and comprehensive civil and administrative immunity from the jurisdiction of the receiving State that diplomatic agents enjoy under the Vienna Convention.  Vienna Convention, art. 31.  That immunity is also dispositive of certain issues of citizenship.  Under Supreme Court precedent, for example, children born in the United States to parents with diplomatic-agent-level immunity are born not "subject to the jurisdiction" of the United States and thus do not acquire U.S. citizenship at birth.  *See* U.S. Const. amend. XIV, § 1 (citizenship at birth extends to persons born "subject to the jurisdiction" of the United States); *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898) ("[t]he Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers").

Diplomatic privileges and immunities are meant "to ensure the efficient performance of the functions of diplomatic missions as representing States" rather than "to benefit individuals." Vienna Convention, preamble ¶ 5; *see Abdulaziz*, 741 F.2d at 1330 ("The courts have recognized

that diplomatic immunity serves the needs of the foreign sovereign and that the diplomat's privilege is 'merely incidental to the benefit conferred on the government he represents.'" (citation omitted)).  The Vienna Convention also serves to protect United States diplomatic agents abroad, which is a critical national interest of the United States.  *Tabion v. Mufti*, 877 F. Supp. 285, 293 (E.D. Va. 1995), *aff'd* 73 F.3d 535 (4th Cir. 1996) ("Because not all countries provide the level of due process to which United States citizens have become accustomed, and because diplomats are particularly vulnerable to exploitation for political purposes, immunity for American diplomats abroad is essential.").

Under the Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, June 26 – Nov. 21, 1947, 61 Stat. 3416, and the Convention on Privileges and Immunities of the United Nations, adopted Feb. 13, 1946, United States accession, April 29, 1970, 21 U.S.T. 1418, representatives of permanent missions to the United Nations are entitled to the same privileges and immunities in the United States that the United States accords to foreign diplomats.

**B.    Factual Background**

On October 15, 1990, the United Nations notified the U.S. Mission to the United Nations in New York (USUN) that the Republic of Yemen (Yemen) had appointed Plaintiff, Ahmed Ali Muthana, as First Secretary of the Permanent Mission of Yemen to the United Nations.  Complaint, ECF No. 1 ¶ 18, Ex. D.  USUN receives, on behalf of the United States, official notifications regarding representatives of permanent missions to the United Nations.

In accordance with Section 15 of the United Nations Headquarters Agreement and Article 39 of the Vienna Convention on Diplomatic Relations, the United States thereafter accorded Plaintiff and family members forming his household diplomatic-agent-level immunity.  Compl.

¶ 18, Exs. C, D.  Yemen terminated Plaintiff as First Secretary in either June or September 1994, but it is undisputed that the United Nations did not notify USUN of Plaintiff's termination at that time.  Compl. ¶¶ 18, 25, 29, 42, Exs. C, D.  In the meantime—before the required notification to USUN occurred—Plaintiff's daughter, Hoda Muthana, was born in New Jersey on ███████ 1994, while Plaintiff and his family, now including the newborn Muthana, continued to enjoy diplomatic-agent-level immunity from the United States.  Compl. ¶ 20, Ex. D.  On February 6, 1995, the United Nations notified USUN that Yemen had terminated Plaintiff as First Secretary in September 1994.  Thus, beginning on February 6, 1995, the United States no longer afforded Plaintiff any privileges and immunities.  Compl. ¶ 21, 25, Ex. D.  Until then, including at the time Muthana was born, Plaintiff enjoyed diplomatic-agent-level immunity.

Years later, on January 24, 2005, the Department of State issued Muthana a U.S. passport.  Compl. ¶ 21, Ex. D.  According to Plaintiff, during the process of applying for the passport, Plaintiff provided the Department of State with a letter dated October 18, 2004, from USUN to the Department of Homeland Security Bureau of Citizenship and Immigration Services.  Compl. ¶ 21, Ex. C.  The letter said that USUN records indicated that Plaintiff had been a member of the Permanent Mission of Yemen to the United Nations from October 15, 1990, to September 1, 1994 and that Plaintiff had enjoyed diplomatic immunity during this time period.  Compl. ¶ 21, Ex. C.  The letter did not state when USUN was notified of Plaintiff's termination, which is the critical factor for terminating diplomatic immunity, or when Plaintiffs' diplomatic-agent-level immunity ended.  Compl. Ex. C.  The Department of State renewed Muthana's passport on February 21, 2014.  Compl. ¶ 21.

In November 2014, Muthana departed the United States for Turkey and eventually entered Syria. *Id.* ¶ 22. After arriving in Syria, Muthana entered territory controlled by the Islamic State of Iraq and Syria (ISIS) and joined ISIS. *Id.* ¶ 23 n.3.

On January 15, 2016, the Department of State revoked Muthana's U.S. passport because it determined that it had issued the passport in error and that Muthana was not, and never had been, a U.S. citizen. *Id.*, Ex. D. In a letter sent to Muthana on that date, the Department of State informed Muthana that her passport had been revoked because it had been issued erroneously. The letter informed Muthana that she was not a U.S. citizen because, due to her father's diplomatic status, she was not subject to the jurisdiction of the United States when she was born. *Id.* The letter advised her that she had a right to request a hearing within 60 days to challenge the passport revocation under 22 C.F.R. § 51.70, a Department of State regulation that allows a passport bearer to request a hearing "to review the basis for the denial or revocation" of a passport. *Id.* ("A person whose passport has been . . . revoked . . . may request a hearing."). Muthana did not challenge the passport revocation, but Plaintiff—who was not the passport bearer—submitted a response stating that Muthana was not in the country and asserting that Muthana was a U.S. citizen. Compl. ¶¶ 28, 29.

After Muthana left the United States, she gave birth to A.M. *Id.* ¶ 24. On or about December 16, 2018, Kurdish forces in Syria allegedly took custody of Muthana and A.M. *Id.* ¶¶ 30, 31.

## C.    Procedural History

On February 21, 2019, Plaintiff, individually and as putative next friend of Muthana and A.M., filed this suit. *See* Compl. Plaintiff seeks injunctive relief barring the United States from rescinding Muthana's (or A.M.'s) purported U.S. citizenship, *id.* ¶¶ 39–56, 67–92 (Counts 1, 2, 4,

5, and 6); a declaratory judgment that the United States denied Muthana due process when it purportedly revoked her alleged U.S. citizenship, *id.* ¶¶ 57–66 (Count 3); a writ of mandamus requiring the United States to aid in the return of Muthana and A.M. to the United States, *id.* ¶¶ 93–116 (Counts 7 and 8); and a declaratory judgment that Plaintiff would not violate 18 U.S.C. § 2339B—which makes it a crime to provide material support or resources to designated foreign terrorist organizations—if he were to provide financial assistance to Muthana, *id.* ¶¶ 117–28 (Count 9).

The same day that he filed the complaint, Plaintiff moved for an expedited hearing on all nine counts under Federal Rule of Civil Procedure 57.  Motion to Expedite Hearing, ECF No. 2; *see* Fed. R. Civ. P. 57.  On February 26, this Court directed the parties to appear "for a hearing on the plaintiff's Expedited Complaint for Declaratory Judgment, Injunctive Relief and Petition for Writ of Mandamus on March 4, 2019."  Feb. 26, 2019 Minute Order.

On March 4, 2019, the Court held a hearing on Plaintiff's request for expedited consideration.  At the end of the hearing, the Court denied expedited treatment.  Mar. 4, 2019 Hearing Transcript at 38:1–11.  The Court followed that denial with a written order stating that "the plaintiff has not satisfied his burden to demonstrate irreparable harm" and that "denial of expedited consideration of this case is appropriate without evaluating the remaining factors." March 11, 2019 Order, ECF No. 18 at 4.  The Court further explained that "the plaintiff's request for expedited consideration rests on '[b]are allegations of what is likely to occur[, which] are of no value to the Court.'"  *Id.* (quoting *GEO Specialty Chems.*, 923 F. Supp. 2d at 148) (second and third alterations in original).

## LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), the Court may dismiss a complaint for "lack of subject-matter jurisdiction."   As the party claiming subject-matter jurisdiction, Plaintiff bears the burden of demonstrating that such jurisdiction exists.   *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).

### B.    Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."   When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts and allegations in the complaint.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   The Court need not, however, accept a plaintiff's legal conclusions.   *Id.*   "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."   *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Id.* at 679 (citing *Twombly*, 550 U.S. at 556).

### C.    Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   When ruling on a motion for summary judgment, "the evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences in favor of the nonmoving party."   *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).   But "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual

disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Although Defendants believe that dismissal is warranted under Rule 12(b)(1) for lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim, Defendants move in the alternative for summary judgment on Counts 1 through 8 of the complaint. A party may move for summary judgment at any time, from the pre-discovery stage until 30 days after the close of discovery, unless a local rule or court order provides otherwise. Fed. R. Civ. P. 56(b). "When the defendant expressly moves for summary judgment in the alternative to a motion to dismiss before discovery has been conducted, and relies upon extra-pleading material, to which the plaintiff has an opportunity to respond, the Court need not issue separate prior notice of the conversion [to summary judgment]." *Proctor v. District of Columbia*, 74 F. Supp. 3d 436, 447–48 (D.D.C. 2014) (citations omitted). "If extra-pleading evidence 'is comprehensive and will enable a rational determination of a summary judgment motion,' a district court will be more likely to convert to summary judgment, but 'when it is scanty, incomplete, or inconclusive,' the district court is more likely to decline to convert to summary judgment and permit further discovery." *Id.* at 448 (quoting 5C Charles Alan Wright, et al., Federal Practice & Procedure § 1366 (3d ed. 2012)). Here, because Defendants have included conclusive evidence of the dates the United States afforded Plaintiff diplomatic-agent-level immunity—a Department of State certification and a contemporaneous KARDEX record listing Muthana's birth and indicating that the Department of State treated Plaintiff and his family as subject to diplomatic immunity at the time of Muthana's birth—and because Plaintiff will have the opportunity to respond to this motion, the Court can convert this motion to summary judgment without further notice.

# ARGUMENT

**A.     The Court Should Dismiss All of Plaintiff's Next-Friend Claims (Counts 1–8) or, in the Alternative, Grant Summary Judgment to Defendants on Those Claims**

The Court should dismiss all of Plaintiff's next-friend claims on behalf of Muthana and A.M. (Counts 1–8) for lack of jurisdiction.  Dismissal is also appropriate for failure to state a claim upon which relief can be granted.  In the alternative, Defendants are entitled to summary judgment on Plaintiff's next-friend claims because Muthana is not and never has been a U.S. citizen.

### 1.     Plaintiff Has Not Satisfied the Requirements to Proceed as a Next Friend

Plaintiff fails to establish that he has standing to sue as next friend of Muthana and A.M. Next-friend standing—which allows a person to file a claim on someone else's behalf—is "by no means granted automatically to whomever seeks to pursue an action on behalf of another." *Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990).  Consistent with Article III of the Constitution, a litigant who asserts next-friend standing bears the burden of "clearly . . . establish[ing] the propriety of his status and thereby justify[ing] the jurisdiction of the court." *Id.* at 164.

To establish standing as a next friend, a purported next friend must satisfy "two firmly rooted prerequisites." *Whitmore*, 495 U.S. at 163–64.  "First, a 'next friend' must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action." *Id.*  "Second, the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest." *Id.*  A next friend does not become a party to the case, "but simply pursues the cause on behalf of the [incompetent or unavailable party], who remains the real party in interest." *Id.* at 163.  "For that reason, the 'next friend' application has been uncommonly granted." *Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502, 523

(1982); *see also Whitmore*, 495 U.S. at 164 ("If there were no restriction on 'next friend' standing in federal courts, the litigant asserting only a generalized interest in constitutional governance could circumvent the jurisdictional limits of Art. III simply by assuming the mantle of 'next friend.'").

Here, Plaintiff asserts that next-friend standing "is appropriate because [Muthana and A.M.] are interned in a Kurdish camp in Syria, with limited and inconsistent access to the internet or other communications, and have had difficulty communicating with counsel." Compl. ¶ 8.

This Court should reject Plaintiff's request for next-friend standing. At the threshold, Plaintiff does not seek such status based on any recognized category. He has not invoked any applicable statute or rule authorizing his next-friend status. Muthana is not a minor, and Plaintiff has not alleged that she is mentally incompetent. *See* Fed. R. Civ. P. 17(c)(2) (providing that a "minor or an incompetent person who does not have a duly appointed representative may sue by a next friend").[1] Nor is this a habeas corpus proceeding, where courts have traditionally allowed next friends to appear "on behalf of detained prisoners who are unable, usually because of mental incompetence or inaccessibility, to seek relief themselves." *Whitmore*, 495 U.S. at 162. In *Whitmore*, the Supreme Court noted that—unlike here—next friends are authorized to appear in habeas proceedings pursuant to federal statute, *see* 28 U.S.C. § 2242 (2010 ed.), and expressly declined to decide whether "a 'next friend' may ever invoke the jurisdiction of a federal court absent congressional authorization." *Id.* at 164. This Court should not expand the concept of next-

---

[1] A.M., although a minor, does not lack a representative; Muthana, his mother, would be the appropriate party to bring a claim on A.M.'s behalf. *See* Fed. R. Civ. P. 17(c)(1) (allowing for a guardian to "sue or defend on behalf of a minor or an incompetent person"); *see also Croce v. Bromley Corp.*, 623 F.2d 1084, 1093 (5th Cir. 1980) ("In the instant case the infant was 'otherwise represented'; the child's legal guardian, his mother, brought this action on his behalf. Thus, there was no need for the court to appoint a guardian ad litem.").

friend standing beyond what courts have traditionally recognized, *see*, *e.g.*, *Al-Aulaqi*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010), or beyond what the Federal Rules of Civil Procedure expressly authorize, given the nature of Plaintiff's suit, which implicates weighty questions of foreign relations, and particularly given the shortcomings in Plaintiff's allegations supporting next-friend standing.

Even if next-friend standing were available in a non-habeas case where no statute or rule authorizes suit by a next friend, Plaintiff does not satisfy either of *Whitmore*'s requirements. Regarding *Whitmore*'s first requirement, Plaintiff has not provided "an adequate explanation . . . why the real party in interest cannot appear on [her] own behalf to prosecute the action." *Whitmore,* 495 U.S. at 163. Plaintiff rests his assertion that he should be entitled to sue as his daughter's next friend on the claim that Muthana has "had difficulty communicating with counsel." Compl. ¶ 8. But this assertion shows she could have authorized the suit (but has not), and in any event is belied by Plaintiff's own allegations.  Plaintiff acknowledges that both he and his counsel have received "communications" from Muthana, *id.* ¶ 9, and further acknowledges that Muthana has "repeatedly [been interviewed] by Western news media," Memo. of Law, ECF No. 9-2 at 22 n.69.  Moreover, another attorney, Hassan Shibly, who purports to represent Plaintiff's family, has stated publicly that he and Muthana have "had many conversations."  Natalie Musumeci, *Hoda Muthana's lawyer: Few people 'resent ISIS' as much as she*, N.Y. Post (Feb. 21, 2019), https://nypost.com/2019/02/21/hoda-muthanas-lawyer-few-people-resent-isis-as-much-as-her.[2] Muthana's numerous contacts with Plaintiff, members of the media, and other individuals defeat Plaintiff's assertion of next-friend standing.  *See Al-Aulaqi*, 727 F. Supp. 2d at 19 (first requirement

---

[2] When ruling on a motion to dismiss under Rule 12(b)(1), a court may consider materials outside the pleadings "to assure itself of its own subject-matter jurisdiction."  *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

of *Whitmore* not met where party on whose behalf next friend sought relief was not "being held incommunicado," and had "communicated with the outside world on numerous occasions").

Plaintiff also has not satisfied *Whitmore*'s second requirement—that "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate." 495 U.S. at 163. Although courts have held that parents typically satisfy this requirement, *see, e.g.*, *Vargas v. Lambert*, 159 F.3d 1161, 1168 (9th Cir. 1998), even where the next friend has a family relationship with the absent party courts still examine whether the "next friend" is acting in accord with the absent party's wishes.[3] "[C]ourts have refused to infer—simply on the basis of a close familial tie—that a putative 'next friend' actually represents the absent party's best interests." *Al-Aulaqi*, 727 F. Supp. 2d at 22 (citations omitted).

Here, Plaintiff has not made an adequate showing that he is acting in accord with Muthana's interests. "A purported 'next friend' may not simply speculate as to the best interests of the party on whose behalf he seeks to litigate." *Id.* at 20. Plaintiff alleges that Muthana wishes to return to the United States and is ready to face the consequences of her actions—including possible criminal prosecution and incarceration. Compl. ¶ 9. But Muthana's own past statements raise questions regarding whether Muthana and Plaintiff are aligned on this point. *See id.* (considering party's public statements in determining whether party's putative next friend was aligned with party's interests). In 2015, Muthana posted a picture of her U.S. passport online, writing, "Bonfire soon,

---

[3] *See Idris v. Obama*, 667 F. Supp. 2d 25, 29 (D.D.C. 2009) (brother of a Guantanamo Bay detainee could not be said to be acting in the detainee's "best interests" because he had not met with the detainee since his confinement began); *Hauser v. Moore*, 223 F.3d 1316, 1322 (11th Cir. 2000) (expressing serious "reservations" about whether a prisoner's "biological mother, who gave [him] up for adoption," was dedicated to his best interests rather than being "motivated solely by [her] desires to block imposition of the death penalty"); *Davis v. Austin*, 492 F. Supp. 273, 276 (N.D. Ga. 1980) (denying next-friend standing to a prisoner's cousin who had "not visited [the prisoner] in over a year and ha[d] had only two contacts with him during that period").

no need for these anymore."   Ellie Hall, *Gone Girl: An Interview With An American In ISIS*, Buzzfeed   News   (Apr.   17,   2015),   available   at https://www.buzzfeednews.com/article/elliehall/gone-girl-an-interview-with-an-american-in-isis.  And Muthana has admitted she has not been truthful with Plaintiff in the past about her desire to leave Syria. "It would never cross my mind to come back," she told a reporter about a previous request for assistance she had made to Plaintiff.  "I wanted to see if he'd help me out during troubling times.  It was just a test.  I knew he wouldn't send me anything anyway." *Id.*  Although Muthana has apparently given contradictory statements,[4] these points raise serious doubt about Plaintiff's plea for next-friend status and confirm that he has not adequately alleged such status.

"[W]here a party's own views as to his best interests appear to conflict with those of a putative "next friend," a court cannot substitute the views of the would-be 'next friend' for those of the absent party, even where the purported 'next friend'" is a loving parent who wants only what he rationally believes to be in the best interests of his adult child.  *Al-Aulaqi*, 727 F. Supp. 2d at 22.   Given the potentially serious consequences Muthana would face on account of her association with ISIS if she were to return to the United States, coupled with her past comments and actions that conflict with the relief Plaintiff now purports to seek on her behalf, Plaintiff has failed to demonstrate that he is acting in accord with Muthana's desires and interests.

Based on public reporting, Muthana has been in contact with counsel and could easily have authorized this litigation through that counsel had she so wanted.  Accordingly, the Court should

---

[4] *Compare, e.g.*, Hall, *Gone Girl: An Interview With An American In ISIS* (picture posted online by Muthana of her U.S. passport online, writing, "Bonfire soon, no need for these anymore"), *with* Rukmini Callimachi and Alan Yuhas, *Alabama Woman Who Joined ISIS Can't Return Home, U.S. Says*, N.Y. Times (Feb. 20, 2019) (Muthana's counsel Hassan Shibly stating that she "is trying to turn herself in to federal authorities and face consequences for her actions").

dismiss Counts 1 through 8 for lack of jurisdiction because Plaintiff has not established next-friend standing.  *See* Fed. R. Civ. P. 12(b)(1).

    2.    <u>Muthana Is Not and Was Never a U.S. Citizen</u>

Plaintiff's next-friend claims, Counts 1 through 8, all rest on a fundamental and dispositive error—the assertion that Muthana is a U.S. citizen.  She is not and never was a U.S. citizen.  Muthana's parents enjoyed diplomatic-agent-level immunity at that time of her birth, meaning that she was born not subject to the jurisdiction of the United States and thus could not and did not acquire U.S. citizenship at birth.[5]  And because A.M.'s only claim to citizenship rests on his mother (Muthana) being a U.S. citizen, the claims related to A.M. must also be dismissed.  *See* Compl. ¶¶ 86–92 (Count 6).

In particular, and as explained below, the Court should dismiss Counts 1 through 8 for failure to state a claim because the allegations in the complaint and the exhibits to the complaint, if taken as true, fail to establish that Muthana is a U.S. citizen.  If the Court believes that it cannot conclude that Muthana is not a U.S. citizen solely on the basis of the complaint and exhibits, and believes that it cannot rely on the relevant government records on a motion to dismiss, Defendants move in the alternative for summary judgment on these claims based on the undisputed facts and the attached Department of State certification and contemporaneous underlying official records.

---

[5] Because Muthana and her parents enjoyed diplomatic-agent-level immunity at the time of her birth, the Court need not decide the issue advanced by *amicus* that Muthana still would not be a U.S. citizen because her parents were not legal permanent residents.  *See* Brief of *Amicus Curiae* Center for Constitutional Jurisprudence, ECF No. 16.  If the Court were to determine that it is necessary to reach that issue notwithstanding the government's arguments for dismissing Plaintiff's next-friend claims, however, *amicus* raises a serious legal question that would merit further briefing.

a) The Allegations in the Complaint and Exhibits to the Complaint Fail to Establish that Muthana Is a U.S. Citizen—So All of Plaintiff's Next-Friend Claims Fail

The Fourteenth Amendment to the U.S. Constitution confers citizenship on persons "born or naturalized in the United States, *and subject to the jurisdiction thereof.*"   U.S. Const. amend. XIV, § 1 (emphasis added); *see also* 8 U.S.C. § 1401(a).   The Supreme Court has long held that the phrase "subject to the jurisdiction thereof" excludes from the coverage of the Fourteenth Amendment's citizenship clause children born in the United States to foreign ministers or diplomatic officers representing foreign nations.   *Wong Kim Ark*, 169 U.S. at 693 ("The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers . . . ."); *Nikoi v. Attorney Gen.*, 939 F.2d 1065, 1066 (D.C. Cir. 1991) ("Because one parent was a foreign official with diplomatic immunity when each child was born, the birth did not confer United States citizenship.").

It is critical to Plaintiff's next-friend claims that Plaintiff enjoyed diplomatic-agent-level immunity when Muthana was born.   As explained above, the Vienna Convention governs that issue.   Article 10 of the Convention requires a sending State to notify the receiving State of "[t]he appointment of members of the mission [and] their arrival."   Vienna Convention, art. 10(1)(a). When someone is appointed to a permanent mission to the United Nations, the individual's sending State must first notify the United Nations Office of Protocol.   Declaration of James B. Donovan (Mar. 3, 2019) ¶ 3 (attached hereto as Exhibit A).   Once the United Nations Office of Protocol accepts the accreditation of the individual, it notifies USUN and requests that the United States afford the individual the appropriate privileges and immunities.   *Id.* ¶ 4.   Article 39 of the Convention states that "[e]very person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if

17

already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed." Vienna Convention, art. 39(1). Article 37, in turn, extends the privileges and immunities specified in Articles 29 to 36 to "members of the family of a diplomatic agent forming part of his household." *Id*. art. 37(2).

In like manner, Article 10 of the Vienna Convention requires a sending State to notify the receiving State of the "final departure or the termination of [members'] functions with the mission." Vienna Convention, art. 10(1)(a). When someone serving in a permanent mission to the United Nations is terminated, the individual's sending State must first notify the United Nations Office of Protocol. Donovan Decl. ¶ 9. Once the United Nations Office of Protocol receives a notice of termination of the individual, it notifies USUN. *Id*. Article 43 of the Convention, in turn, specifies that "[t]he function of a diplomatic agent comes to an end . . . on *notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end*." Vienna Convention, art. 43(a) (emphasis added).[6] Notification from the sending State is the normal method for establishing the date that immunity ends.[7] *See Raya v. Clinton*, 703 F. Supp. 2d 569, 578 (W.D. Va. 2010) ("[T]he Vienna Convention requires sending countries to provide formal notice of a diplomatic agent's appointment and termination, and specifically states that an agent's diplomatic functions come to an end on notification of termination by the sending

---

[6] Article 43 further specifies that the function of a diplomatic agent may also come to an end "[o]n notification by the receiving State to the sending State that . . . it refuses to recognize the diplomatic agent as a member of the mission." Vienna Convention, art. 43(b).

[7] Although not relevant to this case, the Vienna Convention allows for a receiving State to terminate privileges and immunities if the receiving State determines that a member of a sending State is no longer employed at the diplomatic mission. *See* Vienna Convention, art. 43(b) (the function of a diplomatic agent may also come to an end "[o]n notification by the receiving State to the sending State that . . . it refuses to recognize the diplomatic agent as a member of the mission").

country.").   If the United States receives a timely notification of termination, immunity then subsists for a reasonable period after the termination date as notified by the foreign government so that the foreign mission member has a reasonable time to depart, unless it is a late notice received more than 30 days after the date of termination.   Vienna Convention, art. 39(2) ("When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so . . . .").  That is, if the United States had been properly notified on August 25, 1994, that Plaintiff's termination date was September 1, 1994, he and his family would have continued to enjoy diplomatic-agent-level privileges and immunities until October 1, 1994.   But when the notice of termination is received more than 30 days after the date of termination, the immunities cease on the date of notification.  *See Id*., art. 9(2) ("If the sending State refuses or fails within a reasonable period to carry out its obligations under paragraph 1 of this Article, the receiving State may refuse to recognize the person concerned as a member of the mission."); 43(b) ("[t]he function of a diplomatic agent comes to an end . . . on notification by the receiving State to the sending State that, in accordance with paragraph 2 of Article 9, it refuses to recognize the diplomatic agent as a member of the mission.").

Under these principles, Plaintiff's Counts 1 through 8 must be dismissed because the undisputed facts establish that Muthana did not acquire U.S. citizenship at birth.  Plaintiff alleges that he was terminated from his diplomatic position with the Yemeni Mission to the United States "no later than September 1, 1994."  Compl. ¶ 42.  It is undisputed that USUN was not formally notified of his termination, however, until February 6, 1995.  *Id*., Ex. D.  Thus, under the plain terms of the Vienna Convention, and consistent with the practice of the United States regarding individuals accredited to permanent missions to the United Nations, Plaintiff's diplomatic status

ceased on February 6, 1995—the date the receiving State (the United States, through USUN) received notice of his termination. *See* Vienna Convention, art. 43 ("The function of a diplomatic agent comes to an end . . . on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end"). In the meantime, Muthana was born in New Jersey on ████████ 1994. Compl. ¶ 20.

Because USUN did not receive timely notification of Plaintiff's termination, the Department of State afforded Plaintiff's family, including Muthana, immunity through the date of notification, February 6, 1995. When Muthana was born in New Jersey on ████████ 1994, she enjoyed diplomatic-agent-level immunity through her father and, therefore, was born not "subject to the jurisdiction" of the United States and did not acquire U.S. citizenship at birth. *Wong Kim Ark*, 169 U.S. at 693 ("[t]he Fourteenth Amendment affirms the . . . rule of citizenship by birth within the territory . . . with the exceptions or qualifications . . . of children of foreign sovereigns or their ministers"). Because Plaintiff's next-friend claims all rely on Muthana's purported acquisition of U.S. citizenship at birth, they all necessarily fail.

This conclusion makes good sense. Relying on the date of notification of termination, which both accords with the plain language of the Vienna Convention and reflects U.S. practice regarding members of UN permanent missions and foreign missions to the United States, is critical to our foreign relations. The Supreme Court has emphasized the overriding importance of "the concept of reciprocity that governs much of international law" on diplomatic privileges and immunities, as well as other strong reasons "to protect foreign diplomats in this country":

> Doing so ensures that similar protections will be accorded those that we send abroad to represent the United States, and thus serves our national interest in protecting our own citizens. Recent history is replete with attempts, some unfortunately successful, to harass and harm our ambassadors and other diplomatic officials. These underlying purposes combine to make our national interest in protecting diplomatic personnel powerful indeed.

*Boos v. Barry*, 485 U.S. 312, 323–24 (1988).  By relying on the date of notification of termination, the United States preserves foreign governments' control over when their emissaries' functions and immunity ends, absent notice from the receiving State that ends such recognition under Article 43(b) (normally for bad acts by a member of a foreign mission resulting in expulsion).[8]  This approach—of giving primacy to notice of termination by the sending State—is critical to preserving the United States' own ability to control when the immunities granted to our own diplomats serving overseas end.  For example, the United States would not want a foreign State to determine—without formal notification from the United States—that one of our mission members is no longer employed by the Embassy or to commence a criminal prosecution based on the foreign State's own determination of employment (or not) by the United States.  *See* Vienna Convention, preamble ("the purpose of such privileges and immunities is . . . to ensure the efficient performance of the functions of diplomatic missions as representing State").  Relying on the date of notification to determine when diplomatic immunity ends avoids second-guessing and gives the States— through this notice process—control over when diplomatic immunity begins and ends.  Under the principles of reciprocity that govern foreign relations, this rule is of paramount importance to the safety and security of U.S. diplomats abroad.

---

[8] *See* Vienna Convention, art.43(b) (providing that the function of a diplomatic agent comes to an end "on notification by the receiving State to the sending State that, in accordance with paragraph 2 of Article 9, it refuses to recognize the diplomatic agent as a member of the mission."); *see also id.*, art. 9(2) ("If the sending State refuses or fails within a reasonable period to carry out its obligations under paragraph 1 of this Article, the receiving State may refuse to recognize the person concerned as a member of the mission."); *id.*, art. 9(1) ("The receiving State may at any time and without having to explain its decision, notify the sending State that . . . any member of the diplomatic staff of the mission is persona non grata . . . .  In any such case, the sending State shall, as appropriate, either recall the person concerned or terminate his functions with the mission").

Plaintiff maintains that the date of termination of a diplomatic position—rather than the date of notification of termination—governs diplomatic status.  Compl. ¶ 42.  As just explained, the law provides otherwise.  A foreign diplomat enjoys immunity from the time the receiving State confers such immunity until the time the receiving State terminates it, and, consistent with the Department of State's routine and usual practice, Plaintiff's diplomatic-agent-level immunity was in effect until USUN received formal notice of his termination from the U.N. Office of Protocol on February 6, 1994.  None of Plaintiffs' arguments to the contrary has merit.

*First*, at the March 4, 2019 hearing on Plaintiff's request for expedited consideration of the complaint, Plaintiff argued that a sending State could misuse the process afforded parties to the Vienna Convention, under which diplomatic immunity ends upon notification to the receiving State, and that the Court should therefore accept Plaintiff's position that diplomatic immunity ends upon termination.  Mar. 4, 2019 Hearing Transcript at 33:25–34:7 (positing that a sending State "could discharge one of the members of their diplomat part[y] and send that person out to commit acts of espionage and sabotage fully cloaked with the deniability that they're being done on behalf of the country because we discharged them; but with the full knowledge that that person would be able to operate with absolute impunity from the law because they didn't send a notification").

Plaintiff's argument—which is predicated on a signatory purposefully and intentionally violating the Vienna Convention—directly conflicts with the terms of the Vienna Convention and is wildly implausible.  The Vienna Convention directs that "[t]he function of a diplomatic agent comes to an end . . . *on notification by the sending State to the receiving State* that the function of the diplomatic agent has come to an end."  Vienna Convention, art. 43 (emphasis added); *see also id*., art. 43(b) (the function of a diplomatic agent may come to an end "[o]n notification by the receiving State to the sending State that . . . it refuses to recognize the diplomatic agent as a

member of the mission."). So Plaintiff's hypothesized scenario would flout the United States' own negotiated agreement with other counties to rely on the notification of termination. *Logan v. Dupuis*, 990 F. Supp. 26, 29 (D.D.C. 1997) (a "treaty is to be interpreted 'in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose.'") (citing the Vienna Convention on the Law of Treaties, art. 31(1), May 23, 1969, 1155 U.N.T.S. 331).

Plaintiff's hypothetical is also incongruent with the reasons a State enters into the Vienna Convention in the first place, *see* Vienna Convention, preamble (that the purpose of the Convention is to "maintain[] . . . international peace and security and "promot[e] . . . friendly relations among nations"), and is contrary to the foundations of international law—comity, mutuality, and reciprocity, *see Hilton v. Guyot*, 159 U.S. 113, 228 (1895) (recognizing the "that international law is founded upon mutuality and reciprocity"); *The Schooner Adeline*, 13 U.S. 244, 285 (recognizing "the principles of international law, comity and reciprocity"). Under the Vienna Convention, a sending State is *required* to provide notice of termination, *see* Vienna Convention, art. 10(1)(a), and a person enjoying privileges and immunities has a duty "to respect the laws and regulations of the receiving State," *id.*, art 41(1). If a signatory is prepared to violate the express terms of the Vienna Convention to abuse a receiving State's grant of diplomatic immunity as posited in Plaintiff's hypothetical, there is no reason to think a sending State would not further violate the Vienna Convention and use *current* members of its diplomatic mission to engage in espionage and other bad acts.

And the gambit that Plaintiff's counsel posits would almost certainly fail. Given that the sending State would be responsible for having failed to provide the notice of termination (in contravention of the Vienna Convention) and that the "former" diplomat's action would

presumably be of benefit to the sending State, it seems highly unlikely that anyone would be fooled by the sending State's chicanery.   Moreover, if the receiving State was not aware of the termination—because notice had not been provided—it would be even more likely to attribute the actions of the agent to the sending State.   So the sending State would likely suffer the political and diplomatic repercussions of its agent's misconduct regardless.   On top of all of this, the hypothetical ignores the authority of the receiving State to terminate diplomatic privileges by providing notice to the sending State if concerns arise regarding an individual in a diplomatic mission.   *See* Vienna Convention, art. 43(b).

Indeed, because the Convention expressly provides for notice to the sending State or by the receiving State to terminate diplomatic privileges, this hypothetical concern for abuse provides no basis to depart from these express terms of the Convention.   Plaintiff asks the Court to depart from the Convention's plain language and thereby create uncertainty between the United States and signatories to the Vienna Convention.   The Court should not do so.   *See Tabion*, 73 F.3d at 537 ("Treaties are contracts between sovereigns, and as such, should be construed to give effect to the intent of the signatories.").   Plaintiff's position will adversely affect U.S. diplomats abroad and U.S. interests.   *See Hellenic Lines, Ltd v. Moore*, 345 F.2d 978, 980 (D.C. Cir. 1965) (purpose of diplomatic immunity is "to 'contribute to the development of friendly relations among nations' and to 'ensure the efficient performance of the functions of diplomatic missions'") (citing the Vienna Convention, preamble).   As explained above, the Vienna Convention serves to protect the functions of U.S. diplomatic missions and members of U.S. diplomatic missions, and the United States relies on the date of notification of termination to ensure that the diplomatic immunity of U.S. diplomats is not terminated prematurely and without knowledge of the United States in violation of the Vienna Convention.

*Second*, in support of Plaintiff's argument that diplomatic-agent-level immunity "last[s] only as long as the diplomatic position itself," Plaintiff points to a 2004 letter by Russell F. Graham, a minister counselor at USUN.  *See* Compl., Ex C.  Plaintiff alleges that he provided the Department of State with a copy of this letter in support of Muthana's 2005 passport application. Compl. ¶ 21.  The letter, however, is not addressed to Plaintiff or to the Department of State, but rather to the Bureau of Citizenship and Immigration Services, *id.,* Ex. C, a component of the Department of Homeland Security that has no role in either passport issuance or the conferral or termination of diplomatic-agent-level immunity.  The letter does not state for what purpose it was issued, and it is unclear how Plaintiff obtained the letter.

In any event, the letter notes two dates: Plaintiff's date of appointment, October 15, 1990; and date of termination, September 1, 1994.  *Id.*  The letter does not purport to state or analyze when the Department of State no longer afforded Plaintiff's diplomatic privileges, nor does it address the question at issue here: namely, what immunities Plaintiff enjoyed between September 1, 1994, and the date USUN was formally notified of Plaintiff's termination, February 6, 1995. The letter does not address Muthana or her birth at all.  Rather, the letter states, correctly, that diplomatic privileges and immunities existed during Plaintiff's period of employment and makes no assessment of the period at issue in this suit.  The letter, in other words, indicates that Plaintiff enjoyed diplomatic immunity during his period of employment.  It does not, however, establish that his immunity ceased prior to the date USUN was notified of his termination.

*Third*, Plaintiff cites *United States v. Khobragade*, 15 F. Supp. 3d 383 (S.D.N.Y. 2014), and *United States v. Guinand*, 688 F. Supp. 774 (D.D.C. 1988), as support for his claim that the date of termination governs immunity.  Compl. ¶ 41.  Neither case helps him, however, because neither case addresses the distinction between the date that a person is terminated and the date that

the United States is notified of termination.  In *Khobragade*, the defendant was a member of the Indian permanent mission to the United Nations with diplomatic-agent-level immunity who, after being criminally indicted, departed the United States.  15 F. Supp. 3d at 386.  The case does not address the legal significance of the termination date and does not hold that diplomatic immunity under the Vienna Convention ends upon termination.  *Id.*

Nor does *Guinand* address the date of notification of termination or hold that immunity ceases upon termination rather than notification.  It simply states, as a general matter, that U.S. criminal jurisdiction may be exercised "over persons whose status as members of the diplomatic mission has been terminated for acts they committed during the period in which they enjoyed privileges and immunities," *Guinand*, 688 F. Supp. at 775.

The entirety of Plaintiff's next-friend claims rests on a flawed legal position about the time period during which the Department of State afforded Plaintiff diplomatic-agency-level immunity.[9]  Under settled law, Muthana was born to a father who enjoyed diplomatic-agent-level immunity at the time of her birth and, therefore, was not born "subject to the jurisdiction" of the United States.  As a result, she did not acquire U.S. citizenship at birth.  Therefore, the Court should dismiss Counts 1 through 8 for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).

---

[9] Plaintiff incorrectly suggest that the immigration status of Basmeh M. Elshayri, Muthana's mother, is relevant to the question whether Muthana acquired U.S. citizenship at birth.  Compl. ¶ 19. As a non-U.S. national member of Plaintiff's household, Elshayri also enjoyed diplomatic-agent-level immunity.  Vienna Convention, art. 37(1) ("The members of the family of a diplomatic agent forming part of his household shall, if they are not nationals of the receiving State, enjoy the privileges and immunities specified in Articles 29 to 36").  So Elshayri's purported immigration status is not relevant and does not alter the result—the complaint must be dismissed.

> b)   The Attached Department of State Certification and Underlying Records Confirm that Muthana Did Not Acquire U.S. Citizenship at Birth

If Court believes that it cannot conclude that Muthana is not a U.S. citizen solely on the basis of the complaint and exhibits, and it determines that it cannot rely on the official government records included herewith in addressing the motion to dismiss, the Court should grant summary judgment to Defendants on the issue based on the undisputed facts and the attached Department of State certification and underlying records.

Although there is some question whether Plaintiff was terminated from his diplomatic position in June or in September 1994, any dispute on that point is irrelevant to any issue in this case.  Plaintiff and Defendants agree that Plaintiff was terminated "no later than September 1, 1994."  Compl. ¶ 42.  There is also no dispute that Muthana was born in New Jersey on ███ ██ 1994.  *Id.* ¶ 20.  Finally, Plaintiff does not dispute that USUN was not officially notified of Plaintiff's termination until February 6, 1995.  *Id.*, Ex. D.

The attached certification and contemporaneous records from the Department of State confirm that Muthana was born not subject to the jurisdiction of the United States and thus did not acquire U.S. citizenship at birth.  The Court can and should grant summary judgment on this basis.

*First*, the attached Department of State certification—which addresses Plaintiff's diplomatic status at the time of Muthana's birth—conclusively establishes that the Department of State still afforded Plaintiff diplomatic-agent-level immunity at the time of Muthana's birth and that Muthana thus did not acquire U.S. citizenship at birth.  Certification of James B. Donovan, Minister-Counselor for Host Country Affairs at USUN (Mar. 1, 2019) (attached hereto as Ex. B). This certification shows: that the United States was not formally notified of Plaintiff's termination from his diplomatic post until February 6, 1995; that the Muthana family continued to enjoy diplomatic-agent-level immunity until that date; and that Muthana therefore was not born "subject

to the jurisdiction" of the United States and thus did not acquire U.S. citizenship at birth.  Donovan Certification.

Under established law that has been consistent for over a century, when the Department of State certifies the diplomatic status of an individual, "the courts are bound to accept that determination."  *Abdulaziz*, 741 F.2d at 1339.  The "certificate of the secretary of state . . . is the best evidence to prove the diplomatic character of a person."  *In re Baiz*, 135 U.S. 403, 421 (1890); *see also United States v. Al-Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004) ("[W]e hold that the State Department's certification, which is based upon a reasonable interpretation of the Vienna Convention, is conclusive evidence as to the diplomatic status of an individual.  Thus, we will not review the State Department's factual determination that, at the time of his arrest, Al-Hamdi fell outside the immunities of the Vienna Convention.").  Thus, the attached Department of State certification ends the factual inquiry into Plaintiff's diplomatic status at the time of Muthana's birth.  *See Abdulaziz*, 741 F.2d at 1331 ("[O]nce the United States Department of State has regularly certified a visitor to this country as having diplomatic status, the courts are bound to accept that determination.").

*Second*, although the Department of State's certification of Plaintiff's status is dispositive under the law, it is based upon contemporaneous government records that show conclusively that USUN did not receive formal notification of Plaintiff's termination until February 6, 1995.  When an individual comes to work at his or her country's permanent mission to the United Nations, the sending State sends a notification of appointment to the United Nations Office of Protocol.  Donovan Decl. ¶ 3.  After accepting the accreditation, the United Nations Office of Protocol then notifies USUN of the appointment.  *Id.* ¶¶ 4, 5.  The United Nations uses the same process to notify USUN of a termination.  *Id.* ¶¶ 12–14.

Contemporaneous records reflecting these processes establish that the United States was not formally notified of Plaintiff's termination until February 6, 1995.  As explained in the attached Department of State declaration, at the time of Plaintiff's service at the United Nations, USUN maintained its privileges-and-immunities records in what was known as the KARDEX system.  *Id.* ¶¶ 7–11.   Under this system, each accredited diplomat had a paper card reflecting relevant information, including the diplomat's name and place of birth, information about the diplomat's family members, and dates for the beginning and end of the diplomat's privileges and immunities. The KARDEX card for Plaintiff, *id.*, Ex. 1, is clearly annotated to record the termination of his diplomatic-agent-level privileges and immunities as February 6, 1995.  *Id.*, Ex. 1.

Plaintiff's card also reflects an annotation recording the birth of Muthana, with her place and date of birth.  *Id.,* Ex. 1.  This annotation is significant because it indicates that USUN, at the time that it received notification of Muthana's birth, had not terminated Plaintiff's privileges and immunities.  There would have been no reason to annotate the card to reflect the addition of a new child if Plaintiff was not then enjoying such privileges and immunities.  *Id.* ¶ 19.  The annotation thus reflects the Department of State's view that Muthana, like her family, enjoyed diplomatic immunity and that she was not born subject to the jurisdiction of the United States.  The attached Department of State declaration also explains the importance of relying on the date of notification of termination in determining when diplomatic privileges and immunities end: "We rely on the official notification date because anything short of that, such as reliance on hearsay about the status of a diplomat, could erroneously expose an accredited diplomat to the jurisdiction of the United States, when in fact, under applicable international law, he or she would enjoy immunities."  *Id.* ¶ 14.

Nothing in Plaintiff's complaint conflicts with the certification or the underlying contemporaneous government records or raises any potential dispute on a material fact. The complaint alleges that Plaintiff—Muthana's father—served as First Secretary from October 15, 1990, until sometime in 1994. Compl. ¶¶ 18, 25, 42, Ex. D. This is entirely consistent with the attached certification and underlying records. *See* Donovan Certification; Donovan Declaration ¶ 18, Ex. 2, Ex. 3. The complaint also does not dispute that USUN was not officially notified of Plaintiff's termination until February 6, 1995. Compl. ¶ 21, Ex. D. Again, this is consistent with the attached certification and records. *See* Donovan Certification; Donovan Declaration ¶ 18, Ex. 1, Ex. 2, Ex. 3. Accordingly, when Muthana was born on ██████ 1994, Compl. ¶ 20, her father enjoyed diplomatic-agency-level immunity because the United Nations had not yet notified USUN of his termination and the Department of State continued to update its records system, KARDEX, showing that the United States still afforded him diplomatic-agency-level immunity. *See* Vienna Convention, art. 43 ("The function of a diplomatic agent comes to an end . . . on notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end . . . ."). This in turn meant that Muthana was born with diplomatic-agent-level immunity because she was a member of her father's household. *See* Vienna Convention, art. 37(2) (extending diplomatic immunity to "members of the family of a diplomatic agent forming part of his household").

Under these principles, it is clear that Muthana is not and never was a U.S. citizen—and that none of the relief Plaintiff seeks on her behalf can be granted. Accordingly, Defendants are entitled to summary judgment on Counts 1 through 8 of the complaint.

3.      Plaintiff Has Not Alleged a Cause of Action to Challenge Muthana's Passport Revocation

Counts 1 through 6 all rest on the assertion that the Department of State somehow revoked Muthana's purported citizenship through its 2016 revocation of her passport.  Even putting aside that Muthana never had U.S. citizenship, this assertion is mistaken.  Counts 1 through 6 should be dismissed for failure to state a claim.

To begin, Plaintiff is incorrect that the Department of State revoked Muthana's citizenship when it revoked her passport on January 15, 2016.  The Department of State did not "revoke" Muthana's *citizenship*.  Rather, the Department revoked her *passport* and explained that it had been issued in error because Muthana had never been a U.S. citizen.  Compl. ¶ 21, Ex. D.  Although an unexpired U.S. passport may be proof of U.S. citizenship, passports "do not confer citizenship; rather they merely provide proof of one's status as a citizen."  *Chacoty v. Tillerson*, 285 F. Supp. 3d 293, 298 (D.D.C. 2018).  Moreover, under the relevant statute, "[t]he cancellation" "of any document purporting to show the citizenship status of the person to whom it was issued"—such as a passport—"*shall affect only the document and not the citizenship status of the person in whose name the document was issued*."  8 U.S.C. § 1504(a) (emphasis added).  So Plaintiff's claims falter at the threshold because they rest on the erroneous assertion that, by revoking Muthana's passport, the Department of State somehow revoked her citizenship.

In any event, Plaintiff has not pleaded a cause of action challenging the revocation of Muthana's passport.  Congress has mandated a specific remedy for a person in Muthana's circumstances—a person whose passport has been revoked on the ground that the person is not a U.S. citizen.  But Muthana has made no effort to use that remedy.  Under 8 U.S.C. § 1503(b), "[i]f any person who is not within the United States claims a right or privilege as a national of the United States and is denied such right or privilege . . . upon the ground that [s]he is not a national of the

United States, such person may make application . . . for a certificate of identity."  8 U.S.C. § 1503(b).  This section "provides plaintiffs an adequate avenue to assert . . . citizenship claims" when an individual's passport has been revoked.  *Xia v. Tillerson*, 865 F.3d 643, 655 (D.C. Cir. 2017).  Muthana, however, has not followed this process or even attempted to follow this process, which includes "both agency obligations *and* a mechanism for judicial enforcement."  *Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018).[10]  Indeed, Plaintiff does not allege in Counts 1 through 6 of his complaint that Muthana has taken *any* of the steps described in 8 U.S.C. § 1503(b) and (c) to seek a "certificate of identity" or to assert her purported claim for U.S. citizenship.

Counts 1 through 6 of the complaint all rest on the erroneous notion that the Department of State revoked Muthana's citizenship when it revoked her passport.  And Plaintiff has not stated a cause of action to challenge Muthana's passport revocation in any event.  Therefore, the Court should dismiss Counts 1 through 6 for failure to state a claim.  *See* Fed. R. Civ. P. 12(b)(6).

4.    Defendants Did Not Violate Procedural Due Process In Revoking Muthana's Passport

In Count 3, Plaintiff alleges that the Department of State violated Muthana's due-process rights when it revoked her passport.  But Plaintiff's own allegations show that this is wrong.

Indeed, the complaint makes clear that Defendants afforded Muthana due process.  "The Constitution's due process guarantees call for no more than what has been accorded here: a statement of reasons and an opportunity for a prompt postrevocation hearing."  *Haig v. Agee*, 453

---

[10] In *Rusk v. Cort*, 369 U.S. 367 (1962), *abrogated in part by Califano v. Sanders*, 430 U.S. 99 (1977), the Supreme Court allowed the plaintiff, whose passport the Department of State had declined to renew on the grounds he had expatriated himself, to bypass 8 U.S.C. § 1503 and bring an Administrative Procedure Act (APA) claim to challenge the passport denial.  *Id.* at 379–80.  But *Califano* rejected *Rusk*'s assumption that the APA is a jurisdiction-conferring statute.  430 U.S. at 105.

U.S. 280, 310 (1981).  Defendants revoked Muthana's passport under 22 C.F.R. § 51.62(a)(2) after

determining that the United States was affording Plaintiff diplomatic-agent-level immunity at the

time of Muthana's birth.  22 C.F.R. § 51.62(a)(2) (the Secretary of State may revoke a passport

that "was illegally, fraudulently or erroneously obtained from the Department"); *see also* 8 U.S.C.

§ 1504 ("The Secretary of State is authorized to cancel any United States passport . . . or certified

copy thereof, if it appears that such document was illegally, fraudulently, or erroneously obtained

from, or was created through illegality or fraud practiced upon, the Secretary.").  In the revocation

letter, the Department of State informed Muthana of the basis for the revocation (a prior erroneous

finding of citizenship) and afforded her an opportunity to challenge the revocation under 22 C.F.R.

§§ 51.70–51.74.  Compl. ¶ 25, Ex D ("You have a right to a hearing under Sections 51.70 through

51.74 of Title 22 of the U.S. Code of Federal Regulations . . . .  Should you desire such a hearing,

you must notify this office in writing within 60 days of receipt of this notice.").  Muthana did not

use that process, and three years have now passed.

Indeed, Muthana took no steps to contest the Department of State's revocation of her

passport in the first place.  Rather, she publicly stated that she no longer needed her U.S. passport.

*See* Hall, *Gone Girl: An Interview With An American In ISIS*.

Department of State regulations provide that "[a] person whose passport has been . . .

revoked . . . may request a hearing to review the basis for the denial, revocation, or cancellation."

22 C.F.R. § 51.70(a).  Here, the Department of State properly notified Muthana of its decision to

revoke her passport and of her opportunity to contest the revocation.  Compl. Ex. D; *see infra* A.5

(discussing the passport revocation process).  Despite being afforded the opportunity to request a

hearing, however, Muthana chose to take no action at all.  The government has satisfied its due-

process obligations.  *See Haig*, 453 U.S. at 309 ("the Government is not required to hold a

prerevocation hearing" before revoking a passport); Compl. ¶ 59 (recognizing that "passports may be suspended without a pre-suspension hearing"); *see also Kelso v. U.S. Dep't of State*, 13 F. Supp. 2d 1, 4–5 (D.D.C. 1998) ("the Fifth Amendment's Due Process Clause imposes on the Secretary of State nothing more than a requirement that she inform Mr. Kelso why his passport has been revoked and permit him to contest her decision promptly before a hearing officer").

Defendants provided Muthana due process in the revocation of her passport. Thus, the Court should dismiss Count 3 for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

5. Courts Lack Authority to Grant Citizenship Claims in Equity

In Counts 4 and 5, Plaintiff asks this Court to apply principles of equitable estoppel to bar the United States from asserting that Muthana is not a citizen. Well-established law, however, precludes courts from exercising equitable powers in a manner that would contravene statutory requirements regarding citizenship, which the Constitution entrusts to Congress. *See* Art. I, § 8, cl. 4 (Congress shall have power . . . [t]o establish a uniform rule of naturalization . . . throughout the United States."). Congress has explicitly set—by statute—the conditions under which U.S. citizenship is conferred at birth, including for those persons "born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401. Once a court determines that a person does not meet the statutory requirements for U.S. citizenship, "the district court has no discretion to ignore the defect and grant citizenship." *Fedorenko v. United States*, 449 U.S. 490, 517 (1981) (internal citation omitted). "Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of [congressionally imposed] limitations." *INS v. Pangilinan*, 486 U.S. 875, 885 (1988); *see also Hizam v. Kerry,* 747 F.3d 102, 110 (2d Cir. 2014) (finding that the Court could not grant

citizenship through their equitable powers where the Department of State revoked a passport after determining it was erroneously issued).

Here, however, Plaintiff asks the Court to wield such purported equitable authority—to disregard statute and controlling case law and instead make a determination of citizenship based on claimed "extraordinary circumstances."  Compl. ¶ 69.  The Court should reject this request.  It is because Plaintiff cannot satisfy the governing requirement—that Muthana have been "subject to the jurisdiction" of the United States at the time of her birth in order to acquire U.S. citizenship— that Plaintiff raises an equitable cause of action.  *See supra* A.3.  As noted, neither "the doctrine of estoppel" nor "the invocation of equitable powers" enables this Court "to confer citizenship in violation of [congressionally imposed] limitations."  *Pangilinan*, 486 U.S. at 885.

Plaintiff also alleges that "[j]urisdiction is further proper under the general equity jurisdiction granted by 28 U.S.C. § 1331(a)."  Compl. ¶ 11.  But as discussed above, a court cannot use its discretionary authority to overcome a plaintiff's failure to meet the congressionally imposed conditions for citizenship.  *See Pangilinan*, 486 U.S. at 885.  Therefore, this Court lacks general equity jurisdiction under 28 U.S.C. § 1331 to grant the relief sought in Counts 4 and 5.  *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1197 (D.C. Cir. 2005) ("We will not expand upon our equitable jurisdiction if, as here, we are restricted by the statutory language, but may only assume broad equitable powers when the statutory or Constitutional grant of power is equally broad.").

The Court should dismiss Counts 4 and 5 for lack of subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), or, in the alternative, for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6).

6.     The United States Does Not Have a Duty to Facilitate Muthana's Return

In Counts 7 and 8, Plaintiff demands that this Court issue a writ of mandamus instructing the United States to bring Muthana and A.M. to the United States and further demands a declaratory judgment that the United States has a duty under international law to facilitate the release and return of Muthana and A.M. to the United States.  Compl. ¶¶ 93–119 (Counts 7 and 8).[11]  Both demands fail.

To start, both demands assume that Muthana is a U.S. citizen.  As explained above, however, Muthana is not and never was a U.S. citizen.  *See supra*.  Next, and as explained below, Plaintiff cites no plainly defined and non-discretionary duty that requires the United States to return a person to the United States, even in cases where the person is a U.S. citizen.  Thus, Plaintiff cannot satisfy the grounds for mandamus relief.  Finally, and as also explained below, Defendants do not have a duty under international law because the Geneva Convention IV ("GC-IV") does not apply in this instance.  So a declaratory judgment is inappropriate.

a)     The United States Does Not Have a Duty to Facilitate the Return of Its Citizens from Abroad

Plaintiff demands that this Court issue a writ of mandamus instructing the United States to bring Muthana and A.M. to the United States.  Compl. ¶ 98.  Mandamus relief is a "drastic and extraordinary remedy" that is "only to be reserved for extraordinary situations."  *Cheney v. U.S.*

---

[11] In Count 8, Plaintiff appears to be asking the Court to issue a writ of mandamus that the United States has an obligation under international humanitarian law to facilitate Muthana's return.  But in his Motion for Expedited Hearing, Plaintiff appeared to characterize Count 8, *id.* ¶¶ 99-116, as also seeking a declaratory judgment.  ECF No. 2 at 3 ("Plaintiff further respectfully requests an expedited hearing on his claim seeking declaratory judgment that U.S. government has an obligation to assist in the return of its citizens from areas of armed conflict, based on U.S. law regarding the rights of citizenship, applicable international law, and the United States' own publically stated policies regarding the repatriation of American citizens.").  For purposes of this motion, Defendants have combined their argument on Plaintiff's Counts 7 and 8.

*Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004). The relief afforded by a writ of mandamus cannot be used to "compel or control a duty in the discharge of which by law [a federal officer] is given discretion" and is appropriate only where the petitioner has exhausted all administrative remedies and the defendant official owes petitioner a clear and nondiscretionary duty. *Work v. United States ex rel. Rives*, 267 U.S. 175, 177–78 (1925). A plaintiff seeking mandamus has the burden to prove that: (1) the defendant has a plainly defined and non-discretionary duty to do a ministerial act; (2) the plaintiff has a clear right to the relief he is seeking; and (3) the plaintiff has no available, adequate remedy. *See Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005).

Here, Plaintiff cites no authority—and Defendants have found none—that supports Plaintiff's assertion that the United States must facilitate the return of its citizens. There is no unqualified right to government assistance for a U.S. citizen to return to the United States. That is made clear by the fact that the government may, and routinely does, burden this right. *See, e.g.*, *Newton v. INS*, 736 F.2d 336, 343 (6th Cir. 1984) (affirming a deportation order of the alien parents of U.S. citizen children—which had the practical effect of removing a citizen from the United States); *see also Acosta v. Gaffney*, 558 F.2d 1153, 1158 (3d Cir. 1977) (finding children of deportable parents had no right for their parents to remain in the United States). Many federal laws make entering the country more difficult or time-consuming for citizens. The United States can deny or revoke a passport for U.S. citizens on grounds unrelated to citizenship, *see generally Haig*, 453 U.S. at 280; *Worthy v. Herter*, 270 F.2d 905, 913 (D.C. Cir. 1959); can conduct lengthy and intrusive searches and inspections of anyone entering the country, *see United States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004); *Rahman v. Chertoff*, 530 F.3d 622, 624 (7th Cir. 2008); and can impose quarantines, *see, e.g.*, 42 U.S.C. § 264; *United States ex rel. Siegel v. Shinnick*,

219 F. Supp. 789, 791 (E.D.N.Y. 1963).  The United States can even extradite its citizens to face trial and imprisonment in another country, which could permanently prevent the citizen's return. *See, e.g.*, *Neely v. Henkel*, 180 U.S. 109, 125 (1901); *Vo v. Benov*, 447 F.3d 1235, 1247 (9th Cir. 2006); *cf. Munaf v. Geren*, 553 U.S. 674, 699–700 (2008) (declining to stop the U.S. military forces from transferring a U.S. citizen to Iraqi criminal custody).  These actions can delay, complicate, or render prohibitively expensive or impossible international travel, including one's return to the United States.

Given these points, Plaintiff has clearly failed to identify the sort of clear duty that would support mandamus relief.  Notably, Plaintiff is not challenging an action by the United States to prevent her travel to the United States.  Rather, Plaintiff asks this Court to issue the extraordinary writ of mandamus, "instructing the United States government to uphold its duties to these two United States citizens and *assist them in returning* to the United States."  Compl. ¶ 98 (emphasis added).  Such an order is plainly not appropriate—Plaintiff has not demonstrated that Muthana and A.M. have "a clear right" to assistance in returning to the United States or that Defendants have "a clear duty to act" to facilitate their return.  *Fornaro*, 416 F.3d at 69.  Moreover, Muthana's own actions belie any claim for mandamus relief.  The circumstances underlying the alleged need for the extraordinary writ—Muthana's alleged internment by Kurdish forces in Syria—are the result of Muthana's own decision to travel abroad to join a foreign terrorist organization.

        b)        **Plaintiff Has Not Adequately Pleaded a Claim for Relief Under Geneva Convention IV**

Plaintiff suggests that the United States has an obligation to aid Muthana and A.M.'s return under international humanitarian law, specifically the GC-IV, Article 48.  Compl. ¶ 106.  Article 48 prescribes that "[p]rotected persons who are not nationals of the Power whose territory is occupied, may avail themselves of the right to leave the territory . . . according to the procedure

which the Occupying Power shall establish." (Geneva) Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287, art. 48 (entered into force Oct. 21, 1950, for the United States Feb. 2, 1956).

Plaintiff's request for relief fails. GC-IV is not self-executing and does not create a judicially enforceable individual right.[12] *See Medellin v. Texas*, 552 U.S. 491, 516 (2008) (holding that a non-self-executing treaty "addresses itself to political, not the judicial department); *Nattah v. Bush*, 770 F. Supp. 2d 193, 204 (D.D.C. 2011) ("[t]he Geneva Convention does not create a right of action for private individuals to enforce its terms).

Plaintiff has not identified a clear and nondiscretionary duty for Defendants to negotiate with a foreign power and facilitate Muthana's and A.M.'s travel to the United States. Therefore, the Court should dismiss Counts 7 and 8 for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).[13]

---

[12] Nor does Article 48 of GC-IV apply to the conflict against ISIS. For example, because Plaintiff asserts that Muthana and A.M. are currently under the authority of a non-State armed group (*i.e.*, the Syrian Defense forces), Mem. of Law at 1, it is unclear what international armed conflict, *i.e.*, "clash between nations," *Hamdan v. Rumsfeld*, 548 U.S. 557, 630 (2006), Muthana and A.M. are held as part of to which Article 48 would apply. *See* DoD Law of War Manual § 3.3.1 (June 2015, Updated Dec. 2016) ("[A] state of war can exist when States are not on opposite sides of the conflict. These other types of conflict are described as 'not of an international character' or 'non-international armed conflict'"), available at: http://ogc.osd.mil/images/law_war_manual_december_16.pdf; § 17.2 ("[I]n the 1949 Geneva Conventions, only Common Article 3 applies to non-international armed conflict."). Also, the United States is not an Occupying Power to which the obligations in Article 48 are addressed.

[13] In addition to the points already made, the Court also lacks subject-matter jurisdiction because the United States has not waived sovereign immunity. Plaintiff has failed to point to any statute waiving sovereign immunity over Counts 1 through 8. "The doctrine of sovereign immunity . . . bars suits against the United States unless immunity specifically is waived by statute." *Johnson v. Williams*, 699 F. Supp. 2d 159, 165 (D.D.C. 2010). First, Plaintiff alleges that this Court has jurisdiction over Counts 1 through 6 solely on the basis of 28 U.S.C. § 1331, Compl. ¶ 11 (seeking a declaratory judgment), but Plaintiff fails to allege any statute that waives sovereign immunity (or, for that matter, that creates a cause of action over which the Court *could* exercise its federal-question jurisdiction if there were a waiver of sovereign immunity). *See Historic E. Pequots v. Salazar*, 934 F. Supp. 2d 272, 282 n.10 (D.C. Cir. 2013) (noting that section 1331 merely confers

**B.      The Court Should Dismiss Plaintiff's Personal Claim (Count 9) Because Plaintiff Lacks Standing to Seek Declaratory Relief on That Claim**

In Count 9, Plaintiff requests that this Court grant him a declaratory judgment that certain potential future conduct will not violate 18 U.S.C. § 2339B.  Compl. ¶¶ 117–28.  The Court should dismiss this claim as well.

First, Plaintiff has not established standing on this claim.  To seek a declaratory judgment, a party must establish Article III standing.  *See Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242 (1952).  Count 9, however, is based on a hypothetical set of necessarily incomplete facts and on outright speculation.  Plaintiff claims that Muthana is no longer a member of ISIS, has ceased support for ISIS, and would use any money Plaintiff provided her to travel, Compl. ¶¶ 123–27, but provides no support whatsoever for any of these assertions.  Such speculation is insufficient to establish standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) ("the plaintiff must have suffered an injury in fact . . . not conjectural or hypothetical").

Second, Plaintiff improperly seeks an advisory opinion.  Any declaratory judgment would be based on hypothetical facts regarding unknowable conduct, events, and matters of intent.  *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 325 (1936) (the "controversy" must necessarily be "of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts").  Plaintiff hypothesizes that Muthana is no longer a member of ISIS or engaging in terrorist activities in support of ISIS, Compl. ¶ 125, and asks this Court to accept this allegation as true and bless his

---

on district courts subject-matter jurisdiction over certain federal causes of action; but does not waive sovereign immunity.).  Second, Plaintiff alleges that this Court has jurisdiction over Counts 7 and 8 on the basis of 28 U.S.C. § 1361, Compl. ¶ 13 (seeking a writ of mandamus), but Plaintiff has not pleaded that the United States has an affirmative duty to Plaintiff.  *See Wash. Legal Found. v. U.S. Sent'g Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996) ("It is well settled," however, that section 1361 "does not by itself waive sovereign immunity.").  At the least, Plaintiff should be required to address this failure of pleading.

providing support to her based on that hypothetical state of affairs, *id.* ¶¶ 126–28.  But the Court

does not know, and cannot know, if these allegations are true or would be true in the future.  *See*

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (holding that

the case was not "fit[] for judicial review" because the facts upon which the case's resolution

depended were not "fully crystalized") (citation omitted)).  This Court cannot provide the advisory

opinion that Plaintiff seeks.  *See Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 377

(D.C. Cir. 2010) ("a federal court does not have jurisdiction to issue an advisory opinion") (citing

*Flast v. Cohen*, 392 U.S. 83, 95 (1968) ("no justiciable controversy is presented . . . when the

parties are asking for an advisory opinion")).

Indeed, Plaintiff asks this Court to speculate on the application of federal law to future

conduct without an investigation (a thorough gathering of the actual facts) or a charging

determination (based on a thorough review of the facts and their application to law) and to, thereby,

co-opt the exercise of prosecutorial judgment and discretion by the Executive Branch.  Moreover,

Plaintiff asks the Court to provide the sort of advice that individuals seek from attorneys every

day—advice on whether their conduct is lawful or places them at risk of prosecution.  This

situation is no different than a taxpayer who would like a court to tell him in advance whether the

latest tax shelter that his tax advisor is promoting would actually be lawful before he uses it.

Granting Plaintiff's request for an advisory opinion here would be just as improper as ruling on a

tax shelter in advance.

Plaintiff also does not allege a constitutional right to transfer money abroad to an adult

child.  Plaintiff's claim therefore falls outside the narrow category of pre-enforcement challenges

that may be brought where a plaintiff alleges "an intention to engage in a course of conduct

arguably affected with a *constitutional interest*, but proscribed by a statute, and there exists a

credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasis added). Plaintiff has not established that he can bring Count 9, and the Court cannot grant declaratory relief on that Count. *See Wycoff Co.*, 344 U.S. at 242 (declaratory-judgment statute held constitutional "only by interpreting it to confine the declaratory remedy within conventional 'case or controversy limits'").

Therefore, the Court should dismiss Count 9 for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).

## CONCLUSION

This Court should dismiss Plaintiff's claims brought as a next friend (Counts 1–8) for lack of jurisdiction or for failure to state a claim. In the alternative, the Court should grant summary judgment to Defendants on Counts 1 through 8 because Muthana is not and never was a U.S. citizen. And this Court should dismiss Plaintiff's claim brought on his own behalf (Count 9) for lack of jurisdiction.

April 26, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

SCOTT G. STEWART
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

CHRISTOPHER A. BATES
Senior Counsel

WILLIAM C. PEACHEY
Director

EDWARD S. WHITE
Senior Litigation Counsel

/s/ Joseph F. Carilli, Jr.
JOSEPH F. CARILLI, JR.
N.H. Bar Identification No. 15311
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4848
E-mail: joseph.f.carilli2@usdoj.gov

*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 26, 2019, the foregoing was filed electronically.  Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

<div style="margin-left:50%">

/s/ Joseph F. Carilli, Jr.
JOSEPH F. CARILLI, JR.
N.H. Bar Identification No. 15311
Trial Attorney
United States Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-4848
E-mail: joseph.f.carilli2@usdoj.gov

*Attorney for Defendants*

</div>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

AHMED ALI MUTHANA,                          )
                                             )
        Plaintiff,                    )
                                             )
      v.                              )        Civil Action No. 1:19-cv-00445-RBW
                                             )
MICHAEL POMPEO, *et al.*,                    )
                                             )
        Defendants.                   )
                                             )

---

**EXHIBIT INDEX TO MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT**

| Exhibit | Title |
|---------|-------|
| A | Declaration of James B. Donovan (Mar. 3, 2019) |
| B | Certification of James B. Donovan (Mar. 1, 2019) |

Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

AHMED ALI MUTHANA,                          )
                                            )
          Plaintiff,                   )
                                            )
      v.                               )          Civil Action No. 1:19-cv-00445-RBW
                                            )
MICHAEL POMPEO, *et al.*,                   )
                                            )
          Defendants.                  )
_____)

## <u>DECLARATION OF JAMES B. DONOVAN</u>

I, James B. Donovan, do hereby declare:

1.     I am a Minister-Counselor for Host Country Affairs at the United States Mission to the United Nations (USUN Host Country Affairs).  I make this declaration based on my personal knowledge and my review of official documents and records maintained by USUN, Host Country Affairs.  If called to testify, I could and would do so competently.

2.     This declaration describes the process by which USUN Host Country Affairs registers and keeps track of foreign government officials assigned to the Permanent Missions of foreign governments to the United Nations (Permanent Mission).  In addition, this declaration addresses the specific records related to a former First Secretary to the Yemeni Mission to the United Nations – Ahmed A. Muthana.

3.     Before a foreign government official can be afforded privileges and immunities, such as those of a diplomatic agent, in the United State as a result of his or her assignment to a Permanent Mission to the United Nations, the individual's sending state must first notify the United Nations (U.N.) Office of Protocol of the individual's appointment, date of assumption of duties, as well as the level of privileges and immunities the sending state requests for the individual to be afforded. This is accomplished when the Permanent Mission sends the U.N. Office of Protocol notification of the appointment of a Permanent Mission member and a request for privileges and immunities for that mission member and the family members forming his or her household.

4.     Once the U.N. Office of Protocol accepts the accreditation of the Permanent Mission member to the United Nations, the U.N. Office of Protocol notifies USUN Host Country Affairs and requests that the United States afford that individual the appropriate privileges and immunities.

5.     If the proposed Permanent Mission member satisfies the criteria for extending privileges and immunities as set forth by the United States, USUN Host Country Affairs sends back to the Permanent Mission a Department of State Diplomatic Identification Card, bearing the permanent mission member's name.  The back of the card indicates the immunities to which the foreign

mission member is entitled.  In the case of a diplomatic agent, it would state that the individual is immune from criminal and civil jurisdiction.

6.      It is important for the Department of State Diplomatic Identification Card to state the level of immunities accorded to the diplomat because different Permanent Mission members may have different levels of immunities.  For example, a member of the support staff of a Permanent Mission to the United Nations would have only immunity from the jurisdiction of the United States for acts performed within his/her official duties or functions.    Such a person would be subject to the criminal jurisdiction of the United States if he/she commits a crime unrelated to official duties as a member of the permanent mission.  Likewise, such an individual would be subject to the civil jurisdiction of the United States and could be held liable for money damages if, for example, the mission member hits a pedestrian while driving on personal time.  By contrast, diplomatic agents enjoy complete criminal and comprehensive civil and administrative immunity from the jurisdiction of the United States and cannot be held liable for crimes or civil torts unless the sending State waives immunity.

7.      In addition to sending the Department of State Diplomatic Identification Card to the Permanent Mission, USUN Host Country Affairs creates its own internal records pertaining to the accredited individual.  Until around 2013, those records consisted of a physical paper card called the KARDEX; additionally, starting in 1984, as an electronic record created in an electronic database known internally as TOMIS.  While USUN Host Country Affairs still uses the TOMIS system, we ceased using the paper KARDEX records around 2013. We have, however, maintained the vast majority of KARDEX records already in existence.

8.      The KARDEX was a card printed on paper stock, which contained the basic and important information about the Permanent Mission member and his or her family members forming part of his or her household.   In addition to the name of the individual, his or her place of birth, the name of the Permanent Mission to which he or she was accredited, and other important details about the mission member, the KARDEX also contained information about any family members forming part of his/her household.

9.      The KARDEX contained information about the beginning and end of the privileges and immunities afforded to the diplomat and the family members forming part of his or her household. Specifically, the KARDEX contained the date of the U.N. appointment, as well as the date of the approval of attachment of privileges and immunities.  Finally, the KARDEX contained a field for the official U.N. Termination Date.   This field was completed when the U.N. Office of Protocol formally notified USUN Host Country Affairs of the Permanent Mission member's termination. Until we received that official notification from the U.N. Office of Protocol, we continued to extend privileges and immunities to a diplomat and the family members forming part of his or her household.

10.      In addition, the KARDEX was updated to reflect the addition of any new family members joining the Permanent Mission member's household each time the U.N. Office of Protocol informed us of such an addition or we learned of the addition through some other channel.  This might occur, for example, when a diplomat was joined by a spouse who had previously been living abroad, or when a diplomat had a new baby.  It was important to update the KARDEX with these

additional family members because, as members of the diplomat's household, they too enjoyed the same level of privileges and immunities as the diplomat.

11.     In addition to recording information on the KARDEX, which we ceased doing in 2013, we also recorded pertinent facts about the foreign mission member in the TOMIS electronic system, including the foreign mission member's "Appointment Date," "Termination Date," and "Termination Received Date." We record the latter two dates because, as explained above, the United States continues to extend the applicable privileges and immunities to the foreign mission member and the family members forming his or her household until we are notified of the individual's termination from the U.N. Office of Protocol.

12.     Though permanent missions are advised, whenever possible, to notify the U.N. Office of Protocol of the terminations of their Permanent Mission members in advance of the departure or termination date, not infrequently, we receive the notification after the mission member had already been terminated by the permanent mission. This is because, the U.N. Office Protocol itself, relies on the Permanent Missions to self-report these terminations. Thus, if a Permanent Mission is dilatory in timely reporting a termination to the U.N. Protocol Office, the U.N. Protocol Office in turn, will be late in notifying us through no fault of its own.

13.     The notifications of the terminations of diplomats at the various permanent missions come to USUN Host Country Affairs from the U.N. Office of Protocol on a weekly basis. The U.N. Office of Protocol compiles this list based on information it receives from the Permanent Missions. According to the policy of the U.N. Protocol Handbook in effect in 1994 and still applicable today, Permanent Missions are required to submit a form called the "Notification of Final Departure" (known as the SG.8) to the U.N. Office of Protocol each time a foreign mission member is terminated from the mission for whatever reason. The SG.8 serves as official notification of departure for the U.N. Office of Protocol.

14.     When the U.N. Office of Protocol sends us notification of termination in advance of the actual termination date, under applicable international law, the foreign mission member enjoys privileges and immunities for a reasonable period after the actual termination date. It has long been our practice to interpret this reasonable period as consisting of 30 days (absent extenuating circumstances). As mentioned above, not infrequently such notification comes after the termination has already occurred. For that reason, it is important to note the actual termination date as well as the "Termination Received Date." The actual termination date shows when the individual's actual employment with the foreign mission ended. The "Termination Received Date," however, shows when USUN Host Country Affairs received notice of the mission member's termination. In the event the "Termination Received Date" postdated the actual termination date, it is "Termination Received Date" that is used to determine the end of the privileges and immunities afforded to that individual and his or her family members.

This is because when the official notification of termination is not timely sent, *i.e.*, there is a gap between the stated actual date of termination and the date the official notification is sent to USUN Host Country Affairs, USUN Host Country Affairs generally (absent circumstances such as a death of a mission member) does not know that the diplomat is no longer employed by the mission until the official notification is received. Without this knowledge, USUN Host Country Affairs cannot

end the diplomat's and his/her family members' privileges and immunities, and does not terminate a diplomat's privileges and immunities without official notice from the United Nations.  We rely on the official notification date because anything short of that, such as reliance on  hearsay about the status of a diplomat, could erroneously expose an accredited diplomat to the jurisdiction of the United States, when in fact, under applicable international law, he or she would enjoy immunities.

15.     For example, if a March 1, 2019 notification from UN Protocol states that a Permanent Mission member was terminated on February 15, 2019, we would extend that individual's privileges and immunities until March 17, 2019, to ensure that he or she receives the 30-day reasonable period from the actual termination date.   Likewise, if a March 1, 2019 notification from UN Protocol states that a Permanent Mission member will be terminated on March 15, 2019, we would extend that individual's privileges and immunities until April 14, 2019, to ensure that he or she receives the 30-day reasonable period from the actual termination date.   If, however, the March 1, 2019 notification states that the individual <u>was</u> terminated on January 1, 2019, the March 1, 2019 day would be the last day that he or she would enjoy privileges and immunities because in essence he or she has already gotten more than the "30-day reasonable period" from the date of the actual termination.

16.     Upon receipt of the weekly termination list form the U.N. Office of Protocol, before 2013, USUN Host Country Affairs would update both the KARDEX and the TOMIS electronic records to reflect both the termination date and the notification-of-termination date.  After updating the KARDEX and TOMIS, USUN Host Country Affairs would retire the paper KARDEX record for that Permanent Mission member from our active files to our retired files.   The KARDEX would then only be accessed in the event questions come up about the foreign mission member's service.

17.     I have reviewed our records pertaining to Mr. Ahmed A. Muthana and have separately provided the Department of State's Certification of his dates of service, as well as the period during which he enjoyed diplomatic-agent-level privileges and immunities as a result of his status a First Secretary with the Yemeni Mission to the United Nations to the U.S. Department of Justice.  In reaching the conclusion in the Certification, I reviewed the following records: (a) KARDEX, (b) TOMIS, and (c) the Termination List sent to USUN Host Country Affairs by the U.N. Office of Protocol informing us of Mr. Muthana's termination.  A copy of each is attached hereto as Exhibit 1, 2, and 3 respectively.

18.     Based on my review of these three records, I am confident that Mr. Muthana continued to enjoy diplomatic-agent-level privileges and immunities until February 6, 1995, because that is the date on which the U.N. Office of Protocol officially notified us that Mr. Muthana's service at the Yemeni Mission had terminated.  In the termination notice from the U.N. Office of Protocol on February 6, 1995, the United Nations informed us that Mr. Muthana had been terminated from the Yemeni Mission in September of 1994.  It was not until we received the official notice of termination from the U.N. Office of Protocol on February 6, 1995, however, that we stopped extending privileges and immunities to Mr. Muthana.  All three records—KARDEX, TOMIS, and the U.N. Termination List—are consistent on the fact that USUN Host Country Affairs received official notification of Mr. Muthana's termination on February 6, 1995.

19.     The fact that Mr. Muthana enjoyed privileges and immunities in the period between September 1994 (the date he was actually terminated from the Yemeni mission according to the Notice provided to us by the United Nations Office of Protocol) and February 6, 1995 (the date USUN Host Country Affairs received official notice of his termination from the UN Office of Protocol), is evidenced by the fact that we added the birth of his daughter Hoda to the KARDEX after her birth in October 1994.   A U.S.-born child, born after the diplomat's privileges and immunities had ended, would not have been added to the diplomat's KARDEX because any such child would have simply been irrelevant to us.   The only reason to add family members forming part of a diplomat's household to the KARDEX is to register the fact that these family members, like the principal diplomat, enjoy certain privileges and immunities.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Dated: March 3, 2019
New York, New York

James B. Donovan
Minister-Counselor for Host Country Affairs
United States Mission to the United Nations

6

Exhibit 1

NAME  Ahmed Ali Saleh MUTHANA

COUNTRY    YEMEN

TITLE:                              PDOB: ▮ /59
      First Secretary                    59
FAMILY MEMBERS:

11·15·90  WIFE: BASNA MOHAMMED
▮ 93   Son: Anwar Ahmed ALI (bny)
       Dau: Arwa Ahmed ALI (bny)
       Dau: HODA (bny ▮94)

P.I.D.     ▮ 2444
VISA:
U.N. APPOINTMENT:   OCT 15 1990
P&I APPROVED:       OCT 19 1990
U.N. TERMINATION:  FEB 6, 1995
STATE I.D. RETURNED:
DEPARTURE INFORMATION:

HOUSEHOLD EMPLOYEES



REMARKS:
fired 6/94

MUTHANA, AHMED ALI SALEH

left   YEMEN

Exhibit 2

**OFM Information System - [Protocol - Muthana, Ahmed Ali]**

Action    Edit    Subsystem    Reports    Admin    Window    Help

Personnel

PID [ ███ ]-2444    Name MUTHANA, AHMED ALI    Personnel Status

Date of Birth ███ 1959    Nationality YEMENI    Family Status    Created By

Immunity NONE    Job (Function) Title FIRST SECRETARY    I-94 G-1    Modified By

Prod Remarks    |    Personal    |    Positions    |    Family Members    |    Immunity Cards    |    Photo

| Status | Country | Mission | City/St | Annex | Position | Job Title | Duty |
|--------|---------|---------|---------|-------|----------|-----------|------|
| | YM | U | NYNY | 0 | D | FIRST SECRETARY | 10/15 |
| | | | | | | | |
| | | | | | | | |

Position Status TERMINATED ▼    Status Date 02/14/1995    Country YEMEN    Mi:

Mission Name PERMANENT MISSION OF THE REPUBLIC OF YEMEN TO THE    City/State NEW YORK, NY

Address 413 E. 51ST ST
NEW YORK, NY 10022

Job Title FIRST SECRETARY    ↓ Employee/Function Title

Position Type DIPLOMATIC AGENT    ▼    Employer PID    Employe

Appointment Notification Date 10/15/1990    Duty Assume Date 10/15/1990

DoS Accreditation Date    White House Accreditation Date

Termination Received Date 02/06/1995    Termination/Rejection Date 09/01/1994

Termination Destination

2

**OFM Information System - [Protocol - Muthana, Ahmed Ali]**

Action   Edit   Subsystem   Reports   Admin   Window   Help

Personnel

| | | |
|---|---|---|
| PID | ▇-2444 | Name MUTHANA, AHMED ALI | Personnel Status |
| Date of Birth | ▇/1959 | Nationality YEMENI | Family Status | Created By |
| Immunity NONE | Job (Function) Title FIRST SECRETARY | I-94 G-1 | Modified By |

Prod Remarks | Personal | Positions | Family Members | Immunity Cards | Photo

To/From Date: Nature, Location

Biography

Personnel

Position   LEFT MSN SEPTEMBER 1994 W/WIFE AND CHILDREN. WILL WORK IN EGYPT C. END 02/1995:
HIS MOTHER-IN-LAW IS USC & HAS PETITIONED FOR PRA STATUS FOR MUTHANA'S WIFE AND
FIRED 6/94  SEE CARDEX
INT'L USA PROGRAM
ONE DAY BUSINESS TRIP, 12/1/1993: VISIT BOEING FACTORY, SEATTLE

Exhibit 3

Terminations/blue list/6 February 1995/Page Four

TUNISIA (continued)

JERANDI, Mr. Othman

Counsellor. Left the Mission and the U.S. on 20 December 1994 from N.Y. on Air France Flt. 007 with wife.

JOMAA, Mr. Ghazi

First Secretary. Left the Mission on 15 January and the U.S. on 24 January 1995 from N.Y. on Air France Flt. 007.

UKRAINE

ANDRIYAKA, Mr. Victor

Second Secretary. Left the Mission and the U.S. on 26 March 1994 from N.Y. on Air Ukraine with wife and son.

VIET NAM

H.E. Mr. LE VAN BANG

Ambassador, Chargé d'Affaires a.i. Left the Mission on 26 January 1995 with wife and children. Transferred to Washington, D.C.

YEMEN

AL-AKBARI, Mr. Gamal O.

First Secretary. Left the Mission and the U.S. in September 1994 from N.Y. by airplane with wife and son.

GHANIM, Mr. Gamil H.

First Secretary. Left the Mission and the U.S. in September 1994 from N.Y. by airplane with wife and children.

MUTHANA, Mr. Ahmed A.

First Secretary. Left the Mission in September 1994 with wife and children. ~~No further information available.~~ *Will have for residence visa in USA in EGYPT C. and Feb. '95 His mother-in-law is USC & has petitioned for USP status for Muthana's wife (+ family).* 2/16/95

Exhibit B



UNITED STATES MISSION TO THE UNITED NATIONS

799 UNITED NATIONS PLAZA
NEW YORK, N.Y. 10017-3505

March 1, 2019

Re: Ahmed Muthana

    This is to certify that I, James B. Donovan, Minister Counselor, Host Country Affairs, at the U.S. Mission to the United Nations, United States Department of State, am responsible for overseeing the registration and maintenance of the official records of diplomatic officers and other employees of foreign governments serving in missions to the United Nations, and their family members.

    The official records of the Host Country Affairs section of the U.S. Mission indicate that Mr. Ahmed A. Muthana was appointed as First Secretary to the Yemeni Mission to the United Nations on October 15, 1990, and together with other family members forming his household, began to enjoy diplomatic agent level privileges and immunities on October 19, 1990.   On February 6, 1995, the United Nations provided the U.S. Mission with official notification of Mr. Muthana's termination from the Yemeni Mission.  The notification noted that Mr. Muthana had been terminated in September of 1994. Mr. Muthana and his family enjoyed diplomatic agent level immunity until February 6, 1995.

James B. Dononvan
Minister Counselor for
Host Country Affairs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AHMED ALI MUTHANA, individually          )
and as next friend of Hoda Muthana          )
and Minor John Doe initials A.M.,          )
                                           )
          Plaintiff,                       )
                                           )
     v.                                    )          Civil Action No. 1:19-cv-00445-RBW
                                           )
MICHAEL POMPEO, *et al.*,                  )
                                           )
          Defendants.                      )
_____)

**[PROPOSED] ORDER**

Before the Court is Defendants' Motion to Dismiss or, in the Alternative, for Partial

Summary Judgment.  Upon consideration of the motion, the opposition, and reply, the arguments

of counsel, and the entire record herein, it is hereby:

ORDERED that Defendants' Motion to Dismiss is GRANTED.  Plaintiff's Complaint is

DISMISSED.


Dated:  _____          _____
                                       HON. REGGIE B. WALTON
                                       United States District Judge