**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

AHMED ALI MUTHANA                            Civil Action No. 1:19-cv-00445-RBW

       *Plaintiff/Petitioner,*

MICHAEL POMPEO, *et al.,*

       *Defendants/Respondents*

**MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF
AND PROPOSED BRIEF OF AMICUS CURIAE
CENTER FOR IMMIGRATION STUDIES**

Pursuant to Local Civil Rule 7(o), the Center for Immigration Studies (CIS), by and through the undersigned counsel, hereby moves for leave to file an amicus curiae brief in support of Defendants/Respondents.

CIS is an independent, nonprofit, nonpartisan research organization that has been recognized by the Internal Revenue Service as a tax-exempt educational organization. Since its founding in 1985, CIS has pursued a single mission—providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about the social, economic, environmental, security, and fiscal consequences of legal and illegal immigration into the United States. CIS has been awarded grants and contracts for immigration research from U.S. federal agencies, including the Department of Justice and the Census Bureau. On more than 125 occasions, CIS has been invited by Congress to provide expert testimony on immigration, including on the specific topic of birthright citizenship. *See, e.g.,* "Birthright Citizenship: Is It the Right Policy for America?", Hearing Before the Subcomm. on Imm. & Border Sec. of the Comm.

on the Judiciary H.R., 114th Cong. 5 (2015) (statement of Jon Feere), available at http://archive.is/fXgZk.

CIS has carefully reviewed the briefs filed in this case by the Plaintiff, the Defendants, and Amicus Curiae Center for Constitutional Jurisprudence (CCJ). CIS believes that its expertise will aid the Court in balancing the arguments presented in those briefs. The Plaintiff's brief focuses on whether the Plaintiff was still a still a "diplomat" when his daughter Hoda Muthana (Ms. Muthana) was born in the United States, on the implicit assumption that the Fourteenth Amendment confers citizenship on the U.S.-born child of any alien who is not protected from U.S. jurisdiction by diplomatic immunity. The Government's brief argues that Plaintiff was still covered by diplomatic immunity when Ms. Muthana was born and therefor does not address whether she would be eligible for birthright citizenship if that immunity had expired. The latter issue is dealt with in the CCJ brief, which details the legislative history of the Fourteenth Amendment and a number of subsequent pronouncements by the courts and the Executive Branch to demonstrate that, even if the Plaintiff's diplomatic status had technically expired before her birth, he (and therefore she) were still not "subject to the jurisdiction" of the United States absent any evidence that he no longer owed "allegiance" to his home country Yemen. The Government acknowledges that "amicus raises a serious legal question that would merit further briefing" should the court conclude that Plaintiff no longer enjoyed diplomatic immunity when Ms. Muthana was born. Mot. to Dismiss at 16 fn. 5.

CIS agrees with the analysis and conclusions of the briefs filed by the Defendants and CCJ, but CIS's brief will argue in addition that (1) the absence of any elucidation of "subject to the jurisdiction" in pertinent statutes and regulations requires the Defendants and this court to abide by the well-evidenced intent of the Framers that only aliens who owe exclusive allegiance to the United States are subjectto its jurisdiction under the citizenship clause; (2) the consent of the

United States to any alleged transfer of "allegiance" by Plaintiff would be needed in order to "subject" Plaintiff "to the jurisdiction" of the United States, and the Government could not reasonably be considered to have consented to an alleged change of allegiance resulting from an event of which it had not even been informed; and (3) the Framer's wariness of automatically conferring citizenship on the children of aliens whose "allegiance" to the United States was uncertain is more pertinent than ever given the current threats of espionage, intellectual property theft, and terrorism from U.S. residents with allegiance to hostile foreign powers.

Counsel for both Plaintiff/Petitioner and Defendants/Respondents have consented to the filing of CIS's proposed amicus brief. Given the expedited schedule, CIS has attached the proposed amicus brief as Exhibit A.

For the reasons set forth above, CIS requests that its motion for leave to file an *amicus curiae* brief be granted and that the attached proposed brief be accepted as filed.

Respectfully submitted,

May 3, 2019

_____
JULIE AXELROD (D.C. Bar no. 1001557)
1629 K Street, NW
Washington, DC 20006
Tel: (703) 888-2442
jba@cis.org

## CERTIFICATE OF SERVICE

The undersigned hereby affirms that the foregoing will be served on all counsel of record via ECF filing.

_____
JULIE AXELROD (D.C. Bar no. 1001557)

Exhibit A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

AHMED ALI MUTHANA                              Civil Action No. 1:19-cv-00445-RBW

       *Plaintiff/Petitioner,*

MICHAEL POMPEO, *et al.,*

       *Defendants/Respondents*


**BRIEF OF AMICUS CURIAE**
**CENTER FOR IMMIGRATION STUDIES**
**IN SUPPORT OF DEFENDANTS/RESPONDENTS**

_____
JULIE AXELROD (D.C. Bar no. 1001557)
1629 K Street, NW
Washington, DC 20006
Tel: (703) 888-2442
jba@cis.org

# TABLE OF CONTENTS

*TABLE OF AUTHORITIES*..................................................................................................*i*

*INTEREST OF AMICUS CURIAE* ......................................................................................*1*

*BACKGROUND* .................................................................................................................*2*

*SUMMARY OF ARGUMENT*...............................................................................................*2*

*ARGUMENT* ......................................................................................................................*3*

    **I.    The Framers of the Fourteenth Amendment intended that "subject to the jurisdiction" include only aliens that were not "subject to any foreign power" and owed "complete allegiance" to the United States and not "to anybody else."** ...............................**4**

    **II.    Case law and other legal precedents concerning the citizenship clause do not mandate birthright citizenship for the U.S.-born children of any alien who is not a diplomat.**.....................................................................................................................**5**

    **III.  No statute or regulation mandates birthright citizenship for the U.S.-born children of any alien who is not a diplomat.**............................................................................**8**

    **IV.    Under *Elk v. Wilkins*, the purported subjection of an alien to U.S. jurisdiction, under the present and similar circumstances, arguably requires the U.S. government's consent.**.......................................................................................................................**11**

    **V.    Allowing the children of those who have no allegiance to the U.S. to have automatic birthright citizenship threatens national security.** ................................................**12**

    **VI.    Given the lack of binding judicial, legislative, or regulatory authority on the application of the Fourteenth Amendment's "subject to the jurisdiction" clause to the U.S.-born children of aliens who are neither diplomats nor lawfully domiciled in the United States, the court should defer to the Defendant's application of that clause to the Plaintiff if the court concludes that the Defendants' interpretation of that clause is reasonable given the relevant legislative history.** ................................................**15**

*CONCLUSION* ................................................................................................................*16*

# TABLE OF AUTHORITIES

## CASES

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010). ...............................................13
*Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014)...............................................13
*Arizona v. United States*, 567 U.S. 387, (2012) ........................................................15
*Benny v. O'Brien*, 58 N.J.L. 36 (1895),......................................................................6
*Elk v. Wilkin*s, 11 U.S. 94 (1884) ......................................................................passim
*FAA v. Cooper*, 566 U.S. 284, 291 (2012) ..................................................................8
Hamdi v. Rumsfeld, 316 F.3d 450 (4th Cir. 2003)......................................................13
*Hamdi v. Rumsfeld, 542 U.S. 507 (2004),* ................................................................12
*People v. McCormick*, 277 P. 3d 238 (Colo. 2011).....................................................10
*Slaughter-House* Cases, 83 U.S. (16 Wall.) 36 (1872) ................................................5
*Trump v. Hawaii*, 138 S. Ct. 2392 (2018). ................................................................15
*Wong Kim Ark*, 169 U.S. 649 (1898)...................................................................passim

## CONSTITUTIONAL PROVISIONS

*Elk v. Wilkin*s, 11 U.S. 94 (1884) .........................................................................5, 6
U. S. Const. amend. XIV § 1 ...............................................................................passim
US Const. Art. 1 § 8 .................................................................................................8

## STATUTES

14 Stat. 27, ch. 31 (April 9, 1866) .........................................................................3, 4
44 Stat. 1234 (Feb. 25, 1927) ...................................................................................10
48 Stat. 1245 (Jun. 27, 1934).....................................................................................10
54 Stat. 1137 ............................................................................................................9
8 U.S.C. § 1401(a).....................................................................................................8

## REGULATIONS AND GUIDANCE DOCUMENTS

8 FAM 101.1-1 (k) ..................................................................................................10
8 FAM 301.1-U (Jun. 27, 2018) ...............................................................................10

## LEGISLATIVE HISTORY

Birthright .................................................................................................................1
Birthright Citizenship: Is It the Right Policy for America?: Hearing Before the Subcomm. on
    Immigration & Border Sec. of the Comm. on the Judiciary H.R., 114th Cong. 5 (2015) ..........1
CONG. GLOBE, 39th Cong., 1st Sess. (1866). ............................................................4
Hearings on H.R. 6127 & H.R. 9980 Before the H. Comm. on Immigration. & Naturalization,
    76th Cong. (1940)...............................................................................................9
S. Rep. No. 82-1137 (Jan 29. 1952). ........................................................................9
WILLIAM HORATIO BARNES, HISTORY OF THE THIRTY-NINTH CONGRESS OF THE UNITED STATES at
    255 (1866). .......................................................................................................7

**FOREIGN CASES**

*Valivov v. Minister of Citizenship & Imm.* [2017] F.C. 132 para. 58 (Can)..................................15

**OTHER AUTHORITIES**

Andrew R. Arthur, \Birthright Citizenship: An Overview, CENTR. IMM. STUD. (Nov. 5, 2018) ....1

*Ben Harrington, The Citizenship Clause and "Birthright Citizenship": A Brief Legal Overview*
     at 3, CONG. RESEARCH. SERV. (Nov. 8, 2018) ........................................................................8

Jon Feere, *Birthright Citizenship in the United States: A Global Comparison*, CENTR. IMM. STUD.
     (Aug, 2010)..........................................................................................................................2

Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 VA. L.
     REV. 455, 479-80 (2015) ......................................................................................................6

Justin Lollman,*The Significance of Parental Domicile Under the Citizenship Clause,* 101 Va. L.
     Rev. 455 (2015) ..................................................................................................................13

Peter H. Schuck, *Can We Revoke Faisal Shahzad's Citizenship?*, WALL ST. J., May 14, 2010 ...14

Press Release, *Federal Prosecutors Unseal Indictments Naming 19 People Linked to Chinese
     'Birth Tourism' Schemes that Helped Thousands of Aliens Give Birth in U.S. to Secure
     Birthright Citizenship for Their Children*, U.S. DEP'T OF J., (Jan. 31, 2019) ............................14

*The Presidents Power of Interpretation*, 56 J. L. & CONTEMPORARY PROB. 35 (1993)...............16

Tim Yin, *The Republic of Choice, the Pledge of Allegiance, the American Taliban*, 40 TULSA L.
     REV. 599 (2005)..................................................................................................................13

W.D. Reasoner, *Birthright Citizenship for the Children of Visitors--A National Security Problem
     in the Making*?, CNTR. IMM. STUD (Mar. 9, 2011).....................................................................2

## INTEREST OF AMICUS CURIAE

The Center for Immigration Studies (CIS) is an independent, nonprofit, nonpartisan research organization that has been recognized by the Internal Revenue Service as a tax-exempt educational organization. Since its founding in 1985, CIS has pursued a single mission–providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about the social, economic, environmental, security, and fiscal consequences of legal and illegal immigration into the United States. CIS has been awarded grants and contracts for immigration research from federal agencies, including the Department of Justice and the Census Bureau. On more than 125 occasions, CIS has been invited by Congress to provide expert testimony on immigration, including on the specific topic of birthright citizenship. *See, e.g.,* Birthright Citizenship: Is It the Right Policy for America?: Hearing Before the Subcomm. on Immigration & Border Sec. of the Comm. on the Judiciary H.R., 114th Cong. 5 (2015) (statement of Jon Feere), available at http://archive.is/fXgZk.

Although a child born in the United States to an alien visitor may not himself be an "immigrant," whether that child is a "birthright citizen" has a very significant impact on the number of persons, including the child, the child's parents, and other relatives of the child, who may ultimately acquire legal permanent residence in the United States. Given CIS's central concern over the number of aliens admitted to permanent U.S. residence and the consequences thereof, CIS has long conducted and published legal and policy research on the topic of birthright citizenship.[1] CIS hopes to use this expertise to give the Court a fuller understanding of the legal and policy issues that surround birthright citizenship and are relevant to this case.

---

[1] *See, e.g.*, Andrew R. Arthur, *Birthright Citizenship: An Overview*, CENTR. IMM. STUD (Nov. 5, 2018), http://archive.is/yHAVo; Jon Feere, *Birthright Citizenship in the United States: A Global Comparison*, CENTR. IMM. STUD. (Aug, 2010), http://archive.is/RMece; W.D. Reasoner, *Birthright Citizenship for the Children of Visitors--A National Security Problem in the Making?*, CENTR. IMM. STUD (Mar. 9, 2011), available at http://archive.is/wCgT0.

## BACKGROUND

The Plaintiff's brief argues that his diplomatic immunity had expired when his daughter Hoda Muthana (Ms. Muthana) was born in the United States and operates on the implicit premise that any child born in the United States to an alien parent who is not entitled to diplomatic immunity is a birthright citizen under the Fourteenth Amendment. The Government argues that the Plaintiff's family unequivocally enjoyed diplomatic immunity when Ms. Muthana was born and therefore does not address the consequences of that immunity having expired. Amicus Center for Constitutional Jurisprudence (CCJ) argues that the Fourteenth Amendment and existing precedent do not mandate birthright citizenship for aliens who are temporarily in the United States, regardless of whether the alien is a diplomat. *See* Brief of Amicus Curiae Center for Constitutional Jurisprudence, ECF No. 16. (CCJ Brief). The Government acknowledges that CCJ "raises a serious legal question that would merit further briefing" should the court conclude that Plaintiff's father no longer enjoyed diplomatic immunity when she was born. Mot. to Dismiss at 16 fn. 5.

## SUMMARY OF ARGUMENT

The Fourteenth Amendment does not mandate U.S. citizenship for children born in the United States to alien parents who at the time were "temporary sojourners" not "domiciled" in the United States. Fourteenth Amendment birthright citizenship applies only to children having at the time of birth at least one parent "subject to the jurisdiction" of the United States, as intended by the Framers of the Fourteenth Amendment.

Senator Trumbull's interpretation was identical to that of Senator Jacob Howard, who introduced the "subject to the jurisdiction" clause. As Senator Howard explained, the phrase "subject to the jurisdiction" in that clause meant "the same jurisdiction in extent and quality as applies to every citizen of the United States now." *Id.* at 2890. The "jurisdiction" that then applied

2

to "every citizen of the United States" was determined by the Civil Rights Act of 1886, enacted only two years earlier, which declared that birthright citizenship applied only to the children of aliens who were "*not subject to any foreign power*, excluding Indians not taxed." 14 Stat. 27, ch. 31 (April 9, 1866) (emphasis supplied).

In accordance with the statement of Senator Howard, the Supreme Court has repeatedly held that the Fourteenth Amendment's citizenship clause should be interpreted within the context of the Civil Rights Act. *See Wong Kim Ark*, 169 U.S. 649, 675 (1898), (describing the Fourteenth Amendment's motivation to prevent the Civil Rights Act's "declaration of rights to depend upon an ordinary act of legislation, which might be repealed by any subsequent Congress"); *Elk v. Wilkins,* 112 U.S. 94, 103 (1884) ("It is also worthy of remark, that the language used, about the same time, by the very Congress which framed the Fourteenth Amendment, in the first section of the Civil Rights Act of April 9, 1866, declaring who shall be citizens of the United States, is 'all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed.'").

## ARGUMENT

Section 1 of the Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." The Amendment does not define "subject to the jurisdiction," no federal statute or regulation supplies a definition, and the Supreme Court has determined the scope of that phrase only in two very exceptional situations, neither of which involved an alien that was not already a lawful permanent resident. Nevertheless, as the CCJ persuasively argues in its amicus brief, those authorities do provide a substantial foundation for interpreting Fourteenth Amendment "jurisdiction" over alien visitors as arising only if, considering all of the circumstances of the

alien's presence (not just his diplomatic status), the alien is rightly considered as owing a greater allegiance to the United States than to his home country.

I.    **The Framers of the Fourteenth Amendment intended that "subject to the jurisdiction" include only aliens that were not "subject to any foreign power" and owed "complete allegiance" to the United States and not "to anybody else."**

Senator Lyman Trumbull, a leader in drafting and enacting the Fourteenth Amendment, was asked why the children of Indians living on reservations would not be considered "subject to the jurisdiction" of the United States given that such Indians were "clearly subject to our jurisdiction, both civil and military." Senator Trumbull replied that "subject to the jurisdiction" meant "complete" jurisdiction and "[not] owing allegiance to anybody else." CONG. GLOBE, 39th Cong., 1st Sess. 2893 (1866).

Senator Trumbull's interpretation was identical to that of Senator Jacob Howard, who introduced the "subject to the jurisdiction" clause. As Senator Howard explained, the phrase "subject to the jurisdiction" in that clause meant "the same jurisdiction in extent and quality as applies to every citizen of the United States now." *Id. at* 2890. The "jurisdiction" that then applied to "every citizen of the United States" was determined by the Civil Rights Act of 1886, enacted only two years earlier, which declared that birthright citizenship applied only to the children of aliens who were "*not subject to any foreign power*, excluding Indians not taxed." 14 Stat. 27, ch. 31 (April 9, 1866) (emphasis supplied).

In accordance with the statement of Senator Howard, the Supreme Court has repeatedly held that the Fourteenth Amendment's citizenship clause should be interpreted within the context of the Civil Rights Act. *See Wong Kim Ark,* 169 U.S. at 675 (describing the Fourteenth Amendment's motivation to prevent the Civil Rights Act's "declaration of rights to depend upon an ordinary act of legislation, which might be repealed by any subsequent Congress"); *Elk v.*

*Wilkins,* 112 U.S. 94, 103 ("It is also worthy of remark, that the language used, about the same time, by the very Congress which framed the Fourteenth Amendment, in the first section of the Civil Rights Act of April 9, 1866, declaring who shall be citizens of the United States, is 'all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed.'").

## II.     Case law and other legal precedents concerning the citizenship clause do not mandate birthright citizenship for the U.S.-born children of any alien who is not a diplomat.

As explained in much greater detail in the CCJ *amicus* brief, within the three decades following enactment of the Fourteenth Amendment, there were a number of decisions by the Executive Branch and by State and Federal courts in which those authorities, in explaining their decisions, expressly interpreted the Fourteenth Amendment's citizenship clause in a manner consistent with the Amendment's legislative history, as inapplicable to temporary alien visitors on the grounds that they still owed primary allegiance to their home country:

1. In 1872 the Supreme Court majority in the *Slaughter-House* Cases, 83 U.S. (16 Wall.) 36 (1872) declared that "the main purpose" of the Fourteenth Amendment's citizenship clause "was to establish the citizenship of the negro" (most of whom had been domiciled in the United States for many generations and were entirely disconnected from any tribe or nation that might exert a claim of allegiance) and that "subject to the jurisdiction" was intended to exclude from birthright citizenship the U.S.-born children of "ministers, consuls, *and citizens or subjects of foreign states.*" 83 U.S. at 73.

2. In 1884 the Supreme court majority in *Elk v. Wilkin*s, 11 U.S. 94 (1884), held that a U.S. resident, even if domiciled here, was not "subject to the jurisdiction" of the United States for purposes of the Fourteenth Amendment unless the resident was "*not merely subject to in some*

*respect or degree to the jurisdiction of the United States, but was completely subject to their political jurisdiction, and owing them direct and immediate allegiance.*" *Id.* at 102 (emphasis supplied). The Court reiterated that that the key purpose of the Amendment was to establish "the citizenship of free negroes" who were "*owing no allegiance to any alien power.*" *Id.* at 101 (emphasis supplied).

3. In 1885 and 1887, U.S. Secretaries of State Frederick Theodore Frelinghuysen and Thomas F. Bayard rendered opinions that the U.S.-born children of alien parents who were "*temporarily* in the United States" were not subject to Fourteenth Amendment "jurisdiction" because they remained "*subject to a foreign power.*" Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 VA. L. REV. 455, 479-80 (2015) (emphasis supplied).

4. In 1895 the New Jersey Supreme Court held in *Benny v. O'Brien,* 58 N.J.L. 36 (1895), that the only persons to be excepted from Fourteenth Amendment birthright citizenship, apart from the children of alien diplomats, were "those born in this country of foreign parents who are *temporarily* residing here." *Id.* at 39 (emphasis supplied). The court explained: "Persons intended to be excepted are only those born in this country of foreign parents *who are temporarily traveling here*, and children born of persons resident here in the diplomatic service of foreign governments. Such children are, in theory, born within the allegiance of the sovereign power to which they belong or which their parents represent." *Id.* (emphasis supplied).

5. In 1898 the majority opinion in *Wong Kim Ark*, 169 U.S. 649 (1898), enunciated the sole exception to the foregoing string of authorities holding that birthright citizenship presupposed no allegiance to any foreign power and therefore did not apply to temporary visitors. According to the Court, the Chinese parents of the U.S.-born plaintiff had a "permanent domicile" in the United States; consequently, they were not temporary visitors. Thus, as to the U.S.-born children of

6

"sojourners" and "temporary visitors" (to which the Court made no reference), the Court's interpretation of the Fourteenth Amendment is only *dicta.* 169 U.S. at 652. Although noting the "domiciled" status of the Chinese parents, the Court did not premise its decision on that status, but instead on the grounds that "subject to the jurisdiction" of the United States should be interpreted in accordance with English common law, which recognized citizenship of all persons born within the Crown's dominions, with the exception of children born to ambassadors and "hostile" occupants. 169 U.S. at 693.

Chief Justice Fuller's dissent opposed the holding that "a child born in this country of parents *who were not citizens* of the United States . . .is, from the moment of his birth a citizen of the United States." *Id.* at 705 (Fuller, C.J., dissenting) [emphasis supplied]. The majority opinion noted the "main purpose doubtless was, as has been often recognized by this court, to establish the citizenship of free negroes" and the clause was meant to show that citizenship was "restricted only by place *and jurisdiction*, and not by color or race" *Id.* at 676. This is consistent with the Senator Trumbull's statement that the Civil Rights Act only affected the children of foreigners insofar as it ensured, "foreigners are all upon the same footing, whether black or white." WILLIAM HORATIO BARNES, HISTORY OF THE THIRTY-NINTH CONGRESS OF THE UNITED STATES at 255 (1866).

In 2018, the Congressional Research Service reviewed these and other precedents on the citizenship clause and concluded that there was a lack of binding authority on the application of birthright citizenship to the U.S.-born children of aliens who were not lawful permanent residents. Specifically, "(1) the Supreme Court has yet to decide how the Citizenship Clause applies to the children of aliens who lack lawful permanent resident status under the INA, and (2) the primary authority on how the clause applies to people with non-citizen parents is 120 years old." *Ben*

*Harrington, The Citizenship Clause and "Birthright Citizenship": A Brief Legal Overview* at 3, CONG. RESEARCH. SERV. (Nov. 8, 2018), available at http://archive.is/AbsN4.

### III. No statute or regulation mandates birthright citizenship for the U.S.-born children of any alien who is not a diplomat.

That the Fourteenth Amendment does not compel birthright citizenship for every U.S.-born child of an alien who is not a diplomat does not mean that Congress may not extend that privilege to any or all of such children by statute, exercising its power under Article I, Section 8 "to establish a uniform Rule of Naturalization." However, the text, legislative history, and background behind the citizenship statutes enacted by Congress subsequent to enactment of the Fourteenth Amendment make completely clear that Congress has not exercised that authority to expand Fourteenth Amendment birthright citizenship beyond the intended categories of the Framers. Since Congress has not legislated any such expansion, the Executive Branch may not do so by regulation, and has in fact not done so.

The current statute governing citizenship is the Immigration and Nationality Act (the INA), which states at Section 301: "The following shall be nationals and citizens of the United States at birth: (a) a person born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). As the Supreme Court has taught us: "It is a 'cardinal rule of statutory construction' that, when Congress employs a term of art, 'it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken,'" *FAA v. Cooper*, 566 U.S. 284, 291 (2012) (quoting *Molzof v. United States*, 502 U.S. 301, 307, 112 (1992)). The phrase "and subject to the jurisdiction thereof" in the INA is identical to the phrasing in section 1 of the Fourteenth Amendment, is used in the exact same context, and is without elaboration. Consequently, in managing the application of birthright citizenship, the Executive

Branch may reasonably assume that the INA confers birthright citizenship only to the extent intended by the Framers of the Fourteenth Amendment.

The INA supplanted the Nationality Act of 1940. Section 301(a) of the INA is identical, verbatim, to Section 201 of the Nationality Act, 54 Stat. 1137. As stated in the Committee Report on the INA: "The bill carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth." S. Rep. No. 82-1137 at 38 (Jan 29. 1952). The Nationality Act of 1940, in turn was meant to "replace the provision" of the Civil Rights Act of 1866 without any hint that by so doing that Congress intended to work a fundamental change in citizenship policy. That act stated, "That all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Hearings on H.R. 6127 & H.R. 9980 Before the H. Comm. on Immigration. & Naturalization, 76th Cong. 418 (1940) [hereinafter Nationality Act Hearing].[2] Despite changing the wording of the Civil Rights Act, the 1940 Nationality Act was described as being "like the statute which it is to replace." Nationality Act Hearings at 418. Moreover, although the 1940 Act might constitutionally have extended birthright citizenship to U.S.-born children of aliens not "subject to the jurisdiction" of the United States, Congress expressly disavowed any such intention: "It accords with the provision in the fourteenth amendment to the Constitution of the United States that 'all persons . . . in the United States and subject to the jurisdiction thereof are citizens of the United States.'" *Id.* [ellipsis in original]

---

[2] The full citation for the hearings is, Revise and Codify the Nationality Laws of the United States into a Comprehensive Nationality Code: Hearings on H.R. 6127 & H.R. 9980 Before the H. Comm. on Immigration. & Naturalization, 76th Cong. 418 (1940) (Message from The President of the United States Transmitting a Report Proposing Revision and Codification of the Nationality Laws of the United States, Proposed Code with Explanatory Comments).

In expanding U.S. citizenship to children born in U.S. territories and possessions, Congress interchangeably used the terms "subject to the jurisdiction" of the United States and "not . . . subjects, or nationals of any foreign power," demonstrating continuity with the Framer's understanding that "subject to the jurisdiction" of the United States excluded aliens with greater allegiance to another country. Thus, in 1927 Congress established that "All persons born In the Virgin Islands of the United States on or after January 17, 1917 (whether before or after the effective date of this Act), and *subject to the Jurisdiction of the United States*, are hereby declared to be citizens of the United States." 44 Stat. 1234 (Feb. 25, 1927) [emphasis supplied]. Only seven years later Congress extended birthright citizenship to persons born in Puerto Rico by establishing that "All persons born in Puerto Rico on or after April 11, 1899 (whether before or after the effective date of this Act), *and not citizens subjects, or nationals of any foreign power*; are hereby declared to be citizens of the United States." 48 Stat. 1245 (Jun. 27, 1934) [emphasis supplied].

Although the Executive Branch enjoys the authority to issue regulations that interpret or implement the statutory provisions on Fourteenth Amendment birthright citizenship, it has chosen not to do so. Indeed, the only "authority" that appears to establish a broad understanding of the "subject to the jurisdiction" is Volume 8 of the Foreign Affairs Manual, which "provides all passport issuing officers with the information and standard guidance necessary to adjudicate a possible claim to U.S. citizenship/non-citizen U.S. nationality, identity, and entitlement to a U.S. passport." 8 FAM 101.1-1 (k), available at http://archive.is/iCsS0). The manual arbitrarily interprets *Wong Kim Ark* to mean; "Acquisition of U.S. citizenship generally is not affected by the fact that the parents may be in the United States temporarily or illegally." 8 FAM 301.1-U (Jun. 27, 2018) (available at http://archive.is/n8u0Pl). In any event, the courts have described the manual as a "nonbinding guidance document." *People v. McCormick*, 277 P. 3d 238, 246 (Colo. 2011).

As a consequence, in the instant case, the rules to which Defendant's determination are subject are found only in the citizenship statute, which, as shown above, add nothing to the bare wording of the Amendment. Consequently, in deciding whether the determination by Defendants that Ms. Muthana is not entitled to birthright citizenship, the criteria to be considered by the court should include only the language of the Amendment itself and the Amendment's legislative history, giving appropriate weight to interpretations by the Supreme Court and other relevant government authorities, especially those contemporaneous with the Amendment's enactment.

IV.   **Under *Elk v. Wilkins*, the purported subjection of an alien to U.S. jurisdiction, under the present and similar circumstances, arguably requires the U.S. government's consent.**

The Plaintiff asserts that termination of his diplomatic status subjected him to Fourteenth Amendment "jurisdiction" and treats that termination as an entirely technical matter without regard to any other considerations. Compl. ¶ 42. The Government's response focuses on this technical argument, asserting that termination of diplomatic status, as a technical matter, is governed by when the Government is notified of the termination. This brief and the CCJ brief argue that termination of diplomatic status, however confirmed, is not determinative of whether the former diplomat is "subject to the jurisdiction" of the United States for purposes of the Fourteenth Amendment. However, regardless of whether Plaintiff believed he gave up his diplomatic status in some sense prior to Ms. Muthana's birth, a question remains whether voluntary subjection to U.S. jurisdiction in those and similar circumstances requires the consent of the U.S. Government. Even assuming arguendo, Plaintiff's faulty premise that non-permanent aliens are subject to the jurisdiction of the U.S. government grants birthright citizenship, the government still needs to accept that surrender.

*Elk v. Wilkins* addressed a logically similar question—whether an Indian who owed allegiance to his tribe could by his own actions subject himself instead to U.S. "jurisdiction." The Court held, "Though the plaintiff alleges that he 'had fully and completely surrendered himself to the jurisdiction of the United States,' he does not allege that the United States accepted his surrender." *Elk*, 112 U.S. at 99 (1884). In the instant case, Plaintiff alleges that actions taken by his employer definitively subjected him to U.S. jurisdiction without regard to the U.S. Government's awareness, acknowledgement, or acceptance of such subjection. While the "acceptance" requirement has not been explored outside of *Elk v. Wilkins*, its application seems especially appropriate to the present and similar cases in which an alien who has been admitted to the United States for a singular purpose allegedly transfers his allegiance by simply abandoning that purpose without the awareness, acknowledgement, or acceptance of that transfer by the U.S. Government.

## V.   Allowing the children of those who have no allegiance to the U.S. to have automatic birthright citizenship threatens national security.

The present case is not the first time a court has been faced with a major national security question concerning the child of an alien whose U.S. presence when the child was born was neither permanent nor otherwise indicative of his abandonment of allegiance to a "foreign power." Indeed, two key cases on executive power and the rights of "citizens" in the War on Terror involved such individuals.

*Hamdi v. Rumsfeld,* 542 U.S. 507 (2004), addressed the due process that the government owed U.S. citizens detained abroad as enemy combatants. However, as Justices Scalia and Stevens noted in their dissent, "Petitioner Yaser Hamdi" was "a *presumed* American citizen." *Id.* at 554

(Scalia, J., dissenting) [emphasis supplied].[3] "Born in Louisiana in 1980, Hamdi moved with his

family to Saudi Arabia as a child," and was captured fighting with the Taliban 2001. *Id.* at 510.

His father was only temporarily in the United States to work as an engineer. Tim Yin, *The Republic*

*of Choice*, *the Pledge of Allegiance, the American Taliban*, 40 TULSA L. REV. 599, 605 (2005).

Anwar Al-Aulaqi was the first "U.S. Citizen" to whom the U.S. government had

"authorized the targeted killing of" outside of an armed conflict. *Al-Aulaqi v. Obama*, 727 F. Supp.

2d 1, 10 (D.D.C. 2010). The government justified this extreme measure because,

> he "facilitated training camps in Yemen in support of acts of terrorism" and provided
> "instructions" to Umar Farouk Abdulmutallab, the man accused of attempting to detonate
> a bomb aboard a Detroit-bound Northwest Airlines flight on Christmas Day
> 2009. See OFAC Designation. Media sources have also reported ties between Anwar Al-
> Aulaqi and Nidal Malik Hasan, the U.S. Army Major of killing 13 people in a November
> 2009 shooting at Fort Hood, Texas. *Id.* (internal citations removed.).

"Because Anwar Al-Aulaqi was a terrorist leader of al-Qa'ida in the Arabian Peninsula, the United

States intentionally targeted and killed him with a drone strike in Yemen on September 30, 2011."

*Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 58 (D.D.C. 2014). Whether the U.S. could target presumed

U.S. citizens for killing in the War on Terror led to multiple lawsuits. *See id.; Al-Aulaqi v. Obama.*

727 F. Supp. 2d at 1. Yet like Hamdi, Al Aulaqi was born to parents on temporary visas. His father

came to the country on a Fulbright Scholarship and they departed when Hamdi was seven. *Panetta,*

35 F. Supp. 3d at 65.

Cases such as Hamdi and Al-Aulaqi are predictable, because they resulted from a presumed

Constitutional grant of citizenship to individuals who had no grounding from family or

naturalization in loyalty to the country. Those not loyal to the U.S. with citizenship can pose

---

[3] Numerous advocacy organizations along with members of Congress filed amicus briefs in support of the proposition that Hamdi was not entitled to Birthright Citizenship. See Justin Lollman, *The Significance of Parental Domicile Under the Citizenship Clause,* 101 Va. L. Rev. 455, 461 n. 27 (2015). However, the appellate decision notes questions over whether Hamdi had renounced citizenship. Hamdi v. Rumsfeld, 316 F.3d 450, 460 (4th Cir. 2003).

particular risks in the War in Terror. As Yale Law Professor Peter Schuck has written, "American citizenship greases the wheels of terror. . . [P]lotters can travel easily to and from terrorist training camps on American passports. Citizens cannot be monitored as easily as immigrants can, they cannot be deported, and they have certain legal rights that foreigners lack." Peter H. Schuck, *Can We Revoke Faisal Shahzad's Citizenship?*, WALL ST. J., May 14, 2010, at A19.

The national security risks extend to espionage as well as terrorism. The U.S. Attorney's Office for the Central District of California recently indicted 19 people for fraud, money laundering, identity theft, and other charges related to an illegal birth tourism operation. Press Release, *Federal Prosecutors Unseal Indictments Naming 19 People Linked to Chinese 'Birth Tourism' Schemes that Helped Thousands of Aliens Give Birth in U.S. to Secure Birthright Citizenship for Their Children*, U.S. DEP'T OF J., (Jan. 31, 2019), http://archive.is/hUcET. The operation worked with Chinese government officials, including an individual with the Public Security Bureau. *Id.* Joseph Macias, Special Agent in Charge of Homeland Security Investigations for Los Angeles, stated, "No one needs to be reminded about the national security and public safety implications" of the operation. *Id.* While the perpetrators of this birth tourism case engaged in illegal activity, there is nothing *per se* illegal about the practice.

The threats of espionage and terrorism by persons whose presence in the United States must be tolerated on account of birthright citizenship is immensely greater today than when the Fourteenth Amendment was enacted. All the more reason to give effect to the Framer's intent that such citizenship should be limited to those whose alien parents can reasonably be viewed as having abandoned primary allegiance to a foreign power. The concern of course is not limited to actions by the U.S.-born child, but also by actions of his alien parents, whose eventual admission to the United States as permanent residents is almost guaranteed under current immigration law. In a

recent case, a Canadian court, applying a birthright citizenship law that explicitly excluded only children born to foreign government representatives or employees, overturned the government's refusal to acknowledge Canadian citizenship to a Canadian-born child notwithstanding that the Russian father had been arrested and deported for espionage.[4] Given the ample authority for the proposition that U.S. birthright citizenship, unlike its Canadian counterpart, entails a greater allegiance by the alien parent to the United States than to any foreign power, our courts should avoid enunciating a rule that leaves no scope for legitimate Government concerns on the question of allegiance in the circumstances of an individual case.

VI.   **Given the lack of binding judicial, legislative, or regulatory authority on the application of the Fourteenth Amendment's "subject to the jurisdiction" clause to the U.S.-born children of aliens who are neither diplomats nor lawfully domiciled in the United States, the court should defer to the Defendant's application of that clause to the Plaintiff if the court concludes that the Defendants' interpretation of that clause is reasonable given the relevant legislative history.**

In the absence of any constitutional authority to the contrary, the Government has broad discretion to interpret the Fourteenth Amendment's citizenship clause. *See Arizona v. United States*, 567 U.S. 387, 394, (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). Since Congress has declined to exercise that interpretative power in the relevant statute, questioning the Executive Branch's own interpretation would be "inconsistent with the broad statutory text [of the INA] and the deference traditionally accorded the President in this sphere." *Trump v. Hawaii*, 138 S. Ct. 2392, 2401 (2018). As noted by then University of Chicago Law Professor Geoffrey P Miller, "the president cannot execute laws, including the law of the Constitution, unless the laws are interpreted; in many cases the president has no choice but to interpret the Constitution independently, without guidance

---

[4] *Valivov v. Minister of Citizenship & Imm.* [2017] F.C. 132 para. 58 (Can), available at http://archive.is/FbmWi. The case is on appeal at the Canadian Supreme Court. *Minister of Citizenship & Imm. V. Vavilov*, S.C.C Docket No. 37748 (Can.) (last updated Dec. 12, 2018), available at http://archive.is/VguYG.

from the Supreme Court or anyone else." *The Presidents Power of Interpretation*, 56 J. L. & CONTEMPORARY PROB. 35, 36 (1993).

Actively serving diplomats may be the clearest example in case law and the Fourteenth Amendment's legislative history of when the Government may Constitutionally conclude that an alien's physical presence in the United States does not constitute a transfer of allegiance. However, for practical purposes, such as setting up and closing a household and for other reasons, the United States may permit a foreign diplomat to enter the country prior to the commencement of his diplomatic mission and to defer departure after completion of the mission. No legislative history or binding legal precedent deprives the Executive Branch of the legal discretion to determine whether the Government's tolerance of an alien's presence during such limited periods, whether as a diplomat, tourist, or temporary worker, must be construed as the alien's transfer of allegiance to the United States from his home country.

## CONCLUSION

For the reasons stated above, the Government's motion to dismiss should be granted.


Dated: May 3, 2019                    Respectfully submitted,

                                      /s/
                                      JULIE AXELROD (D.C. Bar no. 1001557)
                                      1629 K Street, NW
                                      Washington, DC 20006
                                      Tel: (703) 888-2442
                                      jba@cis.org

16