# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHMED ALI MUTHANA, individually, and as Next Friend of Hoda Muthana and Minor John Doe** [initials A.M.]<br>*Plaintiff/Petitioner,*<br><br>vs.<br><br>**Michael Pompeo, in his official capacity as Secretary of the Department of State, Donald J. Trump, in his official capacity as President of the United States;** and **William Pelham Barr in his official capacity as Attorney General.**<br><br>*Defendants/Respondents.* | Cause No. 1:19-cv-00445-RBW<br><br><br>CIVIL ACTION |

## DECLARATION OF AHMED ALI MUTHANA

I, Ahmed Ali Muthana, hereby declare under penalty of perjury and in accordance with 28 U.S.C. § 1746 the following:

1. I submit this declaration based on my own personal knowledge.

2. I am over the age of 18 and competent to testify to the facts recited below.

3. I am the father to Hoda Muthana and grandfather to Minor John Doe Muthana.

4. I worked as a diplomatic member of the Permanent Mission of Yemen to the United Nations from October 15, 1990 to June 1, 1994.

5. On June 1, 1994, I was terminated from that position.

6. On June 2, 1994, the Yemeni Ambassador Al-Aashtal required me to surrender my diplomatic identity card.

7. My termination was as a result of the outcome of the civil war in Yemen.

8. I am aware that other individuals, including Mr. Gamal O. Al-Akbari and Mr. Gamil H. Ghanim, were transferred from the Permanent Mission of Yemen to the United Nations to other locations in June 1994 for several months, then terminated in September 1994, approximately three months after I was terminated.

9. My daughter Hoda Muthana was born on ▇▇▇▇▇▇, 1994, in New Jersey.

10. At the time of her birth, I was not serving in a diplomatic position, and had not been for many months.

11. In 2004, I applied for a United States passport for my daughter Hoda Muthana.

12. I received a letter from the Department of State stating that the United States believed I had still been a diplomat at the time of Hoda Muthana's birth.

13. I responded that I had not, and provided a letter which I obtained from the United States Mission to the United Nations, dated October 18, 2004, which confirms that my diplomatic position ended no later than September 1, 1994.

14. I provided the letter from the United States Mission to the United Nations to the United States Department of State, which then did issue a United States passport to my daughter Hoda Muthana, on January 24, 2005. A true and correct copy of that letter has been previously filed in this lawsuit at Doc. 1-5.

15. A copy of that passport is attached as Exhibit 1 to this Declaration.

16. The passport issued by the United States Department of State to my daughter Hoda Muthana lists her nationality as "United States of America".

17. If the Department of State had not issued a United States passport to my daughter Hoda Muthana, I would have continued proceedings to get my daughter Hoda a "green card" on

her behalf. This is what my wife and I did for our older children, who were born in the United States while I was still performing diplomatic duties. Since my daughter Hoda Muthana was issued a United States passport listing her nationality as United States of America, though, I did not believe there was any need to continue those proceedings on her behalf.

18. I also went through naturalization proceedings myself, and am now a United States citizen. My wife is a lawful permanent resident of the United States, with a citizenship application pending. My wife's father was a United States citizen before I left my diplomatic position.

19. My daughter Hoda Muthana renewed her United States passport on or about February 21, 2014.

20. She then flew to Turkey, and later arrived in Syria. I did not know in advance that she was taking this trip.

21. As a result of her second marriage in Syria, my daughter Hoda Muthana had a child, referred to herein as Minor John Doe. He was born on ▮▮▮▮, 2017.

22. On January 15, 2016, a letter addressed to my daughter Hoda arrived at my residence, from the United States government informing her that her passport had been revoked. A true and correct copy of that letter has been previously submitted in this lawsuit at Doc. 1-6.

23. I responded to the January 15, 2016 letter that my daughter was out of the country, but also reiterated what I had provided in 2004, and confirmed the facts listed above as to when my diplomatic position ended (which was before Hoda was born).

24. When my daughter went to Syria, I did not agree with what she did.

25. I did not provide her with money after she left for Syria.

26. Hoda and her son are, to the best of my knowledge, currently at Camp Roj in Syria.

27. I would like to send money to my daughter so that she and my grandson can return to the United States.

28. I asked the FBI if I could do this, and the FBI told me that if I send money to my daughter and grandson for them to leave, that I will be breaking the law and will be considered to be providing material support to ISIS.

29. I do not want to support ISIS at all.

30. I do want to help my daughter and grandson get to the United States.

31. My daughter began communicating with me in late 2018 that she wishes to surrender to United States authorities, and is willing to be subject to any legal consequences under the United States judicial system.

32. My daughter also communicated to me at that time that she wants to return to the United States, with her son.

33. I want her to return to the United States with her son (my grandson) as well.

34. I also agree that my daughter should accept any legal consequences under the United States judicial system.

35. In the last two to three months of 2018, I sporadically heard from my daughter, usually via text or WhatsApp.

36. Since my daughter surrendered to Kurdish authorities and was placed at Camp al-Hawl with her son, in December 2018, I have only heard from her intermittently and sporadically.

37. My daughter and her son were transferred to another camp in Syria, Camp Roj, in late February or early March 2019.

38. Around the time of their transfer from Camp al-Hawl to Camp Roj, I did not hear from my

daughter for several weeks, and did not have a way to reach her.

39. Whenever I do hear from my daughter, it is almost always from a new phone number, and she identifies that she is borrowing a phone from someone, or using the camp Administration phone.

40. I have tried to reach her subsequently at each number from which I have received a message from her, but it has not been successful.

41. On March 24, 2019, I received two photos via WhatsApp, which are each one page of a two page handwritten letter dated 3/21/19. This two page letter is attached to this Declaration as Exhibit 2.

42. Based on my personal knowledge of my daughter Hoda Muthana's handwriting, I recognize this two page letter to be in her handwriting.

43. I also recognize the signature on the second page of this letter to be the signature of my daughter Hoda Muthana.

44. In this letter, my daughter writes that she and her son are in Camp Roj in Syria, and that "communication here is very limited and is only done through their administration phone via whatsapp [sic]."

45. In this March 21, 2019 letter, my daughter also writes that her "son has long term bronchitis and asthma and needs medicine often. Most times I have to go running to other peoples tents for emergency medicines. I am terrified of seeing my son sick because there is an average of 2 deaths (children) a month here."

46. My daughter also writes in this letter that "I cannot sleep at night even when my child develops a simple cough. (Please help!)"

47. My daughter writes in this letter that "since I've come here I have no idea about whats [sic] going on with my case and no clue of any time frames."

48. On or about April 16, 2019, I received communication from Dr. Anne Speckhard that she had visited with my daughter Hoda Muthana at Camp Roj in Syria.

49. Dr. Speckhard communicated to me that my daughter was requesting these items: eye glasses, good medication for bronchitis, vitamins for herself and her son, books for herself and her son, shoes for herself and her son, Western clothes for her son, hygenic items such as soap and shampoo, sunglasses, good sunscreen, and learning toys for her son.

50. I am absolutely willing to help pay for supplies and necessities for my daughter and grandson, such as food, clothing and medication and each of the items Dr. Speckhard listed as requests from my daughter, but I have not yet done so because the United States government, via an FBI agent, told me that I will be committing a crime if I do that.

51. Dr. Speckhard informed me that she had also been told by the FBI that providing money or items to my daughter (and any others at Camp Roj, as to Dr. Speckhard) may be considered material support of terrorism.

52. Dr. Speckhard also provided me with an assessment from her visit with my daughter and my grandson. That assessment is attached to this Declaration as Exhibit 3 and is true and correct as I received it from Dr. Speckhard.

53. In her assessment, which is just over two pages long and typed, Dr. Speckhard notes that she "interviewed [Hoda] on April 2, 2019, for over two hours. During that time, it was evident that her son … is sickly and struggles with what Hoda said is a chronic case of bronchitis. She said she had trouble getting medications for him and has repeatedly put him on antibiotics but he has not gotten better. She fears he could die of respiratory ailments, as she knows that

it's a risk in the camp. She told us what we already knew—that doctors are not always readily available for camp residents nor are adequate medications. Hoda is receiving no money from her family and also cannot pay for either."

54. Dr. Speckhard also writes in her assessment that "[i]n my professional opinion, it is not psychologically or physically good to leave [my grandson] in Camp Roj." Dr. Speckhard also observes, as to my grandson, that "[h]e is sick and needs good and regular medical care. He struggles with heavy coughing, looks lethargic and is not behaving like a healthy normal young child presumably because of his chronic bronchitis. As a sickly and unvaccinated child, he is also much more vulnerable to any of the diseases that may spread through the camp of other unvaccinated children. He could easily die there."

55. Dr. Speckhard also recommends in her report that my grandson "should immediately be removed from the camp to ensure his best health, and preferably not separated from his mother. Normally, keeping mothers and children together at that age is crucial to ensure healthy attachment and his trust in the world."

56. I am willing to do anything I can to help bring my daughter and my grandson home to the United States, and to provide for their survival both before and once they are able to come to the United States.

Pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

_____
Ahmed Ali Muthana, Declarant

5/10/19
_____
Date Executed

# EXHIBIT 1

The Secretary of State of the United States of America bereby requests all whom it may concern to permit the citizen/national of the United States named herein to pass without delay or hindrance and in case of need to give all lawful aid and protection.

Le Secrétaire d'Etat des Etats-Unis d'Amérique prie par les présentes toutes autorités compétentes de laisser passer le citoyen ou ressortissant des Etats-Unis titulaire du présent passeport, sans délai ni difficulté et, en cas de besoin, de lui accorder toute aide et protection légitimes.

El Secretario de Estado de los Estados Unidos de América por el presente solicita a las autoridades competentes permitir el paso del ciudadano o nacional de los Estados Unidos aquí nombrado, sin demora ni dificultades, y en caso de necesidad, prestarle toda la ayuda y protección lícitas.

*Hoda Muthana*

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE/FIRMA DEL TITULAR

**NOT VALID UNTIL SIGNED**

PASSPORT / PASSEPORT / PASAPORTE

UNITED STATES OF AMERICA

Type / Type / Tipo: P
Code / Code / Código: USA
Passport No. / No. du Passeport / No. de Pasaporte: [redacted]

Surname / Nom / Apellidos: MUTHANA

Given names / Prénoms / Nombres: HODA AHMED

Nationality / Nationalité / Nacionalidad: UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento:  1994

Sex / Sexe / Sexo: F

Place of birth / Lieu de naissance / Lugar de nacimiento: NEW JERSEY, U.S.A.

Date of issue / Date de délivrance / Fecha de expedición: 24 Jan 2005

Date of expiration / Date d' expiration / Fecha de caducidad: 23 Jan 2010

Authority / Autorité / Autoridad: National Passport Center

Amendments / Modifications / Enmiendas: See Page 24

P<USAMUTHANA<<HODA<AHMED<<<<<<<<<<<<<<<<<<<<
[redacted]USA94[redacted]0F1001233<<<<<<<<<<<<<04

# EXHIBIT 2

3/21/19

Salam, this is Hoda. Please share any information I give you to Charles and Hassan. Communication here is very limited and is only done through their administration phone via WhatsApp. This is legit evidence to make my government aware that I am here (In Camp Roj :)) before they try to deny their acknowledgment as they have for others. Also, I believe I am in danger although my gov. tries to deny that too. I'm still in Syria, that is enough evidence of the danger. I've seen two dying babies with my own eyes, die to the lack of medical equipment, and three children die due to tents burning down. My son has long term bronchitis and asthma and needs medicine often. Most times I have to go running to other peoples tents for emergency medicines. I am terrified of seeing my son sick because there is an average of 2 deaths (children) a month here. I don't have much money left and have resorted to making goods to profit some money. Due to the stress I already have, this just adds to it. Apparently there is a psychologist

by the name of _____, you can find her on facebook. Word is she'll be coming to visit the camp soon so money can be brought in legally through her. On that note I also need psychological help so please contact her as soon as you can because she can only access the people that she has listed. There is another lawyer by the name of _____, Charles might know him (?) He too makes visits here but again can only talk to registered people. Anyway, since I've come here I have no idea about whats going on with my case and no clue of any time frames. Please update me here as much as possible. This phone is only meant for money transfers but this is the only chance of communication I get.

P.S. I was with Shamima Begum in the hospitals while her baby was dying trying to help her translate bc she doesn't know arabic, I know the conditions here when a child gets sick and this is why I cannot sleep at night even when my child develops a simple cough. (Please help!)

— Hoda Sleik

# EXHIBIT 3



April 29, 2019

To Whom It May Concern:

I am writing this letter in response to a request from Ahmed Muthana and the attorneys serving the case of his daughter, Hoda Muthana. Ahmed Muthana is the grandfather of ▇▇▇ who is the 20-month-old son of Hoda Muthana who recently surrendered herself after living for some years under ISIS. Both mother and son are currently being held as prisoners in Camp Roj in Rojava, Syria.

I am the Director of the International Center for the Study of Violent Extremism (ICSVE), a think-tank focused on studying terrorism and violent extremism, Adjunct Associate Professor of Psychiatry in the Georgetown University School of Medicine, and a psychologist of 25+ years experience, treating clinical cases and researching the psychosocial underpinnings of terrorism. I have spent the last two decades studying the trajectories of individuals into, and back out of terrorism, having in-depth interviewed over 650 terrorists, their family members and close associates around the world. Over the past four years, I have interviewed 144 ISIS defectors, returnees and prisoners: men, women and minors from many countries around the world. In 2006-2007, I designed for the U.S. Department of Defense the psychological and Islamic challenge components of the *Detainee Rehabilitation Program*, which was applied to 22,000+ detainees and 800 juveniles held by U.S. forces in Iraq. I am also a trained child development specialist and a mother of three now grown children. I have helped to birth babies, have worked inside prisons, and know what it is to raise children in third world environments.

Along with my ICSVE colleagues, I have been traveling over the past two years into Iraqi prisons and Kurdish-run camps and detention centers in Rojava, Northern Syria. In that regard, I have interviewed 11 women held in YPG-run detention camps in Camp Roj and witnessed the harsh conditions under which these mothers and children live. The women (and their prison caretakers) that we have interviewed in this camp have told us that medical care is scarce, medicines are not available, good food is costly and difficult to procure, vaccinations for children are not provided, schools and child development services don't exist, winters are cold in the tents, dust frequently fills the air creating breathing difficulties for their children, fires break out in the tents, and some women threaten and bully the others—including threatening with knives.

Mothers and children have died in the camps, including three who reportedly died of Typhoid in Camp Roj last year. A newborn died from what seems to have been

malnutrition related issues in the camp recently. Likewise two toddlers perished in a recent tent fire in Camp Roj. One mother we interviewed in the camp told us about her child having regular asthma attacks due to the dusty air attacks, in which he turns blue and stops breathing with no medications provided. Another shared her terror of Pertussis (whooping cough) and others of Typhoid. Mothers told us they feared the cold winter conditions and illnesses that occur during Syrian winters.

Not formally charged with any crimes—at least not known or communicated to me—and totally uncertain of their futures and unable to advance their cases through a proper legal system, mothers in YPG camps live under constant uncertainty, stress, fear, and anxiety. We saw dozens of children in the camps and witnessed that children literally play with, and on, rocks, strewn over the desert ground throughout the camp. There are, to our knowledge, no playgrounds, toys or books provided, and we were told that any education provided is very substandard and none provided for preschoolers.

Hoda Muthana, formerly living under ISIS, surrendered this spring. We interviewed her on April 2, 2019, for over two hours. During that time, it was evident that her son, ▇, is sickly and struggles with what Hoda said is a chronic case of bronchitis. She said she had trouble getting medications for him and has repeatedly put him on antibiotics but he has not gotten better. She fears he could die of respiratory ailments, as she knows that it's a risk in the camp. She told us what we already knew—that doctors are not always readily available for camp residents nor are adequate medications. Hoda is receiving no money from her family and also cannot pay for either.

The YPG detention camps are harsh, dangerous, unsanitary and unhealthy places to house a sickly child, or any child, for that matter. In my professional opinion, it is not psychologically or physically good to leave ▇ in Camp Roj. ▇ has his grandparents in the United State (one a citizen, one a green card holder) who are more than willing to take him home. As I understand Hoda's case, there are disputes over her U.S. citizenship, though to my understanding and knowledge, she was born when her father was out of diplomatic status. To my knowledge, Hoda's father, Ahmed, has a letter from U.S. State Department indicating he was out of his diplomatic status when Hoda was born and that Hoda has possessed at this point two American passports. It appears her citizenship dispute will be resolved in her favor, though with a delay in process. In Hoda's case, this may be a sound judgement, but in ▇'s case, it is not.

He is sick and needs good and regular medical care. He struggles with heavy coughing, looks lethargic and is not behaving like a healthy normal young child presumably because of his chronic bronchitis. As a sickly and unvaccinated child, he is also much more vulnerable to any of the diseases that may spread through the camp of other unvaccinated children. He could easily die there. The camp is also not a good place for him to be for many other reasons, including that there is no good stimulation for him, no place to play, and no safe place to stay—cold in the winter and spring. Also, many of the people living there are anxiety ridden.

He should immediately be removed from the camp to ensure his best health, and preferably not separated from his mother. Normally, keeping mothers and children together at that age is crucial to ensure healthy attachment and his trust in the world.

I would strongly recommend returning ▮▮▮▮ and placing him in the custody of his grandparents who are willing and have a capacity to support him until his mother is back in the United States.

Please let me know if you have any questions or if I can provide any further information to aid in this case.

Best regards,

*Anne Speckhard*

Anne Speckhard, Ph.D.