## IN THE UNITED STATES DISTRICT

## COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHMED ALI MUTHANA, individually, and as next friend of Hoda Muthana and Minor John Doe** [initials A.M.] | Cause No. 1:19-cv-00445 |
| *Plaintiff/Petitioner,* | |
| vs. | CIVIL ACTION |
| **Michael Pompeo, in his official capacity as Secretary of the Department of State, Donald J. Trump, in his official capacity as President of the United States;** and **William Pelham Barr in his official capacity as Attorney General.** | |
| *Defendants/Respondents.* | |

### PLAINTIFF'S ERRATA

Plaintiff Ahmed Ali Muthana, individually and as Next Friend of Hoda Muthana and Minor John Doe, by and through undersigned counsel, files this Errata as follows:

In Plaintiff's originally filed Memorandum of Law in Opposition to Defendants' Motion to Dismiss or in the Alternative Motion for Partial Summary Judgment (Doc. 24), Plaintiff erroneously filed a version showing the administrative codes embedded in the document which are affiliated with each of the authorities, linking them to the Table of Authorities. Plaintiff now attaches a corrected document, attached hereto as Exhibit A, which does not show these codes. This does not change the substance of Plaintiff's filing in any way, and instead is what Plaintiff originally intended to file and makes the document far more readable (as well as making the pagination for the Table of Authorities and Table of Contents accurate).

Plaintiff respectfully requests that this Court replace the version of Document 24 which was filed on Friday, May 10, 2019 with the version attached at Exhibit A to this Errata.  This is not done for purposes of delay and Plaintiff makes no substantive changes to the document from its filing on Friday, May 10, 2019.


Respectfully submitted,


/s/ *Christina A. Jump*
Charles D. Swift
D.C. ID No. 987353
Texas Bar No. 24091964
cswift@clcma.org
Christina A. Jump
D.C. ID No. TX151
Texas Bar No. 00795828
cjump@clcma.org
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax: (972) 692-7454


## CERTIFICATE OF SERVICE

The undersigned counsel hereby affirms that the foregoing will be served on all counsel of record via ECF filing on this 13th day of May, and served with the Complaint in this matter, on all listed Defendants.


/s/ *Christina A. Jump*
Christina A. Jump

## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHMED ALI MUTHANA, individually, and as next friend of Hoda Muthana and Minor John Doe** [initials A.M.]<br><br>*Plaintiff/Petitioner,*<br><br>vs.<br><br>**Michael Pompeo, in his official capacity as Secretary of the Department of State, Donald J. Trump, in his official capacity as President of the United States;** and **William Pelham Barr in his official capacity as Attorney General.**<br><br>*Defendants/Respondents.* | Cause No. 1:19-cv-00445<br><br>Judge: Reggie B. Walton<br><br>CIVIL ACTION |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR IN THE
## ALTERNATIVE MOTION FOR PARTIAL SUMMARY JUDGMENT

/s/ *Charles D. Swift*

Charles D. Swift
D.C. ID No. 987353
Texas Bar No. 24091964
cswift@clcma.org
Christina A. Jump
D.C. ID No. TX151
Texas Bar No. 00795828
cjump@clcma.org
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax: (972) 692-7454

i

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.   BRIEF FACTUAL SUMMARY .................................................................. 2

III.   RELEVANT LEGAL STANDARDS.............................................................5

   A.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)................ 5

   B.   Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)................ 6

   C.   Standard Under Federal Rule of Civil Procedure 56 ........................................7

IV.   NEXT FRIEND STATUS IS APPROPRIATE HERE ................................ 8

   A.   Standard for Need and Identifying an Appropriate Next Friend........................8

   B.   Next Friend Standing May Be Invoked In General Civil Litigation .................9

   C.   Plaintiff Demonstrates Appropriate Grounds for Next Friend Status in This Case....................10

V.   MS. MUTHANA IS ENTITLED TO DECLARATORY RELIEF BASED ON THE
DEPARTMENT OF STATE PREVIOUSLY ISSUING HER TWO PASSPORTS. ................ 14

   A.   A United States Passport is Legal Proof of U.S. Citizenship...............................15

   B. Revocation of a Document Does Not Equal Revocation of Status........................17

   C. Ms. Muthana is Entitled to Declaratory Judgment on Her Continuing Citizenship........18

   D. Public Statements of Administration Officials Have No Legal Effect................18

VI.   AS A UNITED STATES CITIZEN, MS. MUTHANA IS ENTITLED TO RETURN

TO THE UNITED STATES EVEN WITHOUT A PASSPORT ................................... 19

   A. Ms. Muthana Retains the Right to Re-Enter, Passport or Not......................19

   B. Even if Applicable, Section 1503 is Not An Exclusive Remedy........................24

VII.   IN THE ALTERNATIVE, PLAINTIFF SEEKS LEAVE TO AMEND TO ADDRESS §
1503 IN AN AMENDED COMLAINT.  ANY SUCH AMENDMENT WOULD BE IN

THE INTERESTS OF JUSTICE AND NOT FUTILE................................................... 25

   A.   Legal Standard .......................................................................................... 25

   B.   There is No Compelling Reason to Deny Leave to Amend Here ......................... 25

   C   Amendment Would Not Be Futile........................................................................27

     a.   *Diplomatic Immunity Did Not Apply to Plaintiff at the Time of Ms. Muthana's Birth.*......30

     b.   *This Court, and Plaintiff, are Not Bound to Accept the Determination of the State Department*

     *on Immunity in this Situation.* ..................................................................... 32

VIII.   DEFENDANTS ARE PREVENTED BY ESTOPPEL FROM NOW DISPUTING

MS. MUTHANA'S CITIZENSHIP....................................................................... 33

IX.   PLAINTIFF AHMED MUTHANA PROPERLY BRINGS A CLAIM SEEKING

DECLARATORY JUDGMENT AS TO MATERIAL SUPPORT ............................... 36

   A.   Defendants Erroneously Dispute Plaintiff's Claims While Asking for Dismissal.......... 36

   B.   There Exists a Live Controversy. .................................................................. 37

   C.   Plaintiff's Request Relates Directly to Ms. Muthana's Constitutional Right to Return. . 38

X.   CONCLUSION............................................................................................39

## **TABLE OF AUTHORITIES**

**U.S. SUPREME COURT CASES**

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986) ............................................... 8, 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................... 7

*Babbitt v. Farm Workers,* 442 U.S. 289 (1979)..........................................................39

*Califano v. Sanders*, 430 U.S. 99 (1977) ...............................................................24

*Conley v. Gibson*, 355 U.S. 41 (1957) ................................................................. 6

*Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189 (1989) ........................ 20

*Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227 (1962) ......................................... 25

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ............................................................. 22

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 25 (2010)........................................38

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993) ........... 6

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ........................................................... 29

*Reid v. Covert*, 354 U.S. 1 (1957) .................................................................... 23

*Scheuer v. Rhodes,* 416 U.S. 232 (1974) ............................................................... 6

*Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53 (2001) .................................................... 23

*Whitmore v. Arkansas,* 495 U.S. 149 (1990) .........................................................9, 10

**CIRCUIT AND DISTRICT COURT CASES**

*Abigail Alliance for Better Access to Dev. Drugs v. McClellan*, 2004 U.S. Dist. LEXIS 29594
   (D.D.C. Aug. 30, 2004) at *17 .................................................................. 28

*ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457 (D.C. Cir. 1991)..................................... 6

*ACLU Found. v. Mattis*, 286 F. Supp. 3d 53 (D.D.C. 2017)......................................... 12

*Ahmed Salem Bin Jaber v. United States*, 155 F. Supp. 3d 70 (D.D.C. 2016)....................9, 11, 13

*Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1 (D.D.C. 2010) ........................................... 10,  19

*Ali v. Dist. Dir.*, 743 Fed. Appx. 354 (11th Cir. 2018)........................................... 32

*Americable Int'l v. Department of Navy*, 129 F.3d 1271 (D.C. Cir. 1997)...................................... 8

*Artis v. Greenspan,* 223 F. Supp. 2d 149 (D.D.C. 2002) ............................................. 28

*Atchinson v. District of Columbia*, 73 F.3d 418 (D.C. Cir. 1996) ................................. 30

*Avocados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004)................................. 29

*Banchong v. Kane*, 2009 U.S. Dist. LEXIS 127134 (D. Ariz. Dec. 23, 2009)........................... 16

*Barr v. Clinton*, 370 F.3d 1196 (D.C. Cir. 2004)........................................................ 6

*Bronner v. Duggan*, 324 F.R.D. 285 (D.D.C. 2018)................................................... 27

*Brown v. FBI*, 744 F. Supp. 2d 120 (D.D.C. 2010)................................................... 26

*Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002)................................................. 6

*Chacoty v. Tillerson*, 285 F. Supp. 3d 293 (D.D.C. 2018) ............................... 15, 18, 24

*Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d. 18 (D.D.C. 2000) ............................ 28

40 F. 3d 426 (D.C. Cir. 1994) .................................................................................................. 28

*Doe v. Bush*, 2006 U.S. Dist. LEXIS 79175 (D.D.C. October 31, 2006)............................ ..9

*Doe v. Mattis*, 889 F.3d 745 (D.C. Cir. 2018) ..........................................................................22

*Dove v. Wash. Metro. Area Transit Auth.*, 221 F.R.D. 246 (D.D.C. 2004) .................................. 26

*Edwards v. Bryson*, 884 F. Supp. 2d 202 (E.D. Pa. 2012)................................................... 16

*Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338 (D.C. Cir. 2003)...........................6, 37

*Estate of Gaither v. District of Columbia,* 272 F.R.D. 248 (D.D.C. 2011) ................................. 26

*Estate of Gaither v. District of Columbia*, 655 F. Supp. 2d 69 (D.D.C. 2009)............................. 7

*First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375 (D.C. Cir. 1988).................................. ..8

*Foreman v. Heineman*, 240 F.R.D. 456 (D. Neb. 2007) ..........................................................9

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000) ..................................................................... 39

*Grumman Ohio Corp. v. Dole*, 776 F.2d 338 (D.C. Cir. 1985)......................................................34

*Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999) ......................................................... 30

*Heller v. District of Columbia*, 290 F.R.D. 1 (D.D.C. 2013)......................................................26

*Hertzberg v. Veneman,* 273 F. Supp 2d 67 .............................................................................. 33

*In re Vitamins Antitrust Litigation*, 217 F.R.D. 30 (D.D.C. 2003).................................................. 25

*ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104 (D.C. Cir. 1988) ......................................... 33

*Keil v. Triveline*, 661 F.3d 981 (8th Cir. 2011) ......................................................................... 16

*Laningham v. U.S. Navy*, 813 F.2d 1236 (D.C. Cir. 1987) ........................................................ 8

*Latif v. Holder*, 969 F. Supp. 2d 1293 (D. Or. 2003) .............................................................. 20

*Lempert v. Rice*, 956 F. Supp. 2d 17 (D.D.C. 2013) ................................................................. 5

*Magnuson v. Baker,* 911 F.2d 330 (9th Cir. 1990)...........................................16, 17, 33, 35, 36

*Matter of Villanueva, Interim Decision #2968* (BIA 1984) ....................................................15. 16

*Maydak v. United States,* 254, F. Supp. 2d 23 (D.D.C. 2003) ............................................... 7

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (D. Or. 2014) ....................................................... 19, 20

*Momenian v. Davidson*, 878 F.3d 381 (D.C. Cir. 2017) ............................................................ 7

*Muhammad v. United States*, 300 F. Supp. 3d 257 (D.D.C. 2018) ............................................ 7

*Nattah v. Bush,* 770 F. Supp. 2d 193 (D.D.C. 2001) ............................................................6, 37

*Northland Capital Corp., v. Silver*, 1983 U.S. Dist. LEXIS 18115, *14 (D.D.C. March 30, 1983)
................................................................................................................................................ 7

*Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397 (D.C. Cir. 2012)........................................... 7

*Polsby v. Thompson*, 201 F. Supp. 2d 45 (D.D.C. 2002) ......................................................... 25

*Randolph-Sheppard Vendors of America v. Weinberger*, 254 U.S. App. D.C. 45, 795 F.2d 90,
105 (D.C. Cir. 1986)................................................................................................................ 28

*Raya v. Clinton*, No. 09-cv-00169-GEC........................................................................... ..32

*Samirah v. Holder*, 627 F.3d 652 (7th Cir. 2010) .................................................................. 23

*Settles v. U.S. Parole Comm'n*, 429 F.3d 1098 (D.C. Cir. 2005) .........................................6, 37

*Tabb v. District of Columbia*, 477 F. Supp. 2d 185 (D.D.C. 2007)...........................................8

*Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294 (D.C. Cir. 1987)........................................ 7

*United States v. Clarke*, 628 F. Supp. 2d 15 (D.D.C. 2009).................................................. 16

*Wilson v. District of Columbia*, 269 F.R.D. 8 (D.D.C. 2010) ..........................................................6, 37

*Worthy v. United States*, 328 F.2d 386 (5th Cir. 1964)......................................................................23

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d  1 (D.D.C. 2010)................................................37

*Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017)........................................................................ 16, 17

## STATUTES

18 U.S.C. § 2339B ................................................................................................................... 2

22 U.S.C. § 2705.................................................................................................................. 19, 20

8 U.S.C § 1453.......................................................................................................................... 21

8 U.S.C. § 1503............................................................................................................... passim

8 U.S.C. § 1504......................................................................................................................... 21

8 U.S.C. §1451......................................................................................................................... 21, 36

## RULES

Fed. R. Civ. P. 12(b)(6)...........................................................................................................5, 7

Fed. R. Civ. P. 12(b)1 ......................................................................................................... 5. 6. 7

Fed. R. Civ. P. 17(c)(2)............................................................................................................ 11

Fed. R. Civ. P. 56 ......................................................................................................................7

Fed. R. Civ. Pro. 15(a) ........................................................................................................... 29

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. XIV ..................................................................................................... 22, 23

U.S. Const. Amend. XIV ........................................................................................................... 23

# I.      INTRODUCTION

Plaintiff Ahmed Ali Muthana is a naturalized United States citizen.  He is also the father of Hoda Muthana, and the grandfather of Minor John Doe.  He brings this action on his own behalf for declaratory judgment, and as proper Next Friend of Hoda Muthana and Minor John Doe seeking declaratory, injunctive and mandamus relief.  Plaintiff Muthana's U.S.-born daughter and his grandson are currently in a precarious position by way of their present location in Camp Roj in Syria.  The United States has begun its withdrawal of U.S. forces from the Syrian conflict.[1]  Upon withdrawal, the ability of the United States to obtain military cooperation from the Syrian Democratic forces, with which they have been previously aligned, will be greatly diminished if even possible.  As set forth further in Plaintiff's Complaint and below, the failure of the United States to use reasonable efforts to facilitate the return of Ms. Muthana and her son as it is obligated to do under both the Constitution and the Fourth Geneva Convention will cause immediate and irreparable harm by jeopardizing their ability in the future to return to the United States.  Of greater urgency, as reflected in the Declaration of Ahmed Muthana, attached to this Response in Opposition as Exhibit A, the health of Mr. Muthana's young grandson is declining, and he is at increasing risk of serious health decline, up to and including death, the longer he is prevented by the actions of Defendants from leaving his current conditions.

After both President Trump and Secretary of State Mike Pompeo specifically declared Hoda Muthana not to be a citizen of the United States, or entitled to become one or to return at any time, Plaintiff filed this suit.  Plaintiff seeks declaratory relief recognizing that Ms. Muthana remains a citizen of the United States, that her son is eligible for United States citizenship, and that

---

[1] "The Planned U.S. Troop Withdrawal from Syria: Here's the Latest," The New York Times, January 16, 2019 (https://www.nytimes.com/2019/01/16/world/middleeast/syria-us-troops-timeline.html) (last accessed January 20, 2019).

Mr. Muthana will not violate 18 U.S.C. § 2339B by helping provide what his daughter and grandson need to survive until they reach the United States; Plaintiff also seeks an order in mandamus instructing the United States to use reasonable good faith efforts to assist in the return travel of Hoda Muthana, along with her minor child, and in the alternative that the Department of State issue a certificate of identity for Ms. Muthana. Defendants now seek dismissal of all claims in this matter by way of a single motion brought under Fed. R. Civ. P. 12(b)(1), Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56. For the reasons set forth below, Plaintiff respectfully requests that this Court deny Defendants' Motion in full; in the alternative, Plaintiff respectfully requests leave of this Court to file an amended complaint, in the interests of justice and judicial economy.

## II.     BRIEF FACTUAL SUMMARY

The following facts are undisputed. Prior to the birth of his daughter Hoda Muthana, Plaintiff Ahmed Ali Muthana worked as a diplomat for the Yemen Permanent Mission to the United Nations. Doc. 1-5. He held this position beginning on October 15, 1990. Doc. 1-5. He was fired from this position in June 1994. Doc. 19-2 at 12 ("Fired 6/94 SEE CARRDEX"). On June 2, 1994, the Yemeni Ambassador Al-Aashtal required Mr. Muthana to surrender his diplomatic identity card. Doc. 1 at 6; *see also* Ex. A. Mr. Muthana's diplomatic position officially ended no later than September 1, 1994. Doc. 19-2 at 5, 14; *see also* Doc. 1-5. Sometime after his termination, the United States Mission to the United Nations received notice of both Mr. Muthana's June termination and his official end date of September 1, 1994.[2]

---

[2] Defendants erroneously state that there is no dispute as to the date on which the United States Mission to the United Nations learned of the termination of Mr. Muthana's duties. Doc. 19 at 27. While Plaintiff does not believe the date of official notice to be relevant to the end of his duties and therefore his entitlement to immunity, Plaintiff does not know when, exactly, the United States Mission to the United Nations learned of his termination. Plaintiff notes that the document dated February 6, 1995 provided by Defendants (Doc. 19-2 at p. 14), and presumably compiled in advance of that date, lists Plaintiff and two other individuals on behalf of Yemen as "left the Mission in September 1994" and that, regarding Plaintiff, the typed notation of "No further information available" is crossed out by hand, with a handwritten notation reflecting Plaintiff's plans for the future added, with the date February 11, 1995 also

Hoda Muthana was born later, in the state of New Jersey, on ███████, 1994.[3] Utilizing his daughter's birth certificate, Mr. Muthana applied for a passport for his minor daughter Hoda Muthana in 2004. Doc. 1 at 6.  After receiving this application, officials from the United States State Department initially questioned whether Ms. Muthana was eligible for a U.S. passport, based on their records purportedly showing her father's diplomatic status remained in effect until February 6, 1995.  In response, Ahmed Ali Muthana provided the government with a letter from the United States Mission to the United Nations, signed by Russell F. Graham, Minister Counselor for Host Country Affairs, and addressed to Bureau of Citizenship and Immigration Services, which confirms that the diplomatic status he had due to his employment at the U.N. was terminated prior to the time of Ms. Muthana's birth.[4]  The United States accepted this documentation and issued Hoda Muthana the requested passport on January 24, 2005, listing her nationality as "United States of America."[5]  The United States later renewed Ms. Muthana's passport on February 21, 2014.[6]

Ms. Muthana traveled to Syria beginning in November 2014, unbeknownst to her family at the time.  Plaintiff Ahmed Ali Muthana immediately began working with the FBI to find her, and kept them up to date on any communications he had with her. Doc. 1.  In or about November 2018, Ms. Muthana communicated that she was trying to escape ISIS-controlled Syria. Ex. A.  By December 2018 she had left her home in Syria with her young son, hoping to turn herself into

---

handwritten beneath it.  However, other than to strongly indicate that the United States Mission to the United Nations knew of the end of Plaintiff's duties prior to the February 6 publication date of the "blue list" termination excerpt provided, the documents provided by Defendants do not conclusively reveal the date on which the United States first learned of the end of Mr. Muthana's duties.

[3] *See* Doc. 1-4, Ex. B to Plaintiff's Complaint.

[4] Doc. 1-5, Exhibit C to Plaintiff's Complaint.

[5] Doc. 1-6, Exhibit D to Plaintiff's Complaint.

[6] *Id.*

American forces.  By January 2019, she approached Syrian Democratic forces, and was first detained at Camp al-Hawl prior to her relocation to Camp Roj. Ex. A.  Ms. Muthana identified herself and her son as United States citizens. Despite this identification, she was not interred with other persons believed to be United States citizens.

She has repeatedly and consistently articulated her desire to return to the United States, her remorse over her prior actions, and her willingness to surrender to United States authorities for any criminal consequences she may face.[7]  Nonetheless, on February 20, 2019, the United States Department of State declared on its website that "Ms. Hoda Muthana is not a U.S. citizen and will not be admitted into the United States. She does not have any legal basis, no valid U.S. passport, no right to a passport, nor any visa to travel to the United States."[8]  Later on February 20, 2019, President Donald J. Trump tweeted that "I have instructed Secretary of State Mike Pompeo, and he fully agrees, not to allow Hoda Muthana back into the Country!"[9] Secretary of State Pompeo then appeared on national television, proclaiming that Ms. Muthana "is a terrorist.  She is not a

---

[7] Ex. A, letter from Hoda Muthana, attached to Declaration of Ahmed Muthana; *see also* Martin Chow and Bethlan McKernan, *Hoda Muthana 'deeply regrets' joining Isis and wants to return home,* The Guardian (Feb. 17, 2019), available at https://www.theguardian.com/world/2019/feb/17/us-woman-hoda-muthana-deeply-regrets-joining-isis-and-wants-return-home (where Ms. Muthana stated that "I want to return [to the United States] and I'll never come back to the Middle East" as well as that she "deeply regrets" traveling to Syria to join the Islamic State.); *"I am allowed back," U.S. "ISIS bride" Hoda Muthana tells CBS News*, CBS News (March 4, 2019), available at  https://www.cbsnews.com/news/us-isis-bride-hoda-muthana-court-bid-to-come-home-donald-trump-says-not-citizen/ ("Muthana told CBS News she would be willing to "go to jail if that's what it takes to get back to America."); Richard Engel, *ISIS bride Hoda Muthana says she'll have 'no problem' returning to U.S.*, NBC News (Feb. 22, 2019), available at https://www.nbcnews.com/news/world/isis-bride-hoda-muthana-says-she-ll-have-no-problem-n974391 ("[w]hen asked what she expects will happen if she is allowed to return to the U.S., Muthana replied, 'Of course I'll be given jail time.'").

[8] Press Release dated February 20, 2019, located on Department of State website (https://www.state.gov/secretary/remarks/2019/02/289558.htm) (last visited February 20, 2019).

[9] https://twitter.com/realdonaldtrump/status/1098327855145062411?s=21 (last visited February 20, 2019).

United States citizen.  She ought not return to this country."[10]  After prompting that she had been

born in the United States, Secretary Pompeo averred that "she may have been born in the United

States", but nonetheless made the conclusory assertion, which is not within his authority to make,

that "she is not a U.S. citizen, nor is she entitled to U.S. citizenship."[11]  As reasoning, Secretary

Pompeo stated simply "You have to remember the context" and described the war against ISIS.[12]

 Prior to the above proclamations, the United States did not initiate any action in the courts

of the United States to revoke Ms. Muthana's citizenship.  It has not done so since then either.

Defendants did, however, file their Motion to Dismiss or in the Alternative Partial Motion for

Summary Judgment in this matter.  Doc. 19 ("Defendants' Motion").  Plaintiff hereby submits this

Response in Opposition, and for the reasons stated below respectfully requests that Defendants'

Motion be denied in its entirety.[13]

## III. RELEVANT LEGAL STANDARDS

 As Defendants attempt to dismiss Plaintiff's claims under several different standards,

Plaintiff will address these in turn below under the appropriate standards.

## A. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(1)

 Generally, a reviewing court "consider[] Rule 12(b)(1) challenges to its subject matter

jurisdiction before assessing the legal sufficiency of a claim under Rule 12(b)(6)." *Lempert v. Rice*,

956 F. Supp. 2d 17, 27 (D.D.C. 2013). In evaluating a motion to dismiss brought under Rule

12(b)(1), courts must "accept as true all of the factual allegations contained in the complaint."

---

[10] https://www.today.com/video/mike-pompeo-on-hoda-muthana-she-is-not-a-us-citizen-1446009923715 (last visited February 27, 2019).

[11] *Id*.

[12] *Id*.

[13] Plaintiff does not wish to pursue the claim at Count 2 in Plaintiff's Original Complaint, which is derivative of Ms. Muthana's mother's immigration status at the time of Ms. Muthana's birth (Doc. 1 at 13).

*Wilson v. District of Columbia*, 269 F.R.D. 8, 11 (D.D.C. 2010) (citing *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993)). Reviewing courts are instructed to "review the complaint liberally while accepting all inferences favorable to the plaintiff." *Nattah v. Bush,* 770 F. Supp. 2d 193, 199 (D.D.C. 2001) (citing *Barr v. Clinton*, 370 F.3d 1196, 1199, 361 U.S. App. D.C. 472 (D.C. Cir. 2004)). In other words, a reviewing court "assumes the truth of the allegations made and construes them favorably to the pleader." *Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A court may dismiss a complaint for lack of subject-matter jurisdiction only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Empagran*, 315 F.3d at 343 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). Courts may also consider relevant materials outside the pleadings when evaluating a motion to dismiss brought under Fed. R. Civ. P. 12(b)(1). *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

## B.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Accordingly, the proper test when assessing 12(b)(6) motion is not "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Supreme Court has also held that in reviewing a complaint, "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Id.* All that a reviewing court is required to determine is whether a plaintiff has properly stated a claim. *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457, 467 (D.C. Cir. 1991). In order to survive a motion to dismiss brought under this Rule, the complaint must "plead[] factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and "must suggest a plausible scenario that shows that the pleader is entitled to relief.'" *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Similar to the review of Rule 12(b)(1) motions, courts reviewing (12)(b)(6) challenges must treat a plaintiff's allegations as true, and draw all reasonable inferences in the favor of the plaintiff. *Muhammad v. United States,* 300 F. Supp. 3d 257, 262 (D.D.C. 2018) (citing *Momenian v. Davidson*, 878 F.3d 381, 387 (D.C. Cir. 2017)).

## C.   Standard Under Federal Rule of Civil Procedure 56

In evaluating a motion for summary judgment brought pre-judgment as here, Defendants request summary judgment on Counts 1-8 of Plaintiff's Complaint "in the alternative";  they ask this Court to find that there is no genuine issue of material fact on the question of Ms. Muthana's citizenship. Summary judgment is only appropriate "when no genuine issues of material fact are in dispute."  Fed. R. Civ. P 56. "[T]o be material, the factual assertion must be capable of affecting the substantive outcome of the litigation," and to be genuine, "the issue must be supported by sufficient admissible evidence that a reasonable trier-of fact could find for the nonmoving party." Fed. R. Civ. P 56; *see also Maydak v. United States DOJ*, 254, F. Supp. 2d 23, 32 (D.D.C. 2003); *Estate of Gaither v. District of Columbia,* 655 F. Supp. 2d 69, 78 (D.D.C. 2009).

The party seeking summary judgment "bears the heavy burden of establishing that the merits of its case are so clear" that summary judgment is appropriate. *Taxpayers Watchdog, Inc. v. Stanley,* 819 F.2d 294, 297 (D.C. Cir. 1987); *see also Northland Capital Corp., v. Silver,* 1983 U.S. Dist. LEXIS 18115, *14 (D.D.C.  March 30, 1983) ("a party who seeks to dispose of an action on a motion for summary judgment bears a heavy burden"). In considering a motion for summary judgment, the non-movant's evidence must be believed, and "all justifiable inferences are to be

drawn in his favor." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986). The non-movant's

burden at this stage is not to prove his case; he may prevail simply by providing evidence "that

would permit a reasonable jury to find [in his favor]." *Laningham v. U.S. Navy*, 813 F.2d 1236,

1242, 259 U.S. App. D.C. 115 (D.C. Cir. 1987). The burden for demonstrating the appropriateness

of summary judgment is even heavier in the early stages of litigation, and summary judgment

"ordinarily 'is proper only after the plaintiff has been given adequate time for discovery.'"

*Americable Int'l v. Department of Navy,* 129 F.3d 1271 (D.C. Cir. 1997) (quoting "*First Chicago*

*Int'l v. United Exch. Co.,* 836 F.2d 1375, 1380 (D.C. Cir. 1988); *see also Tabb v. District of*

*Columbia,* 477 F. Supp. 2d 185, 188, n. 1 (D.D.C. 2007) ("Defendants…sought summary

judgment very early in this lawsuit—before any discovery. The Court notes that this is usually a

disfavored practice"). No discovery has taken place to date in this matter. Accordingly, this Court

finding summary judgment appropriate in this matter at this stage would require that the Court

hold that, even at this early pre-discovery stage, the issues presented are "so one-sided that one

party must prevail as a matter of law." *Liberty Lobby,* 477 U.S. at 259. Defendants have fallen

significantly short of this burden.

## IV.     NEXT FRIEND STATUS IS APPROPRIATE HERE

In their Motion to Dismiss, Defendants argue that Plaintiff's Complaint should be dismissed

because he "fails to establish that he has standing to sue as next friend of Muthana and A.M." Doc.

19 at 11. The facts do not support this argument.

## A.     Standard for Need and Identifying an Appropriate Next Friend

Next friend status, which allows a person to bring suit on behalf of the actual party in interest,

is appropriate when two conditions are met. First, "a next friend must provide an adequate

explanation—such as inaccessibility, mental incompetence, or other disability—why the real party

in interest cannot appear on his own behalf," and second the purported next friend "must be truly

dedicated to the best interest of the person on whose behalf he seeks to litigate, and it has been

further suggested that a 'next friend' must have some significant relationship with the real party in

interest." *Whitmore v. Arkansas,* 495 U.S. 149, 163 (1990); *see also Doe v. Bush,* 2006 U.S. Dist.

LEXIS 79175 (D.D.C. October 31, 2006) (noting that "precedent in this circuit does not speak to

whether or not the Court should impute a significant relationship requirement to the second prong

of *Whitmore*"). While the burden to satisfy the requirements of next friend standing is on the party

seeking to assert it, Plaintiff has clearly done so here. *See Whitmore,* 495 U.S. at 164.

**B.**     **Next Friend Standing May Be Invoked In General Civil Litigation**

Prior to applying the two prongs set forth in *Whitmore,* Defendants argue "at the threshold"

that the Court should reject Plaintiff's claim of next friend standing because he "has not invoked

any applicable statute or rule authorizing his next-friend status." Doc. 19 at 12. Defendants

accurately note that "Muthana is not a minor, and Plaintiff has not alleged that she is mentally

incompetent…nor is this a habeas corpus proceeding," citing to *Whitmore* and Fed. R. Civ. P.

17(c)(2). *Id.* Although Defendants are correct that next friend standing is commonly invoked in

habeas proceedings, this Court has expressly held that "the most natural reading of *Whitmore* is

that next friend standing is *not* limited to habeas cases, but instead **may be invoked if plaintiffs**

**can sufficiently demonstrate its necessity.**" *Ahmed Salem Bin Jaber v. United States*, 155 F.

Supp. 3d 70, 75-77 (D.D.C. 2016) (emphasis added). In *Ahmed Salem Bin Jaber,* a case involving

drone strikes in Yemen, this Court rejected as unpersuasive defendants' claim that "in cases

involving mentally competent adults, next friend standing has only been recognized in habeas

corpus cases," and instead held that the *Whitmore* opinion "expressly declined to hold that such

statutory authorization is necessary." *Id.* at 75; *see also Foreman v. Heineman*, 240 F.R.D. 456,

516 (D. Neb. 2007) (noting that "although *Whitmore's* next friend analysis was first enunciated in the context of habeas law, it has been extended to general civil litigation"). Defendants' contention that next friend standing should not be available "in a non-habeas case where no statute or rule authorizes suit by a next friend" contradicts this Court's precedent. Doc. 19 at 13. Plaintiff should be permitted to assert next friend standing, as the factual background supports its appropriateness.

## C.    Plaintiff Demonstrates Appropriate Grounds for Next Friend Status in This Case

Defendants next argue that Plaintiff cannot satisfy the *Whitmore* test because he fails to provide an "adequate explanation why the real party in interest cannot appear." Doc. 19 at 13, citing *Whitmore,* 495 U.S. at 163. Defendants assert that Plaintiff's references to receiving communications from Ms. Muthana, as well as Ms. Muthana's conversations with western media, undercut the assertion that she is unable to bring this lawsuit on her own behalf. This argument mischaracterizes the factual basis underlying Plaintiff's claim of next friend standing, as well as the requirement applicable to a motion to dismiss to view all facts in the light most favorable to the non-movant. Unlike in *Al-Aulaqi*, where the court found that Plaintiff was voluntarily incommunicado as a "result of his own choice," Ms. Muthana is being held by Kurdish forces and has little to no control over her ability to communicate with the outside world. *Compare Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 19 (D.D.C. 2010). She is not able to text or call home freely, and both Plaintiff and counsel for Plaintiff have no ability to initiate contact with her. Ms. Muthana has not had reliable access to communication since her arrival at Camp Roj, where communication via phone can only be done through the camp's administration phone, using WhatsApp, cannot be arranged in advance, and does not occur at predictable intervals.[14] Accordingly, although Plaintiff has sporadically received text messages from Ms. Muthana, these messages arrive inconsistently

---

[14] *See* the attached declarations of Ahmed Ali Muthana, at Exhibit A.

and have largely come from unrecognized numbers, with no way to properly verify that Ms. Muthana is in fact the actual sender. *See Ahmed Salem Bin Jaber*, 155 F. Supp. 3d at 76-77 (finding that plaintiffs were inaccessible where "telephone contact was sporadic and difficult," despite defendants' speculation that "even if plaintiffs cannot physically leave Yemen, they 'may be able to participate in any court hearings by telephone'"). Plaintiff has received no phone calls from his daughter, and counsel for Plaintiff has been unable to speak directly to Ms. Muthana since her arrival at Camp al-Hawl at the beginning of this year. Since then, multiple critical steps in this lawsuit have occurred, all without counsel's ability to directly or consistently contact the main person on whose behalf this lawsuit has been brought.

Defendants are correct in their assertion that, on a handful of occasions, Ms. Muthana has spoken with members of the western news media; however, those conversations were facilitated by the media outlets themselves, and conducted largely in circumstances where the individual interviewing Ms. Muthana physically traveled to Camp Roj. In light of the national attention garnered by Ms. Muthana's case and the thorough news coverage of the events unfolding in Syria, it would be highly unusual for Ms. Muthana <u>not</u> to be contacted by members of the media. However, since arriving at Camp Roj, Ms. Muthana lacks the freedom of mobility and communication required to arrange such meetings independently, and has not done so on any occasion. Finally, counsel for Plaintiff cannot be reasonably expected to travel to Syria in order to communicate with Ms. Muthana. Not only is travel to Syria highly discouraged by Defendants, as indicated by the level four travel advisory put in place by the U.S. Department of State, but Plaintiff is represented by a nonprofit organization with limited financial resources.[15] Ms. Muthana's rights and status as a U.S. citizen rest on the outcome of this litigation, and requiring her to litigate those

---

[15] https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/syria-travel-advisory.html

rights in circumstances where her counsel cannot physically visit her, initiate contact with her, or reliably count on her ability to access telephone or internet communication would be fundamentally unjust. This is particularly true since Ms. Muthana's inaccessibility comes as a direct result of Defendants' position that she will not be permitted to return to the United States. *See ACLU Found. v. Mattis,* 286 F. Supp. 3d 53, 58 (D.D.C. 2017) (noting that the Defense Departments argument that next friend standing should be denied based on a failure to meet and confer with the detainee was "disingenuous at best, given that the Department is the sole impediment" to counsel's ability to meet with the plaintiff).

Defendants' final argument against the appropriateness of next friend standing rests on their assertion that Plaintiff "has not made an adequate showing that he is acting in accord with Muthana's interests." Doc. 19 at 14. In support of this argument, Defendants rely on statements made by Ms. Muthana in 2015, nearly four years ago.[16] Those statements are not legally relevant to the determination of whether her present interests align with Plaintiff's in this 2019 litigation. In all communications since leaving ISIS-controlled territory, Ms. Muthana has been clear and consistent that she regrets her actions and wishes to return to the United States face justice. This is true of both her conversations with the media, which have been made public, and her limited communications with her father and counsel for Plaintiff.[17] In light of Ms. Muthana's own

---

[16] Even examining statements purportedly made by Ms. Muthana in 2017 is irrelevant to this analysis. *See https://www.buzzfeednews.com/article/ellievhall/hoda-muthana-isis-instagram-twitter-tumblr-alabama.* Ms. Muthana left ISIS-controlled territory in December of 2018, and has since then voiced nothing but her desire to return to the United States with her son, and willingness to be held accountable for her actions under the U.S. justice system.

[17] *See* letter from Hoda Muthana, attached to Declaration of Ahmed Muthana, Ex. A (the only physical letter received by Plaintiff or Plaintiff's counsel); *See also* https://www.hstoday.us/subject-matter-areas/terrorism-study/american-born-hoda-muthana-tells-all-about-joining-isis-and-escaping-the-caliphate/ ("it was up until the very end that I told my dad and my family that I wanted to come back. And my lawyers." She further states that, in going to the Islamic State, she "found hell on earth."); *see also* https://www.buzzfeednews.com/article/ellievhall/hoda-muthana-isis-instagram-twitter-tumblr-alabama ("Now, she's sitting in a Kurdish refugee camp with her son … who will turn 2 soon, begging to return to her homeland, the United States").

12

videotaped, recent and consistent expressions of her interests, as well as her actions involuntarily leaving ISIS-controlled territory and surrendering, Defendants cannot convincingly argue that Ahmed Muthana's interest in bringing Ms. Muthana back to the United States with her son is not aligned with her own, when she has repeatedly stated that same wish. The current harmony in interest between Ms. Muthana and her father is further evidenced by the fact that, since Ms. Muthana left the U.S. in 2015, her father did not attempt at any point to initiate litigation on his daughter's behalf, until she explicitly stated her remorse and her desire to return home in late 2018. Prior to that alignment, and despite being her parent, Mr. Muthana did not attempt to use the courts for what he thought was best for his daughter.  Thus, Plaintiff is not merely "a loving parent who wants only what he rationally believes to be in the best interests of his adult child;" he brought this litigation in order to facilitate the precise relief that Ms. Muthana herself has repeatedly requested: her return to the United States with her son. Doc. 19 at 15.

The showing required for a proper assertion of next friend standing is meant to ensure that individuals cannot circumvent constitutional limitations on the courts' jurisdiction by merely declaring themselves a 'next friend;' there is no risk of any such slippery slope in allowing Ms. Muthana to access the courts through her father, who is present in the United States and regularly and reliably communicates with counsel. *See Ahmed Salem Bin Jaber,* 155 F. Supp. 3d at 77 ("no slippery slope is likely to result from this Court's decision, which holds only that a close family relative, who has advocated on plaintiffs' behalf for years, is able to survive a motion to dismiss"). This case is based on a set of highly unusual and context-specific facts, unlikely to be repeated in future lawsuits; even if they do recur, next friend status here is consistent with the law. Accordingly, this Court bears no risk in applying next friend standing here, where Plaintiff satisfies the requirements. Conversely, without utilizing next friend standing, Ms. Muthana and her young child

13

are left without a vehicle to fairly challenge the effective revocation of her United States

citizenship, and the United States' failure to continue recognizing her as a United States citizen.

## V.  MS. MUTHANA IS ENTITLED TO DECLARATORY RELIEF BASED ON THE DEPARTMENT OF STATE PREVIOUSLY ISSUING HER TWO PASSPORTS.

Defendants point out that the Department of State only revoked Ms. Muthana's passport,

and did not revoke her citizenship.[18]  Plaintiff agrees. What matters here is not that the Department

of State revoked Ms. Muthana's United States passport in 2016; what matters is that the

Department of State issued her one in the first place. The Department of State did this on two

occasions: first in January 2005, then again in February, 2014. Doc. 1-6.  The Department of State

did this after initially raising the question of her father's diplomatic status at the time of Ms.

Muthana's, and after considering his response which provided the letter Mr. Muthana received

from the then-current Minister Counselor, Host Country Affairs, United States Mission to the

United Nations. Doc. 1-5.  This passport, issued in 2005 by the Department of State, lists Ms.

Muthana's nationality as "United States of America." Ex. A at internal Ex. 1.

Defendants do not, and cannot, dispute any of these facts.  And while Defendants may wish

the legal impact of these facts were otherwise, they cannot reverse the clock to 2005, or even 2014,

to change the facts as they existed at the time, and therefore remain today. With a letter from the

---

[18] While Plaintiff does not challenge that the Department of State has the right to revoke passports of U.S. citizens, Plaintiff does dispute that Defendants ever provided the proper notice to Ms. Muthana that it was revoking her passport. At the time the Department of State sent the letter in question dated January 15, 2016 addressed to Ms. Muthana (Doc. 1-6), Ms. Muthana had been a legal adult for just over three years.  And Ms. Muthana's presence outside the United States at that time, and break in communications with her family at the time, was widely publicized and reported.  Doc. 19 at 20, fn. 4.  Nonetheless, the Department of State sent this letter to Ms. Muthana's parents' address.  Doc. 1-6. Upon receipt of this letter, Mr. Muthana responded that (1) Ms. Muthana no longer resided at that address and was out of the country, and (2) Mr. Muthana was not a diplomat at the time of his daughter Hoda's birth, and he re-sent copies of the materials already provided to the Department of State eleven years prior to that, when the Department of State had first raised any question as to his status as a diplomat at the time of Ms. Muthana's birth.  Ex. A. Nonetheless, Defendants now assert that Ms. Muthana "has not followed this process or even attempted to follow this process" – despite Defendants knowing the letter did not reach her.  Doc. 19 at 32.  Defendants' attempt to place the burden on Ms. Muthana to have appealed from a letter she never received, when she was not in the country, and which the Department of State was notified Ms. Muthana had not received, is disingenuous at best.  At the least, it is not grounds for dismissal of Plaintiff's claims in this matter.

official in the very same position which Defendants now claim is such compelling authority, Plaintiff Muthana sufficiently demonstrated to the Department of State his lack of immunity at the time of Ms. Muthana's birth, and therefore her status as a birthright citizen; the Department of State was convinced enough to issue Ms. Muthana a passport.  *Cf*. Doc. 1-5 *with* Doc. 19-2; *see also* Doc. 19 at 27 (characterizing the "certification" by the individual in the position of Minister/Counselor for Host Country Affairs issued 25 years after the fact as "contemporaneous" and "conclusive" despite its contradictions to the letter issued by the individual in the same position in 2004, only 10 years after Ms. Muthana's birth).

### A.     A United States Passport Is Legally Recognized as Proof of U.S. Citizenship.

Defendants recognize the legal import of passports in their Motion: [19] passports "'provide proof of one's status as a citizen.' *Chacoty v. Tillerson*, 285 F. Supp. 3d 293, 298 (D.D.C. 2018)." Doc. 19 at 31.[20]  Multiple courts as well as Congress recognize that a United States passport serves as proof of recognition as a United States citizen.  "The INS [Immigration and Naturalization Service, precursor to present USCIS] has recognized … a passport [as] conclusive evidence of citizenship. See *Matter of Villanueva*, Interim Decision #2968 (BIA 1984). In *Villanueva*, the petitioner sought to obtain a preferential visa for his spouse on the basis of his United States

---

[19] Defendants assert that they bring both a Motion to Dismiss under Rules 12(b)(1) and (6), and a partial motion for summary judgment.  However, Defendants have failed to comply with this Court's stated preferences for motions for summary judgment, that "[t]he moving party's statement of material facts shall be a short and concise statement, in numbered paragraphs, of all material facts as to which the moving party claims there is no genuine dispute. The statement must contain only one factual assertion in each numbered paragraph."  Accordingly, it is difficult for Plaintiff to comply with this Court's counterpart requirement that "[t]he party responding to a statement of material facts must (1) restate the movant's statement of undisputed material fact in numbered paragraphs, and (2) immediately following each numbered paragraph state the opponent's response to the stated fact."  Further complicating this task is the intermingled manner in which Defendants present their Motion, which does not readily segregate moving to dismiss from moving for summary judgment.  Nonetheless, where clear that Defendants move for summary judgment within this blended Motion, Plaintiff will note the stated and disputed facts.

[20] As discussed in further detail in Section VI. B, *infra*, the *Chacoty* case on which Defendants rely is immensely instructive in showing why a plaintiff who is outside of the United States at the time of bringing an action, as Ms. Muthana is, does not need to exhaust the administrative provisions of 8 U.S.C. § 1503(b) and (c).  *Chacoty*, 285 F. Supp. 3d at 303.

citizenship. He proved his citizenship with a passport. The INS held that 22 U.S.C. § 2705 made a passport conclusive proof of citizenship." *Magnuson v. Baker*, 911 F.2d 330, n. 7 (9th Cir. 1990).

Numerous other courts recognize that, pursuant to 22 U.S.C. § 2705, a U.S. passport provides conclusive proof of U.S. citizenship. *See Xia v. Tillerson*, 865 F.3d 643, 656 (D.C. Cir. 2017) (stating that "[p]resenting proof of a naturalization certificate or passport—even if already administratively cancelled—would seem to satisfy that prima facie requirement [for evidence of citizenship]"); *Keil v. Triveline*, 661 F.3d 981, 987 (8th Cir. 2011) (acknowledging that passports are "conclusive proof of citizenship in administrative immigration proceedings."); *Magnuson*, 911 F.2d at 333 (finding that "[t]he statute [22 U.S.C. § 2705] plainly states that a passport has the same force and effect as a certificate of naturalization or citizenship. […]. The holders of these other documents can use them as conclusive evidence of citizenship. Therefore, so can a holder of a passport"); *Edwards v. Bryson*, 884 F. Supp. 2d 202, 206 (E.D. Pa. 2012) (reasoning that a holder of an expired passport is a U.S. citizen because "[t]o hold otherwise, would lessen the import of a passport as compared to that of a certificate of naturalization or a certificate of citizenship, which is exactly what § 2705 forbids...."); *United States v. Clarke*, 628 F. Supp. 2d 15, 21 (D.D.C. 2009) (recognizing that 22 U.S.C. § 2705 "puts passports in the same status as certificates of naturalization for the purpose of proving U.S. citizenship."); *Banchong v. Kane*, 2009 U.S. Dist. LEXIS 127134 (D. Ariz. Dec. 23, 2009) (citing 22 U.S.C. § 2705 as support for the statement that "passports [are] conclusive proof of citizenship."); *In re Villanueva*, 19 I. & N. Dec. 101, 103 (B.I.A. 1984) (holding that "unless void on its face, a valid United States passport issued to an individual as a citizen of the United States […] constitutes conclusive proof of such person's United States citizenship.").

**B.**     **Revocation of a Document Does Not Equate to Revocation of Status**

With the promulgation of 22 U.S.C. § 2705, if the Department of State discovers that a passport was "illegally, fraudulently, or erroneously obtained," the Secretary of State is authorized to cancel it. "But administrative cancellation of a citizen's passport, like administrative cancellation of a certificate of naturalization, shall affect only the document and not the citizenship status of the person in whose name the document was issued." *Xia*, 865 F.3d at 651-2.

Lest any doubt remain, Congress passed 8 U.S.C. § 1504 in 1994 (coincidentally, the year of Ms. Muthana's birth).  Promulgated in response to the holding in *Magnuson* and similar cases which found no right of the Department of State to revoke passports without a pre-deprivation hearing, § 1504 specifically makes clear that the Department of State is given the power only to revoke the <u>document</u>, not the <u>status</u> of the individual in question:

> The cancellation under this section of any document purporting to show the citizenship status of the person to whom it was issued shall affect only the document and not the citizenship status of the person in whose name the document was issued.

8 U.S.C. § 1504(a).  This Circuit has in fact specifically clarified that the government cannot make an "end run" around the requirement of obtaining a judicial ruling, supported by clear and convincing evidence, in order to revoke citizenship:

> If the government were correct that a successful administrative challenge to a … passport on the ground that it was unlawfully procured sufficed to reveal the holder's true status as a noncitizen, obviating any need for judicial action under section 1451 to effect denaturalization, the precedents, the process provided by section 1451, and the express preservation of citizenship status in sections 1504 and 1453 would be illusory.

*Xia v. Tillerson*, 865 F.3d 643, 654 (D.C. Cir. 2017).  This requirement of judicial action for status, as opposed to documents, is true in all contexts of citizenship.  "Section 1421 grants the Attorney General the power to naturalize individuals. 8 U.S.C. § 1421. It says nothing about denaturalization or cancellation of certificates of naturalization." *Id*. at 656.  "On the government's logic, anyone

17

whose naturalization the government deemed invalidly obtained would not be protected by the requirement of a court order to denaturalize, but could instead be denaturalized administratively. No court of which we are aware has accepted the contention that, in such circumstances, judicial process is unnecessary." *Id*. at 655. "The government's theory would appear to allow it to circumvent in every such case its burden to obtain a judicial denaturalization order, based on the theory that the naturalization was never valid to begin with." *Id*. at 653-54.

**C.**   **Ms. Muthana is Entitled to Declaratory Judgment on Her Continuing Citizenship Status**

In the absence of a judicial ruling to the contrary, based on clear and convincing evidence, Ms. Muthana's citizenship continues despite the prior revocation of her passport. "Assuming, as we must, that plaintiffs were naturalized United States citizens, they retain that citizenship status until the government obtains a court order vitiating it. Administrative actions alone are inadequate to extinguish any United States citizenship plaintiffs may have." *Xia*, 865 F.3d at 655. She is, therefore entitled to a declaratory order from this Court recognizing her continuing status as a United States citizen. *See, e.g., Chacoty*, 285 F. Supp. 3d at 303. As there has been no judicial order to the contrary after a showing of clear and convincing evidence, the citizenship evidenced by Ms. Muthana's previous passports remains in existence. Ms. Muthana is, therefore, entitled to a declaratory action from this Court that she remains a United States citizen.

**D.**   **The Public Statements of the Administration Officials Have No Legal Effect on Ms. Muthana's Citizenship**

As referenced earlier and in the previous pleadings in this matter, both President Trump and Secretary of State Mike Pompeo have issued conclusory statements that Ms. Muthana is not a United States citizen. Neither has the authority to decide this, and their statements therefore have no legal effect on Ms. Muthana's citizenship status.

The Fourteenth Amendment to the U.S. Constitution declares that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside."[21]   The Constitution, therefore, grants the citizenship which is applicable here for Ms. Muthana.   While the Department of State is vested with the authority to issue passports, it has never had the authority to revoke citizenship via administrative process, whether that citizenship is gained through naturalization or birthright.

## VI.   AS A UNITED STATES CITIZEN, MS. MUTHANA IS ENTITLED TO RETURN TO THE UNITED STATES EVEN WITHOUT A PASSPORT

### A.   Ms. Muthana Retains the Right to Re-Enter the United States, Passport or Not.

Mandamus relief is appropriate in this matter. As a recognized U.S. citizen, Ms. Muthana has a clear right to relief and is "entitled [to] constitutional protections even when abroad." *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 71 (D.D.C. 2014) (citing Reid v. Covert, 354 U.S. 1, 5-9 (1957)).   Among the constitutional protections U.S. citizens possess is the absolute and unequivocal right to return back to the United States from overseas travel.   *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001) (recognizing the absolute right of United States citizens to enter its borders and stating that citizens "have the right to return to this country at any time of their liking"); *see also Worthy v. United States*, 328 F.2d 386, 394 (5th Cir. 1964) ("it is inherent in the concept of citizenship that the citizen, when absent from the country to which he owes allegiance, has a right to return, again to set foot on its soil").   Therefore, "governmental actions taken to prevent or impede a citizen from reaching the border infringe upon the citizen's right to reenter the United States." *Mohamed v. Holder*, 995 F. Supp. 2d 520, 536-537 (D. Or. 2014).

---

[21]  U.S. Const. Amend. XIV.

While the Defendants argue that they do not have an affirmative duty to act in this matter, Defendants actually incurred an affirmative duty to protect Ms. Muthana and her son, due in part to the Defendants' revocation of Ms. Muthana's passport. As the Supreme Court has noted:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- *e. g.*, food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. See *Estelle* v. *Gamble, supra,* at 103-104; *Youngberg* v. *Romeo, supra,* at 315-316. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. See *Estelle* v. *Gamble, supra,* at 103.

> *Deshaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 200 (1989).

The United States revoked Ms. Muthana's passport, and because of this, any attempt Ms. Muthana would make to travel on the revoked passport would constitute a felony.  *See* 18 U.S.C. § 1544.  Ms. Muthana should not be forced to choose between subjecting herself to criminal penalty and her "fundamental right to have free ingress" back to the United States as a U.S. citizen. *Worthy,* 328 F.2d at 394. Even in circumstances where individuals are placed on the No Fly List while abroad, the United States must not prohibit their citizens on the No Fly List from returning back.  *See generally Latif v. Holder,* 969 F. Supp. 2d 1293, 1298-1300 (D. Or. 2003) (U.S. government offered "one time" waivers to at least five U.S. citizen plaintiffs on the No Fly List so they could return to the United States).  Therefore, because the Defendants revoked Ms. Muthana's passport, the Defendants owe a duty to facilitate Ms. Muthana's return to the United States, or else they will continue to unlawfully infringe upon her right as a U.S. citizen to reenter the country. *See Mohamed,* 995 F. Supp. at 537.

In addition, despite Defendants' officials calling for other countries to repatriate their citizens detained in Syria,[22] the aforementioned public statements by Defendants' officials express an unwillingness of the Defendants to accept Ms. Muthana in any circumstance and act in accordance with their own proclamation.[23]   In this case, the Syrian Democratic Forces do not want to continue holding individuals like Ms. Muthana or her son, but have no choice as the United States is unwilling to recognize its duty to accept their arrival as citizens.[24]   Due to the Defendants' refusal to allow her to return home, Ms. Muthana is unable to care for herself and her son.[25] Accordingly, the Defendants have not only restrained Ms. Muthana's liberty and the freedom to act on her own behalf by revoking her passport, but have also blocked Ms. Muthana's right to return through public statements that prevent her repatriation, and thereby owes affirmative duties to Ms. Muthana, including recognizing Ms. Muthana's citizenship and facilitating Ms. Muthana's return to the United States.

Defendants also owe Ms. Muthana and her son the exercise of good faith efforts to secure their release and return to the United States, pursuant to the requirements of the Fourth Geneva Convention Relative to the Protections of Civilian Persons in Time of War.[26]   Under Articles 4

---

[22] Robert Palladino, Press Statement, *Foreign Terrorist Fighters in Syria*, Department of State (Feb. 4, 2019), available at https://www.state.gov/r/pa/prs/ps/2019/02/288735.htm ("the United States calls upon other nations to repatriate and prosecute their citizens detained by the [Syrian Democratic Forces].").

[24] Vivian Yee, *Thousands of ISIS Children Suffer in Camps as Countries Grapple With Their Fate,* New York times (May 8, 2019), available at https://www.nytimes.com/2019/05/08/world/middleeast/isis-prisoners-children-women.html?searchResultPosition=1 ("In overflowing camps in eastern Syria, the wives and children of ISIS fighters who fled the last shreds of ISIS territory are dying of exposure, malnutrition and sickness. Children are too spent to speak. Women who have renounced the group live in dread of attacks from those who have not.").

[25] *Id.,* "In overflowing camps in eastern Syria, the wives and children of ISIS fighters who fled the last shreds of ISIS territory are dying of exposure, malnutrition and sickness. Children are too spent to speak. Women who have renounced the group live in dread of attacks from those who have not."

[26] *See* www.un.org/en/genocideprevention/documents/atrocity-crimes/Doc.33_GC-IV-EN.pdf. Over 130 countries have signed the Geneva Conventions of 1949, including Syria, Iran, Turkey, Russia and the United States.  The United States signed the Geneva Conventions in 1949, which were ratified by the Senate in 1955.  Article 2 of that Convention specifies that it "shall apply to all cases of declared war or of any other armed conflict which may arise

and 5 of the Fourth Geneva Convention, in the absence of evidence that Ms. Muthana or her young son directly took part in armed hostilities or engaged in espionage, sabotage or other direct hostilities, both Ms. Muthana and her young son are protected persons.[27]  As foreign nationals, Ms. Muthana and her son have further protection under Article 48 of the Fourth Geneva Convention, which states that "protected persons who are not nationals of the Power whose territory is occupied, may avail themselves of the right to leave the territory subject to the provisions of Article 35, and decisions thereon shall be taken according to the procedure which the Occupying Power shall establish in accordance with the said article."  Under Article 35, a detaining state is required to permit the departure of protected persons upon application, unless it is contrary to the security interests of the detaining state.[28]

While this Court has no jurisdiction over the detaining power, or authority to compel the Syrian Democratic Forces' release of Ms. Muthana and her son, this Court may order the United

---

between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them."  In this case, the Syrian conflict at present has involved multiple High Contracting parties, including the United States, Iran, Russia, and Turkey, all of whom have engaged in armed hostilities within the context of this conflict; accordingly, the Syrian conflict constitutes armed conflict within the scope of the contract, to which the full scope of the Geneva Conventions. The United States Supreme Court has previously acknowledged the legitimacy of invoking the Geneva Convention in order to challenge wartime conduct and sustain fundamental liberties. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 126 S.Ct. 2749, 164 L.Ed. 2d 723 (2006) (recognizing that it is permissible for a foreign national to invoke the Geneva Conventions in order to challenge procedures used by military commissions during his criminal trial).

[27] *See* Article 4, stating that "persons protected by the Convention are those who at a given moment and in any manner whatsoever, find themselves, in case of a conflict or occupation, in the hands of a Party to the conflict or Occupying Power of which they are not nationals."  *See also* Article 5, excepting persons "definitely suspected of or engaged in activities hostile to the security of the State," and defining such persons as a "spy or saboteur, or as a person under definite suspicion of activity hostile to the security of the Occupying Power." www.un.org/en/genocideprevention/documents/atrocity-crimes/Doc.33_GC-IV-EN.pdf.

[28] As Plaintiff stated previously (Dkt. 15 at 22), there is no reason to believe that the Syrian Democratic forces would oppose the departure of Ms. Muthana or her son upon application, as the Syrian Democratic forces repeatedly permitted journalists to interview Ms. Muthana so that she can communicate her desire to return to the United States. Allowing these interviews to occur is not consistent with a desire to retain her in the country for matters of security. *Compare Doe v. Mattis*, 889 F.3d 745, 748 (D.C. Cir. 2018) (holding that the Executive branch cannot transfer a United States citizen from one foreign nation to another, if the citizen seeks return to the United States).

States to use all reasonable and good faith efforts consistent with its treaty obligations under the Geneva Conventions to affect their return, as well as the obligations of the Defendants based on their statements and revocation of Ms. Muthana's passport.  This Court also has the authority to compel the Defendants to recognize that she is a U.S. citizen and their duty to accept U.S. citizens, like Ms. Muthana and her son, detained abroad.

As outlined in the foregoing, Plaintiff has a clear right to relief, based on the Defendant's prior recognition of Ms. Muthana's U.S. citizenship.  Defendants have a clear duty to act, based in part on their actions in prohibiting Ms. Muthana's rightful return to the United States and the resulting duties owed to her based on those actions, as well as their obligations under Geneva Conventions treaty obligations.  Defendants are the only actors who are able to grant Ms. Muthana and her son the relief they seek. Therefore, in order to cure the infringement Defendants brought upon Ms. Muthana's right to return to the United States, which resulted after Defendants revoked Ms. Muthana's passport and through their statements preventing her repatriation, Plaintiff seeks a mandamus order of this Court compelling the Defendants to recognize Ms. Muthana as a U.S. citizen and use all reasonable and good faith efforts to affect her return, which includes providing Ms. Muthana with transportation and travel documents to permit her reentry. Courts have compelled the Attorney General of the United States to facilitate the return for other persons who were prevented from returning to the United States while abroad. [29] The same duty of the Defendants is no less required here.

---

[29] *See Samirah v. Holder,* 627 F.3d 652, 655 (7th Cir. 2010) (where the U.S. government wrongfully refused to allow an applicant to adjust his status from non-lawful resident to lawful resident the right to return to the United States so that he could adjust status, the appellate court remanded "case to the district court for the issuance of a mandamus commanding the Attorney General to take whatever steps are necessary to enable the plaintiff to reenter the United States for the limited purpose of reacquiring the status, with respect to his application for adjustment of status, that he enjoyed when he left the United States pursuant to the grant of advance parole later revoked. An order couched in terms of "take whatever steps are necessary" may seem vague. But the Attorney General has as we have indicated several means of compliance and we can let him decide which to employ to enable the plaintiff to

**B.** **Even if Section 1503 Does Apply in this Matter, it is Not an Exclusive Remedy.**

Should this Court determines that the provisions of § 1503 do apply to Ms. Muthana, § 1503 is not an exclusive remedy. As noted by Defendants in their Motion, the United States Supreme Court in *Rusk v. Cort* recognized that plaintiffs who are out of the country and seek a judicial determination may do so without exhausting the provisions of § 1503(b) or (c). 369 U.S. at 379-80. The Supreme Court permitted this because the intent of subparts (b) and (c) was to prevent those with "spurious citizenship claims" to enter and litigate simply as a way of getting into the country. *Id*. For those seeking declaratory judgment while still outside the country, however, those actions are consistent with the intent of the statute, barring "clear and convincing" evidence that Congress intended otherwise. *Id*. The Supreme Court found just this clear and convincing evidence in the *Califano* case, noting that Congress had specifically intended that administrative exhaustion occur in the limited scope of cases arising under the Social Security Act. *Califano v. Sanders*, 430 U.S. 99 (1977). The facts of *Califano* arose under the Social Security Act; the facts of this matter do not. The right to seek declaratory judgment without utilizing subparts (b) and (c) was again confirmed in *Chacoty v. Tillerson*: "Congress did not intend to foreclose lawsuits by claimants . . . who do not try to gain entry to the United States before prevailing in their claims to citizenship." 285 F. Supp. 3d 293, 303, n. 5 (D.D.C. 2018) (Moss, J.) (noting that "*Cort's* holding that § 1503 is not an exclusive remedy, however, remains good law").

---

return.").

**VII.   IN THE ALTERNATIVE, PLAINTIFF SEEKS LEAVE TO AMEND TO ADDRESS § 1503 IN AN AMENDED COMPLAINT.  ANY SUCH AMENDMENT WOULD BE IN THE INTERESTS OF JUSTICE AND NOT FUTILE.**

Should this Court find Defendants' arguments compelling despite the arguments and authorities listed above, Plaintiff respectfully requests leave to amend his Complaint in order to clarify the claims and supporting facts in this matter, and to address any provisions of § 1503 which this Court may deem relevant.  Plaintiff makes this request in the alternative to the arguments and authorities set forth in the preceding portions of this Response in Opposition.

**A.      Legal Standard**

Fed. R. Civ. Pro. 15(a) provides that leave to amend should be freely given when justice requires. *Polsby v. Thompson*, 201 F. Supp. 2d 45, 51-52 (D.D.C. 2002). This Court has previously held that "when a court denies a motion to amend a complaint, the court must base its ruling on a valid ground and provide an explanation." *Id.* Accordingly, the burden is on the party opposing amendment to show that there is a reason to deny leave. *In re Vitamins Antitrust Litigation*, 217 F.R.D. 30, 32 (D.D.C. 2003). The Supreme Court found an abuse of discretion where courts deny leave to amend, absent a satisfactory reason for doing so, such as "undue delay, bad faith or dilatory motive…repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party…[or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962); *see also Firestone v. Firestone,* 316 U.S. App. D.C. 152, 76 F.3d 1205, 1208 (1996) ("although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason").

**B.      There is No Compelling Reason to Deny Leave to Amend Here**

Plaintiff does not make this alternative request after much development in the case; this matter is still in its initial stages. The United States Court of Appeals for the District of Columbia

previously held that "where an amendment would do no more than clarify legal theories or make technical corrections…delay, without a showing of prejudice is not a sufficient ground for denying the motion." *Harrison v. Rubin*, 174 F.3d 249, 253 (D.C. Cir. 1999); *see also Atchinson v. District of Columbia*, 73 F.3d 418, 426 (D.C. Cir. 1996) (holding that in order to determine the severity of the delay, courts consider any resulting prejudice the delay may cause); *Estate of Gaither v. District of Columbia*, 272 F.R.D. 248, 252 (D.D.C. 2011) ("the mere passage of time does not preclude amendment—the delay must result in some prejudice to the judicial system or the opposing party").

This Court has held that "delay without requisite prejudice is ordinarily insufficient to justify denial of leave to amend;" here, Plaintiff would seek only to clarify and update the claims in this matter. *Dove v. Wash. Metro. Area Transit Auth.*, 221 F.R.D. 246, 249 (D.D.C. 2004). Because a proposed amendment would still relate to and rely upon predominantly the same underlying facts as the original Complaint, this amendment does not substantially alter the nature or factual basis of Plaintiff's claim, and will not significantly expand the scope of the litigation that Defendant must respond to. *Brown v. FBI*, 744 F. Supp. 2d 120, 123 (D.D.C. 2010) (finding that "a court may deny leave to amend if the amendment bears 'only [a] tangential relationship' to the initial claim, which could unduly prejudice the opposing party by expanding the scope of the litigation"). Further, any potential prejudice created by that potential and minimal delay would not be significant where, as here, this case is still at an early stage of litigation. There is no risk of unduly increasing discovery or delaying trial, where no discovery has occurred and no trial has been set. *Heller  v. District of Columbia*, 290 F.R.D. 1 (D.D.C.  2013). ("A case's position along the litigation path proves particularly important in that

[hardship] inquiry: the further the case has progressed, the more likely the opposing party is to have relied on the unamended pleadings.").

This alternative request is further not brought in bad faith or for dilatory motive. "Preventing a party from amending [his] complaint on the basis of bad faith generally requires an affirmative showing by the nonmoving party," and this typically "entails a showing that 'the proposed amendments are similar to already-rejected claims or otherwise unlikely to succeed on their face." *Bronner v. Duggan*, 324 F.R.D. 285, 292-93 (D.D.C. 2018). No such circumstances exist here. Accordingly, should this Court not be persuaded by the arguments set forth in the earlier sections, Plaintiff respectfully requests leave to amend his pleading in this matter.

**C.** **Amendment under § 1503 Would Not Be Futile**.

For the reasons set forth below, allowing leave to amend Plaintiff's Complaint to reflect any relevant provisions of § 1503 would not be futile.

1. Ms. Muthana is, and was, out of the country; therefore, § 1503(a) does not apply to her.

Section 1503(a) applies to "any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States" and allows those individuals to bring claims in the federal courts after exhausting the administrative process contained within 8 U.S.C. § 1503(a). At the time the Department of State revoked Ms. Muthana's passport, she had already been out of the country for approximately two years. Doc. 1; Ex. A. Accordingly, the provisions contained within 8 U.S.C. § 1503(a) do not apply to Ms. Muthana's situation.

2.  <u>As Ms. Muthana is seeking declaratory relief prior to attempting to enter the United States, she need not utilize § 1503(b) or (c).</u>

As noted in Section 6(b), *supra*, the provisions of § 1503 are not exclusive remedies. Plaintiff hereby incorporates by references the citations and authorities included above, which demonstrate that Plaintiff could seek declaratory relief without utilizing the provisions of § 1503.

3.  <u>Even if she were required to utilize § 1503(b) or (c), administrative exhaustion under these circumstances would be futile.</u>

Even if § 1503 were an exclusive remedy despite the authority to the contrary cited above, this matter still fits an exception to a plaintiff's requirement to exhaust his or her administrative remedies, under the futility exception, "when following the administrative remedy would be futile because of certainty of an adverse decision." *Abigail Alliance for Better Access to Dev. Drugs v. McClellan*, 2004 U.S. Dist. LEXIS 29594 (D.D.C. Aug. 30, 2004) at *17 (citing *Randolph-Sheppard Vendors of America v. Weinberger*, 254 U.S. App. D.C. 45, 795 F.2d 90, 105 (D.C. Cir. 1986)). A future adverse decision is regarded as certain if the agency "has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider." *Abigail Alliance*, 2004 U.S. Dist LEXIS 29594 at *17 (quoting *Randolph-Sheppard*, 795 F.2d at 105). In other words, the exception applies when there is "objective and undisputed evidence of administrative bias" (*Artis v. Greenspan*, 223 F. Supp. 2d 149, 154-55 (D.D.C. 2002)), or an "indication that resort to the administrative process would be 'clearly useless.'" *Coleman v. Pension Benefit Guar. Corp.*, 94 F. Supp. 2d. 18, 23 (D.D.C. 2000) (quoting *Communications Workers of America v. American Tel. & Tel. Co.*, 309 U.S. App. D.C. 170, 40 F.3d 426, 431 (D.C. Cir. 1994)). In this case, Plaintiff easily satisfies this standard: the multiple statements of Defendants' officials that Ms. Muthana is not a U.S. citizen and does not even has the right to

28

travel to the United States irrefutably demonstrates futility. These clear statements include the following:

- On February 20, 2019, the United States Department of State issued a press release stating that "Ms. Hoda Muthana is not a U.S. citizen and will not be admitted into the United States. She does not have any legal basis, no valid U.S. passport, no right to a passport, nor any visa to travel to the United States."[30]

- That same day, President Donald J. Trump tweeted that he has "instructed Secretary of State Mike Pompeo, and he fully agrees, not to allow Hoda Muthana back into the Country!"[31]

- Secretary of State Michael Pompeo then appeared on national television, proclaiming that Hoda Muthana "is a terrorist.  She is not a United States citizen.  She ought not return to this country"  and also stating that "she is not a U.S. citizen, nor is she entitled to U.S. citizenship" because "you have to consider the context."[32]

These multiple statements by Defendants provide objective evidence of administrative bias, a very clear position on the issue, and a position on which the government has demonstrated its unwillingness to reconsider.

Courts evaluating futility may also consider whether "the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further." *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146, 112 S. Ct. 1081, 117 L. Ed. 2d 291 (1992)). As Ms. Muthana is in a precarious position under the authority of Kurdish forces, and her young son is in poor health,[33] the litigants' interests here in proceeding outweigh

---

[30] Press Release dated February 20, 2019, located on Department of State website (https://www.state.gov/secretary/remarks/2019/02/289558.htm) (last visited May 7, 2019).

[31] https://twitter.com/realdonaldtrump/status/1098327855145062411?s=21 (dated February 20, 2019) (last visited May 7, 2019).

[32] https://www.today.com/video/mike-pompeo-on-hoda-muthana-she-is-not-a-us-citizen-1446009923715 (dated February 21, 2019) (last visited May 7, 2019).

the government's interests in a futile administrative exercise. Accordingly, Defendants' Motion to Dismiss fails due to the futility of Plaintiff pursuing the remedies provided under 8 U.S.C. § 1503(b), as demonstrated by the public and unambiguous statements of Defendants' own officials.[34]

4.   As Ms. Muthana Can Establish a Prima Facie Showing in a Judicial Proceeding Under § 1503, Defendants Will Need To Show Clear and Convincing Evidence That She Is Not A Citizen.  They Will Be Unable To Do So.

Section 1503 provides for judicial review of denial of any "right or privilege" of citizenship, including invalidations of passports or naturalization certificates. *Xia*, 865 F.3d at 655.  The initial burden is on the plaintiff, but only to show a prima facie case: "the minimal initial showing the statute requires of a plaintiff to trigger the government's proof burden" can be met by "[p]resenting proof of a naturalization certificate or passport—even if already administratively cancelled" which then triggers the government's "burden to establish by "clear, unequivocal, and convincing evidence" the plaintiff's lack of entitlement to the disputed "right or privilege" of citizenship." *Id.* at 656.  To do so, the government will have to override its own earlier decision.

a.   *Diplomatic Immunity Did Not Apply to Plaintiff at the Time of Ms. Muthana's Birth.*

As previously discussed above, the Department of State considered and ultimately rejected the idea that Mr. Muthana was still serving as a diplomat at the time of Ms. Muthana's birth. *See* Doc. 1-5.  In its review at the time closest to Ms. Muthana's birth, the Department of State

---

[34] Even if Defendants demonstrated a willingness to reconsider their position as to Hoda Muthana's citizenship, which is not the case here for the reasons set forth above, 8 U.S.C. § 1503 is not an applicable administrative avenue to Ms. Muthana's specific circumstances. Under 8 U.S.C. § 1503(a), persons must be within the United States to claim a right or privilege as a national of the United States, so this section does not apply to Ms. Muthana as she is not currently in the country. Additionally, 8 U.S.C. § 1503(b) is not realistic or practical for Ms. Muthana to pursue, given the current situation in Syria and the inability for her to visit a diplomatic or consulate office in the foreign country she currently resides, which is Syria. In any event, Defendants demonstrated their unwillingness to reconsider whether Ms. Muthana is a citizen as evidenced by the unequivocal statements of Defendants' officials, and therefore would not grant Ms. Muthana a Certificate of Identity.

determined that Mr. Muthana was not serving as a diplomat at the time of her birth, and was not covered by diplomatic immunity. *Id.* Defendants produce with their instant Motion several documents which they purport to be "conclusive" and "contemporaneous" but which were, in fact., attested to and compiled more than twenty years after Ms. Muthana's birth. Doc. 19-2. As previously noted in the *Magnuson* case, "Congress in section 1451 has precluded revocation merely on the basis of having "second thoughts." *Magnuson*, 911 F.2d at 335. That is simply all the Department of State demonstrated in its January 2016 letter, and all the Defendants attempt now: second thoughts, based on no new evidence which was not available closer to the time in question and at the time of the original decision.

As stated above, it is undisputed that Mr. Muthana was fired from his diplomatic position in June 1994. Doc. 19-2 at p. 12 ("Fired 6/94 SEE CARRDEX"). On June 2, 1994, the Yemeni Ambassador Al-Aashtal required Mr. Muthana to surrender his diplomatic identity card. Doc. 1 at 6; *see also* Ex. A. Mr. Muthana's diplomatic position officially ended no later than September 1, 1994. Doc. 19-2 at pp. 5, 14; *see also* Doc. 1-5. Sometime after his termination, the United States Mission to the United Nations received notice of both Mr. Muthana's June termination and his official end date of September 1, 1994. The documents Defendants produce contain an unclear combination of handwritten notice added at unverifiable times, which list self-contradictory dates for the end of Mr. Muthana's position ranging from "fired 6/94" (Doc. 19-2 at 9 and 12) to February 6, 1995 as a notification date (Doc. 19-2 at 14), to February 10, 1995 (*id.*) to numerous references to a September 1, 1994 end date for his position (the only one which matches with other diplomats from Yemen, whose positions at the UN ended at or near the same time) (Doc. 19-2 at 9, 11, 12, 14). This hardly equates to "clear and convincing" reason to doubt the 2004

31

determination by the United States Mission to the United Nations that Mr. Muthana's position did in fact end on September 1, 1994.  Doc. 1-5.

      b. *This Court, and Plaintiff, are Not Bound to Accept the Determination of the State Department on Immunity in this Situation.*

This Court, and Plaintiff, are not obligated to accept the determination made by the Defendants regarding Mr. Muthana's diplomatic status, particularly when the Department of State documents contradict themselves and the Department of State's own prior determination.  *See Ali v. Dist. Dir.*, 743 Fed. Appx. 354, 358 (11th Cir. 2018) (noting that parties dispute the diplomatic records produced by USCIS, and deferring to the determination made after a full trial on the merits). And while Defendants assert in this matter that the date of receipt of notification is what is important for determining immunity, they have previously argued the opposite. *See Raya v. Clinton*, No. 09-cv-00169-GEC, March 5, 2010 Reply Brief of Government, Doc. 31 ("accordingly, the date of termination for purposes of privileges and immunities under the Vienna Convention is controlled in this case by the date of termination reported by the Egyptian Embassy to the Department of State" and "thus, applying the plain language of the Vienna Convention, Plaintiff's father maintained privilege and immunities until the date the Egyptian Embassy reported *as his termination date*") (emphasis added) (attached hereto as Exhibit B).

Furthermore, the Government's own documentation states that the US Mission to the United Nations' "Blue List" of resident foreign diplomats entitled to diplomatic immunity, on which Defendants rely in this matter, "should be viewed as a resource, but not the definitive source of information."  Ex. C, 7 FAM 1116.2-3(b), Resident Representatives to and Officials of the United Nations, Acquisition and Retention of U.S. Citizenship and Nationality.  At the least, Defendants cannot demonstrate "clear and convincing evidence" that Ms. Muthana is not a

birthright citizen; at worst, Defendants demonstrate exactly why courts do not permit the government to simply disregard citizenship due to "second thoughts." *Magnuson*, 911 F.2d at 335.

Finally, Defendants exert great time and effort in their Motion attempting to refute a hypothetical used by counsel for Plaintiff at a prior hearing in this matter. Doc. 19 at 27-29. The net result of these efforts, however, is not to negate the value of the hypothetical discussed at length in Defendants' Motion but to fail to provide more than their own extended hypotheticals in a series of responses. Sticking to the realities of the world in which the relevant laws must be applied, it is clear that diplomatic immunity is tied to duties of a position, not to timeliness of receipt of notification. As discussed above, Defendants have previously adhered to the importance of the duties and positions, until this case.

## VIII.   **DEFENDANTS ARE PREVENTED BY ESTOPPEL FROM NOW DISPUTING MS. MUTHANA'S CITIZENSHIP**

The U.S. government should be equitably estopped from disputing Ms. Muthana's previously recognized citizenship based on its earlier determination. The doctrine of estoppel requires a showing that: (1) there was a "definite" representation to the party claiming estoppel; (2) the party relied on its adversary's conduct to his detriment; and (3) the reliance on the representation was "reasonable." *Graham v. SEC,* 222 F.3d 994, 1007, 343 U.S. App. D.C. 57 (D.C. Cir. 2000). Equitable estoppel is available against the government in the extraordinary circumstances presented here. The case for estoppel against the government requires proof of both the traditional elements of the doctrine as well as "a showing of an injustice . . . and lack of undue damage to the public interest." *Hertzberg v. Veneman*, 273 F. Supp 2d 67, 83, quoting *ATC Petroleum, Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988). A showing of injustice requires a demonstration that the government and/or its agents "engage[d]—by commission or omission—

in misrepresentation or concealment, or, at least, behave[d] in ways that have or will cause an egregiously unfair result." *Grumman Ohio Corp. v. Dole,* 776 F.2d 338, 347 (D.C. Cir. 1985) (quoting *General Accounting Office v. General Accounting Office Personnel Appeals Board*, 225 U.S. App. D.C. 350, 698 F.2d 516, 526 n.57 (D.C. Cir. 1983)).

As set forth above, the United States, in recognition of Ms. Muthana's birthright citizenship, granted Ms. Muthana a United States passport in January 2005, and later renewed that passport in 2014. Prior to issuing her a passport, the U.S. was necessarily aware of Mr. Muthana's prior diplomatic post, and the fact that Yemen had delayed in its duty to notify the United States Permanent Mission to the United Nations of Mr. Muthana's termination, because the office that in 2004 certified his termination date is the same office to which Yemen would have made the notification. Regardless, the United States accepted the proof of termination provided by Mr. Muthana and issued the passport without further inquiry or dispute. Issuing this passport constituted a recognition of Ms. Muthana's status as a United States citizen. Mr. Muthana and his daughter relied on this representation, and as a result did not take further action to procure or clarify her status in the United States, as they would have otherwise, and as they did for their older children. There is no evidence to suggest that Mr. Muthana or his daughter (who was a minor at the time) acted in bad faith or presented anything but accurate information to the United States. Mr. Muthana simply procured a letter from his previous employer, indicating his termination date, and relied on the U.S. government's determination that this was sufficient.

Conversely, the actions of the U.S. are in bad faith and would create an injustice which does not serve the public interest. The U.S. was aware of all relevant facts at the time that they issued Ms. Muthana a passport in 2005. They failed to raise a specific objection, precluding Mr. Muthana from applying for legal residency, and later, naturalization for his daughter, as he and his

34

spouse did for their older children, who were born prior to their father's loss of diplomatic status. Instead, Mr. Muthana was left with no reason to believe that this process was necessary for Ms. Muthana. The timing of the United States' objection to Ms. Muthana's citizenship further demonstrates bad faith. The government did not raise objections to her citizenship until over a year after Ms. Muthana left the United States, and had allegedly associated herself with ISIS. It was only at this point that the government sought to revisit its previous determination, despite the absence of any new or material facts underlying its previous decision.

In the context of determinations of citizenship under Section 2705, in conjunction with the issuance of a passport, the Ninth Circuit recognized that relief through collateral estoppel was appropriate in *Magnuson v. Baker*, 911 F.2d 330, n. 12 (9th Cir. 1989). The facts in Magnuson are remarkably similar to the facts presented here. In Magnuson, the plaintiff applied to the State Department for a passport on the basis of his father's citizenship in the United States. His application was initially rejected; thereafter, the plaintiff submitted additional documents and the passport office, after consideration of these documents, determined that the plaintiff was in fact a U.S. citizen entitled a passport. Subsequently, it was discovered that the plaintiff was wanted in Canada for a conviction of tax evasion. After the discovery, the INS attempted to revoke his passport and deport him as a noncitizen to Canada. The plaintiff filed suit contesting the revocation of his passport and underlying citizenship. In overruling the Secretary of State's revocation of his citizenship, the court found that a determination under Section 2705 was "conclusive proof of citizenship," which the INS could not collaterally attack. Analyzing the determination of citizenship under 2705 to a "final civil determination," which could not be reopened absent "exceptional circumstances such as fraud or misrepresentation," and finding that by limiting revocation of a certificate to cases of fraud or misrepresentation, Congress had likewise "limited

35

successful collateral attacks on citizenship determination." *Id*. Congress may not revoke citizenship merely on the basis of having "second thoughts." *Magnuson*, 911 F.2d at 335. That is exactly what the government attempts to do here through its attempt to revisit the earlier decision to issue a passport without evidence of fraud or misrepresentation.

Although Ms. Muthana's case has garnered a significant amount of public attention, hers is not the only case where the United States, if permitted, could seek to rescind its earlier determination of citizenship, without new facts, and without the proper judicial proceeding. Allowing the U.S. government to reconsider and revoke prior findings of citizenship without new facts or adequate due process opens the door for the United States to utilize citizenship and the rights it entails as a weapon against the unpopular and the undesirable.

## IX.    PLAINTIFF AHMED MUTHANA PROPERLY BRINGS A CLAIM SEEKING DECLARATORY JUDGMENT AS TO MATERIAL SUPPORT

Defendants assert that Plaintiff Ahmed Muthana has no standing to bring the claim for declaratory judgment which he asserts on his own behalf regarding a potential violation of 18 U.S.C. § 2339B if he provides financial support for his daughter and grandson. Defendants ask this Court to dismiss this claim for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). However, Plaintiff has alleged, and his Declaration supports, that he brings this claim based on a live controversy which impacts him directly, and is not seeking an advisory opinion.

## A.    Defendants Erroneously Dispute Plaintiff's Claims While Asking for Dismissal.

In asking this Court to dismiss Plaintiff's claims seeking declaratory judgment that he will not violate 18 U.S.C. § 2339B, Defendants repeatedly dispute the factual assertions made by Plaintiff. Doc. 19 at 40-42 ("Plaintiff claims that Muthana is no longer a member of ISIS, has ceased support for ISIS, and would use any money Plaintiff provided her to travel … but provides

no support whatsoever for these assertions").  However, that is not an appropriate approach when seeking dismissal under Rule 12.  In evaluating a motion to dismiss brought under Rule 12(b)(1), courts must "accept as true all of the factual allegations contained in the complaint." *Wilson*, 269 F.R.D. at 11.  Reviewing courts are instructed to "review the complaint liberally while accepting all inferences favorable to the plaintiff." *Nattah,* 770 F. Supp. 2d at 199.  In other words, a reviewing court "assumes the truth of the allegations made and construes them favorably to the pleader." *Empagran*, 315 F.3d at 343.  Furthermore, courts may also consider relevant materials outside the pleadings in evaluating a motion to dismiss brought under Fed. R. Civ. P. 12(b)(1). *Settles*, 429 F.3d at 1107.  Mr. Muthana's Declaration, then, and the documentation attached to it sufficiently support the allegations contained in Count 9 of the Complaint that Plaintiff should be allowed to proceed.  He identifies, for example, the communications directly from his daughter via a handwritten letter received last month, his communications with the FBI warning him that providing money to his daughter would constitute material support, and his communications with the psychiatrist who recently saw his daughter and grandson, regarding their needs and what she was informed by the FBI regarding providing money or items to them. Ex. A, Declaration of Ahmed Muthana.

### B.  <u>There Exists a Live Controversy.</u>

Defendants erroneously claim there is no live dispute, and that this claim is merely hypothetical.  That, however, disregards the facts as pled and Mr. Muthana's statements to date. A dispute on which a plaintiff seeks relief must be "actual or imminent" to be appropriate. *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 10 (D.D.C. 2010).  Plaintiff Ahmed Muthana would have sent money already to his daughter and grandson, for their basic needs such as medication and shoes, were it not for the fact that Mr. Muthana has been informed by United States

government agents that if he sends any money to his daughter he will be providing material support for terrorism in violation of 18 U.S.C. 2339B.  Ex. A.  There continues to be a need on the part of his daughter and grandson, which based on recent communications from the psychiatrist who visited her, and the sole handwritten letter he has received from his daughter since she has been interred at Camp Roj, is rapidly increasing in both degree and risk. Ex. A.  Mr. Muthana remains willing to provide support for the survival of his daughter and grandson, but cannot do so without a declaration that, under the exact conditions present currently, he would not be in violation of 18 U.S.C. 2339B.

While it is difficult to conceive how internment at a camp not run by ISIS or its supporters, where Ms. Muthana has now repeated disavowed ISIS and advised others to stay away, and which would clearly go to survival needs of Ms. Muthana and her young son and his health condition, the government still apparently stands by this approach.  Doc. 19 at 40.  Therefore, Defendants' own motion demonstrates the very real risk to Plaintiff should he try to provide medication, clothing or other basic needs while his daughter continues her quest to return to the United States with her son.  Plaintiff does not need to commit an act which he has been told by authorities may be a crime in order to find out if it is.

## C. Plaintiff's Request Relates Directly to Ms. Muthana's Constitutional Right to Return.

As Plaintiff has consistently stated in filings in this matter, including his Complaint and Memorandum of Law in support of the Complaint (Doc. 15), he wishes to provide assistance to his daughter and grandson to assist with his daughter's exercise of her constitutional right to return to the United States.  This fits within the framework contemplated in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 25 (2010) (holding that "with respect to these claims that gradations of fact or charge would make a difference as to criminal liability, and so adjudication of the reach and

constitutionality of the statute must await a concrete fact situation") (quoting *Zemel v. Rusk*, 381 U.S. 1, 20 (1965)). Despite Defendants' assertions to the contrary, the very case cited as support in Defendants' Motion demonstrates that this is exactly the sort of constitutional interest which conflicts with "a credible threat of prosecution made thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (holding that where the "plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief'"), quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973); *cf*. Doc. 19 at 47.

## X.   CONCLUSION

For the reasons set forth above, Plaintiff Ahmed Ali Muthana, on behalf of himself and as Next Friend for his daughter Hoda Muthana and his grandson Minor John Doe (A.M.) prays that this Court grant the relief requested herein, in the form of declaratory relief that Ms. Muthana is a United States citizen and retains that presumption of citizenship unless and until proven otherwise by clear and convincing evidence in a judicial proceeding; declaratory relief that Minor John Doe is entitled to a presumption of citizenship; injunctive relief preventing the United States from taking any further action to revoke the citizenship of Ms. Muthana or, by acquisition, the presumed citizenship of Minor John Doe; mandamus relief compelling the United States to use all reasonable and good faith efforts to affect the return of Ms. Muthana and her young son to the United States; and declaratory relief that Plaintiff Ahmed Ali Muthana will not violate § 2339B by providing funds to his daughter for the return of his daughter, with his grandson, to the United States, or for their necessary survival while they await the ability to exercise this constitutional right to return.

Respectfully submitted,

/s/  *Charles D. Swift*
Charles D. Swift
D.C. ID No. 987353
Texas Bar No. 24091964
cswift@clcma.org
Christina A. Jump
D.C. ID No. TX151
Texas Bar No. 00795828
cjump@clcma.org
Constitutional Law Center for
Muslims in America
833 E. Arapaho Rd, Suite 102
Richardson, TX  75081
Phone: (972) 914-2507
Fax: (972) 692-7454

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby affirms that the foregoing will be served on all counsel of

record via ECF filing on this 28th day of February, and served on all listed Defendants.


/s/ *Charles D. Swift*
Charles D. Swift

**IN THE UNITED STATES DISTRICT**

**COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AHMED ALI MUTHANA, individually, and as next friend of Hoda Muthana and Minor John Doe** [initials A.M.] | Cause No. 1:19-cv-00445 |
| | Judge: Reggie B. Walton |
| *Plaintiff/Petitioner,* | CIVIL ACTION |
| vs. | |
| **Michael Pompeo, in his official capacity as Secretary of the Department of State, Donald J. Trump, in his official capacity as President of the United States;** and **William Pelham Barr in his official capacity as Attorney General.** | |
| *Defendants/Respondents.* | |

**EXHIBIT INDEX TO PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT**

| Exhibit | | Description |
|---|---|---|
| A | | Declaration of Ahmed Muthana, with internal exhibits |
| | 1 | Photo of Hoda Muthana's First Passport |
| | 2 | Letter from Hoda Muthana dated March 21, 2019 |
| | 3 | Letter from Anne Speckhard, Ph.D, Director of ICSVE |
| B | | *Raya v. Clinton*, No. 09-cv-00169-GEC, March 5, 2010 Reply Brief of Government, Doc. 31 (relevant portions highlighted) |
| C | | 7 FAM 1100 Acquisition and Retention of U.S. Citizenship and Nationality (relevant portions highlighted) |

# EXHIBIT A

**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AHMED ALI MUTHANA, individually, and as Next Friend of Hoda Muthana and Minor John Doe** [initials A.M.] | Cause No. 1:19-cv-00445-RBW |
| *Plaintiff/Petitioner,* | |
| vs. | CIVIL ACTION |
| **Michael Pompeo, in his official capacity as Secretary of the Department of State, Donald J. Trump, in his official capacity as President of the United States;** and **William Pelham Barr in his official capacity as Attorney General.** | |
| *Defendants/Respondents.* | |

**DECLARATION OF AHMED ALI MUTHANA**

I, Ahmed Ali Muthana, hereby declare under penalty of perjury and in accordance with 28 U.S.C.

§ 1746 the following:

1. I submit this declaration based on my own personal knowledge.

2. I am over the age of 18 and competent to testify to the facts recited below.

3. I am the father to Hoda Muthana and grandfather to Minor John Doe Muthana.

4. I worked as a diplomatic member of the Permanent Mission of Yemen to the United Nations from October 15, 1990 to June 1, 1994.

5. On June 1, 1994, I was terminated from that position.

6. On June 2, 1994, the Yemeni Ambassador Al-Aashtal required me to surrender my diplomatic identity card.

7. My termination was as a result of the outcome of the civil war in Yemen.

8. I am aware that other individuals, including Mr. Gamal O. Al-Akbari and Mr. Gamil H. Ghanim, were transferred from the Permanent Mission of Yemen to the United Nations to other locations in June 1994 for several months, then terminated in September 1994, approximately three months after I was terminated.

9. My daughter Hoda Muthana was born on ▮▮▮▮▮▮▮▮, 1994, in New Jersey.

10. At the time of her birth, I was not serving in a diplomatic position, and had not been for many months.

11. In 2004, I applied for a United States passport for my daughter Hoda Muthana.

12. I received a letter from the Department of State stating that the United States believed I had still been a diplomat at the time of Hoda Muthana's birth.

13. I responded that I had not, and provided a letter which I obtained from the United States Mission to the United Nations, dated October 18, 2004, which confirms that my diplomatic position ended no later than September 1, 1994.

14. I provided the letter from the United States Mission to the United Nations to the United States Department of State, which then did issue a United States passport to my daughter Hoda Muthana, on January 24, 2005. A true and correct copy of that letter has been previously filed in this lawsuit at Doc. 1-5.

15. A copy of that passport is attached as Exhibit 1 to this Declaration.

16. The passport issued by the United States Department of State to my daughter Hoda Muthana lists her nationality as "United States of America".

17. If the Department of State had not issued a United States passport to my daughter Hoda Muthana, I would have continued proceedings to get my daughter Hoda a "green card" on

her behalf.  This is what my wife and I did for our older children, who were born in the United States while I was still performing diplomatic duties.  Since my daughter Hoda Muthana was issued a United States passport listing her nationality as United States of America, though, I did not believe there was any need to continue those proceedings on her behalf.

18. I also went through naturalization proceedings myself, and am now a United States citizen. My wife is a lawful permanent resident of the United States, with a citizenship application pending.  My wife's father was a United States citizen before I left my diplomatic position.

19. My daughter Hoda Muthana renewed her United States passport on or about February 21, 2014.

20. She then flew to Turkey, and later arrived in Syria.  I did not know in advance that she was taking this trip.

21. As a result of her second marriage in Syria, my daughter Hoda Muthana had a child, referred to herein as Minor John Doe.  He was born on ███, 2017.

22. On January 15, 2016, a letter addressed to my daughter Hoda arrived at my residence, from the United States government informing her that her passport had been revoked.  A true and correct copy of that letter has been previously submitted in this lawsuit at Doc. 1-6.

23. I responded to the January 15, 2016 letter that my daughter was out of the country, but also reiterated what I had provided in 2004, and confirmed the facts listed above as to when my diplomatic position ended (which was before Hoda was born).

24. When my daughter went to Syria, I did not agree with what she did.

25. I did not provide her with money after she left for Syria.

26. Hoda and her son are, to the best of my knowledge, currently at Camp Roj in Syria.

27. I would like to send money to my daughter so that she and my grandson can return to the United States.

28. I asked the FBI if I could do this, and the FBI told me that if I send money to my daughter and grandson for them to leave, that I will be breaking the law and will be considered to be providing material support to ISIS.

29. I do not want to support ISIS at all.

30. I do want to help my daughter and grandson get to the United States.

31. My daughter began communicating with me in late 2018 that she wishes to surrender to United States authorities, and is willing to be subject to any legal consequences under the United States judicial system.

32. My daughter also communicated to me at that time that she wants to return to the United States, with her son.

33. I want her to return to the United States with her son (my grandson) as well.

34. I also agree that my daughter should accept any legal consequences under the United States judicial system.

35. In the last two to three months of 2018, I sporadically heard from my daughter, usually via text or WhatsApp.

36. Since my daughter surrendered to Kurdish authorities and was placed at Camp al-Hawl with her son, in December 2018, I have only heard from her intermittently and sporadically.

37. My daughter and her son were transferred to another camp in Syria, Camp Roj, in late February or early March 2019.

38. Around the time of their transfer from Camp al-Hawl to Camp Roj, I did not hear from my

daughter for several weeks, and did not have a way to reach her.

39. Whenever I do hear from my daughter, it is almost always from a new phone number, and she identifies that she is borrowing a phone from someone, or using the camp Administration phone.

40. I have tried to reach her subsequently at each number from which I have received a message from her, but it has not been successful.

41. On March 24, 2019, I received two photos via WhatsApp, which are each one page of a two page handwritten letter dated 3/21/19.  This two page letter is attached to this Declaration as Exhibit 2.

42. Based on my personal knowledge of my daughter Hoda Muthana's handwriting, I recognize this two page letter to be in her handwriting.

43. I also recognize the signature on the second page of this letter to be the signature of my daughter Hoda Muthana.

44. In this letter, my daughter writes that she and her son are in Camp Roj in Syria, and that "communication here is very limited and is only done through their administration phone via whatsapp [sic]."

45. In this March 21, 2019 letter, my daughter also writes that her "son has long term bronchitis and asthma and needs medicine often.  Most times I have to go running to other peoples tents for emergency medicines.  I am terrified of seeing my son sick because there is an average of 2 deaths (children) a month here."

46. My daughter also writes in this letter that "I cannot sleep at night even when my child develops a simple cough.  (Please help!)"

47. My daughter writes in this letter that "since I've come here I have no idea about whats [sic] going on with my case and no clue of any time frames."

48. On or about April 16, 2019, I received communication from Dr. Anne Speckhard that she had visited with my daughter Hoda Muthana at Camp Roj in Syria.

49. Dr. Speckhard communicated to me that my daughter was requesting these items: eye glasses, good medication for bronchitis, vitamins for herself and her son, books for herself and her son, shoes for herself and her son, Western clothes for her son, hygenic items such as soap and shampoo, sunglasses, good sunscreen, and learning toys for her son.

50. I am absolutely willing to help pay for supplies and necessities for my daughter and grandson, such as food, clothing and medication and each of the items Dr. Speckhard listed as requests from my daughter, but I have not yet done so because the United States government, via an FBI agent, told me that I will be committing a crime if I do that.

51. Dr. Speckhard informed me that she had also been told by the FBI that providing money or items to my daughter (and any others at Camp Roj, as to Dr. Speckhard) may be considered material support of terrorism.

52. Dr. Speckhard also provided me with an assessment from her visit with my daughter and my grandson.  That assessment is attached to this Declaration as Exhibit 3 and is true and correct as I received it from Dr. Speckhard.

53. In her assessment, which is just over two pages long and typed, Dr. Speckhard notes that she "interviewed [Hoda] on April 2, 2019, for over two hours.  During that time, it was evident that her son … is sickly and struggles with what Hoda said is a chronic case of bronchitis. She said she had trouble getting medications for him and has repeatedly put him on antibiotics but he has not gotten better.  She fears he could die of respiratory ailments, as she knows that

it's a risk in the camp.  She told us what we already knew—that doctors are not always readily available for camp residents nor are adequate medications.  Hoda is receiving no money from her family and also cannot pay for either."

54. Dr. Speckhard also writes in her assessment that "[i]n my professional opinion, it is not psychologically or physically good to leave [my grandson] in Camp Roj."  Dr. Speckhard also observes, as to my grandson, that "[h]e is sick and needs good and regular medical care. He struggles with heavy coughing, looks lethargic and is not behaving like a healthy normal young child presumably because of his chronic bronchitis.  As a sickly and unvaccinated child, he is also much more vulnerable to any of the diseases that may spread through the camp of other unvaccinated children.  He could easily die there."

55. Dr. Speckard also recommends in her report that my grandson "should immediately be removed from the camp to ensure his best health, and preferably not separated from his mother.  Normally, keeping mothers and children together at that age is crucial to ensure healthy attachment and his trust in the world."

56. I am willing to do anything I can to help bring my daughter and my grandson home to the United States, and to provide for their survival both before and once they are able to come to the United States.

Pursuant to 28 U.S.C. § 1746. I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

_____
Ahmed Ali Muthana, Declarant

_____
Date Executed

# EXHIBIT 1

The Secretary of State of the United States of America
hereby requests all whom it may concern to permit the citizen/national
of the United States named herein to pass without delay or hindrance
and in case of need to give all lawful aid and protection.

Le Secrétaire d'Etat des Etats-Unis d'Amérique
prie par les présentes toutes autorités compétentes de laisser passer le citoyen
ou ressortissant des Etats-Unis titulaire du présent passeport, sans délai ni
difficulté et, en cas de besoin, de lui accorder toute aide et protection légitimes.

El Secretario de Estado de los Estados Unidos de América por el presente solicita a las
autoridades competentes permitir el paso del ciudadano o nacional de los Estados Unidos
aquí nombrado, sin demora ni dificultades, y en caso de necesidad, prestarle toda la
ayuda y protección lícitas.

*Hoda Muthana*

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE/FIRMA DEL TITULAR

**NOT VALID UNTIL SIGNED**

**PASSPORT**
**PASSEPORT**
**PASAPORTE**

USA

**UNITED STATES OF AMERICA**

Type / Type / Tipo    Code / Code / Código    Passport No. / No. du Passeport / No. de Pasaporte
P                     USA

Surname / Nom / Apellidos
**MUTHANA**

Given names / Prénoms / Nombres
**HODA AHMED**

Nationality / Nationalité / Nacionalidad
UNITED STATES OF AMERICA

Date of birth / Date de naissance / Fecha de nacimiento
1994

Sex / Sexe / Sexo    Place of birth / Lieu de naissance / Lugar de nacimiento
F                    **NEW JERSEY, U.S.A.**

Date of issue / Date de délivrance / Fecha de expedición    Authority / Autorité / Autoridad
**24 Jan 2005**

Date of expiration / Date d' expiration / Fecha de caducidad    **National**
**23 Jan 2010**                                                 **Passport Center**

Amendments / Modifications / Enmiendas
**See Page 24**

P<USAMUTHANA<<HODA<AHMED<<<<<<<<<<<<<<<<<<<<
USA94      0F1001233<<<<<<<<<<<<<04

# EXHIBIT 2

3 / 21 / 19

Salam, This is Hoda. Please share any
information I give you to Charles and Hassan.
Communication here is very limited and is
only done Through Their administration phone
via Whatsapp This is legit evidence to make
my government aware that I am here
before They try to deny Their acknowledgment
as They have for others. Also, I believe I am
in danger although my gov. tries to deny
that too. I'm still in Syria, that is enough
evidence of The danger. I've seen two dying
babies with my own eyes, die to the lack
of medical equipment, and Three children
die due to tents burning down. My son
has long term bronchitis and asthma and
needs medicine often. Most times I have
to go running to ~~~~~~ other peoples tents
for emergency medicines. I am terrified
of seeing my son sick because there is an
average of 2 deaths (children) a month here.
I don't have much money left and have
resorted to making goods to profit some money.
Due to The stress I already have, this just
adds to it. Apparently There is a psychologist

(In camp Roj!)

by the name of _____ , you can
find her on facebook. Word is she'll be coming
to visit the camp soon so money ~~₦~~ can be
brought in legally through her. On that note
I also need psychological help so please
contact her as soon as you can because she
can only access the people that she has
listed. There is another lawyer by the name
of _____ , Charles might know him (?)
He too makes visits here but again can only
talk to registered people. Anyway, since I've
come here I have no idea about whats
 going on with my case and no clue of any
time frames. Please update me here as much as
possible. This phone is only meant for money transfers
but this is the only chance of communication I get.
P.S. I was with Shamima Begum in the hospitals
while her baby was dying trying to help her
translate bc she doesn't know arabic, I know the
conditions here when a child gets sick and this is why
I cannot sleep at night even when my child
develops a simple cough. (Please help!)
                              —Hoda Letho

# EXHIBIT 3



# International Center for
# the Study of Violent Extremism

April 29, 2019

To Whom It May Concern:

I am writing this letter in response to a request from Ahmed Muthana and the attorneys serving the case of his daughter, Hoda Muthana.  Ahmed Muthana is the grandfather of ▓▓▓▓ who is the 20-month-old son of Hoda Muthana who recently surrendered herself after living for some years under ISIS.  Both mother and son are currently being held as prisoners in Camp Roj in Rojava, Syria.

I am the Director of the International Center for the Study of Violent Extremism (ICSVE), a think-tank focused on studying terrorism and violent extremism, Adjunct Associate Professor of Psychiatry in the Georgetown University School of Medicine, and a psychologist of 25+ years experience, treating clinical cases and researching the psychosocial underpinnings of terrorism. I have spent the last two decades studying the trajectories of individuals into, and back out of terrorism, having in-depth interviewed over 650 terrorists, their family members and close associates around the world. Over the past four years, I have interviewed 144 ISIS defectors, returnees and prisoners: men, women and minors from many countries around the world.  In 2006-2007, I designed for the U.S. Department of Defense the psychological and Islamic challenge components of the *Detainee Rehabilitation Program*, which was applied to 22,000+ detainees and 800 juveniles held by U.S. forces in Iraq. I am also a trained child development specialist and a mother of three now grown children. I have helped to birth babies, have worked inside prisons, and know what it is to raise children in third world environments.

Along with my ICSVE colleagues, I have been traveling over the past two years into Iraqi prisons and Kurdish-run camps and detention centers in Rojava, Northern Syria.  In that regard, I have interviewed 11 women held in YPG-run detention camps in Camp Roj and witnessed the harsh conditions under which these mothers and children live. The women (and their prison caretakers) that we have interviewed in this camp have told us that medical care is scarce, medicines are not available, good food is costly and difficult to procure, vaccinations for children are not provided, schools and child development services don't exist, winters are cold in the tents, dust frequently fills the air creating breathing difficulties for their children, fires break out in the tents, and some women threaten and bully the others—including threatening with knives.

Mothers and children have died in the camps, including three who reportedly died of Typhoid in Camp Roj last year. A newborn died from what seems to have been

malnutrition related issues in the camp recently. Likewise two toddlers perished in a recent tent fire in Camp Roj. One mother we interviewed in the camp told us about her child having regular asthma attacks due to the dusty air attacks, in which he turns blue and stops breathing with no medications provided. Another shared her terror of Pertussis (whooping cough) and others of Typhoid. Mothers told us they feared the cold winter conditions and illnesses that occur during Syrian winters.

Not formally charged with any crimes—at least not known or communicated to me—and totally uncertain of their futures and unable to advance their cases through a proper legal system, mothers in YPG camps live under constant uncertainty, stress, fear, and anxiety. We saw dozens of children in the camps and witnessed that children literally play with, and on, rocks, strewn over the desert ground throughout the camp. There are, to our knowledge, no playgrounds, toys or books provided, and we were told that any education provided is very substandard and none provided for preschoolers.

Hoda Muthana, formerly living under ISIS, surrendered this spring. We interviewed her on April 2, 2019, for over two hours. During that time, it was evident that her son, ████, is sickly and struggles with what Hoda said is a chronic case of bronchitis. She said she had trouble getting medications for him and has repeatedly put him on antibiotics but he has not gotten better. She fears he could die of respiratory ailments, as she knows that it's a risk in the camp. She told us what we already knew—that doctors are not always readily available for camp residents nor are adequate medications. Hoda is receiving no money from her family and also cannot pay for either.

The YPG detention camps are harsh, dangerous, unsanitary and unhealthy places to house a sickly child, or any child, for that matter. In my professional opinion, it is not psychologically or physically good to leave ████ in Camp Roj. ████ has his grandparents in the United State (one a citizen, one a green card holder) who are more than willing to take him home. As I understand Hoda's case, there are disputes over her U.S. citizenship, though to my understanding and knowledge, she was born when her father was out of diplomatic status. To my knowledge, Hoda's father, Ahmed, has a letter from U.S. State Department indicating he was out of his diplomatic status when Hoda was born and that Hoda has possessed at this point two American passports. It appears her citizenship dispute will be resolved in her favor, though with a delay in process. In Hoda's case, this may be a sound judgement, but in ████'s case, it is not.

He is sick and needs good and regular medical care. He struggles with heavy coughing, looks lethargic and is not behaving like a healthy normal young child presumably because of his chronic bronchitis. As a sickly and unvaccinated child, he is also much more vulnerable to any of the diseases that may spread through the camp of other unvaccinated children. He could easily die there. The camp is also not a good place for him to be for many other reasons, including that there is no good stimulation for him, no place to play, and no safe place to stay—cold in the winter and spring. Also, many of the people living there are anxiety ridden.

He should immediately be removed from the camp to ensure his best health, and preferably not separated from his mother. Normally, keeping mothers and children together at that age is crucial to ensure healthy attachment and his trust in the world.

I would strongly recommend returning [ ] and placing him in the custody of his grandparents who are willing and have a capacity to support him until his mother is back in the United States.

Please let me know if you have any questions or if I can provide any further information to aid in this case.

Best regards,

*Anne Speckhard*

Anne Speckhard, Ph.D.

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| AMANY MOHAMED RAYA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 7:09-CV-00169 |
| | ) |
| HILLARY RODHAM CLINTON, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION
## TO DISMISS, IN PART, AND MOTION FOR SUMMARY JUDGMENT, IN PART

### INTRODUCTION

Plaintiff's arguments against dismissal of Counts 1, 2, and 3 attempt to distort the clear

statutory framework for judicial review of nationality claims in removal proceedings under 8

U.S.C. § 1252.  Plaintiff does not oppose the dismissal of Counts 4 and 5.  The Immigration and

Nationality Act provides a framework for judicial review of all removal proceedings, including a

specific statutory path for review of nationality claims enveloped therein.  *See* 8 U.S.C.

§ 1252(b)(5).  This subsection provides subject matter jurisdiction only in the court of appeals

for nationality claims in removal proceedings, with transfer jurisdiction to district courts under

certain circumstances.  8 U.S.C. § 1252(b)(5)(C). Likewise, the statute invoked by Plaintiff in

her Complaint, 8 U.S.C. § 1503, contains exceptions for nationality claims that arose or

otherwise are in issue in removal proceedings.  These exceptions serve as guideposts to

Subsection 1252(b)(5) and work to avoid fragmenting the judicial review framework for removal

1

proceedings, including attempts to circumvent decisions made in removal proceedings by resurrecting prior identical claims.

Plaintiff is currently subject to a removal order issued by Judge David W. Crosland of the Immigration Court in Arlington, Virginia.[1]  (*See* Defendants' Memorandum in Support of the Motions to Dismiss in Part and Motion for Summary Judgment in Part, Dkt. # 23, Exhibit 2, p. 8-10.)  The issue of Plaintiff's nationality arose in her removal proceedings when Plaintiff filed a motion to terminate proceedings using her alleged nationality as her only defense to removal. The issue was fully briefed, and Judge Crosland issued an Order of the Court on October 28, 2008, finding that Plaintiff was not a U.S. citizen because her father remained in diplomatic status at the time of her birth.  (*Id.* at p. 8-12.)  Furthermore, Plaintiff was afforded a hearing subsequent to the Order where she declined to seek additional relief from the Immigration Court. (*Id.* at p. 10.)

Plaintiff also was provided written instructions on how she could appeal Judge Crosland's decision to the Board of Immigration Appeals.  (*Id.*)  If Plaintiff had taken advantage of the forum provided before the Board and had remained unsatisfied with the result, she could have appealed to the court of appeals under 8 U.S.C. § 1252(b)(5).  Then, and only if the court of appeals found there was an outstanding factual issue in the nationality claim, would this Court have subject matter jurisdiction over Plaintiff's nationality claim by transfer from the court of appeals.  Thus, Plaintiff has failed to follow the proper channel to find subject matter jurisdiction

---

[1]  In their memorandum in opposition to Defendants' motions, Plaintiff's counsel only notes that she moved to terminate these proceedings and that the proceedings concluded.  (*See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss in Part and Motion for Summary Judgment in Part ("Plaintiff's Memorandum"), Dkt. #28, p. 2.)  In fact, the motion to terminate was based solely on her nationality claim, and after it was rejected, Plaintiff was ordered removed from the United States.

2

in this Court, and is attempting to invoke an improper path to subject matter jurisdiction under 8

U.S.C. § 1503(a) by distorting the clear meaning of the statute defining the judicial review of

removal proceedings.

Alternatively, this Court should grant Defendants' Motion for Summary Judgment where

the sole fact necessary for this Court to decide the motion is not contested, and where Plaintiff's

other challenges are immaterial, irrelevant, and lack sufficient evidentiary support.

A.     **The Court Should Grant Defendants' Motion To Dismiss Because 8 U.S.C.
       §§ 1252(b)(5) and 1503(a) Do Not "Limit" Judicial Review of Nationality Claims,
       But Channel Nationality Claims To The Court Of Appeals To Avoid Unnecessary
       And Potentially Contrasting Decisions.**

Defendants agree with Plaintiff that U.S. citizenship by birth is a Fourteenth Amendment

right.  However, the proper avenue for Plaintiff to exercise her rights is through the framework

of 8 U.S.C. §§ 1503 and 1252.  Here, Congress enacted a vehicle for nationality claims under the

Fourteenth Amendment, which includes a specific provision for nationality claims in removal

proceedings. *See* 8 U.S.C. § 1252(b)(5); *see, e.g.*, *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964,

968 (9th Cir. 2003) (reviewing the citizenship claim of an alien in removal proceedings through

an analysis of the Fourteenth Amendment and corresponding statutes defining nationality

pursuant to the jurisdiction provided under 8 U.S.C. § 1252(b)(5)); *cf. Carrillo-Lozano v. Stolc*,

No. CV-07-1861-PHX-GMS, 2009 WL 3818841 (D. Ariz. Nov. 13, 2009) (finding the district

court did not have jurisdiction over a Fourteenth Amendment citizenship claim in a habeas

petition because the issue involved a final removal order for which 8 U.S.C. § 1252(b)(5)

provided exclusive jurisdiction to the court of appeals).  Thus, judicial review of Plaintiff's

nationality claim is only limited if she fails to pursue the proper path provided by Congress via

Subsection 1252(b)(5) in or following removal proceedings, or Section 1503 outside of removal proceedings.[2]

The judicial review of issues in removal proceedings is complex, but the framework provides for judicial review of Plaintiff's nationality claim.  Subsection 1503(a) provides the guideposts to this review process, but the plain language of Section 1252(b)(5) provides that the courts of appeals are the *only* forum for individuals who raise nationality as a defense to removal, unless the circuit court chooses to transfer the case to the district court to address questions of fact.  *See* 8 U.S.C. § 1252(b)(5)(C); *Lopez v. Holder*, 563 F.3d 107, 110 (5th Cir. 2009).  Thus the Court should dismiss Plaintiff's arguments and grant Defendants' Motion to Dismiss Counts 1, 2, and 3 for lack of subject matter jurisdiction.[3]

1.     **The Ordinary Meaning of the Language in 8 U.S.C. §§ 1503(a) and 1252(b)(5) Precludes this Court From Exercising Jurisdiction over Plaintiff's Nationality Claim.**

Plaintiff's interpretation of the jurisdictional bar in the provisions of 8 U.S.C. §§ 1252(b)(5) and 1503 is incorrect.  Plaintiff ignores alternative definitions of the terms in question, and similarly fails to appropriately consider the statutory context of 8 U.S.C. §§ 1252(b)(5) and 1503.

---

[2]  Contrary to Plaintiff's assertions, two scenarios would provide original jurisdiction under 8 U.S.C. § 1503(a), though neither is found in Plaintiff's Complaint.  First, if a nationality claim is truly independent of removal proceedings, then the exceptions in Subsection 1503(a) and the limitations in Subsection 1252(b)(5) would not apply.  Second, if removal proceedings are terminated without a final determination on the nationality claim or the nationality claim in removal proceedings is decided in a plaintiff's favor, then any subsequent challenge of a plaintiff's nationality would arise independent of removal proceedings.

[3]  Defendants note that the issue of whether a later-occurring removal proceeding where nationality is at issue takes priority over a previous administrative denial of a naturalization claim is novel.

4

Statutory language must be given its "ordinary meaning unless the context counsels otherwise." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991). Plaintiff first looks to the ordinary meaning of "arose," and concludes that the term must mean "first arose," "to originate from a source," or "to come into being or to attention," such that if a nationality claim *first arose* outside of removal proceedings, then Congress did not preclude a separate claim under 8 U.S.C. § 1503. (*See* Plaintiff's Memorandum, Dkt. #28, p. 6.)[4]

However, Plaintiff's discussion of the ordinary meaning of "arose," fails to consider alternative definitions of the term "arise," such as "[t]o result (from)." Black's Law Dictionary 115 (8th ed. 2004) (offering the exemplary sentence "litigation routinely arises from such accidents"). Other alternative definitions include "[t]o result, issue, or proceed," where the primary definition of the verb "issue" is "[t]o go or come out," and the primary definition of "result" is "[t]o come about as a consequence." The American Heritage College Dictionary, 73 for arise, 721 for issue (3d ed. 1997). Accordingly, another equally valid ordinary meaning of the statutory provision in question would result in a finding that if a nationality claim resulted

---

[4] Plaintiff extensively relies on the same two sentences from *Rios-Valenzuela v. Dept. of Homeland Security*, 506 F.3d 393, 399 (5th Cir. 2007), and *Ortega v. Holder*, 592 F.3d 738, 744 (7th Cir. 2010), to support her proposition of "first arose." However, the issue of prior claims to nationality was not at issue in either case and the significance of the use of the term "first" is mere dictum. Moreover, even where the origination of the nationality claim was not at issue, the Fifth Circuit was reluctant to accept the definition of "first arose," because such interpretation would mean that an individual subject to removal who "first" raised a nationality claim in removal proceedings could never raise the claim under 8 U.S.C. § 1503. *See Rios-Valenzuela*, 506 F.3d at 399 (finding that such an interpretation would "forever hang[] an albatross around the neck of those who first raise citizenship as a defense in a removal proceeding."). Furthermore, Plaintiff miscites *Ortega*'s discussion of "first arose." *See* Plaintiff's Memorandum, Dkt. #28, p. 7, ¶ 3. There, the Seventh Circuit only noted that "if the question of nationality first arises in the context of a removal proceeding," then the plaintiff is required to pursue her claim through the removal proceedings. *See Ortega*, 592 F.3d at 744.

5

from or came up in the course of removal proceedings, then Congress did intend to preclude

separate claims under 8 U.S.C. § 1503.

### 2. When 8 U.S.C. § 1503(a) is Read in the Context of the Judicial Framework of 8 U.S.C. § 1252, this Court Lacks Jurisdiction Over Plaintiff's Claim.

Where there is any question about the ordinary meaning of the term "arose," in this

matter, the context of the term in relation to other statutory provisions at 8 U.S.C. § 1252(b)(5),

demonstrates that Defendants' proffered interpretation is proper.  To hold to the contrary, and to

allow a claim to separately proceed under 8 U.S.C. § 1503 could lead to disparate results.  There

does not appear to be any disagreement that a plaintiff who raises a nationality claim as a

defense to removal may only have that claim heard in the course of removal proceedings and up

through the courts of appeal per Subsection 1252(b)(5).  However, Plaintiff argues that her

nationality claim raised in a prior passport application is wholly independent of a nationality

claim later raised in removal proceedings, and that such claim gives rise to a separate claim

under Subsection 1503(a).  (Plaintiff's Memorandum, Dkt. #28, p. 4.)  If this Court accepts

Plaintiff's interpretation of the statutory context, then two federal courts could emerge with

contrasting views.  Under Subsection 1252(b)(5), a court of appeals might consider a plaintiff's

nationality claim and affirm a plaintiff's removability via a petition for review of her removal

order, and a district court might consider a plaintiff's nationality claim under Subsection 1503

and conclude that a plaintiff is a U.S. national deserving of a passport.

Congress did not intend such a result, and the statutory structure clearly evidences

Congress's intent to prioritize removal proceedings and the issues relating to such proceedings.

Generally, Subsection 1252(b)(9) provides a bar against district court review of removal orders –

and preserves such review to the courts of appeals.  8 U.S.C. § 1252(b)(9).  Congress provided

6

more specific instructions as it applies to nationality claims raised in removal proceedings at

Subsection 1252(b)(5), explaining that "[t]he petitioner may have such nationality claim decided

*only* as provided in this paragraph," on a petition for review of a final removal order file with the

appropriate court of appeals.  8 U.S.C. § 1252(b)(5) (emphasis added).

The leading decisions on Subsection 1503 specifically recognize the primacy of

Subsection 1252(b)(5) as it applies to nationality claims raised in removal proceedings.  The

*Rios-Valenzuela* and *Ortega* courts concluded that if a plaintiff's nationality claim was

considered and rejected in removal proceedings, then the "appropriate" and "exclusive" forum

for judicial review of the nationality claim is through 8 U.S.C. § 1252(b)(5).  In *Rios-Valenzuela*,

the Fifth Circuit stated "[o]f course, if the person claiming to be a citizen loses in the removal

proceedings, the appropriate means for judicial review of his nationality claim is § 1252(b))."

*Rios-Valenzuela*, 506 F.3d at 399, n.11.  In *Ortega*, the Seventh Circuit was more adamant:

> Taken together, the exceptions set forth in [8 U.S.C. § 1503(a)] are designed to
> protect removal proceedings from judicial interference and preserve 8 U.S.C.
> § 1252 as the exclusive means of challenging a final order of removal.  A party
> may not frustrate the Government's effort to remove him by instituting an action
> under 8 U.S.C. § 1503(a) while proceedings are ongoing.  Similarly, a party may
> not use § 1503(a) to frustrate Congress's effort to channel all appeals from
> removal proceedings–including those in which the alien raised claims of
> nationality–through 8 U.S.C. § 1252.

*Ortega*, 592 F.3d at 743-44.

Courts do recognize that a cause of action under 8 U.S.C. § 1503 may again arise after

removal proceedings have "run their full course," because "any future nationality claim would

not arise in those removal proceedings."  *Rios-Valenzuela*, 506 F.3d at 399.  Removal

proceedings run their full course in two ways:  either a plaintiff prevails on their nationality

claim in removal proceedings and those proceedings are terminated, or a plaintiff is not

7

successful and pursues appeals of such an unsuccessful claim until a final appeal is rejected

under the framework of 8 U.S.C. § 1252 and the plaintiff is removed from the United States.[5]

The Fifth Circuit was very clear that a district court should not consider the denial of a

nationality claim made outside of removal proceedings while the removal proceedings are

underway or after the plaintiff has lost in a removal proceeding where the question was at issue.

*Id.*

Accordingly, the Eastern District of New York recently found jurisdiction to consider a

nationality claim under Subsection 1503 that was previously raised in removal proceedings.  *See*

*Henry v. Quarantillo*, No. 08-cv-1718, 2010 WL 447385 (E.D.N.Y. Feb. 2, 2010).  However, the

plaintiff there had previously been removed, illegally reentered the United States, had his prior

removal order reinstated.  *Id.* at *1-2.  Only then did he re-file a Form N-600 Application for

Certificate of Citizenship.  *Id.*  The district court found that the only reason the removal

proceedings did not preclude the plaintiff's claim under Subsection 1503 was because the latest

Form N-600 was filed "well after" the original removal proceedings had ended and plaintiff had

presented new evidence.  *Id.* at *6.

Accordingly, it would be an absurd result to allow a claim under 8 U.S.C. § 1503(a) for a

nationality claim made prior to removal proceedings where the plaintiff unsuccessfully raised the

same nationality claim as a defense in subsequent removal proceedings.  The interpretation by

Defendants does not preclude Plaintiff from ever raising a claim under Subsection 1503 in the

---

[5]  A plaintiff who is initially unsuccessful in immigration court and misses the deadline
for appeal to the Board of Immigration Appeals can always jointly move the immigration court
to reopen or reconsider the courts findings.  *See* 8 C.F.R. § 1003.23(b).  However, deadlines in
the judicial review of removal proceedings are no different than deadlines throughout the judicial
system, and missing a deadline for appeal may preclude review options.

8

future.  However, this Court should not find jurisdiction over the nationality claim until some

time has passed – at least until after the unappealed removal order is executed or until Plaintiff

raises a new nationality claim separate from her removal proceedings.

> **3.    Plaintiff's Attempts to Analogize the Exceptions to Subsection 1503(a) to Other Provisions with Similar Language are Without Merit.**

In analyzing the context of the statutory provisions in question, Plaintiff attempts to argue

that her nationality claim was independent and merely collateral to her removal proceedings, and

analogizes to authority that admittedly recognizes exceptions that otherwise channel issues

raised in removal proceeding to the court of appeals via petitions for review of final removal

orders.  However, Plaintiff's effort to analogize to *Aguilar v. U.S. Immigration and Customs*

*Enforcement Div. Of Dept. Of Homeland Sec.,* 510 F.3d 1 (1st Cir. 2007), to suggest that

Plaintiff's nationality claim did not arise but was independent of her removal proceedings is

without merit.[6]

In *Aguilar,* the First Circuit held, in part, that the district court was not precluded from

exercising subject matter jurisdiction over plaintiffs' constitutional claims regarding the familial

integrity of detained parents who were separated from their children, because such claims were

collateral to removal and should have been considered outside the channeling mechanism of the

statutory framework for judicial review of removal proceedings.  *Id.* at 20-21.  In contrast, the

*Aguilar* court also held that the district court lacked subject matter jurisdiction over plaintiffs'

---

[6]  It is important to note that Plaintiff uses *Aguilar* to interpret the meaning of "arose by reason of" and "in connection with" in 8 U.S.C. § 1503(a), but the words cited in *Aguilar* are from the general channeling subsection in the judicial framework for removal proceedings in 8 U.S.C. § 1252(b)(9).  Subsection 1252(b)(9) bars separate claims in district courts for *any* issue raised in removal proceedings, while Subsections 1503(a) and 1252(b)(5) provide a particular exception for nationality claims.  Irregardless, *Aguilar* did not adopt the definition of the terms proffered by Plaintiff.

right to counsel claims because those claims were not "independent" or "collateral" to issues in the plaintiff's removal proceedings. *Id.* at 13. The court concluded that the issue of right to counsel was an appropriate issue to be raised in removal proceedings and that allowing aliens to ignore the channeling provisions of the statute governing judicial review of removal proceedings "would result in precisely the type of fragmented litigation that Congress sought to forbid" in the separate judicial framework. *Id.* at 14.

Plaintiff's effort to analogize to habeas as a valid basis for jurisdiction over detention claims independent from removal proceedings is similarly without merit. If fact, with regard to nationality claims, Congress has specifically granted district courts exclusive habeas jurisdiction over the issue of whether the detainee is an alien. *See* 8 U.S.C. § 1252(e)(2). The only other exception granted by Congress is that individuals raising nationality claims in the course of their removal proceedings may also raise such claims in criminal proceedings. *See* 8 U.S.C. § 1252(b)(7)(B). Thus, where the exceptions specifically provided by Congress do not apply to Plaintiff, the intent of Congress to require that nationality claims raised in removal proceedings be exhausted in the course of those proceedings is even more clear. *See* 8 U.S.C. § 1252(b)(5).

Here, the issue in Plaintiff's case is not collateral to the issue in her removal proceedings. In fact, it was the *only* defense Plaintiff presented in response to the charge of her removability and directly addressed by the Arlington Immigration Court. Thus, at a minimum, the nationality claim from the passport application "arose in connection with" the removal proceedings because the Plaintiff raised the issue in her removal proceeding and it is the sole issue enveloping all aspects of her case. Plaintiff's nationality claim is not independent of removal proceedings, and finding subject matter jurisdiction for a separate claim would result in precisely the type of fragmentation rightfully avoided by the *Aguilar* court.

10

**B.**     **Alternatively, This Court Should Grant Defendants' Motion For Summary Judgment Where Plaintiff Does Not Dispute The Date The Egyptian Embassy Reported Her Father's Duties Were Terminated, And Where Defendants' Are Accordingly Entitled to Judgment As A Matter Of Law.**

Plaintiff offers three categories of responses in opposition to Defendants' Motion for Summary Judgment.  She argues that Defendants' Motion for Summary Judgment:  (1) fails as a matter of law, (2) should be denied because there are material facts at issue, and (3) should be denied because Plaintiff is entitled to further discovery.  None of these arguments have merit, and for the following reasons, the Court should grant Defendants' Motion for Summary Judgment.

First, as noted in Defendants' original motion, the Court is compelled to grant a moving-party's motion for summary judgment where "the evidence is so one-sided that one party must prevail as a matter of law."  *O'Connor v. Consol. Coin Caterers Corp.,* 56 F.3d 542, 545 (4th Cir. 1995) (citations omitted).  It is insufficient for a party opposing a motion for summary judgment to offer "mere unsupported speculation . . . if the undisputed evidence indicates the other party should win as a matter of law."  *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Moreover, to be considered on summary judgment, "evidence must be in one of the forms specified by [Fed. R. Civ. P.] 56(e)."  *See Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993).  Documents purporting to be public records must also be authenticated.  *See* Fed. R. Evid. 901; *Vulcan Iron Works, Inc. v. Polish American Machinery Corp.*, 479 F.Supp. 1060, 1067-68 (S.D.N.Y. 1979).

In opposition to Defendants' Motion for Summary Judgment, Plaintiff asserts a number of facts that she believes support her claim that she was born a U.S. citizen:

11

(1)     Plaintiff was born in the United States four months after her father's duties ended as a military attaché to the Egyptian Embassy;

(2)      Plaintiff was born five months after her father's A-1 visa expired;

(3)     At the time of Plaintiff's birth, her father was in the Arab Republic of Egypt in the service of the Egyptian Air Force;

(4)     At the time of Plaintiff's birth, Plaintiff's mother was illegally present in the United States on an expired A-2 visa and revoked diplomatic passport.

(Plaintiff's Memorandum, Dkt. #28, p. 2.)  Plaintiff does not contest Defendants' assertion, supported by the certification of the Department of State, that on December 11, 1981, the Embassy of Egypt notified the Department of State that the termination date for Plaintiff's father would be December 13, 1981.  (*See* Defendants' Memorandum, Dkt. #23, Exhibit 1.)  Accordingly, the Court should grant Defendants' Motion for Summary Judgment where the sole fact necessary for this Court to decide the motion is not contested, and where Plaintiff's other challenges are immaterial, irrelevant, and lack sufficient evidentiary support.

1.     **Based on the Undisputed Material Facts, this Court Should Grant Defendants' Motion for Summary Judgment where Notification of Termination is the Critical Date for Determining Privileges and Immunities.**

Plaintiff's Memorandum counters Defendants' reading of the Vienna Convention on Diplomatic Relations ("Vienna Convention"), Apr. 18, 1961, 23 U.S.T. 3227, T.I.A.S. No. 7502, and argues that "the 'evidentiary effect' of the State Department's certification is thus bound by the Court's own interpretation of "the treaty's language, considering the context in which the words were used."  Plaintiff's Memorandum at 5, citing *United States v. Al Hamdi*, 356 F.3d 564, 573 (4th Cir. 2004); *Tabion v. Mufti,* 73 F.3d 535, 537 (4th Cir. 1996).  This analysis beings with the plan language of the treaty.  *See, e.g., Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991).  Where the text of a treaty is clear and unambiguous, the courts have no power to insert an amendment.  *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989).  Unlike in *Al-Hamdi*, there is no need for the Court to consider the propriety of the Department of State's

12

interpretation of the Vienna Convention here because the text of the treaty is clear and unambiguous.[7]

Contrary to Plaintiff's myopic consideration of only Article 39 of the Vienna Convention, three separate articles of the Vienna Convention control this case. Article 10 of the Vienna Convention provides that receiving states shall be notified of "[t]he appointment of members of the mission, their arrival and their final departure or the termination of their functions with the mission." Vienna Convention, Art. 10(a). Article 43 of the Vienna Convention provides, in part, that "[t]he function of a diplomatic agent comes to an end, inter alia: [o]n notification by the sending State to the receiving State that the function of the diplomatic agent has come to an end." Vienna Convention, Art. 43(a). Finally, as discussed by Plaintiff, Article 39 of the Vienna Convention provides that:

> *When the functions of a person enjoying privileges and immunities have come to an end*, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

Vienna Convention, Art. 39(2) (emphasis added).

Accordingly, Plaintiff's discussion of Article 39 of the Vienna Convention is misguided. Plaintiff focuses on the portion of the phrase providing that, "such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable

---

[7] In *Al Hamdi*, the Court found that it had to first consider whether the Department of State's certification was based on a permissible interpretation of the treaty. *Al Hamdi*, 356 F.3d at 569-70. After it found that the Department of State's certification was based on a reasonable interpretation, the Court considered the evidentiary weight of the certification, and found the certification was conclusive. *Id.* at 571-73. It follows that where the plain language controls and no interpretation of the Vienna Convention has taken place, the Department of State's Certification should be conclusive.

13

period to do so . . . ."  Absent from Plaintiff's discussion, however, is reference to the predicate

part of Article 39, which provides that the "functions of a person enjoying privileges and

immunities have come to an end . . . ."  Thus, plaintiff's conclusions that her father's diplomatic

immunity ceased either when:  (1) he left the United States, or (2) when a reasonable period of

time passed, are without merit.  If Plaintiff's arguments were true, then presumably any time a

diplomat with immunity left the United States, he would lose his immunity.

Rather, upon consideration of Article 43(a) of the Vienna Convention, it becomes clear

that in order for the functions of a person enjoying privileges and immunities to come to an end,

the sending State must send notification to the receiving State.  Vienna Convention, Art. 43(a).

Accordingly, the date of termination for purposes of privileges and immunities under the Vienna

Convention is controlled in this case by the date of termination reported by the Egyptian

Embassy to the Department of State.  Plaintiff does not contest that this date is December 13,

1981, and that the date falls after Plaintiff's birth.  Thus, applying the plain language of the

Vienna Convention, Plaintiff's father maintained privilege and immunities until the date the

Egyptian Embassy reported as his termination date – December 13, 1981 – which means that as a

matter of law, Plaintiff was not born subject to the jurisdiction of the United States, is not a U.S.

citizen, and is not entitled to a passport.[8]  This factual finding, based on a plain reading of the

Vienna Convention, and reflected in the certifications filed by the Department of State in this

---

[8]  Plaintiff's reliance on *United States v. Aritzi*, 229 F. Supp. 53 (S.D.N.Y. 1964), for the proposition that a foreign government should determine whether someone is in diplomatic status is readily distinguishable.  There, Uruguay never sent the Department of State notice of the arrival of the criminal defendant in a diplomatic capacity.  *Id.* at 55.  Moreover, even if they had, the court's analysis is based on the ability of a sending State to waive diplomatic immunity of one of its officers.  *Id.* at 54.  Here, the question is one of termination of duties pursuant to notice to the receiving State under the Vienna Convention, not waiver of immunity by the sending State.

matter, is entitled to conclusive weight by this Court.  *Al Hamdi*, 356 F.3d at 573 (affirming

judgment of lower court that found Department of State's certification of diplomatic status was

conclusive as to diplomatic immunity).

> **2.      Even if the Court does not Defer to the Department of State's Certification, the Court should Still Grant Defendants' Motion for Summary Judgment where Plaintiff's Factual Challenges are Immaterial, Irrelevant, and Lack Proper Evidentiary Support.**

In support of Plaintiff's Memorandum, Plaintiff avers that summary judgment should not

be granted to Defendant because there are material facts at issue and Plaintiff requires discovery.

Where this Court should find that Defendants are correct as a matter of law, and that Article

43(a) of the Vienna Convention regarding notification controls the immunities provided for at

Article 39 of the Vienna Convention, the only relevant and material fact is the date of

termination reported by the Egyptian Embassy to the Department of State.  Plaintiff never

contests this fact.

Instead, Plaintiff avers that there are documents from the Egyptian Embassy that report a

termination date for Plaintiff's father of June 11, 1981.  (Plaintiff's Memorandum, Dkt. # 28, at

17, 20, citing Exhibit 3).  However, Plaintiff fails to allege, or support with evidence, that the

June 11, 1981, date was reported to the Department of State as required by Article 43(a) of the

Vienna Convention.  The documents referenced at Exhibit 3 to Plaintiff's Memorandum only

support a finding that documents were transmitted to the Department of State, but the only

indication of the content of these documents is Plaintiff's own speculation.  Moreover, even were

the Court to consider the exhibits submitted along with Plaintiff's complaint, these documents

similarly fail to establish the required notification, fail to fall within the requirements of Fed. R.

Civ. P. 56(e), and are unauthenticated as required by Fed. R. Evid. 901.

15

Plaintiff also attempts to place at issue the departure date reported on the Notice of Final Departure of Foreign Diplomatic Officer, Exhibit 1 to Defendants' Memorandum, the noting date for the November 1981 Blue List which listed Plaintiff's father, and the fact that her father's diplomatic visa expired before the date of termination reported by the Egyptian Embassy. None of these dates are relevant or material to the present matter where the date of termination – not departure – reported to the Department of State by the Egyptian Embassy controls. Vienna Convention, Art. 43(a).

Finally, for the first time in her Memorandum, Plaintiff challenges whether her father was ever "properly accredited with full immunity," or whether it extended to his family. Where this allegation was not raised in Plaintiff's complaint, it is not properly before the Court now. Moreover, that Plaintiff's father was entitled to full diplomatic immunity that extended to his family has been certified by the Department of State and is reflected by the very fact that Plaintiff's father was on the November 1981 Blue List. (*See* Defendants' Memorandum, Dkt. # 23, Exhibit 1.) The Blue List contains the names of "ambassadors, ministers, charges d'affaires, counselors, secretaries and attaches of embassies and legations as well as members of the Delegation of the Commission of the European Communities," and "individuals with comparable *diplomatic status and immunities* who are accredited to the United Nations or to the Organization of American States, and other individuals who are also accorded comparable diplomatic status." 8 C.F.R. § 101.3(a)(2) (emphasis added). The White List, in contrast, contains the names of individuals who "enjoy certain diplomatic immunities, but they are not foreign diplomatic officers as defined in paragraph (a)(2) of this section." 8 C.F.R. § 101.3(b). Accordingly, where Plaintiff offers no more than speculation to counter the certification of the Department of State

16

and the regulatory definition of Blue List, Plaintiff's challenge to whether her father was

properly accredited with full immunity that extended to his family is without merit.

## **CONCLUSION**

For the foregoing reasons Defendants are entitled to dismissal of all claims, and

alternatively are entitled to summary judgment on the claims involving Plaintiff's alleged

citizenship and to dismissal of all other claims.

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

Dated: March 5, 2010

*/s/ Sara Bugbee Winn*
SARA BUGBEE WINN
Assistant United States Attorney
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2254
FAX (540) 857-2283

TONY WEST
Assistant Attorney General
Civil Division

ELIZABETH J. STEVENS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Jeffrey S. Robins*
JEFFREY S. ROBINS
Senior Litigation Counsel
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
TEL (202) 616-1246
FAX (202) 305-7000

17

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this 5th day of March, 2010, caused the foregoing

Memorandum to be electronically filed with the Clerk of the Court using the CM/ECF system,

which will send notification of such filing to the following:

Christine Lockhart Poarch
105 Keesling Avenue
Salem, VA 24153

Chris K. Kowalczuk
P.O. Box 11971
Roanoke, VA 24022-1971

*/s/ Jeffrey S. Robins*
Senior Litigation Counsel

18

# EXHIBIT C

# 7 FAM 1100  ACQUISITION AND RETENTION OF U.S. CITIZENSHIP AND NATIONALITY

# 7 FAM 1110  ACQUISITION OF U.S. CITIZENSHIP BY BIRTH IN THE UNITED STATES

## 7 FAM 1111  BASIC TERMS AND DISTINCTIONS

### 7 FAM 1111.1  Terms Not Always Interchangeable

*(TL:CON-64;  11-30-95)*

While most people and countries use the terms "citizenship" and "nationality" interchangeably, U.S. law differentiates between the two [see Section 101(a)(21)-(22) of the Immigration and Nationality Act (INA)]. Under current law all U.S. citizens are also U.S. nationals, but not all U.S. nationals are U.S. citizens.

### 7 FAM 1111.2  Citizenship

*(TL:CON-64;  11-30-95)*

a. U.S. citizenship may be acquired *either* at birth or through naturalization.

b. U.S. laws *governing* the acquisition of citizenship at birth embody two legal principles:

(1) *Jus soli* (*the law* of the soil), a rule of common law under which the place of a person's birth determines citizenship. *In addition to common law, this principle is embodied in the 14th Amendment to the U.S. Constitution and the various U.S. citizenship and nationality statutes.*

(2) *Jus sanguinis* (the *law* of the *bloodline* ), a concept of Roman or civil law under which a person's  citizenship is determined by the citizenship of *one or both* parents. This rule, *frequently* called "citizenship by descent" or "derivative citizenship", *is not embodied in the U.S. Constitution, but such citizenship is granted through statute. As laws have changed, the requirements for conferring and retaining derivative citizenship have also changed*.

c. Naturalization is "the conferring of nationality of a state upon a person after birth, by any means whatsoever" (Section 101(a)(23) INA) or conferring of citizenship upon a person (Sections 310 and 311 INA). Naturalization can be granted automatically or pursuant to an application. *Under U.S. law, foreign naturalization acquired automatically is not an expatriating act [*see chapter 7 FAM 1200 *]*.

d. Historically, a number of U.S. laws have provided for the automatic naturalization of children or wives (not husbands) of naturalized U.S. citizens or for automatic collective naturalization of persons residing in territories over which the United States has gained sovereignty.

# 7 FAM 1111.3  Nationality

*(TL:CON-64;   11-30-95)*

a. The term "nationals of the United States", as defined by statute (Section l0l(a)(22) INA) includes all citizens of the United States, and other persons who owe allegiance to the United States but who have not been granted the privilege of citizenship.

b. Nationals of the United States who are not citizens are entitled to the consular protection of the United States when abroad, and to U.S. documentation, such as U.S. passports. They are not entitled to voting representation in Congress and, under most state laws, are not entitled to vote in federal, State, or local elections except in their place of birth.

c. Historically, Congress, through statutes, granted U.S. nationality, but not citizenship, to persons born or inhabiting territory acquired by the United States through conquest or treaty.  At one time or other natives and certain other residents of Puerto Rico, the U.S. Virgin Islands, the Philippines, Guam, and the Panama Canal Zone were U.S. non-citizen nationals.

d. Under current law (the Immigration and Nationality Act of 1952, as amended through October 1994), only persons born in American Samoa and the Swains Islands are U.S. nationals (Secs. 101(a)(29) and 308(1) INA).

# 7 FAM 1111.4  Dual or Multiple Nationality

*(TL:CON-64;   11-30-95)*

a. U.S. nationals and citizens may possess dual or multiple nationality and owe allegiance to one or several foreign states.  They may even have identified themselves more closely with the foreign state than with the United States, thereby calling into question the propriety of extending protection to them. Since each country establishes its own law of nationality, dual nationality cannot be eliminated, may result in confusion, and could complicate the ability of the U.S. Government to protect its nationals/citizens.

b.  The United States has no special arrangements with  individual countries to "permit" dual nationality. U.S. Government policy toward dual nationality is the same regardless of other nationalities involved.

c. While a person who has dual or multiple nationality resides in the United States, the right of the United States to claim his or her allegiance is held to be paramount of the right of the other countries of which he or she may be a national. Conversely, while a person who has dual nationality  resides abroad in a foreign country of which he or she also is a national, the right of that country to claim his or her allegiance is paramount to that of the United States.

d. It has been the policy of the U.S. Government, when the occasion arises, to intercede on behalf of a person in another country who owes allegiance both to that country and the United States, when the facts clearly indicate that the person has been detained, harassed, or molested by the authorities of the foreign country of which he or she is also a national.

*e. The circumstances of a person's conduct abroad may very well be a determining factor in considering the extent to which such protection should be granted. In the case of a dual national living in the foreign country of which he or she is also a national, the circumstances may restrict, to a great extent, a national's ability to receive the protection and consular services of the U.S. Government.*

# 7 FAM 1112  AUTHORITY

*(TL:CON-64;   11-30-95)*

The two principal U.S. laws on which most citizenship and nationality matters now are based are the Immigration and Nationality Act of 1952, effective December 24, 1952, as amended *(herein "INA"),* and the Nationality Act of 1940, effective January 13, 1941 *(herein "NA"),* which was repealed by the INA. Numerous other authorities are cited in this chapter. Because all posts have been furnished copies of the INA, this chapter quotes from it sparingly.

# 7 FAM 1113  DEFINITIONS

*(TL:CON-64;   11-30-95)*

*The following definitions apply in citizenship and nationality cases (and other terms are defined in the context of the sections 7 FAM where they occur):*

a. "Alien" means any person who is not a citizen or national of the United States *(Sec. 101(a)(3) INA).*

b. "American", *for purposes of this chapter*, means a person who is a citizen or national of the United States, or, when used as a modifier, pertaining to or of the United States, its people, customs, laws and regulations, documents, government agencies, and services. Because other groups of people in the Western Hemisphere also consider themselves to be American (that is, Central American, North American, South American), the modifier "U.S." generally is used in this volume of the Foreign Affairs Manual instead of "American" (such as, U.S. citizen, U.S. court decrees, U.S. veteran; but American Embassy).

c. "Citizen", *for purposes of this chapter*, means a person who acquired U.S. citizenship at birth or upon naturalization as provided by law. All U.S. citizens are nationals of the United States.

d. "Citizenship" indicates the status of being a U.S. citizen.

*e. "Dual National", for the purposes of this chapter, means a person who owes permanent allegiance to more than one country.*

*f. "INA" means the Immigration and Nationality Act of 1952 as amended by various Acts up to and including 1994 [*see sections 7 FAM 1112 and 7 FAM 1132.8 *].*

*g.* "NA" means the Nationality Act of 1940 [see section 7 FAM 1112 *].*

*h. "Minor," for the purposes of this chapter, means a person under the age of 18.*

i. "National", *for purposes of this chapter*, means a person on whom U.S. nationality has been conferred and who owes permanent allegiance to the United States  but who is not a citizen  *[see* section 7 FAM 1111.3 *b]* . All U.S. citizens are nationals, but U.S. nationals are not necessarily U.S. citizens. For purposes of expatriation, references to U.S. citizens extend to U.S. nationals [see chapter 7 FAM 1200 on loss and restoration of U.S. citizenship].

*j*. "Nationality" indicates  the status of being a national of the United States. *(Nationality is also part of citizenship.)*

*k*. "Naturalization" means conferring  the citizenship or nationality of a state  on a person after birth by any means whatsoever *[see* section 7 FAM 1111.2 *c]*.

*l. "Outlying possessions of the United States" means American Samoa and Swains Island (Section 101(a)(29) INA).*

*m.* "Person" means an individual.

*n. "Residence" means the "place of general abode" which is the "principal,  actual dwelling place in fact, without regard to intent" (Section 101(a)(33) INA).*

*o. "United States" means "the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States" (Section 101(a)(38) INA).*

# 7 FAM 1114  CITIZENSHIP DURING EARLY YEARS OF THE NATION

*(TL:CON-64;   11-30-95)*

a. Until 1866, the citizenship status of persons born in the United States was not defined in the Constitution or in any federal statute. Under the common law rule of *jus soli*-- the law of the soil-persons born in the United States generally acquired U.S. citizenship at birth *[see* section 7 FAM 1116.1-1 *]*.

b. This rule was made part of the Civil Rights Act of April 9, 1866 (14 Stat. 27) and, 2 years later, it was adopted as part of the 14th Amendment to the Constitution.

# 7 FAM 1115  CITIZENSHIP UNDER THE 14th AMENDMENT

*(TL:CON-64;   11-30-95)*

*a.* The 14th Amendment states, in part, that-

All persons born *or naturalized* in the United States, and subject to the jurisdiction thereof, are citizens of the United States *and of the State wherein they reside...*

*b.* Questions have arisen about the meaning of the phrases "in the United States" and "subject to the jurisdiction thereof." Some of the conclusions reached by U.S. courts and administrative authorities are summarized *in* section 7 FAM 1116 .

# 7 FAM 1116  KEY PHRASES USED IN THE 14th AMENDMENT AND IN LAWS DERIVED FROM IT

## 7 FAM 1116.1 "In The United States"

### 7 FAM 1116.1-1 States and Incorporated Territories

*(TL:CON-64;   11-30-95)*

a. *The phrase* "in the United States" *as used in the 14th Amendment* clearly includes States that have been admitted to the Union. *Sections 304 and 305 of the INA provide a basis for citizenship of persons born in Alaska and Hawaii while they were territories of the United States. These sections reflect, to a large extent, prior statutes and judicial decisions which addressed the I4th Amendment citizenship implications of birth in these and other U.S. territories. Guidance on evidence on such births should be sought from CA/OCS.*

b. Sec. 101(a)(38) INA *provides that, for the purposes of the INA,*



The term "United States",... when used in the geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States.*In addition, under Pub. L. 94-241, the "approving Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America", (Sec. 506(c)), which took effect on November 3, 1986, the Northern Mariana Islands are treated as part of the United States for the purposes of sections 301 and 308 of the INA.*

c. All of the *aforenamed* areas, except Guam *and the Northern Mariana Islands, came within the definition of "United States" given in the Nationality Act of 1940, which was effective from January 13, 1941 through December 23, 1952.*

d. *Prior to January 13, 1941, there was no statutory definition of "the United States" for citizenship purposes. Thus there were varying interpretations. Guidance should be sought from the Department (CA/OCS) when such issues arise.*

## 7 FAM 1116.1-2  In U.S. Waters

*(TL:CON-64;   11-30-95)*

a. Persons born on ships *located within U.S. internal* waters are considered to have been born in the United States. *Such persons will acquire U.S. citizenship at birth if they are subject to the jurisdiction of the United States [see section 7 FAM 1116.2-1 ]. Internal waters include the ports, harbors, bays and other enclosed areas of the sea along the U.S. coast.*

b. *Prior FAM guidance advised that persons born within the 3-mile limit of the U.S. territorial sea were born "within the United States" and could be documented as U.S. citizens if they were also born subject to U.S. jurisdiction. Analysis of this issue undertaken in 1994-1995 revealed, however, that there is a substantial legal question whether persons born outside the internal waters of the United States but within the territorial sea are in fact born "within the United States" for purposes of the 14th Amendment and the INA.  Cases involving persons born outside the internal waters but within the U.S. territorial sea should, therefore, be submitted to the Department (CA/OCS) for adjudication.*

## 7 FAM 1116.1-3  Airspace

*(TL:CON-64;   11-30-95)*

a. Airspace above the *land territory and internal waters* is held to be part of the United States (Art. 1(1), 1958 Geneva Convention on the Territorial Sea and the Contiguous Zone, 15 U.S.T. 1606, TIAS 5639). Gordon and Rosenfeld, in Immigration Law and Procedure, Volume 3, Nationality (New York:  Matthew Bender, 1986), *commenting on the applicability of the 14th Amendment to vessels and planes, states:*

..The rules applicable to vessels obviously apply equally to airplanes.
Thus a child born on a plane in the United States, or flying over its
territory, would acquire United States citizenship at birth.

b. *Cases of persons born on planes in airspace outside the U.S. coastal borders but within the U.S. territorial sea should be submitted to the Department (CA/OCS) for adjudication.*

## 7 FAM 1116.1-4  Not Included in the Meaning of "In the United States"

*(TL:CON-64;   11-30-95)*

a. A U.S.-registered or *documented* ship on the high seas or in the exclusive economic zone is not considered to be part of the United States. A child born on such a vessel does not acquire U.S.  citizenship by reason of the place of birth (*Lam Mow v. Nagle*, 24 F.2d 316 (9th Cir., 1928)).

b. *A U.S.-registered aircraft outside U.S. airspace is not considered to be part of U.S. territory. A child born on such an aircraft outside U.S. airspace does not acquire U.S. citizenship by reason of the place of birth.*

c.  *Despite widespread popular belief, U.S. military installations abroad and U.S. diplomatic or consular facilities are not part of the United States within the meaning of the 14th Amendment. A child born on the premises of such a facility is not subject to the jurisdiction of the United States and does not acquire U.S. citizenship by reason of birth.*

## 7 FAM 1116.2   "Subject to the Jurisdiction" of the United States

### 7 FAM 1116.2-1   Subject at Birth to U.S. Law

*(TL:CON-64;   11-30-95)*

a. Simply stated, "subject to the jurisdiction" of the United States means subject to the laws of the United States.

b. In *U.S. v. Wong Kim Ark*, 169 U.S. 649 (1898), the U.S. Supreme Court examined at length the theories and legal precedents on which the U.S. citizenship laws are based and, in particular, the types of persons who are subject to U.S. jurisdiction. After doing so, it affirmed that a child born in the United States to Chinese parents acquired U.S. citizenship even though the parents were, *at the time*, racially ineligible for naturalization. The Court concluded that:

> The 14th Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The Amendment, in clear words and in manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States. 

c. Pursuant to this ruling, it has been *considered* that:

(1) Acquisition of U.S. citizenship *generally* is not affected by the fact that the parents may be in the United States temporarily or illegally; and that

(2) A child born in an immigration detention center *physically located in the United States* is considered to have been born in the United States and be subject to its jurisdiction. This is so even if the child's parents have not been legally admitted to the United States and, for immigration purposes, *may be* viewed as not being in the United States.

## 7 FAM 1116.2-2   Officers and Employees of Foreign Embassies and Consulates and their Families

*(TL:CON-64;   11-30-95)*

a. Under international law, *diplomatic agents are immune from the criminal jurisdiction of the receiving state. Diplomatic agents are also immune, with limited exception, from the civil and administrative jurisdiction of the state. The immunities of diplomatic agents extend to the members of their family forming part of their household.* For this reason children born in the United States to diplomats to the United States are not subject to U.S. jurisdiction and do not acquire U.S. citizenship under the 14th Amendment or the laws derived from it.

b. The names of *diplomatic agents* accredited or notified to the United States and who have full diplomatic privileges and immunities are published every three months in the Department's <u>Diplomatic List</u>, often called the "Blue List." The <u>Diplomatic List</u> also gives the name of the spouses residing with them, but does not include other members of the family forming part of the household, although *they may* be entitled to *privileges and immunities*.

c. *The <u>Diplomatic List</u> does not indicate the dates of accreditation or notification, or of termination, and any given issue of the <u>Diplomatic List</u> does not include accreditations, notifications or terminations occurring after the closing date for submission of information for that issue. In addition, the Diplomatic List does not include persons who have entered the territory of the United states to take up the post of diplomatic agent but who are not yet accredited or notified, although they enjoy privileges and immunities from the moment of entry pursuant to Article 39 of the Vienna Convention on Diplomatic Relations. For all of these reasons, the <u>Diplomatic List</u>, while an important source in citizenship inquiries involving the children of diplomats, cannot by itself resolve such inquiries. The Office of Protocol (CPR) maintains complete records to supplement the Diplomatic List. CA/OCS will inquire of CPR if necessary.*

d. As a rule, children born in the United States to the following employees of foreign governments acquire U.S. citizenship:

*(1) Members of the administrative and technical (A&T) staff or service staff of foreign embassies. However, bilateral agreements with certain countries grant A&T and service staff members and their families diplomatic-level privileges and immunities, and children born in the United States to such persons do not acquire U.S. citizenship. CA/OCS, through the Office of Protocol, will address inquiries as to whether such bilateral agreements affect the A&T or service staff members of specific countries;*

(2) Foreign diplomats accredited to a country other than the United States;

*(3) Diplomatic agents whose functions in the United States have ended, and whose privileges and immunities have ceased upon the expiration of a reasonable time for departure. The general practice of the United States is to consider 30 days a reasonable period of departure. In specific cases, the Department may allow a shorter or longer period;*

*(4) Diplomatic agents who have the children in question with U.S. citizens capable of transmitting U.S. citizenship to children born abroad. Such children acquire citizenship under pertinent law as if born abroad and would be subject to any citizenship retention requirements in effect at the time of birth;*

*(5) Consular officers and employees [see NOTES].*

*NOTES:*

*(a) Consular officers assigned to the embassy of the sending state are accredited as diplomatic agents. Children born to such officers do not acquire U.S. citizenship.*

*(b) Bilateral agreements with certain countries grant consular officers and their families diplomatic-level privileges and immunities, and children born in the United States to such persons do not acquire U.S. citizenship. CA/OCS should be queried as to whether such bilateral agreements affect the consular officers of specific countries.*

e. The recollections of the parents or child about the parents' status at the time of the child's birth may be imprecise, and the only way to ascertain whether the child was born subject to U.S. jurisdiction is to review the <u>Diplomatic List</u> and other records dating from the time of the birth. Therefore, a post that has received an application from a first-time applicant born in the United States to a *member of a diplomatic mission or consular post* or

an inquiry about the citizenship status of such a person should request the Department (CA/OCS/ACS ) by telegram to check the pertinent records [see 7 FAM 1116  Exhibit 1116.2-2 ]. The telegram should give the child's name, date and place of birth, the name of the parent who may have had diplomatic status at the time of the child's birth, and the name of the country represented. The telegram should indicate whether the other parent was a U.S. citizen when the child was born.

# 7 FAM 1116.2-3  Resident Representatives to and Officials of the United Nations

*(TL:CON-64;   11-30-95)*

a. The considerations noted in Section 7 FAM 1116.2-2 relating to the children of diplomatic agents also apply to those of the Resident Representatives to and Officials of the United Nations described as follows:

(1) <u>Resident Representatives.</u> Under the UN Headquarters Agreement, certain individuals are entitled to the same privileges and immunities accorded to diplomatic envoys. These individuals include:

(i)  the principal resident representative to the UN of a member state or a resident representative with the rank of Ambassador or minister plenipotentiary;

(ii) resident staffs of members agreed upon by the Secretary-General, the United States, and the member state;

(iii) principal resident representatives with the rank of Ambassador or minister plenipotentiary to specialized agencies of the UN with headquarters in the United States;

(iv) other principal resident representatives and resident staffs of members to specialized agencies agreed upon by the principal executive officer of the agency, the United States, and the member state.

(2) <u>High-level UN Officials.</u>  Under the Convention on the Privileges and Immunities of the United Nations, the Secretary-General and all Assistant Secretaries-General are entitled to the same privileges and immunities as are accorded to diplomatic envoys.

b. The U.S. Mission to the United Nations issues a "Blue List" of the resident representatives and staff of the Missions to the United Nations who are entitled to diplomatic privileges and immunities accorded to diplomatic envoys. As in the case of the <u>Diplomatic List</u> for bilateral diplomats, the Blue List should be viewed as a resource, but not the definitive source of information. Upon receipt of a telegram, as described in 7 FAM 1116  Exhibit 1116.2-2 , modified to indicate the name of the UN Mission or the position of the diplomat with the UN secretariat, CA/OCS/ ACS  will check the relevant records and provide an opinion of the child's claim to citizenship.

c. As a rule, children born in the United States to the following members of the UN community acquire U.S. citizenship:

(1) Members of the non-diplomatic staff of the UN Missions, e.g., secretaries, administrative clerks and drivers;

(2) Employees of the UN secretariat not included in section 7 FAM 1116.2-3 a.(2);

(3) Members of UN Observer Missions;

*(4) Members who were accorded diplomatic immunity, but whose functions in the U.S. have ended, and whose privileges and immunities have ceased; and*

*(5) Members who are U.S. citizens or have the children in question with citizens capable of transmitting U.S. citizenship to children born abroad. A child who acquired U.S. citizenship under such circumstances would be subject to any citizenship retention requirements in effect at the time of birth.*

## 7 FAM 1116.2-4   Representatives to and  Officials of Certain Other International Organizations

*(TL:VISA-64;   11-30-95)*

*a. The considerations noted in  Section 7 FAM 1116.2-2 relating to the children of diplomatic agents, also apply to those of certain Resident Representatives to and Officials of international organizations including, but not limited to, the Organization of American States, the International Monetary Fund and the World Bank.  The number of such Resident Representatives and Officials entitled to diplomatic immunity is small. Generally, most employees of international organizations with offices in the United States are not entitled to diplomatic immunity and their children born in the United States are U.S. citizens.*

*b. Because the source of immunity derives from several different conventions or treaties, and because there are not consolidated lists for all of those eligible for diplomatic immunity, consular officers should send a cable, as described in 7 FAM 1116  Exhibit 1116.2-2 , modified to indicate the name of the international organization, to CA/OCS/ ACS for an opinion on the child's claim to citizenship.*

## 7 FAM 1116.2-5  Foreign Heads of State

*(TL:CON-64;   11-30-95)*

*Acquisition of U.S. citizenship by children born to foreign sovereigns or heads of state visiting the United States is a complex issue. Posts should notify the Department (CA/OCS and L/SFP) in any case in which this issue arises.*

## 7 FAM 1116.2-6  Foreign Vessels

*(TL:CON-64;   11-30-95)*

a. Foreign *warships, naval auxiliaries, and other vessels or aircraft owned or operated by a state and used for the time being, only on government non-commercial service,* are not subject to jurisdiction of the United States. Persons born on such vessels while in U.S. *internal waters* do not acquire U.S. citizenship at birth.

b. A child born on a foreign merchant ship *or privately owned vessel* in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.

## 7 FAM 1116.2-7  Alien Enemies During Hostile Occupation

*(TL:CON-64;   11-30-95)*

a. If part of the United States were occupied by foreign armed forces against the wishes of the United States, children born to enemy aliens in the occupied areas would not be subject to U.S. jurisdiction and would not acquire U.S. citizenship at birth.

b. Children born to others in an area temporarily occupied by hostile forces would acquire U.S. citizenship at birth because sovereignty would not have been transferred to the other country.

## 7 FAM 1116.2-8  Native Americans and Eskimos

*(TL:CON-64;   11-30-95)*

a. Before Wong Kim Ark *[*see section 7 FAM 1116.2-1 *],* the only occasion on which the Supreme Court had considered the meaning of the 14th Amendment's phrase "subject to the jurisdiction" of the United States was in Elk v. Wilkins, 112 U.S. 94 (1884). That case hinged on whether a *Native American* who severed ties with the tribe and lived among whites was a U.S. citizen and entitled to vote. The Court held that the plaintiff had been born subject to tribal rather than U.S. jurisdiction and could not become a U.S. citizen merely by leaving the tribe and moving within the jurisdiction of the United States. The Court stated that:

> The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal...through treaties...or acts of Congress...They were never deemed citizens of the United States except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens upon application...for naturalization...

b. The Act of June 2, 1924 (43 Stat. 253) was the first comprehensive law relating to the citizenship of Native Americans. *It provided:*

> *That all noncitizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States:  Provided, That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property.*

c. Section 201(b) NA, effective January 13, 1941, declared that persons born in the United States to members of an Indian, Eskimo, Aleutian, or other aboriginal tribe were nationals and citizens of the United States at birth. Section 301(b) (formerly Sec. 301(a)(2) INA), in effect from December 24, 1952, restates this provision.

# 7 FAM 1117  LEGISLATION REGARDING CITIZENSHIP BY BIRTH IN THE UNITED STATES

*(TL:CON-64;  11-30-95)*

a. The citizenship provision of the 14th Amendment is essentially restated in Section 201(a) of the Nationality Act of 1940 (NA) and in Section 301(a) [formerly Section 301(a)(1)] of the Immigration and Nationality Act of 1952 (INA).

b. The current section of law that governs the acquisition of citizenship by birth in the United States is Section 301 INA, which states:

Sec. 301. The following shall be nationals and citizens of the United States at birth:

(a) A person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian or other aboriginal tribe, <u>Provided</u>, that the  granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right to tribal or other property;...

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;...

c. The provisions of Section 201(a) and (b) NA were identical to those of Section 301(a) and (b) INA. The differences between Section 201(f) NA and Section 301(f) INA are discussed in section 7 FAM 1118 .

d. All children born in and subject, *at the time of birth*, to the jurisdiction of the United States acquire U.S. citizenship at birth  *even if their parents were in the United States illegally at the time of birth.*

# 7 FAM 1118  FOUNDLINGS

*(TL:CON-64;  11-30-95)*

a. Under Section 301(f) INA (formerly Section 301(a)(6)), a child of unknown parents is conclusively presumed to be a U.S. citizen if found in the United States when under 5 years of age, unless foreign birth is established before the child reaches age 21.

b. Under Section 201(f) NA, a child of unknown parents, found in the United States, was presumed to have been a U.S. citizen at birth until shown not to have been born in the United States *no matter at what age this might have been demonstrated.*

# 7 FAM 1119  PROOF OF CITIZENSHIP BY BIRTH IN THE UNITED STATES

*(TL:CON-64;  11-30-95)*

a. To establish a claim to U.S. citizenship by birth in the United States:

A person born in the United States in a place where official records of birth were kept at the time of his birth shall submit with the application for a passport a birth certificate under the seal of the official custodian of records. [22 CFR 51.43.]

b. The birth certificate must:

(1) Show the applicant's full name, and date and place of birth;

(2) Have a filing date within 1 year of the birth; and

(3) Bear the signature of the official custodian of birth records and the raised, impressed, or multicolored seal of the issuing office.

c. Bulletin M-343 (Notice to Applicant Concerning Birth Records) may be given to the applicant to assist in obtaining an acceptable birth certificate.

d. Information on the availability and cost of birth certificates is published by the Department of Health and Human Services in *Where to Write for Vital Records:  Births, Deaths, Marriages, and Divorces* (DHHS Publication No. (PHS) 93 -1142; Hyattsville, MD., U.S. Department of Health and Human Services, March l993, revised periodically).

*e. Consular officers are urged to obtain, with post funds, a copy of this publication which will assist them in advising applicants needing documentation on how to procure birth or other required documents.*

f. For details on evidence of U.S. citizenship, including information on the documentation that may be presented by U.S.-born applicants who cannot obtain a birth certificate of the type described in 7 FAM 1119 (b), see subchapters 7 FAM 1130 and 7 FAM 1330 .

*g. Posts are authorized to document, without prior approval from the Department, first-time applicants who present citizenship evidence meeting the requirement of 22 CFR 51.43 and satisfactory evidence of identity, unless it appears that the applicant was not subject to the jurisdiction of the United States at birth, e.g.  because he or she was born to a foreign diplomat or one of the other categories of persons not subject to the jurisdiction of the United States. Any questions regarding this issue should be referred to CA/OCS with a CPAS TAGS.*

# 7 FAM 1116  Exhibit 1116.2-2

## SAMPLE INQUIRY ABOUT THE CITIZENSHIP STATUS OF A CHILD OF A FOREIGN DIPLOMAT

FROM:              Amembassy Cotonou

ACTION:            SecState WASHDC ROUTINE

UNCLAS COTONOU

CLASSIFICATION:          Unclassified

Attention:        CA/OCS/ACS/AF

E.O.  12356:      N/A

TAGS:       CPAS (UMOH, Richard Tombo)

SUBJECT:   Citizenship Status of Child of Foreign Diplomat

REF:        7 FAM 1116.2-2

1.  Richard Tombo Umoh, DPOB 7/025/70, Silver Spring Md, inquired today about his possible claim to U.S. citizenship. He reports that his father, Mr. Friday Eyi Umoh, was assigned to the Nigerian Embassy in Washington from 1970 to 1979 as Attache (Finance). His mother, Veronica Nwoko Umoh, is a Nigerian citizen.

2. Please verify whether Friday Eyi Umoh was on the diplomatic list at the time of Richard's birth and whether Richard was born subject to the jurisdiction of the United States.
COOPER

DRAFTED BY:        CON/SRHydes
DRAFTING DATE:  7/12/95
APPROVED BY:       DCM; AZMaendert

## IN THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AHMED ALI MUTHANA, individually, and as next friend of Hoda Muthana and Minor John Doe** [initials A.M.] | Cause No. 1:19-cv-00445 |
| | Judge: Reggie B. Walton |
| *Plaintiff/Petitioner,* | CIVIL ACTION |
| vs. | |
| **Michael Pompeo, in his official capacity as Secretary of the Department of State, Donald J. Trump, in his official capacity as President of the United States;** and **William Pelham Barr in his official capacity as Attorney General.** | **PROPOSED ORDER** |
| *Defendants/Respondents.* | |

## [PROPOSED] ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

Upon consideration of Defendants' Motion to Dismiss or, in the Alternative for Partial Summary Judgment (Doc. 19), and Plaintiff's Response in Opposition to Defendants' Motion to Dismiss or in the Alternative Motion for Partial Summary Judgment, it is hereby ORDERED AND ADJUDGED that:

Defendants' Motion to Dismiss or, in the Alternative for Partial Summary Judgment is DENIED on all counts.

SO ORDERED this ___ day of May, 2019

_____
HON. REGGIE B.WALTON
United States District Judge